# EXHIBIT A

**EXEMPLARY CLAIM TERMS**

**'478 patent claim 1 (JA18)**

> **1.** A method of exponential nucleic acid amplification to form detectable colonies of nucleic acids comprising the steps of
>
> (a) providing an immobilized medium, said medium including
>
> > (i) an aqueous liquid phase that includes a cell-free, enzymatic, exponential nucleic acid amplification system; and
> >
> > (i) a solid, water-insoluble matrix having an average pore size ranging from 100 μm to 5 nm, completely entrapping said liquid phase, and
>
> (b) distributing in said aqueous liquid phase nucleic acid molecules, at least one of which may comprise a template for said amplification system; and
>
> (c) incubating said immobilized medium containing said distributed molecules under conditions promoting synthesis of an exponentially amplified nucleic acid product by said amplification system from said at least one template,
>
> wherein said matrix is stable under said conditions, and wherein said step of distributing separates individual tem-

**'698 patent claim 1 (JA38)**

> 1. A method of detecting a nucleic acid sequence in a sample that may contain said sequence comprising the steps of:
>
>    (a) providing a cell-free, enzymatic, exponential amplification system;
>
>    (b) forming a liquid mixture of the sample and said amplification system;
>
>    (c) entrapping said liquid within solid surfaces comprising a thin layer;
>
>    (d) incubating said trapped mixture under conditions promoting synthesis of an exponentially amplified nucleic acid product from said nucleic acid sequence; and
>
>    (e) screening to detect said amplified product,
>
>    wherein the average distance between the nearest solid surfaces is smaller than the distance which the synthesized nucleic acid product can migrate by diffusion during the reaction, and
>
>    wherein copies of said nucleic acid sequence, if present in said sample, are sufficiently widely distributed in said liquid mixture to produce separate, detectable colonies of the synthesized nucleic acid product.

**'568 claim 1 (JA57)**

> 1. A preformed immobilized medium suitable for producing, from individual nucleic acid molecules applied thereto, separate detectable colonies by a cell-free enzymatic exponential amplification process, comprising
>
>    a) an aqueous liquid phase that includes a cell-free nucleic acid polymerase enzyme system capable of performing said process, and
>
>    b) a thin layer, from 1 $\mu$m to 10 mm in thickness, of a solid, water-insoluble matrix having an average pore size ranging from 100 $\mu$m to 5 nm, completely entrapping said liquid phase.

**'568 patent claim 16 (JA58)**

> **16**. A preformed enzyme-free solid, water-insoluble matrix having a thickness of 0.1 $\mu m$ to 10 mm, having an average pore size of from 100 $\mu m$ to 5 nm, and ==completely entrapping nucleotide substrates== for a cell-free enzymatic exponential amplification system.

**'994 claim 1 (JA1101)**

> **1. A system** for detecting a sequence of optical signals from each of a plurality of microparticles during a sequence of processing steps, the system comprising:
>
> a planar array of uniformly sized spherical microparticles, wherein the coefficient of variation of the diameters of said microparticles is less than five percent;
>
> an optical train effective to collect and focus the sequence of optical signals from the microparticles, and to record at least one ==optical characteristic of each microparticle== which can be used to determine the approximate center of said microparticle;
>
> an imaging device onto which said signals are focused, effective to generate and record a sequence of digital images of the microparticles, ==with sufficient resolution for individual microparticles to be distinguished; and==
>
> ==signal tracking means effective to correlate the optical signals from each of the microparticles in each of the sequence of digital images with said center of said microparticle.==

**'505 patent claim 1 (JA1075)**

1. A device-readable medium embodying a program of instructions for execution by said device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, said program of instructions comprising instructions for:

    rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles; and

    processing the plurality of digital images, wherein said processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images.

**'656 patent claim 7 (JA1119)**

7. A method for analysing genome wide variation in an individual comprising:

    i) randomly fragmenting a genome of said individual;

    ii) arraying the fragments such that different fragments can be individually resolved by optical microscopy;

    iii) generating sequence reads of multiple bases on all fragments of said genome;

    iv) aligning said sequence reads with a known genomic reference sequence; and

    v) analysing variations between the sequence reads derived from the individual sample and the known genomic reference sequence.

**'035 claim 1 (JA1135)**

1. A method of forming a linked pair of segments from each fragment of a population of polynucleotide fragments, wherein each said fragment is in a vector, said vector comprises two type IIs restriction endonuclease recognition sites, one of said type IIs restriction endonuclease recognition sites is adjacent to one end of the fragment and another of said type IIs restriction endonuclease recognition sites is adjacent to another end of the fragment, and one or more type IIs restriction endonucleases recognizing said type IIs restriction endonuclease recognition sites have two cleavage sites within the interior of the fragment, the method comprising:

treating each said vector and fragment with said one or more type IIs restriction endonucleases recognizing said type IIs restriction recognition sites, such that each fragment is cleaved at said cleavage sites, thereby removing the region of the fragment between said cleavage sites, whereby a pair of segments from said fragment remain connected to each other via said vector after said removing and each of said segments has a cleaved end; and

ligating together the cleaved ends produced by said removing thereby forming a linked pair of segments from each said fragment.

# EXHIBIT B

Atty. Dkt. No.: 11236

I hereby certify that this correspondence is being electronically transmitted
through ESF-WEB to Commissioner for Patents, P.O. Box 1450, Alexandria,
VA 22313-1450, on May 21, 2010. A copy of this correspondence is being
served on the Third-Party Requester by First Class U.S. Mail to Margaret J.
Sampson, Vinson & Elkins, L.L.P., First City Tower, 1001 Fannin Street,
Suite 2500, Houston TX 77002-6760, on May 21, 2010.
Reinhart Boerner Van Deuren  s.c.

By:   /Linda Kasulke/

Date:   May 21, 2010

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## GROUP ART UNIT:  3991

## PRIMARY EXAMINER:  Brenda G. Brumback

| | |
|---|---|
| In re U.S. Patent of:  Bridgham, et al.          ) | |
| ) | |
| Patent No.:  6,654,505                                  ) | |
| Issue Date: Nov. 25, 2003                            ) | |
| Reexam Control No.:  95/001,292               ) | For:  SYSTEM AND APPARATUS FOR |
| Reexam Filing Date: December 31, 2009     ) | SEQUENTIAL PROCESSING OF |
| Reexam Confirmation No.: 9037                  ) | ANALYTES |
| ) | |
| Attorney Docket No.: 11236                         ) | |
| ) | |
| Customer No.: 22922                                     ) | |

Mail Stop PETITION
Commissioner for Patents                                                   May 21, 2010
P.O. Box 1450
Alexandria, VA 22313-1450

## PETITION TO THE DIRECTOR UNDER 37 C.F.R. §§ 1.78

Sir:

This is a petition to accept an unintentionally delayed claim under 35 U.S.C. § 120 for the
benefit of prior-filed applications, for a utility patent application filed after November 29, 2000.
U.S. Patent No. 6,654,505 ("the '505 patent") is presently the subject of *Inter Partes* Reexamination,
Ser. No. 95/001,292, filed December 31, 2009.

ATTORNEY WORK PRODUCT                                    Atty. Dkt. No.: 11236
PRIVILEGED AND CONFIDENTIAL

The Patent Owner provides the following reference required by 35 U.S.C. § 120 and 37 C.F.R. §§ 1.78(a)(2) and (a)(3) in the Patent Owner's Response to the Office Action mailed March 24, 2010 in the *Inter Partes* Reexamination.  The response is being filed concurrently herewith.

<u>CROSS-REFERENCE TO RELATED PATENT APPLICATIONS</u>

This application is a divisional of U.S. Application Ser. No. 09/424,028, filed November 16, 1999, now U.S. Patent No. 6,406,848, which is a National Stage of International Application No. PCT/US98/11224 filed on May 22, 1998, and a continuation-in-part of U.S. Application Ser. No. 08/946,138, filed October 7, 1997, now U.S. Patent No. 6,013,445, which are both continuations-in-part of U.S. Application Ser. No. 08/862,610, filed May 23, 1997, now abandoned, which is a continuation-in-part of U.S. Application Ser. No. 08/689,587, filed August 12, 1996, now abandoned, which is a continuation-in-part of U.S. Application Ser. No. 08/659,453, filed June 6, 1996, now U.S. Patent No. 5,846,719, which is a continuation-in-part of U.S. Application Ser. No. 08/358,810, filed December 19, 1994, now U.S. Patent No. 5,604,097, which is a continuation-in-part of U.S. Application Ser. No. 08/322,348, filed October 13, 1994, now abandoned.  This application is also a continuation-in-part of U.S. Application Ser. No. 09/090,809, filed June 4, 1998, now U.S. Patent No. 6,280,935, which is a divisional of U.S. Application Ser. No. 08/659,453, filed June 6, 1996, now U.S. Patent No. 5,846,719, which is a continuation-in-part of U.S. Application Ser. No. 08/358,810, filed December 19, 1994, now U.S. Patent No. 5,604,097, which is a continuation-in-part of U.S. Application Ser. No. 08/322,348, filed October 13, 1994, now abandoned.  The entire disclosures of U.S. Application Ser. No. 09/424,028, International Application No. PCT/US98/11224, U.S. Application Ser. No. 08/862,610, and U.S. Application Ser. No. 08/358,810 are incorporated herein by reference.

The surcharge set forth in 37 C.F.R. § 1.17(t) accompanies this petition.

The entire delay between the due date for the priority claim set out above (*i.e.* November 17, 2001) and the filing date of this petition and was unintentional.

## <u>REMARKS</u>

This petition requests correction of an unintentionally delayed claim under 35 U.S.C. § 120 for the benefit of prior-filed applications, for a utility patent application filed after November 29, 2000.  The '505 patent was filed on July 17, 2001.  Previously, the '505 patent claimed priority only to Application No. PCT/US98/11224 and U.S. Application Ser. No. 08/862,610.

ATTORNEY WORK PRODUCT                                                    Atty. Dkt. No.: 11236
PRIVILEGED AND CONFIDENTIAL

The priority claim has been amended to claim benefit of U.S. Application Ser. No. 09/424,028, International Application No. PCT/US98/11224, U.S. Application Ser. No. 08/946,138, U.S. Application Ser. No. 08/862,610, U.S. Application Ser. No. 08/689,587, U.S. Application Ser. No. 08/659,453, U.S. Application Ser. No. 08/358,810, and U.S. Application Ser. No. 08/322,348. Previously, U.S. Patent No. 6,654,505 expressly claimed priority only to Application No. PCT/US98/11224 and U.S. Application Ser. No. 08/862,610.  U.S. Patent No. 5,604,097 to Brenner is specifically incorporated by reference in the specification of U.S. Patent No. 6,654,505.  No new matter has been added.

A reissue application has been filed under 37 C.F.R. § 1.171 for U.S. Patent No. 6,031,445 ("the '445 patent").  An amendment to the specification of the '445 patent was filed on May 18, 2010 claiming priority for to U.S. Application Ser. No. 08/322,348, filed October 13, 1994.

U.S. Patent No. 6,406,848 ("the '848 patent"), to which the '505 patent claims priority, is presently the subject to *Ex Parte* Reexamination**,** Ser. No. 90/009,581, filed on November 4, 2009. An amendment to the specification of the '848 patent was filed on May 20, 2010 claiming priority for to U.S. Application Ser. No. 08/322,348, filed October 13, 1994.

In view of the foregoing amendment and remarks, consideration and grant of this petition is respectfully requested.

Respectfully submitted,

*Illumina Inc., Patent Owner*

  */ Robert A. Lawler  /*
Robert A. Lawler
Attorney for Applicants
Registration No. 62,075

Reinhart Boerner Van Deuren s.c.
Attn:  Linda Kasulke, Docket Coordinator
1000 North Water Street, Suite 1700
Milwaukee, WI  53202
(414) 298-8317

# Appendix A
## Listing of Claims

U.S. Patent No. 6,654,505
Reexamination: 95/001,292
Listing of Original and Amended Claims

1.      (Original)  A device-readable medium embodying a program of instructions for execution by said device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, said program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

and processing the plurality of digital images, wherein said processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images.

2.      (Original)  The device-readable medium of claim 1, wherein said processing further includes determining the approximate center of each microparticle, based on a recorded optical characteristic of said microparticle.

3.      (Original)  The device-readable medium of claim 2, wherein said processing further includes assigning a plurality of pixels to each microparticle, for determining at least one property of the optical signals generated at each microparticle.

4.      (Original)  The device-readable medium of claim 3, wherein the number of pixels assigned to a given microparticle is determined based on at least one of: (i) the degree to which the approximated center of the given microparticle is likely to deviate from the geometric center; (ii) the size of the given microparticle; and (iii) the uniformity of the diameter and shape of the given microparticle.

5.      (Original)  The device-readable medium of claim 3, wherein an initial pixel of the plurality of pixels is assigned to each microparticle which encloses the approximated center of that microparticle.

6.      (Original)  The device-readable medium of claim 5, wherein said processing further includes assigning additional pixels, immediately adjacent the initial pixel, to each microparticle, after the initial pixel is assigned.

7.      (New)  The device readable medium of claim 1, further comprising instructions for: delivering process reagents for the sequence of processing steps to a flow chamber from a fluidics system.

8.      (New)  The device readable medium of claim 7, wherein the instructions for delivering process reagents for the sequence of processing steps comprise delivering processing reagents for repeated cycles of ligation.

9.      (New)  The device readable medium of claim 8, wherein the instructions for delivering process reagents for the sequence of processing steps comprise delivering processing reagents for repeated cycles of cleavage.

10.      (New)  A device-readable medium comprising:

a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles comprising DNA fragments and tracking positions of the microparticles during a sequence of processing steps for determining a sequence of nucleotides corresponding to the DNA fragments, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

converting each of a plurality of the optical signals into respective data representative of the nucleotides;  and

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to a plurality of the DNA fragments.

11.     (New)  The device-readable medium of claim 10, wherein said processing further includes determining the approximate center of each microparticle, based on a recorded optical characteristic of said microparticle.

12.     (New)  The device-readable medium of claim 10 wherein the nucleotides are at least one of the group including A (deoxyadenosine), T (thymidine), C (deoxycytidine) and G (deoxyguanosine).

13.     (New)  The device-readable medium of claim 12, further comprising instructions for storing data representative of the sequences of nucleotides.

14.     (New)  A device-readable medium comprising:

a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles comprising DNA fragments and tracking positions of the microparticles during a sequence of processing steps for determining a sequence of nucleotides corresponding to the DNA fragments, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and

converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative of a sequence of nucelotides corresponding to a plurality of the DNA fragments.

15.     (New)  A device-readable medium comprising:.

a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, wherein each microparticle includes a group of the same

kind of polynucleotide and the kinds of polynucleotides on a plurality of microparticles are different, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

converting each of a plurality of the optical signals into respective data representative of respective nucleotides; and

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides.

16.　　(New)  A device-readable medium comprising:

a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, wherein each microparticle includes a group of the same kind of polynucleotide and the kinds of polynucleotides on a plurality of microparticles are different, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and

converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides.

17.　　(New)  A nucleotide sequencing system comprising:

at least a plurality of microparticles, each microparticle including a unique group of the same kind of polynucleotide;

a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

converting each of a plurality of the optical signals into respective data representative of respective nucleotides; and

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides.

18.    (New)  The device-readable medium of claim 17,  wherein the microparticles are contained in a flow cell.

19.    (New)  The system of claim 18, wherein each microparticles is on a glass surface.

20.    (New)  The system of claim 18, wherein the microparticles further include glass beads.

21.    (New)  The system of claim 18, wherein the microparticles further include silica beads.

22.    (New)  The system of claim 18, wherein the microparticles further include beads formed from an organic support material.

23.    (New)  The system of claim 22, wherein the organic support material comprises a polymeric material.

24.     (New)  The system of claim 22, wherein the organic support material comprises polystyrene.

25.     (New)  The system of claim 22, wherein the organic support material comprises polyacrylate.

26.     (New)  The system of claim 22, wherein the organic support material comprises polymethylmethacrylate.

27.     (New)  The system of claim 22, wherein the organic support material comprises glycidylmethacrylate.

28.     (New)  A nucleotide sequencing system comprising:

at least a plurality of microparticles, each microparticle including a unique group of the same kind of polynucleotide;

a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps based on optical signals generated at the microparticles;

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and

converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides.

29.     (New)  A nucleotide sequencing system comprising:

at least a plurality of microparticles, each microparticle including a unique polynucleotide;

a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and

converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative of a sequence of nucleotides corresponding to each of the plurality of the polynucleotides.

30.     (New)  A nucleotide sequencing system comprising:

at least a plurality of microparticles, each microparticle including a unique polynucleotide;

a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

converting each of a plurality of the optical signals into respective data representative of respective nucleotides;  and

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides.

# Appendix B

## Claim Chart

| Claims of U.S. Pat. No. 6,654,505 | Support in U.S. Pat. No. 6,654,505 |
|---|---|
| 7.  The device readable medium of claim 1, further comprising instructions for delivering process reagents for the sequence of processing steps to a flow chamber from a fluidics system. | Col. 8, ll. 4-8; Figs. 5 and 8 |
| 8.  The device readable medium of claim 7, wherein the instructions for delivering process reagents for the sequence of processing steps comprise delivering processing reagents for repeated cycles of ligation. | Col. 15, ll. 33-40 Col. 19, l. 38-col. 20, l. 20 |
| 9.  The device readable medium of claim 8, wherein the instructions for delivering process reagents for the sequence of processing steps comprise delivering processing reagents for repeated cycles of cleavage. | Col. 15, ll. 33-40; Col. 19, l. 38-col. 20, l. 20 |
| 10.  A device-readable medium comprising: | |
|     a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles comprising DNA fragments and tracking positions of the microparticles during a sequence of processing steps for determining a sequence of nucleotides corresponding to the DNA fragments, the program of instructions comprising instructions for: | Claim 1; Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 5, ll. 56-67; Col. 5, ll. 23-42; Col. 8, l. 48-col. 9, l. 5. |
|     rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles; | Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 8, l. 4-col. 9, l. 5. |
|     converting each of a plurality of the optical signals into respective data | Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 9, l. 59-col 10, l. 38; |

| | |
|---|---|
| representative of the nucleotides;  and | Col. 19, l. 38-col. 20, l. 51. |
| processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to a plurality of the DNA fragments. | Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 9, l. 59-col 10, l. 38; Col. 19, l. 38-col. 20, l. 51. |
| 11.  The device-readable medium of claim 10, wherein said processing further includes determining the approximate center of each microparticle, based on a recorded optical characteristic of said microparticle. | Col. 8, l. 48-col. 9, l. 5. |
| 12.  The device-readable medium of claim 10 wherein the nucleotides are at least one of the group including A (deoxyadenosine), T (thymidine), C (deoxycytidine) and G (deoxyguanosine). | Col. 3, ll. 42-49. |
| 13.  The device-readable medium of claim 12, further comprising instructions for storing data representative of the sequences of nucleotides. | Col. 10, ll. 3-5. |
| 14.  A device-readable medium comprising: | |
| a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles comprising DNA fragments and tracking positions of the microparticles during a sequence of processing steps for determining a sequence of nucleotides corresponding to the DNA fragments, the program of instructions comprising instructions for: | Claim 1; Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 5, ll. 56-67; Col. 5, ll. 23-42; Col. 8, l. 48-col. 9, l. 5. |
| rendering a plurality of digital images of the planar array of the microparticles during the sequence of | Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 8, l. 4-col. 9, l. 5. |

| | |
|---|---|
| processing steps, based on optical signals generated at the microparticles; | |
|     processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and | Fig. 1a and Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 9, l. 59-col 10, l. 38;<br>Col. 19, l. 38-col. 20, l. 51. |
|     converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative of a sequence of nucleotides corresponding to a plurality of the DNA fragments. | Fig. 1a and Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 9, l. 59-col 10, l. 38;<br>Col. 19, l. 38-col. 20, l. 51. |
| 15.  A device-readable medium comprising: | |
|     a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, wherein each microparticle includes a group of the same kind of polynucleotide and the kinds of polynucleotides on a plurality of microparticles are different, the program of instructions comprising instructions for: | Claim 1;<br>Fig. 1a and Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 5, ll. 56-67;<br>Col. 5, ll. 23-42;<br>Col. 8, l. 48-col. 9, l. 5. |
|     rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles; | Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 8, l. 4-col. 9, l. 5. |
|     converting each of a plurality of the optical signals into respective data representative of respective nucleotides; and | Fig. 1a and Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 9, l. 59-col 10, l. 38;<br>Col. 19, l. 38-col. 20, l. 51. |
|     processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding | Fig. 1a and Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 9, l. 59-col 10, l. 38;<br>Col. 19, l. 38-col. 20, l. 51. |

| | |
|---|---|
| image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides. | |
| 16.  .  A device-readable medium comprising: | |
| a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, wherein each microparticle includes a group of the same kind of polynucleotide and the kinds of polynucleotides on a plurality of microparticles are different, the program of instructions comprising instructions for: | Claim 1; Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 5, ll. 56-67; Col. 5, ll. 23-42; Col. 8, l. 48-col. 9, l. 5. |
| rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles; | Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 8, l. 4-col. 9, l. 5. |
| processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and | Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 9, l. 59-col 10, l. 38; Col. 19, l. 38-col. 20, l. 51. |
| converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides. | Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 9, l. 59-col 10, l. 38; Col. 19, l. 38-col. 20, l. 51. |
| 17.  A nucleotide sequencing system comprising: | |
| at least a plurality of microparticles, each microparticle | Col. 11, ll. 6-12. |

| | |
|---|---|
| including a unique group of the same kind of polynucleotide; | |
| a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, the program of instructions comprising instructions for: | Claim 1; Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 5, ll. 56-67; Col. 5, ll. 23-42; Col. 8, l. 48-col. 9, l. 5. |
| rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles; | Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 8, l. 4-col. 9, l. 5. |
| converting each of a plurality of the optical signals into respective data representative of respective nucleotides; and | Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 9, l. 59-col 10, l. 38; Col. 19, l. 38-col. 20, l. 51. |
| processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides. | Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 9, l. 59-col 10, l. 38; Col. 19, l. 38-col. 20, l. 51. |
| 18.  The device-readable medium of claim 17,  wherein the microparticles are contained in a flow cell. | Col. 5, ll. 56-67. |
| 19.  The system of claim 18, wherein each microparticles is on a glass surface. | Col. 5, ll. 31-34. |
| 20.  The system of claim 18, wherein the microparticles further include glass beads. | Col. 10, ll. 60-65. |
| 21.  The system of claim 18, wherein the microparticles further include silica beads. | Col. 10, ll. 60-65. |
| 22.  The system of claim 18, wherein the | Col. 10, ll. 60-65. |

| | |
|---|---|
| microparticles further include beads formed from an organic support material. | |
| 23.  The system of claim 22, wherein the organic support material comprises a polymeric material. | Col. 10, ll. 60-65. |
| 24.  The system of claim 22, wherein the organic support material comprises polystyrene. | Col. 10, ll. 60-65. |
| 25.  The system of claim 22, wherein the organic support material comprises polyacrylate. | Col. 10, ll. 60-65. |
| 26.  The system of claim 22, wherein the organic support material comprises polynethylmethacrylate. | Col. 10, ll. 60-65. |
| 27.  The system of claim 22, wherein the organic support material comprises glycidylmethacrylate. | Col. 10, ll. 60-65. |
| 28.  A nucleotide sequencing system comprising: | |
|      at least a plurality of microparticles, each microparticle including a unique group of the same kind of polynucleotide; | Col. 11, ll. 6-12. |
|      a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, the program of instructions comprising instructions for: | Claim 1;<br>Fig. 1a and Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 5, ll. 56-67;<br>Col. 5, ll. 23-42;<br>Col. 8, l. 48-col. 9, l. 5. |
|      rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps based on optical signals generated at the microparticles; | Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 8, l. 4-col. 9, l. 5. |
|      processing the plurality of digital | Fig. 1a and Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22; |

| images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and | Col. 9, l. 59-col 10, l. 38; Col. 19, l. 38-col. 20, l. 51. |
|---|---|
| converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides. | Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 9, l. 59-col 10, l. 38; Col. 19, l. 38-col. 20, l. 51. |
| 29.  A nucleotide sequencing system comprising: | |
| at least a plurality of microparticles, each microparticle including a unique polynucleotide; | Col. 11, ll. 6-12. |
| a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps the program of instructions comprising instructions for: | Claim 1; Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 5, ll. 56-67; Col. 5, ll. 23-42; Col. 8, l. 48-col. 9, l. 5. |
| rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles; | Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 8, l. 4-col. 9, l. 5. |
| processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and | Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 9, l. 59-col 10, l. 38; Col. 19, l. 38-col. 20, l. 51. |
| converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative | Fig. 1a and Fig. 8; Col. 4, l. 65-col. 5, l. 22; Col. 9, l. 59-col 10, l. 38; Col. 19, l. 38-col. 20, l. 51. |

| | |
|---|---|
| of a sequence of nucleotides corresponding to each of the plurality of the polynucleotides. | |
| 30.  A nucleotide sequencing system comprising: | |
| at least a plurality of microparticles, each microparticle including a unique polynucleotide; | Col. 11, ll. 6-12. |
| a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, the program of instructions comprising instructions for: | Claim 1;<br>Fig. 1a and Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 5, ll. 56-67;<br>Col. 5, ll. 23-42;<br>Col. 8, l. 48-col. 9, l. 5. |
| rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles; | Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 8, l. 4-col. 9, l. 5. |
| converting each of a plurality of the optical signals into respective data representative of respective nucleotides; and | Fig. 1a and Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 9, l. 59-col 10, l. 38;<br>Col. 19, l. 38-col. 20, l. 51. |
| processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides. | Fig. 1a and Fig. 8;<br>Col. 4, l. 65-col. 5, l. 22;<br>Col. 9, l. 59-col 10, l. 38;<br>Col. 19, l. 38-col. 20, l. 51. |

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 95001292 |
| **Filing Date:** | 31-Dec-2009 |
| **Title of Invention:** | SYSTEM AND APPARATUS FOR SEQUENTIAL PROCESSING OF ANALYTES |
| **First Named Inventor/Applicant Name:** | 6,654,505 B2 |
| **Filer:** | Leslie S. Miller/Linda Kasulke |
| **Attorney Docket Number:** | INV850/4-046REUS |

Filed as Large Entity

## inter partes reexam Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| Reexamination Independent Claims | 1821 | 6 | 220 | 1320 |
| Reexamination claims in excess of 20 | 1822 | 10 | 52 | 520 |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| Priority accept. unintent. delayed claim | 1454 | 1 | 1410 | 1410 |
| **Patent-Appeals-and-Interference:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **3250** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 7665536 |
| **Application Number:** | 95001292 |
| **International Application Number:** | |
| **Confirmation Number:** | 9037 |
| **Title of Invention:** | SYSTEM AND APPARATUS FOR SEQUENTIAL PROCESSING OF ANALYTES |
| **First Named Inventor/Applicant Name:** | 6,654,505 B2 |
| **Customer Number:** | 26371 |
| **Filer:** | Leslie S. Miller/Linda Kasulke |
| **Filer Authorized By:** | Leslie S. Miller |
| **Attorney Docket Number:** | INV850/4-046REUS |
| **Receipt Date:** | 21-MAY-2010 |
| **Filing Date:** | 31-DEC-2009 |
| **Time Stamp:** | 18:11:08 |
| **Application Type:** | inter partes reexam |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Deposit Account |
| Payment was successfully received in RAM | $3250 |
| RAM confirmation Number | 6199 |
| Deposit Account | 180882 |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.20 (Post Issuance fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Response after non-final action-owner timely | 11236Response.pdf | 233412<br>1c6b09441afa45047f992aec072bd8186cbcbf80 | no | 49 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Petition for review by the Office of Petitions. | 11236Petition.pdf | 79693<br>c0ce1c2232278d5d7706bb9014e422c97de76a12 | no | 3 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Reexam Miscellaneous Incoming Letter | 11236AppendixA.pdf | 60957<br>79f6e84a1750fcf51aa4711fa2dbf78c98cf9019 | no | 9 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Reexam Miscellaneous Incoming Letter | 11236AppendixB.pdf | 55181<br>70b85aedf9fe42dfb57a882b245dfb61a8ac5d31cd | no | 9 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 5 | Fee Worksheet (PTO-875) | fee-info.pdf | 35551<br>14ad4750359338beaddddb4168b2584d18c02b54 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 464794 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Atty. Dkt. No.: 11236

I hereby certify that this correspondence is being electronically transmitted through ESF-WEB to Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450, on May 21, 2010.  A copy of this correspondence is being served on the Third-Party Requester by First Class U.S.  Mail to Margaret J. Sampson, Vinson & Elkins, L.L.P., First City Tower, 1001 Fannin Street Suite 2500, Houston TX 77002-6760, on May 21, 2010.
Reinhart Boerner Van Deuren  s.c.


By:   /Linda Kasulke/



Date:    May 21, 2010

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

### GROUP ART UNIT:  3991

### PRIMARY EXAMINER:  Brenda G. Brumback

| | |
|---|---|
| In re U.S. Patent of:  Bridgham, et al. | ) |
| | ) |
| Patent No.:  6,654,505 | ) |
| Issue Date: November 25, 2003 | ) |
| Reexam Control No.:  95/001,292 | )   For:  SYSTEM AND APPARATUS FOR |
| Reexam Filing Date: December 31, 2009 | )        SEQUENTIAL PROCESSING OF |
| Reexam Confirmation No.: 9037 | )        ANALYTES |
| | ) |
| Attorney Docket No.: 11236 | ) |
| | ) |
| Customer No.: 22922 | ) |

Mail Stop INTER PARTES REEXAMINATION
Commissioner for Patents                                              May 21, 2010
P.O. Box 1450
Alexandria, VA 22313-1450

### AMENDMENT AND RESPONSE TO OFFICE ACTION IN
### *INTER PARTES* REEXAMINATION

Sir:

In response to the Office Action mailed March 23, 2010, the Patent Owner respectfully requests reconsideration and that the Office amend the above-identified application as follows:

**Amendments to the Specification** begin on page 2.

**Amendments to the Claims** begin on page 3.

**Remarks** begin on page 10.

**Amendments to the Specification:**

Applicant respectfully requests that the application be amended as follows:

Please replace the first paragraph immediately following the title "SYSTEM AND APPARATUS FOR SEQUENTIAL PROCESSING OF ANALYTES" in column 1 with the following heading and rewritten paragraph:

CROSS-REFERENCE TO RELATED PATENT APPLICATIONS

This application is a divisional of U.S. Application Ser. No. 09/424,028, filed November 16, 1999, now U.S. Patent No. 6,406,848, which is a National Stage of International Application No. PCT/US98/11224 filed on May 22, 1998, and a continuation-in-part of U.S. Application Ser. No. 08/946,138, filed October 7, 1997, now U.S. Patent No. 6,013,445, which are both continuations-in-part of U.S. Application Ser. No. 08/862,610, filed May 23, 1997, now abandoned, which is a continuation-in-part of U.S. Application Ser. No. 08/689,587, filed August 12, 1996, now abandoned, which is a continuation-in-part of U.S. Application Ser. No. 08/659,453, filed June 6, 1996, now U.S. Patent No. 5,846,719, which is a continuation-in-part of U.S. Application Ser. No. 08/358,810, filed December 19, 1994, now U.S. Patent No. 5,604,097, which is a continuation-in-part of U.S. Application Ser. No. 08/322,348, filed October 13, 1994, now abandoned.  This application is also a continuation-in-part of U.S. Application Ser. No. 09/090,809, filed June 4, 1998, now U.S. Patent No. 6,280,935, which is a divisional of U.S. Application Ser. No. 08/659,453, filed June 6, 1996, now U.S. Patent No. 5,846,719, which is a continuation-in-part of U.S. Application Ser. No. 08/358,810, filed December 19, 1994, now U.S. Patent No. 5,604,097, which is a continuation-in-part of U.S. Application Ser. No. 08/322,348, filed October 13, 1994, now abandoned.  The entire disclosures of U.S. Application Ser. No. 09/424,028, International Application No. PCT/US98/11224, U.S. Application Ser. No. 08/862,610, and U.S. Application Ser. No. 08/358,810 are incorporated herein by reference.

Submitted herewith are a petition for acceptance of an unintentionally delay claim for priority under 37 C.F.R. § 1.78(a)(3) and the associated petition fee required by 37 C.F.R § 1.17(t).

**Amendments to the Claims**:

A complete listing of unamended original claims 1-6 and new claims 7-30 is attached as Appendix A.  Applicant respectfully requests that the application be amended to add new claims 7-30 as follows:

7.      (New)  The device readable medium of claim 1, further comprising instructions for delivering process reagents for the sequence of processing steps to a flow chamber from a fluidics system.

8.      (New)  The device readable medium of claim 7, wherein the instructions for delivering process reagents for the sequence of processing steps comprise delivering processing reagents for repeated cycles of ligation.

9.      (New)  The device readable medium of claim 8, wherein the instructions for delivering process reagents for the sequence of processing steps comprise delivering processing reagents for repeated cycles of cleavage.

10.      (New)  A device-readable medium comprising:

a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles comprising DNA fragments and tracking positions of the microparticles during a sequence of processing steps for determining a sequence of nucleotides corresponding to the DNA fragments, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

converting each of a plurality of the optical signals into respective data representative of the nucleotides;  and

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the

Atty. Dkt. No.: 11236

plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to a plurality of the DNA fragments.

11.     (New)  The device-readable medium of claim 10, wherein said processing further includes determining the approximate center of each microparticle, based on a recorded optical characteristic of said microparticle.

12.     (New)  The device-readable medium of claim 10 wherein the nucleotides are at least one of the group including A (deoxyadenosine), T (thymidine), C (deoxycytidine) and G (deoxyguanosine).

13.     (New)  The device-readable medium of claim 12, further comprising instructions for storing data representative of the sequences of nucleotides.

14.     (New)  A device-readable medium comprising:

a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles comprising DNA fragments and tracking positions of the microparticles during a sequence of processing steps for determining a sequence of nucleotides corresponding to the DNA fragments, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and

converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative of a sequence of nucleotides corresponding to a plurality of the DNA fragments.

15.     (New)  A device-readable medium comprising:

a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, wherein each microparticle includes a group of the same kind of polynucleotide and the kinds of polynucleotides on a plurality of microparticles are different, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

converting each of a plurality of the optical signals into respective data representative of respective nucleotides; and

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides.

16. (New) A device-readable medium comprising:

a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, wherein each microparticle includes a group of the same kind of polynucleotide and the kinds of polynucleotides on a plurality of microparticles are different, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and

converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides.

Atty. Dkt. No.: 11236

17.      (New)  A nucleotide sequencing system comprising:

at least a plurality of microparticles, each microparticle including a unique group of the same kind of polynucleotide;

a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

converting each of a plurality of the optical signals into respective data representative of respective nucleotides; and

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides.

18.      (New)  The device-readable medium of claim 17,  wherein the microparticles are contained in a flow cell.

19.      (New)  The system of claim 18, wherein each microparticles is on a glass surface.

20.      (New)  The system of claim 18, wherein the microparticles further include glass beads.

21.      (New)  The system of claim 18, wherein the microparticles further include silica beads.

22.      (New)  The system of claim 18, wherein the microparticles further include beads formed from an organic support material.

Atty. Dkt. No.: 11236

23.    (New)  The system of claim 22, wherein the organic support material comprises a polymeric material.

24.    (New)  The system of claim 22, wherein the organic support material comprises polystyrene.

25.    (New)  The system of claim 22, wherein the organic support material comprises polyacrylate.

26.    (New)  The system of claim 22, wherein the organic support material comprises polymethylmethacrylate.

27.    (New)  The system of claim 22, wherein the organic support material comprises glycidylmethacrylate.

28.    (New)  A nucleotide sequencing system comprising:

at least a plurality of microparticles, each microparticle including a unique group of the same kind of polynucleotide;

a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps based on optical signals generated at the microparticles;

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and

converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides.

7

Atty. Dkt. No.: 11236

29.     (New)  A nucleotide sequencing system comprising:

at least a plurality of microparticles, each microparticle including a unique polynucleotide;

a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images; and

converting each of a plurality of the optical signals into respective data representative of respective nucleotides to generate a sequence of data representative of a sequence of nucleotides corresponding to each of the plurality of the polynucleotides.

30.     (New)  A nucleotide sequencing system comprising:

at least a plurality of microparticles, each microparticle including a unique polynucleotide;

a device-readable medium including a program of instructions for execution by the device to perform a method of generating images of a planar array of microparticles and tracking positions of the microparticles during a sequence of processing steps, the program of instructions comprising instructions for:

rendering a plurality of digital images of the planar array of the microparticles during the sequence of processing steps, based on optical signals generated at the microparticles;

Atty. Dkt. No.: 11236

converting each of a plurality of the optical signals into respective data representative of respective nucleotides;  and

processing the plurality of digital images, wherein the processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images to generate a sequence of data representative of a sequence of nucleotides corresponding to each of a plurality of the polynucleotides.

Atty. Dkt. No.: 11236

## REMARKS

This Amendment and Response is filed in response to the Office Action mailed March 23, 2010. The Patent Owner presents the following remarks in support of the patentability of the claims and respectfully requests their consideration.

## I.     NOTICE OF CONCURRENT PROCEEDINGS

Pursuant to C.F.R. § 1.985(a), Patent Owner hereby alerts the Examiner that U.S. Patent No. 6,654,505 ("505 patent") is the subject of litigation in *Life Technologies Corp. v. Illumina, Inc.*, No. 1:09-cv-00706-RK (D.Del., filed September 21, 2009). Life Technologies filed a Motion to Stay on April 16, 2010, which is fully briefed and awaiting a ruling. The claim construction hearing is scheduled for July 26, 2010, Motions for Summary Judgment are to be filed by February 4, 2011, and trial is scheduled to commence on July 11, 2011.

## II.    AMENDMENTS TO THE SPECIFICATION

The priority claim has been amended in response to the third-party requester's ("TPR") assertion that the '505 patent is not entitled to a priority date of May 23, 1997, and the Examiner's determination at page 3 of the Order Granting Request for *Inter Partes* Reexamination that the '505 patent is entitled only to a priority date of May 22, 1998. The priority claim has been amended to claim benefit of U.S. Application Ser. No. 09/424,028, International Application No. PCT/US98/11224, U.S. Application Ser. No. 08/946,138, U.S. Application Ser. No. 08/862,610, U.S. Application Ser. No. 08/689,587, U.S. Application Ser. No. 08/659,453, U.S. Application Ser. No. 08/358,810, and U.S. Application Ser. No. 08/322,348. Previously, U.S. Patent No. 6,654,505 expressly claimed priority only to Application No. PCT/US98/11224 and U.S. Application Ser. No. 08/862,610. U.S. Patent No. 5,604,097 to Brenner is specifically incorporated by reference in the specification of U.S. Patent No. 6,654,505. No new matter has been added.

A reissue application has been filed under 37 C.F.R. § 1.171 for U.S. Patent No. 6,031,445 ("the '445 patent"). An amendment to the specification of the '445 patent was filed on May 18, 2010, claiming priority for to U.S. Application Ser. No. 08/322,348, filed October 13, 1994.

U.S. Patent No. 6,406,848 ("the '848 patent"), to which the '505 patent claims priority, is presently the subject to *Ex Parte* Reexamination**,** Ser. No. 90/009,581, filed on November 4, 2009. An amendment to the specification of the '848 patent was filed on May 20, 2010, claiming priority to U.S. Application Ser. No. 08/322,348, filed October 13, 1994.

## III.   STATUS OF CLAIMS AND SUPPORT FOR AMENDED CLAIMS

Claims 1-6 are subject to reexamination.  By this amendment, the Patent Owner adds new claims 7-30.  As a result, claims 1-30 are pending in this reexamination, of which claims 1, 10, 14, 15, 16, 17, 28, 29, and 30 are independent claims.  Each of the newly-added independent claims has all of the features of original independent claim 1.

Support for claim amendments in reexamination proceedings is determined in accordance with 37 C.F.R. § 1.530(e).  Support in the disclosure of the '505 patent for newly added claims 7-30 is provided in the claim chart attached hereto as Appendix B.

## IV.   INTRODUCTION

In requesting reexamination, the TPR noted language in the Abstract of the '505 patent stating that "[a] key feature of the invention is the correlation of the sequence of optical signals generated by each microparticle in the planar array during the analytical process."  (Abstract, emphasis supplied in Third-Party Request, page 7).  However, while emphasizing the correlation techniques, the TPR has not addressed an important component of the invention: rendering images of the microparticles "during the analytical process."  As a result, the TPR has provided the Examiner with numerous references directed to tracking cellular movement on a stable, unchanging microscope slide, processing static images of various types of samples, and imaging the positions of analytes affixed directly to a planar support.  These groups of references do not contain disclosures directed to the difficulties inherent in "tracking positions of the microparticles during a sequence of processing steps" as provided by claim 1 of the '505 patent.

The '505 patent discloses that "[a]n important feature of detection means (114) of the invention is the ability to keep track of individual microparticles through multiple process steps and/or cycles."  (Col. 8, lines 48-50).  The '505 patent specifically states that "[a] key feature of the invention is flow chamber (100)" (Col. 5, line 23), and that "process reagents are delivered to flow chamber (100)  by the fluidics system illustrated in Fig. 5." (Col. 8, lines 4-5).  The '505 patent also discloses that "process steps are initiated (804) by way of a fluidics controller operationally associated with a computer." (Col. 9, lines 59-61).  As shown in Fig. 8, such process steps are performed by fluidics controller 804 between the capture of bead (microparticle) images (see Fig. 8, 804, 810 and 816, and 826).  The '505 patent further discloses that following image capture, "the next steps and/or cycles of the process are executed (826)." (Col. 10, lines 24-25 and generally Col 9, line 59 through Col. 10, line 27).  Thus, as recited in the '505 patent, the phrase "sequence of

11

Atty. Dkt. No.: 11236

processing steps" as provided by claim 1 refers to manipulation of the environment containing the microparticles, including the addition of reagents and washes to a flow chamber using a fluidics controller.

As discussed in detail below, it is respectfully submitted that pending claims 1-30 are all allowable in view of the prior art upon which the adopted rejections are based.

## Remarks Concerning Determination of Obviousness

Basic requirements for the determination of obviousness are discussed in MPEP § 2141(II), which states:

> It must be remembered that while the ultimate determination of obviousness is a legal conclusion, the underlying Graham inquiries are factual. When making an obviousness rejection, Office personnel must therefore ensure that the written record includes findings of fact concerning the state of the art and the teachings of the references applied. In certain circumstances, it may also be important to include explicit findings as to how a person of ordinary skill would have understood prior art teachings, or what a person of ordinary skill would have known or could have done. Factual findings made by Office personnel are the necessary underpinnings to establish obviousness.

MPEP § 2141(II)(C) further states that "[a]ny obviousness rejection should include, either explicitly or implicitly in view of the prior art applied, an indication of the level of ordinary skill." The Office Action also cites to the *Graham* factors for determining obviousness, stating:

> the factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148 U.S.P.Q. 459 (1966), that are applied for establishing a background for determining obviousness under 35 U.S.C. § 103(a) are summarized as follows:
>
> 1. Determining the scope and content of the prior art.
> 2. Ascertaining the differences between the prior art and the claims at issue.
> 3. Resolving the level of ordinary skill in the pertinent art.
> 4. Considering objective evidence present in the application indicating obviousness or non-obviousness.

(Office Action, page 16).  However, neither the TPR nor the Office Action provides any discussion of the appropriate level of ordinary skill in the pertinent art.  Because the prior art cited by the TPR implicates multiple fields of expertise, including cellular biology, cellular classification,

DNA sequencing, medical imaging, and image processing, the Patent Owner does not believe that a level of ordinary skill in the art can be implicitly determined. Absent explicit delineation of the level of ordinary skill, any conclusion that claims of the '505 patent are obvious over combinations of prior art references lacks critical foundational support. The TPR has proposed combinations of prior art references in a vacuum, without any discussion of the knowledge or skills necessary to effect such combinations. The Patent Owner thus respectfully requests that the Examiner provide factual findings regarding the level of ordinary skill in the art being applied in concluding that certain combinations of prior art references are obvious or nonobvious.

To summarize, under <u>Graham</u>, a *prima facie* case of obviousness requires a determination of the level of ordinary skill in the art, and factual support for this determination. It is respectfully submitted that, as a result of the failure to make any proof of the level of ordinary skill in the art, neither the TPR nor the Examiner has established a *prima facie* case of obviousness for any of the pending claims at issue.

**Scope of the Prior Art**

All of the pending independent claims of the '505 patent are entitled to a priority date of October 13, 1994. The amendment to the specification providing support for priority under 35 U.S.C. §120 is set forth above. As such only prior art properly antedating October 13, 1994, is relevant to the independent claims in this reexamination. The Patent Owner believes that only 5 of the rejections (*i.e.* the rejections which adopt SNQ nos. 2, 6, 59, 60 and 61) adopted by the Examiner meet the criteria of being based on references available before of the October 13, 1994 priority date.[1] Accordingly, the Patent Owner first traverses the rejections based on those references, either alone or in combination.

**Detailed Discussion of Rejections**

**SNQ 2:  Claims 1-6 are rejected under 35 U.S.C. 102(b) as being anticipated by Gelles.**

The Office Action states that Gelles discloses imaging and recording the position of "plastic beads (*i.e.* microparticles), on a glass coverslip (*i.e.*, a planar array) as the microparticles, driven by kinesin, attach to and move along microtubules in vitro (*i.e.*, a sequence of processing steps…)" (Office Action, page 6). Patent Owner respectfully traverses the rejection.

---

[1] Even though the respective references are dated before October 13, 1994, that does not necessarily mean that those references qualify as prior art. The Patentee does not waive its right to show that these references do not qualify as prior art.

The Patent Owner's claimed inventions set forth in the '505 patent recite the generation of images of microparticles and tracking the microparticles "during a sequence of processing steps." This is not disclosed or suggested by the Gelles reference.  The Office Action appears to equate motion of microparticles with the claimed "sequence of processing steps."  However, neither the TPR nor the Office Action set forth any rationale for equating movement driven by an enzymatic chemical reaction with a "processing step," or explains how molecular-level microparticle motion would constitute "a sequence of processing steps."  As set forth *supra* in the introductory remarks, independent claim 1 provides that "during a sequence of processing steps" includes the rendering of images during or between processing steps, *i.e.* external manipulation of the environment containing the microparticles.

The Gelles reference recites only a single processing step prior to rendering images: beads with adhered kinesin are placed in a buffer solution containing ATP (Page 450, column 2).  After this single step is completed, the beads are observed and their positions recorded without any intervention by the experimenter.  The motion of beads induced by "molecular level mechanical events associated with individual reaction steps in the catalytic cycles of single enzyme molecules" (Gelles, abstract) is not a "sequence of processing steps" as provided in claim 1 of the '505 patent. The Office Action does not identify any other action comprising a "sequence of processing steps," nor any processing step that occurs during the image rendering.

Because Gelles discloses only a single step prior to image capture, and does not disclose or contemplate any additional processing steps occurring during or between image capture, it is respectfully submitted that the reference does not disclose "tracking positions of the microparticles during a sequence of processing steps."  In view of the foregoing, withdrawal of the rejection of independent claim 1 is respectfully requested.  Dependent claims 2-6 depend from independent claim 1 and are patentable for at least the same reasons as independent claim 1.

Claim 5 – no initial pixel is assigned

Claim 5 recites that "an initial pixel of the plurality of pixels is assigned to each microparticle which encloses the approximated center of the microparticle."  The '505 patent discloses that "once microparticle centers (700) are determined, pixels (702) are assigned for determining characteristics, *e.g.* intensity, of an optical signal generated at each microparticle (602).  The size of microparticle (602) and pixel area determine how many pixels are assigned to each microparticle." (Col. 9, ll. 6-

11).  Thus, assignment of pixels for additional analysis is a step subsequent to, and independent from, use of pixels representing a microparticle to calculate the center of the microparticle.

As disclosed by Gelles, the centroid of a microparticle determined using all pixels of the kernel segment, and the centroid is then "taken as the bead position of the bead in *a*." (Fig. 1, last paragraph).  Gelles does not disclose any assignment of pixels for determining characteristics following calculation of the centroid.  Moreover, there does not appear to be any reason or motivation for Gelles to assign pixels to a microparticle.  It is respectfully submitted that Gelles does not anticipate or render obvious claim 5.  In view of the foregoing, withdrawal of the rejection of dependent claim 5 is respectfully requested.  Dependent claim 6 is patentable for at least the same reasons as is claim 5.

Claim 6 – no assignment of additional pixels immediately adjacent to initial pixel

The '505 patent discloses that "an initial pixel is assigned which encloses the computed center of the microparticle....  Thereafter, additional pixels are assigned, usually the immediately adjacent pixels." (Col. 9, ll. 24-27).  As discussed above with respect to claim 5, assignment of additional pixels adjacent to the initial pixel constitutes a step subsequent to, and independent from, assignment of an initial pixel as recited in claim 5.

As disclosed by Gelles, the centroid of a microparticle determined using all pixels of the kernel segment, and the centroid is then "taken as the bead position of the bead in *a*." (Fig. 1, last paragraph).  Gelles does not disclose an additional step of "further includes assigning additional pixels, immediately adjacent to the initial pixel, to each microparticle, after the initial pixel is assigned." (emphasis added).  Based on the language of claim 6, the assignment of additional pixels that are adjacent to a center pixel is a step performed subsequent to the center calculation.  It is respectfully submitted that Gelles does not anticipate or render obvious claim 6, and withdrawal of the rejection of claim 6 is respectfully requested.

**SNQ 6:  Claims 1-4 are rejected under 35 U.S.C. 102(b) as being anticipated by Dow.**

Claims 1-4 stand rejected under 35 U.S.C. § 102(b) as anticipated by Dow.  Specifically, the Examiner states that "Dow teaches a device readable medium employing a program of instructions to generate images of a planar array of microparticles for tracking the positions of cells during real time while they are moving (*i.e.*, a sequence of processing steps)."  Patent Owner respectfully traverses the rejection.

As a preliminary matter, the Patent Owner does not concede that the microparticles disclosed in the '505 patent encompass biological cells.  The '505 patent states:

> An important feature of the system of the invention is the use of microparticles for carrying analytes. A variety of microparticles may be employed depending on particular applications. Generally, microparticles <u>must consist of a material compatible with the reagents and chemistry of the process steps</u> being carried out and microparticle <u>must be substantially mechanically rigid</u> so that they retain their shape and size during process steps....
>
> Suitable microparticle materials include inorganic support materials such as glass, e.g. controlled-pore glass, Balltoni beads; silica, zirconia, and the like .... and organic support materials such as highly cross-linked polystyrene, polyacrylate, polymethylmethacrylate, glycidylmethacrylate (GMA), Dynabeads (Dynal, Oslo, Norway), and the like ...

(Col. 10, lines 41-66) (emphasis supplied).  From the foregoing list of characteristics and examples, it is clear that the microparticles disclosed in the '505 patent do not encompass living biological cells.  The living biological cells disclosed by Dow are not necessarily compatible with reagents used in process steps disclosed in the '505 patent, such as the salt water/ethanol wash disclosed at Col. 20, lines 28-31.  Additionally, living biological cells are not a material of the type that are "substantially mechanically rigid" as set out in the '505 patent.

Although the PTO is required to give claims the broadest reasonable construction, the Federal Circuit "has instructed that any such construction '<u>be consistent with the specification</u>, ... and that claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art.'"  *In re Suitco Surface, Inc.*, 2009-1418, *8 (Fed. Cir. April 14, 2010) (emphasis in original and quoting *In re Bond*, 910 F.2d. 831, 833 (Fed. Cir. 1999).  Without evidence regarding the level of ordinary skill in the art, and evidence that such a person would consider cells to be microparticles despite the specific disclosure of the '505 patent, it is respectfully suggested that the dissimilar nature of the microparticles disclosed in the patent specification as compared the living biological cells of the Dow reference precludes the broad statement that cells are "microparticles" as recited by claim 1.

Even if the Dow reference is considered to be relevant prior art, the reference does not disclose rendering images "during a sequence of processing steps."  As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the rendering of images during or between processing steps, *i.e.* external manipulation of the

environment containing the microparticles.  Dow discloses only a single step: placing live cells on a microscope slide.  Following this placement step, the cells are tracked as they move, under their own power, on a microscope slide.  Once imaging commences, Dow does not disclose or suggest any processing steps.  The Examiner has not identified any other steps in the Dow reference comprising a "sequence of processing steps," or where Dow discloses tracking microparticles during more than one such processing step.

Finally, there does not seem to be any reason or motivation to use Dow in the manner claimed in the '505 patent.  The living cells disclosed in the Dow reference are not fixed to the glass microscope slide or otherwise constrained, as the object of the Dow reference is to track living cells as they move freely under their own power.  However, the "sequence of processing steps" provided by claim 1 includes external manipulation of the environment containing the microparticles, such as the addition of reagents and washes by a fluidics controller.  The unattached and unconstrained cells of the Dow reference, if exposed to such process steps, would experience significant positional displacements as fluids flow through the experimental system.  Such displacements would be incompatible with the box search method of cell tracking disclosed in Dow, which assumes that relatively small displacements occur between each image.  The resulting loss of tracking continuity would frustrate the purpose of the Dow reference.

In view of the foregoing, withdrawal of the rejection of independent claim 1 is respectfully requested.  Claims 2-4 depend from independent claim 1 and are patentable for at least the same reasons as claim 1.

## SNQ 59:  Claims 5-6 are rejected under 35 U.S.C. 103(a) as unpatentable over Dow in view of Gelles.

It is respectfully submitted that the combination of the Dow and Gelles references is not proper.  Dow is directed to tracking moving cells, where the type and quantity of the cells are chosen based on the needs of a researcher.  Although the Office Action states that a person of ordinary skill in the art would have made the combination "to better facilitate cell tracking" (Office Action, page 78, without specifying the level of ordinary skill in the art), the Gelles reference does not relate to cell tracking.

Additionally, the combination of Dow and Gelles still fails to disclose at least one feature of the claims.  As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes external manipulation of the environment containing the

Atty. Dkt. No.: 11236

microparticles.  As discussed *supra* in the remarks concerning SNQs 2 and 6, Neither Dow nor

Gelles disclose rendering images "during a sequence of processing steps."  Thus, independent claim

1 is allowable over the combination of the Dow and Gelles references.  Claims 5 and 6 depend from

independent claim 1, and are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the

level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to

which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further

respond if the Examiner make a *prima facie* case of obviousness in the future.

**SNQ 60:  Claims 5-6 are rejected Under 35 U.S.C. 103(a) as unpatentable over Dow in view of**

**Luck.**

It is respectfully submitted that the combination of the Dow and Luck references is not

proper.  Dow is directed to tracking moving cells, where the type and quantity of the cells are chosen

based on the needs of a researcher.  Although the Office Action states that a person of ordinary skill

in the art would have made the combination "to better facilitate cell tracking" (Office Action, page

80, without specifying the level of ordinary skill in the art), the Luck reference does not relate to cell

tracking of moving cells.  Instead, Luck is directed to a method of processing static images of a

microscope slide, for the purpose of classifying types of cells in a cytological specimen.  In effect,

Luck discloses specific methods of cell classification using predetermined criteria to filter out a large

excess of normal, healthy cells from a small group of potentially malignant cells, and present images

of potentially malignant cells for human review.  Unlike Dow, there is no indication in Luck that the

cells are capable of movement on the slide.  Thus, there is no motivation to apply the pattern filtering

techniques disclosed by Luck to better track moving objects.

Additionally, the combination of Dow and Luck still fails to disclose at least one feature of

the claims.  As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence

of processing steps" includes external manipulation of the environment containing the

microparticles.  As discussed *supra* in the remarks concerning SNQ 6, Dow does not disclose

rendering images "during a sequence of processing steps."  The disclosure of Luck is directed to

image processing of a static microscope slide, using a first, low-resolution scan and a second, higher

resolution scan.  Luck does not, however, discuss or contemplate taking images during a "sequence

of processing steps."  Thus, even if the combination is proper, independent claim 1 is allowable over

the combination of Dow and Luck.  Claims 5 and 6 depend from independent claim 1, and are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner make a *prima facie* case of obviousness in the future.

**SNQ 61:  Claims 5-6 are rejected under 35 U.S.C. 103(a) as unpatentable over Dow in view of Sizto.**

It is respectfully submitted that the combination of the Dow and Sitzo references is not proper.  Dow is directed to tracking moving cells, where the type and quantity of the cells are chosen based on the needs of a researcher.  Although the Office Action states that a person of ordinary skill in the art would have made the combination "to better facilitate cell tracking" (Office Action, page 82, without specifying the level of ordinary skill in the art), the Sitzo reference does not relate to cell tracking.  Instead, Sitzo discloses fluorescent imaging of a sample at different wavelengths, followed by processing of those two images.  Sitzo discloses that the sample is held within a container, such as a capillary tube.  There is no indication in Sitzo that the cells are capable of movement within the capillary tube.  Thus, there would be no motivation to apply the analysis techniques disclosed by Sitzo to better track moving objects.

Additionally, the combination of Dow and Sitzo still fails to disclose at least one feature of the claims.  As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes external manipulation of the environment containing the microparticles.  As discussed above in the remarks concerning SNQ 6, Dow does not disclose the rendering images "during a sequence of processing steps."  The disclosure of Sitzo is directed to image processing of a static sample contained in a capillary tube.  Sitzo does not, however, discuss or contemplate imaging the sample "during a sequence of processing steps."  As neither the Dow nor Sitzo references disclose rendering an image "during a sequence of processing steps," it is respectfully suggested that claim 1 is allowable over the combination of the Dow and Luck references.  Claims 5 and 6 depend from independent claim 1, and are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to

which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner make a *prima facie* case of obviousness in the future.

**Additional Remarks**

Based on the foregoing, the Patent Owner believes that all claims of the '505 patent are patentable over the prior art, and respectfully requests their allowance.  For the remaining SNQs, fully or partially adopted by the Examiner, the Patent Owner also offers the following comments on references and combinations of references that are dated after the corrected priority date of the '505 patent.  These references were relied upon in the proposed rejections adopted in the Office Action.  SNQs 12,14, 18-27, 29, 30, 34-37, 49, 54, 55, 57, 58, 62, 63, and 68-72 were not adopted by the Examiner.

**SNQ1:  Claim is 1 rejected under 35 U.S.C. 102(b) as being anticipated by Brenner.**

Claim 1 stands rejected under 35 U.S.C. § 102(b) as anticipated by Intl. Publ. No. WO 96/12014 to Brenner.  Brenner was published on April 25, 1996, after the '505 patent's corrected priority date of October 13, 1994.  It is respectfully submitted that Brenner does not constitute a prior art reference under § 102(b) to independent claim 1, and respectfully requests that the rejection be withdrawn.

**SNQ 3:  Claims 1-3 are rejected under 35 U.S.C. 102(e) as being anticipated by Lee.**

Claims 1-3 stand rejected under 35 U.S.C. § 102(e) as anticipated by Lee.  Lee issued on May 2, 2000, and the application claims priority to a filing date of September 19, 1997, after the '505 patent's corrected priority date of October 13, 1994.  Because Lee does not constitute prior art under 35 U.S.C. § 102(e) to independent claim 1, it is respectfully requested that the rejection be withdrawn with respect to independent claim 1 and claims 2-3 which depend therefrom.

Furthermore, Lee discloses the use of microspheres having a diameter of $1\mu m$ as the points of marker triangles on a stretchable membrane.  As the membrane is stretched, "[t]hree segment lengths between triangular arrangements of microspheres located 5-20 µm apart" are used to calculate membrane strains. (Lee, col. 8, lines 35-41 and col. 9, lines 22-38).  As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles.  Contrary to the TPR's assertion, Lee does not externally manipulate the environment containing the microparticles as contemplated by the disclosure of the '505 patent.  Accordingly, the membrane stretching disclosed

by Lee do not constitute a "sequence of processing steps" as disclosed and claimed by the '505 patent.

Accordingly, the membrane stretching disclosed by Lee do not constitute a "sequence of processing steps" as disclosed and claimed by the '505 patent. Based on the foregoing, it is respectfully submitted that independent claim 1 is allowable over Lee. Claims 2-3 depend from claim 1, and are allowable for at least the same reasons as claim 1.

**SNQ 4:  Claims 1-6 rejected under 35 U.S.C. 102(b) as being anticipated by Schmidt.**

Claims 1-6 stand rejected under 35 U.S.C. § 102(b) as anticipated by the Schmidt article. The Schmidt article was published in November 1993, less than one year before the '505 patent's corrected priority date of October 13, 1994. It is respectfully submitted that Schmidt does not constitute a prior art reference under § 102(b) to independent claim 1, and respectfully requests that the rejection be withdrawn.

Furthermore, as set forth *supra* in the introductory remarks, independent claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles. Schmidt states that prior to video microscopy,

> [t]he coverslip containing the cells was then mounted on an aluminum coverslip holder using vacuum grease. 20μl of the appropriate bead solution was ... added to the cells, and then a second 22-mm$^2$, No.1 glass coverslip was mounted on top. The unit was then sealed at the corners using hot wax.

(Schmidt, page 979, paragraph bridging columns 1 and 2). From this description, it is apparent that the cells and microparticles analyzed by Schmidt were sealed within a microscope slide apparatus, and were not further subjected to any "sequence of processing steps." Schmidt thus fails to disclose keeping track of microparticles "during a sequence of processing steps." In view of the foregoing, withdrawal of the rejection of independent claim 1 is respectfully requested. Dependent claims 2-6 are patentable for at least the same reasons as is claim 1.

**SNQ 5:  Claim 1 is rejected under 35 U.S.C. 102(b) as being anticipated by Wilson.**

Claim 1 stands rejected under 35 U.S.C. § 102(b) as anticipated by Wilson. The Wilson reference was published in 1996, after the '505 patent's corrected priority date of October 13, 1994. Because Wilson does not constitute prior art under 35 U.S.C. § 102(b) to independent claim 1, it is respectfully requested that the rejection be withdrawn.

It is respectfully suggested that  Wilson is not directed to tracking "microparticles" as provided by the '505 patent.  Although Wilson states that single particle tracking is a powerful approach, the particles disclosed by Wilson are monoclonal antibodies bound to a fluorescent marker.  The '505 patent discloses that "microparticles diameters may range from 0.1μm to 100μm." (Col. 10, lines 56-57).  Thus, even the smallest microparticles contemplated by the '505 patent are far larger than the nanometer-scale complex formed by phycoerthrin (PE) and Immunoglobulin G (IgG) the TPR mistakenly conflates with microparticles.  Finally, equating the PE-IgG complex disclosed in Wilson and microparticles ignores the disclosure of the '505 patent relating to suitable microparticle materials. (*See* col. 10, lines 6-67).

As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles.  Wilson discloses placing cells on a microscope slide and tracking the movement of the fluorescent PE-IgG complex, without any subsequent processing steps.  Following this placement step, the particles are tracked as they interact with living cells on a microscope slide.  The Examiner has not identified any other steps in the Wilson reference comprising a "sequence of processing steps," or where Wilson discloses tracking microparticles during more than one such processing step.  In view of the foregoing, withdrawal of the rejection of independent claim 1 is respectfully requested.

**SNQ 7:  Claims 1-6 are rejected under 35 U.S.C. 102(e) as being anticipated by Douglass.**

Claims 1-6 stand rejected under 35 U.S.C. §  102(e) as anticipated by Douglass.  The Douglass patent application claims priority to a filing date of November 29, 1996, after the '505 patent's corrected priority date of October 13, 1994.  Because Douglass does not constitute prior art under 35 U.S.C. § 102(e) to independent claim 1, it is respectfully requested that the rejection be withdrawn.

Additionally, for the reasons set forth in the response to SNQ 6, the Patent Owner does not concede that the microparticles claimed in the '505 patent are equivalent to the biological cells imaged by Douglass.  Thus, Douglass is not directed to "microparticles" as claimed in the '505 patent, and can not anticipate independent claim 1.

As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles.  Douglass discloses placing treated cells on a microscope slide without any

subsequent processing steps.  Following this placement step, images of the cells are recorded and digitally analyzed, without any processing steps as disclosed in the '505 patent.  The Examiner has not identified any steps in the Douglass reference comprising a "sequence of processing steps," or where Douglass discloses tracking microparticles during more than one such processing step.  In view of the foregoing, withdrawal of the rejection of independent claim 1 is respectfully requested.  Dependent claims 2-6 are patentable for at least the same reasons as is claim 1.

**SNQ 8:  Claims 2-3 and 5-6 are rejected under 35 U.S.C. 103(a) as being unpatentable over Brenner in view of Wernet.**

Claims 2-3 and 5-6 stand rejected under 35 U.S.C. § 103(a) over Brenner in view of Wernet.  Brenner was published on April 25, 1996, after the '505 patent's corrected priority date of October 13, 1994.  Because the Brenner reference does not constitute prior art under 35 U.S.C. § 102 to independent claim 1, it is respectfully requested that the rejection be withdrawn.

Even if Brenner qualified as a prior art reference, Wernet teaches away from the disclosure of Brenner.  Wernet states that particle displacement tracking ("PDT") techniques are applicable to "low velocity ... sparsely seeded PIV [Particle Imaging Velocimetry] fluid flow systems."  (Wernet, page 296, col. 1).  Wernet further discloses an amplitude coding method that "unambiguously defines the particle direction of travel and lowers the probability of mistakenly identifying a particle image from a different particle as being part of another particle displacement record."  (Wernet, page 296, col. 2)  Thus, Wernet contemplates that microparticles are distinguished from each other in part because that they are unlikely to be in close proximity, a condition which can result in mistaken particle identification.  Brenner teaches, however, that "[p]referably, the scanning system should be capable of resolving closely spaced microparticles, *e.g.* separated by a particle diameter or less."  (Brenner, page 7, lines 6-7).  In view of the foregoing, the teachings of the Brenner and Wernet references are incompatible, there would be no motivation to improve the accuracy of the Brenner particle tracking using the PDT techniques disclosed by Wernet.

As set forth *supra* in the introductory remarks, claim 1 sets forth rendering images "during a sequence of processing steps" which includes the external manipulation of the environment containing the microparticles.  Wernet does not perform any process steps as disclosed in the '505 patent, including the addition of reagents and washes to a flow chamber using a fluidics controller.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to

which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 9:  Claims 2-6 are rejected under 35 U.S.C. 103(a) as being unpatentable over Brenner in view of Luck.**

Claims 2-6 stand rejected under 35 U.S.C. § 103(a) over Brenner in view of Luck.  Brenner was published on April 25, 1996, after the '505 patent's corrected priority date of October 13, 1994.  Because Brenner does not constitute prior art under 35 U.S.C. § 102 independent claim 1.  Claims 2-6 depend from claim 1 and it is respectfully requested that the rejection be withdrawn.

Further more, it is respectfully submitted that the combination of the Brenner and Luck references in not proper.  For the reasons set forth in the response to SNQ 6, the Patent Owner does not concede that the microparticles claimed in the '505 patent are equivalent to the biological cells imaged by Luck.  Because Luck is not directed to microparticles as disclosed in the '505 patent, there would be no motivation to combine Luck with Brenner.

Additionally, the disclosure of Luck is directed to image processing of a static microscope slide, using a first, low-resolution scan and a second, higher resolution scan.  Luck does not, however, discuss or contemplate a "sequence of processing steps."  Because Luck is directed to processing images of static samples, it is not relevant to the difficulties inherent in tracking microparticles between successive processing steps, and there would be no motivation to combine the references.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 10:  Claims 2-3 are rejected under 35 U.S.C. 103(a) as being unpatentable over Brenner in view of Stimpson.**

Claims 2-3 stand rejected under 35 U.S.C. § 103(a) over Brenner in view of Stimpson.  Brenner was published on April 25, 1996, after the '505 patent's corrected priority date of October 13, 1994.  Because Brenner does not constitute prior art under 35 U.S.C. § 102 to independent claim 1.  Claims 2-3 depend from claim 1 and it is respectfully requested that the rejection be withdrawn.

It is respectfully submitted that the combination of Brenner and Stimpson is not proper.  Regarding claim 2, the Office Action states that:

a circular area the approximate size of a signal spot is used to measure the numerical
grayscale values of the image data.  The digital values within the circular measuring
area are averaged for the capture situs and then compared to a representative
background

(Office Action, pages 20-21, referencing Stimpson, col. 25, lines 22-26).  Stimpson discloses
in Fig. 3 and at col. 18, line 60 through col. 19, line 3, that the circular area corresponds to the
capture situs rather than a microparticle location.  A capture situs is defined as the location of at least
one "capture SBM" (shown in Fig. 3 as a "capture oligonucleotide"), and preferably there are
multiple SBMs immobilized at distinct sites, which are separated by non-situs portions.  Thus, the
resulting signal spot in the case of successful pairing of a capture SBMs and LSLs – will contain one
or more light scattering labels ("LSLs," identified as microparticles by the Office Action).
Correspondingly, in situations where a capture SBM does not hybridize with a matching LSL, a
signal spot with a low or "dark" value (*i.e.*, at the low end of the 0-255 range of the 8-bit grayscale),
but would not actually contain a microparticle.  Because Stimpson discloses monitoring the changes
at particular locations from high to low brightness values in real time, Stimpson necessarily discloses
that microparticles are moving into and out of the observed circles.  From the foregoing, it is
apparent that the disclosure of the Stimpson reference does not contemplate finding the center of the
individual microparticles, and is instead centering the observation circles on the known locations of
capture SBMs.  Thus, the capture situs and corresponding signal spot are not equivalent to LSLs, and
circles assigned to a signal spot are not equivalent to or dependent on the presence (or absence) of a
microparticle.  Withdrawal of the rejection of claim 2 is respectfully requested.  Because claim 3
depends from claim 2, it is allowable for at least the same reasons as claim 2.

Regarding claim 3, the Office Action equates mere recordation of a digital image file with
assignment of particular pixels to microparticles, stating in relevant part that:

The digital images consist of a series of 8-bit grayscale values, ranging from 0 (dark)
to 255 (white).  The digital file thus consists of a series of such numbers and each
number corresponds to a particular and unique pixel location of the image.

(Office Action, page 21, citing Stimpson, col. 25, lines 17-21).  The quoted disclosure
discloses only the general format of a digital image file generated by a CCD and frame grabber – 8
bit, grayscale values.  It does not disclose or even suggest "assigning a plurality of pixels to each

microparticle" as recited by claim 3 of the '505 patent.  Withdrawal of the rejection of claim 3 is respectfully requested.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

## SNQ 11:  Claims 2-6 are rejected under 35 U.S.C. 103(a) as being unpatentable over Brenner in view of Sizto.

Claims 2-6 stand rejected under 35 U.S.C. § 103(a) over Brenner in view of Sitzo.  Brenner was published on April 25, 1996, after the '505 patent's corrected priority date of October 13, 1994.  Because Brenner does not constitute prior art under 35 U.S.C. § 102 to independent claim 1.  Claims -6 depend from claim 1 and it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Brenner and Sizto is not proper.  Brenner discloses analytical technique including repetition of steps including ligatating polynucleotides to probes, removing unligated probes, identifying polynucleotides based on the identity of the probe, and cleaving the ligated complex.  In contrast, Sitzo discloses technique for scanning samples requiring only minimal processing, such as blood samples contained in a capillary tube.  Sitzo specifically teaches that "[a]fter the fluidic sample is reacted with the labeled binding agent, it is diluted and drawn into a capillary.  Minimal processing of the biological fluid sample is necessary to practice the method of the present invention."  (Sitzo, col. 5, lines 50-53).  Accordingly, there would be no motivation to combine the dissimilar teachings of the Brenner and Sitzo references.  Withdrawal of the rejection is respectfully requested.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

## SNQ 13:  Claims 2-6 are rejected under 35 U.S.C. 103(a) as unpatentable over Brenner in view of Douglass.

Claims 2-6 stand rejected under 35 U.S.C. § 103(a) over Brenner in view of Douglass. Brenner was published on April 25, 1996, after the '505 patent's corrected priority date of October 13, 1994.  Douglass was issued on November 21, 2000, and was filed on March 28, 1997.  Because

neither reference constitutes prior art under 35 U.S.C. § 102 to independent claim 1.  Claims 2-6 depend from claim 1 and it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Brenner and Douglass is not proper.  For the reasons set forth in the response to SNQ 6, the Patent Owner does not concede that the microparticles claimed in the '505 patent are equivalent to the biological cells imaged by Douglass.  As such, there would be no motivation to combine Brenner and Douglass.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 15:  Claim 2 is rejected under 35 U.S.C. 103(a) as being unpatentable over Brenner in view of DiMilla.**

Claim 2 stands rejected under 35 U.S.C. § 103(a) over Brenner in view of DiMilla.  Brenner was published on April 25, 1996, after the '505 patent's corrected priority date of October 13, 1994.  The Patent Owner thus believes that the Brenner reference does not constitute a prior art reference under § 102 to independent claim 1.  Claim 2 depends from claim 1 and it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of the Brenner and DiMilla references is not proper.  DiMilla does not disclose, and teaches away from, the subject matter of claim 2.  In particular, the technique taught by DiMilla is inappropriate for a preferred embodiment of the '505 patent.  The '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array."  (Col. 5, lines 56-57).  However, DiMilla specifically notes that the method employed to track moving cells was applied only to "isolated and spread cells" (DiMilla, page 731, col. 2), and the reference does not indicate that the method would be applicable to cells in close proximity.  Thus, DiMilla reference would not be relevant to "closely packed" microparticles, and there would be no motivation to combine the teachings of the DiMilla and the Brenner references.

DiMilla also states that an "image processing system" was used to track the centroid position of cells.  However, DiMilla does not actually disclose how the centroids were determined.  In fact, the reference states only that individual fields were selected for analysis with a joystick,  and that the algorithm used by the system to track centroids was "semiautomated," that implying that human

intervention was required to perform the image processing.  Thus, the DiMilla reference does not necessarily disclose or contemplate a "program of instructions comprising instructions for ... correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images" as provided by claim 1, and "determining the approximate center of each microparticle" as provided by claim 2.  Accordingly, withdrawal of the rejection of claim 2 is respectfully requested.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 16:  Claims 2-6 are rejected under 35 U.S.C. 103(a) as being unpatentable over Brenner in view of Gelles.**

Claims 2-6 stands rejected under 35 U.S.C. § 103(a) over Brenner in view of Gelles.  Brenner was published on Apr 25, 1996, after the '505 patent's corrected priority date of October 13, 1994.  The Patent Owner thus believes that the Brenner reference does not constitute a prior art reference under § 102 to independent claim 1.  Claims 2-6 depend from claim 1 and it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Brenner and Gelles is not proper.  The Examiner has stated that Gelles anticipates claims 1-6 of the '505 patent, and that a person of ordinary skill in the art would also combine Brenner with Gelles (without defining the level of ordinary skill in the art).  It is respectfully submitted that these positions are contradictory, as there can be no motivation to combine two references when one reference already contains a complete disclosure, and that the rejection is thus not proper.

The disclosure of Gelles is directed to measuring the velocities of beads in a buffer solution.  Gelles does not, however, discuss or contemplate a "sequence of processing steps."  Because Gelles is directed to processing images of beads without intervening processing steps, it is not relevant to the difficulties inherent in tracking microparticles between successive processing steps, and there would be no motivation to combine Brenner and Gelles.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to

28

Atty. Dkt. No.: 11236

which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 17:  Claims 2-3 are rejected under 35 U.S.C. 103(a) as being unpatentable over Brenner in view of NIH.**

Claims 2-3 stand rejected under 35 U.S.C. § 103(a) over Brenner in view of NIH.  Brenner was published on Apr 25, 1996, after the '505 patent's corrected priority date of October 13, 1994. Therefore, the Brenner reference does not constitute a prior art reference under § 102 to independent claim 1 from which claims 2-3 depend.  Additionally, the Patent Owner does not concede that the NIH Image Manual qualifies as prior art.  The NIH Image Manual does not contain a publication date.  The third-party requestor alleges that because Opalenik, published 1995, refers to NIH Image v. 1.58 (the software), the NIH Image Manual (the publication) is prior art.  However, Opalenik refers only to the software and not to any manual.  Because the request does not provide evidence of when NIH Image Manual, the publication, was available to the public, it can not be considered prior art with respect to the '505 patent.  Even if the alleged 1995 date of the NIH Image Manual is accepted, the manual is dated after the corrected priority date of October 13, 1994.  It is respectfully submitted that the NIH Image Manual does not constitute a prior art reference under § 102 to independent claim 1.  Because neither reference constitutes a prior art reference under § 102, withdrawal of the rejection is respectfully requested.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 28:  Claims 4-6 are rejected under 35 U.S.C. 103(a) as unpatentable over Lee in view of Douglass.**

Claims 4-6 stand rejected under 35 U.S.C. § 103(a) over Lee in view of Douglass.  Lee issued on May 2, 2000, and claims priority to a filing date of September 19, 1997, and Douglass issued on November 21, 2000, and claims priority to March 28, 1997.  Because both references are dated after the '505 patent's corrected priority date of October 13, 1994, the references do not constitute a prior art reference under § 102 to independent claim 1, from which claims 4-6 depend, and it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Lee and Douglass is not proper. For the reasons set forth in the response to SNQ 6, the Patent Owner does not concede that the microparticles claimed in the '505 patent are equivalent to the biological cells imaged by Douglass. As such, there would be no motivation to combine Lee and Douglass. Additionally, the '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array." (Col. 5, lines 56-57). Lee discloses the use of microspheres having a diameter of 1μm as the points of marker triangles on a stretchable membrane. As the membrane is stretched, "[t]hree segment lengths between triangular arrangements of microspheres located 5-20 μm apart" are used to calculate membrane strains. (Lee, col. 8, lines 35-41 and col. 9, lines 22-38). There is no indication in Lee that the microparticles could be tracked if they were closely packed, and it is respectfully submitted that there would be no reason to combine Lee with another reference to reach the inventions claimed in the '505 patent.

As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles. Contrary to the TPR's assertion, Lee does not externally manipulate the environment containing the microparticles as contemplated by the disclosure of the '505 patent. Accordingly, the membrane stretching disclosed by Lee do not constitute a "sequence of processing steps" as disclosed and claimed by the '505 patent.

Similarly, Douglass discloses placing treated cells on a microscope slide without any subsequent processing steps. Following this placement step, images of the cells are recorded and digitally analyzed, without any processing steps as claimed by the '505 patent. The Examiner has not identified any steps in the Douglass reference comprising a "sequence of processing steps," or where Douglass discloses tracking microparticles during more than one such processing step. Because neither Lee nor Douglass teach or even suggest a "sequence of processing steps" as recited by claim 1, independent claim 1 is allowable over the combination of Lee and Douglass. Dependent claims 2-6 are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made. Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 31:  Claims 4-6 are rejected under 35 U.S.C. 103(a) as unpatentable over Lee in view of Gelles.**

Claims 4-6 stand rejected under 35 U.S.C. § 103(a) over Lee in view of Gelles.  Lee issued on May 2, 2000, and claims priority to a filing date of September 19, 1997, after the '505 patent's corrected priority date of October 13, 1994.  Because Lee does not constitute prior art under 35 U.S.C. § 102 to independent claim 1, from which claims 4-6 depend, it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Lee and Gelles is not proper. The '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array."  (Col. 5, lines 56-57).  Lee discloses the use of microspheres having a diameter of 1μm as the points of marker triangles on a stretchable membrane.  As the membrane is stretched, "[t]hree segment lengths between triangular arrangements of microspheres located 5-20 μm apart" are used to calculate membrane strains. (Lee, col. 8, lines 35-41 and col. 9, lines 22-38). There is no indication in Lee that the microparticles could be tracked if they were closely packed, and it is respectfully submitted that there would be no reason to combine Lee with another reference to reach the inventions claimed in the '505 patent.

Lee discloses the use of microspheres having a diameter of 1μm as the points of marker triangles on a stretchable membrane.  As the membrane is stretched, "[t]hree segment lengths between triangular arrangements of microspheres located 5-20 μm apart" are used to calculate membrane strains. (Lee, col. 8, lines 35-41 and col. 9, lines 22-38).  As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles.  Contrary to the TPR's assertion, Lee does not externally manipulate the environment containing the microparticles as contemplated by the disclosure of the '505 patent.  Accordingly, the membrane stretching disclosed by Lee do not constitute a "sequence of processing steps" as disclosed and claimed by the '505 patent.

Similarly, Gelles recites only a single processing step prior to rendering images: beads with adhered kinesin are placed in a buffer solution containing ATP (Page 450, column 2).  After this single step is completed, the beads are observed and their positions recorded, without any processing steps as claimed by the '505 patent.  The motion of beads induced by "molecular level mechanical events associated with individual reaction steps in the catalytic cycles of single enzyme molecules"

31

Atty. Dkt. No.: 11236

(Gelles, abstract) is not a "sequence of processing steps" as provided in claim 1 of the '505 patent. The Office Action does not identify any other action comprising a "sequence of processing steps," nor any processing step that occurs during image rendering. Because neither Lee nor Gelles teach or even suggest a "sequence of processing steps" as recited by claim 1, independent claim 1 is allowable over the combination of Lee and Gelles. Dependent claims 2-6 are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made. Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 32: Claims 4-6 are rejected under 35 U.S.C. 103(a) as unpatentable over Lee in view of Luck.**

Claims 4-6 stand rejected under 35 U.S.C. § 103(a) over Lee in view of Luck. Lee issued on May 2, 2000, and claims priority to a filing date of September 19, 1997, after the '505 patent's corrected priority date of October 13, 1994. Because Lee does not constitute prior art under 35 U.S.C. § 102 to independent claim 1, from which claims 4-6 depend, it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Lee and Luck is not proper. The '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array." (Col. 5, lines 56-57). Lee discloses the use of microspheres having a diameter of 1μm as the points of marker triangles on a stretchable membrane. As the membrane is stretched, "[t]hree segment lengths between triangular arrangements of microspheres located 5-20 μm apart" are used to calculate membrane strains. (Lee, col. 8, lines 35-41 and col. 9, lines 22-38). There is no indication in Lee that the microparticles could be tracked if they were closely packed, and it is respectfully submitted that there would be no reason to combine Lee with another reference to reach the inventions claimed in the '505 patent.

As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles. Contrary to the TPR's assertion, Lee does not externally manipulate the environment containing the microparticles as contemplated by the disclosure of the '505 patent. Accordingly, the

membrane stretching disclosed by Lee do not constitute a "sequence of processing steps" as disclosed and claimed by the '505 patent.

Similarly, Luck is directed to image processing of a static microscope slide, using a first, low-resolution scan and a second, higher resolution scan.  Luck does not, however, discuss or contemplate a "sequence of processing steps."  Thus, even if the combination is proper, independent claim 1 is allowable over the combination of the NIH and Luck references.  Claims 2-6 indirectly depend from independent claim 1, and are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 33:  Claims 4-6 are rejected under 35 U.S.C. 103(a) as unpatentable over Lee in view of Sizto.**

Claims 4-6 stand rejected under 35 U.S.C. § 103(a) over Lee in view of Sitzo.  Lee issued on May 2, 2000, and claims priority to a filing date of September 19, 1997, after the '505 patent's corrected priority date of October 13, 1994.  Because Lee does not constitute prior art under 35 U.S.C. § 102 to independent claim 1, from which claims 4-6 depend, it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Lee and Sitzo is not proper. The '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array."  (Col. 5, lines 56-57).  Lee discloses the use of microspheres having a diameter of 1μm as the points of marker triangles on a stretchable membrane.  As the membrane is stretched, "[t]hree segment lengths between triangular arrangements of microspheres located 5-20 μm apart" are used to calculate membrane strains. (Lee, col. 8, lines 35-41 and col. 9, lines 22-38). There is no indication in Lee that the microparticles could be tracked if they were closely packed, and it is respectfully submitted that there would be no reason to combine Lee with another reference to reach the inventions claimed in the '505 patent.

As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles.  Contrary to the TPR's assertion, Lee does not externally manipulate the environment containing the microparticles as contemplated by the disclosure of the '505 patent.  Accordingly, the

membrane stretching disclosed by Lee do not constitute a "sequence of processing steps" as disclosed and claimed by the '505 patent.

Similarly, Sitzo is directed to image processing of a static sample contained in a capillary tube. Sitzo does not, however, discuss or contemplate imaging the sample "during a sequence of processing steps." The Office Action does not identify any other action comprising a "sequence of processing steps," nor any processing step that occurs during image rendering. Because neither Wilson nor Sitzo teach or even suggests a "sequence of processing steps" as recited by claim 1, independent claim 1 is allowable over the combination of Lee and Sitzo. Dependent claims 4-6 are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made. Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 48: Claims 2-6 are rejected under 35 U.S.C. 103(a) as being unpatentable over Wilson in view of Douglass.**

Claims 2-6 stand rejected under 35 U.S.C. § 103(a) over Wilson in view of Douglass. Wilson was published in 1996, and Douglass issued on November 21, 2000, and claims priority to March 28, 1997. Because both references are dated after the '505 patent's corrected priority date of October 13, 1994, the references do not constitute a prior art reference under § 102 to independent claim 1, from which claims 2-6 depend, and it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Wilson and Douglass is not proper. For the reasons set forth in the response to SNQ 6, the Patent Owner does not concede that the microparticles claimed in the '505 patent are equivalent to the biological cells imaged by Douglass. For the reasons set forth in the response to SNQ 5, the Patent Owner does not concede that the PE-IgG complex disclosed by Wilson constitutes a microparticle as claimed in the '505 patent. As such, neither reference is relevant to tracking the claimed microparticles, there would be no motivation to combine Wilson and Douglass to reach the inventions claimed in the '505 patent.

The '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array." (Col. 5, lines 56-57). However, Wilson specifically notes that "[i]n the images obtained in this work, the observed densities were low, so that distances between

spots were typically >2μm.  Wilson further notes "[t]he intensity probability is only important in crowded areas ... the distance probability provides the most important part of the tracking algorithm."  (Wilson, page 2103, col. 1).Thus, the reference indicates that the method would not be applicable to tracking PE-IgG complexes in high density areas.  Because Wilson does not teach a method of tracking "closely packed" microparticles, it is respectfully submitted that there would be no motivation to combine Wilson with another reference to reach the inventions claimed in the '505 patent.

As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles.  Wilson discloses placing cells on a microscope slide and tracking the movement of the fluorescent PE-IgG complex, without any subsequent processing steps.  Following this placement step, the particles are tracked as they interact with living cells on a microscope slide.  The Examiner has not identified any other steps in the Wilson reference comprising a "sequence of processing steps," or where Wilson discloses tracking microparticles during more than one such processing step.

Similarly, Douglass discloses placing treated cells on a microscope slide without any subsequent processing steps.  Following this placement step, images of the cells are recorded and digitally analyzed, without any processing steps as claimed by the '505 patent.  The Examiner has not identified any steps in the Douglass reference comprising a "sequence of processing steps," or where Douglass discloses tracking microparticles during more than one such processing step.  Because neither Wilson nor Douglass teach or even suggests a "sequence of processing steps" as recited by claim 1, independent claim 1 is allowable over the combination of Wilson and Douglass.  Dependent claims 2-6 are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 50:  Claims 2-6 are rejected under 35 U.S.C. 103(a) as unpatentable over Wilson in view of Gelles.**

Claims 2-6 stand rejected under 35 U.S.C. § 103(a) over Wislon in view of Gelles.  Wilson was published in 1996, after the '505 patent's corrected priority date of October 13, 1994.  Because

Atty. Dkt. No.: 11236

Wilson does not constitute prior art under 35 U.S.C. § 102 to independent claim 1, from which claims 2-6 depend, it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Wilson and Gelles is not proper. For the reasons set forth in the response to SNQ 5, the Patent Owner does not concede that the PE-IgG complex disclosed by Wilson constitutes a microparticle as claimed in the '505 patent. As such, there would be no motivation to combine Wilson and Gelles to reach the inventions claimed in the '505 patent.

The '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array." (Col. 5, lines 56-57). However, Wilson specifically notes that "[i]n the images obtained in this work, the observed densities were low, so that distances between spots were typically >2µm. Wilson further notes "[t]he intensity probability is only important in crowded areas ... the distance probability provides the most important part of the tracking algorithm." (Wilson, page 2103, col. 1). Thus, the reference indicates that the method would not be applicable to tracking PE-IgG complexes in high density areas. Because Wilson does not teach a method of tracking "closely packed" microparticles, it is respectfully submitted that there would be no motivation to combine Wilson with another reference to reach the inventions claimed in the '505 patent.

As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles. Wilson discloses placing cells on a microscope slide and tracking the movement of the fluorescent PE-IgG complex, without any subsequent processing steps. Following this placement step, the particles are tracked as they interact with living cells on a microscope slide. The Examiner has not identified any other steps in the Wilson reference comprising a "sequence of processing steps," or where Wilson discloses tracking microparticles during more than one such processing step.

Similarly, Gelles recites only a single processing step prior to rendering images: beads with adhered kinesin are placed in a buffer solution containing ATP (Page 450, column 2). After this single step is completed, the beads are observed and their positions recorded, without any processing steps as claimed by the '505 patent. The motion of beads induced by "molecular level mechanical events associated with individual reaction steps in the catalytic cycles of single enzyme molecules" (Gelles, abstract) is not a "sequence of processing steps" as provided in claim 1 of the '505 patent.

Atty. Dkt. No.: 11236

The Office Action does not identify any other action comprising a "sequence of processing steps," nor any processing step that occurs during image rendering. Because neither Wilson nor Gelles teach or even suggests a "sequence of processing steps" as recited by claim 1, independent claim 1 is allowable over the combination of Wilson and Gelles. Dependent claims 2-6 are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made. Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 51: Claims 2-6 are rejected under 35 U.S.C. 103(a) as unpatentable over Wilson in view of Sizto.**

Claims 2-6 stand rejected under 35 U.S.C. § 103(a) over Wislon in view of Sitzo. Wilson was published in 1996, after the '505 patent's corrected priority date of October 13, 1994. Because Wilson does not constitute prior art under 35 U.S.C. § 102 to independent claim 1, from which claims 2-6 depend, it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Wilson and Sitzo is not proper. For the reasons set forth in the response to SNQ 6, the Patent Owner does not concede that the cells disclosed by Sitzo constitute microparticles as claimed in the '505 patent. For the reasons set forth in the response to SNQ 5, the Patent Owner does not concede that the PE-IgG complex disclosed by Wilson constitutes a microparticle as claimed in the '505 patent. As such, there would be no motivation to combine Wilson and Sitzo to reach the inventions claimed in the '505 patent.

The '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array." (Col. 5, lines 56-57). However, Wilson specifically notes that "[i]n the images obtained in this work, the observed densities were low, so that distances between spots were typically >2μm. Wilson further notes "[t]he intensity probability is only important in crowded areas ... the distance probability provides the most important part of the tracking algorithm." (Wilson, page 2103, col. 1). Thus, the reference indicates that the method would not be applicable to tracking PE-IgG complexes in high density areas. Because Wilson does not teach a method of tracking "closely packed" microparticles, it is respectfully submitted that there would be no motivation to combine Wilson with another reference to reach the inventions claimed in the '505 patent.

As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles.  Wilson discloses placing cells on a microscope slide and tracking the movement of the fluorescent PE-IgG complex, without any subsequent processing steps.  Following this placement step, the particles are tracked as they interact with living cells on a microscope slide.  The Examiner has not identified any other steps in the Wilson reference comprising a "sequence of processing steps," or where Wilson discloses tracking microparticles during more than one such processing step.

Similarly, Sitzo is directed to image processing of a static sample contained in a capillary tube.  Sitzo does not, however, discuss or contemplate imaging the sample "during a sequence of processing steps."  The Office Action does not identify any other action comprising a "sequence of processing steps," nor any processing step that occurs during image rendering.  Because neither Wilson nor Sitzo teach or even suggests a "sequence of processing steps" as recited by claim 1, independent claim 1 is allowable over the combination of Wilson and Sitzo.  Dependent claims 2-6 are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 52:  Claim 2 is rejected under 35 U.S.C. 103(a) as unpatentable over Wilson in view of DiMilla.**

Claim 2 stands rejected under 35 U.S.C. § 103(a) over Wislon in view of DiMilla.  Wilson was published in 1996, after the '505 patent's corrected priority date of October 13, 1994.  Because Wilson does not constitute prior art under 35 U.S.C. § 102 to independent claim 1, from which claim 2 depends, it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of the Wilson and DiMilla references is not proper.  For the reasons set forth in the response to SNQ 6, the Patent Owner does not concede that the cells disclosed by DiMilla constitute microparticles as claimed in the '505 patent.  For the reasons set forth in the response to SNQ 5, the Patent Owner does not concede that the PE-IgG complex disclosed by Wilson constitutes a microparticle as claimed in the '505 patent.

As such, there would be no motivation to combine Wilson and DiMilla to reach the inventions claimed in the '505 patent.

Wilson and DiMilla do not disclose, and teach away from, the subject matter of claim 2.  In particular, the technique taught by DiMilla is inappropriate for a preferred embodiment of the '505 patent.  The '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array."  (Col. 5, lines 56-57).  However, DiMilla specifically notes that the method employed to track moving cells was applied only to "isolated and spread cells" (DiMilla, page 731, col. 2), and the reference does not indicate that the method would be applicable to cells in close proximity.  Similarly, Wilson specifically notes that "[i]n the images obtained in this work, the observed densities were low, so that distances between spots were typically >2µm.  Wilson further notes "[t]he intensity probability is only important in crowded areas ... the distance probability provides the most important part of the tracking algorithm."  (Wilson, page 2103, col. 1).  Thus, the reference indicates that the method would not be applicable to tracking PE-IgG complexes in high density areas.  Because neither reference teaches a method of tracking "closely packed" microparticles, it is respectfully submitted that there would be no motivation to combine Wilson and DiMilla to reach the inventions claimed in the '505 patent.

DiMilla also states that an "image processing system" was used to track the centroid position of cells.  However, DiMilla does not actually disclose how the centroids were determined.  In fact, the reference states only that individual fields were selected for analysis with a joystick,  and that the algorithm used by the system to track centroids was "semiautomated," that implying that human intervention was required to perform the image processing.  Thus, the DiMilla reference does not necessarily disclose or contemplate a "program of instructions comprising instructions for ... correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images" as provided by claim 1, and "determining the approximate center of each microparticle" as provided by claim 2.  Accordingly, withdrawal of the rejection of claim 2 is respectfully requested.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

Atty. Dkt. No.: 11236

**SNQ 53:  Claims 2-3 are rejected under 35 U.S.C. 103(a) as unpatentable over Wilson in view of NIH.**

Claims 2-3 stand rejected under 35 U.S.C. § 103(a) over Wislon in view of NIH.  Wilson was published in 1996, after the '505 patent's corrected priority date of October 13, 1994.  Therefore, the Wilson reference does not constitute a prior art reference under § 102 to independent claim 1, from which claims 2-3 depend.  Additionally, the Patent Owner does not concede that the NIH Image Manual qualifies as prior art.  The NIH Image Manual does not contain a publication date.  The third-party requestor alleges that because Opalenik, published 1995, refers to NIH Image v. 1.58 (the software), the NIH Image Manual (the publication) is prior art.  However, Opalenik refers only to the software and not to any manual.  Because the request does not provide evidence of when NIH Image Manual, the publication, was available to the public, it can not be considered prior art with respect to the '505 patent.  Even if the alleged 1995 date of the NIH Image Manual is accepted, the manual is dated after the '505 patent's corrected priority date of October 13, 1994.  It is respectfully submitted that the NIH Image Manual does not constitute a prior art reference under § 102.  Because neither reference constitutes a prior art reference under § 102, withdrawal of the rejection is respectfully requested.

It is respectfully submitted that the combination of Wilson and NIH is not proper.  For the reasons set forth in the response to SNQ 5, the Patent Owner does not concede that the PE-IgG complex disclosed by Wilson constitutes a microparticle as claimed in the '505 patent, and the Examiner concedes that "NIH Images does not teach tracking microparticles during a series of processing steps."  (Office Action, page 86).  As such, there would be no motivation to combine Wilson and NIH to reach the inventions claimed in the '505 patent.

The '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array."  (Col. 5, lines 56-57).  However, Wilson specifically notes that "[i]n the images obtained in this work, the observed densities were low, so that distances between spots were typically >2μm.  Wilson further notes "[t]he intensity probability is only important in crowded areas ... the distance probability provides the most important part of the tracking algorithm."  (Wilson, page 2103, col. 1).  Thus, the reference indicates that the method would not be applicable to tracking PE-IgG complexes in high density areas.  Because Wilson does not teach a method of tracking "closely packed" microparticles, it is respectfully submitted that there would be

no motivation to combine Wilson with another reference to reach the inventions claimed in the '505 patent.

As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles. Wilson discloses placing cells on a microscope slide and tracking the movement of the fluorescent PE-IgG complex, without any subsequent processing steps. Following this placement step, the particles are tracked as they interact with living cells on a microscope slide. The Examiner has not identified any other steps in the Wilson reference comprising a "sequence of processing steps," or where Wilson discloses tracking microparticles during more than one such processing step. Similarly, Examiner concedes that "NIH Images does not teach tracking microparticles during a series of processing steps." (Office Action, page 86). Because neither Wilson nor NIH teach or even suggests a "sequence of processing steps" as recited by claim 1, independent claim 1 is allowable over the combination of Wilson and NIH. Dependent claims 2-3 are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made. Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 56: Claims 5-6 are rejected under 35 U.S.C. 103(a) as unpatentable over Dow in view of Douglass.**

Claims 5-6 stand rejected under 35 U.S.C. § 103(a) over Dow in view of Douglass. Douglass issued on November 21, 2000, and claims priority to March 28, 1997, after the '505 patent's corrected priority date of October 13, 1994. Because Douglass does not constitute prior art under 35 U.S.C. § 102 to independent claim 1, from which claims 5-6 depend, it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Dow and Douglass is not proper. Dow does not disclose, and teaches away from the subject matter of claims 1-6. In particular, the box search method of Dow is inappropriate for a preferred embodiment of the '505 patent. The '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array." (Col. 5, lines 56-57). However, Dow specifically notes that the box-search method employed to track moving cells are successful at "low cell densities"

(Abstract, col. 2) and that a "limitation of the box search concerns the possibility that a second cell might intrude into another cell's box.... These problems can be overcome by keeping the cell density low, so that the chances that two cells move within one box radius of each other are slight." (Dow, pages 174-175). Thus, the teachings of the Dow reference are not applicable to the claims of the '505 patent, and there would be no motivation to combine Dow with another reference to reach the claims of the '505 patent.

Even if the Dow reference is considered to be relevant prior art, the reference does not disclose rendering images "during a sequence of processing steps." As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the rendering of images during or between processing steps, *i.e.* external manipulation of the environment containing the microparticles. Dow discloses only a single step: placing live cells on a microscope slide. Following this placement step, the cells are tracked as they move, under their own power, on a microscope slide. Once imaging commences, Dow does not disclose or suggest any processing steps. The Examiner has not identified any other steps in the Dow reference comprising a "sequence of processing steps," or where Dow discloses tracking microparticles during more than one such processing step.

Similarly, Douglass discloses placing treated cells on a microscope slide without any subsequent processing steps. Following this placement step, images of the cells are recorded and digitally analyzed, without any processing steps as claimed by the '505 patent. The Examiner has not identified any steps in the Douglass reference comprising a "sequence of processing steps," or where Douglass discloses tracking microparticles during more than one such processing step. Because neither Dow nor Douglass teach or even suggests a "sequence of processing steps" as recited by claim 1, independent claim 1 is allowable over the combination of Dow and Douglass. Dependent claims 5-6 are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made. Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 64:  Claims 1-3 are rejected under 35 U.S.C. 103(a) as unpatentable over NIH in view of Stern.**

Claims 1-3 stand rejected under 35 U.S.C. § 103(a) over NIH in view of Stern.  The Patent Owner does not concede that the NIH Image Manual qualifies as prior art.  The NIH Image Manual does not contain a publication date.  The third-party requestor alleges that because Opalenik, published 1995, refers to NIH Image v. 1.58 (the software), the NIH Image Manual (the publication) is prior art.  However, Opalenik refers only to the software and not to any manual.  Because the request does not provide evidence of when NIH Image Manual, the publication, was available to the public, it can not be considered prior art with respect to the '505 patent.  Even if the alleged 1995 date of the NIH Image Manual is accepted, the manual is dated after the corrected priority date of October 13, 1994.  It is respectfully submitted that the NIH Image Manual does not constitute a prior art reference under § 102 to independent claim 1, from which claims 2-3 depend. Additionally, Stern was published on November 20, 1997, and claims priority to May 16, 1996, after the '505 patent's corrected priority date of October 13, 1994.   Because neither reference constitutes a prior art reference under § 102 to independent claim 1, withdrawal of the rejection is respectfully requested.

Although the Examiner states that Stern teaches "imaging high density arrays of materials" (Office Action, page 85), the Examiner elsewhere concedes that Stern "does not specifically teach a planar array of microparticles" (Office Action, page 96).  The Examiner does not state that NIH teaches or suggests a planar array of microparticles, and only makes a general statement that NIH is "applicable for analysis of biological material."  (Office Action, page 85).  As neither reference discloses or even suggests a "planar array of microparticles" as provided by claim 1, claim 1 is allowable over the combination of NIH and Stern.  Claims 2-3 depend from claim 1 and are allowable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 66:  Claims 1-6 are rejected under 35 U.S.C. 103(a) as being unpatentable over NIH in view of Luck.**

Claims 1-3 stand rejected under 35 U.S.C. § 103(a) over NIH in view of Luck.  The Patent Owner does not concede that the NIH Image Manual qualifies as prior art.  The NIH Image Manual

does not contain a publication date. The third-party requestor alleges that because Opalenik, published 1995, refers to NIH Image v. 1.58 (the software), the NIH Image Manual (the publication) is prior art. However, Opalenik refers only to the software and not to any manual. Because the request does not provide evidence of when NIH Image Manual, the publication, was available to the public, it can not be considered prior art with respect to the '505 patent. Even if the alleged 1995 date of the NIH Image Manual is accepted, the manual is dated after the corrected priority date of October 13, 1994. It is respectfully submitted that the NIH Image Manual does not constitute a prior art reference under § 102 to independent claim 1, from which claims 2-6 depend. Because the NIH reference does not constitute a prior art reference under § 102 to claim 1, withdrawal of the rejection is respectfully requested.

The Examiner concedes that NIH does not teach "tracking microparticles during a series of processing steps." (Office Action, page 86). However, the Examiner has also failed to identify any teaching in the Luck reference of a "sequence of processing steps." As set forth *supra* in the introductory remarks, claim 1 provides that "during a sequence of processing steps" includes the external manipulation of the environment containing the microparticles. The disclosure of Luck is directed to image processing of a static microscope slide, using a first, low-resolution scan and a second, higher resolution scan. Luck does not, however, discuss or contemplate a "sequence of processing steps." Thus, even if the combination is proper, independent claim 1 is allowable over the combination of the NIH and Luck references. Claims 2-6 indirectly depend from independent claim 1, and are patentable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made. Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 67: Claims 1-6 are rejected under 35 U.S.C. 103(a) as unpatentable over NIH in view of Sizto.**

Claims 1-6 stand rejected under 35 U.S.C. § 103(a) over NIH in view of Sitzo. The Patent Owner does not concede that the NIH Image Manual qualifies as prior art. The NIH Image Manual does not contain a publication date. The third-party requestor alleges that because Opalenik, published 1995, refers to NIH Image v. 1.58 (the software), the NIH Image Manual (the publication) is prior art. However, Opalenik refers only to the software and not to any manual. Because the

request does not provide evidence of when NIH Image Manual, the publication, was available to the public, it can not be considered prior art with respect to the '505 patent. Even if the alleged 1995 date of the NIH Image Manual is accepted, the manual is dated after the corrected priority date of October 13, 1994. It is respectfully submitted that the NIH Image Manual does not constitute a prior art reference under § 102 to independent claim 1, from which claims 2-6 depend. Because the NIH reference does not constitute a prior art reference under § 102 to claim 1, withdrawal of the rejection is respectfully requested.

Furthermore, the Examiner concedes that the NIH reference "does not teach tracking microparticles during a series of processing steps." (Office Action, page 90). However, the Office Action fails to identify any corresponding disclosure in Sitzo, and states only that "Sitzo teaches a computerized method to analyze cells within a cellular sample, such as a blood sample, by generating a plurality of digital images of the cells..." (Office Action, page 90). Sitzo discloses imaging of a fluorescently-labeled fluid sample at different wavelengths, followed by image processing. Sitzo discloses that the sample is held within a container, such as a capillary tube, but does not disclose or suggest any processing steps that occur while the sample is in the capillary for imaging. Indeed, Sitzo specifically teaches that "[a]fter the fluidic sample is reacted with the labeled binding agent, it is diluted and drawn into a capillary. Minimal processing of the biological fluid sample is necessary to practice the method of the present invention." (Sitzo, col. 5, lines 50-53). Based on the foregoing, it neither NIH nor Sitzo teaches rendering images "during a sequence of processing steps." It is respectfully submitted that claim 1 is allowable over NIH in view of Sizto. Because claims 2-6 depend from claim 1, claims 2-6 are allowable for at least the same reasons as claim 1.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made. Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 73: Claims 1-4 are rejected under 35 U.S.C. 103(a) as unpatentable over Stern in view of Zaun.**

Claims 1-4 stand rejected under 35 U.S.C. § 103(a) over Stern in view of Zaun. Stern was published on November 20, 1997, and claims priority to May 16, 1996, after the corrected priority date of October 13, 1994. Because Stern does not constitute prior art under 35 U.S.C. § 102 to

independent claim 1, from which claims 2-4 depend, it is respectfully requested that the rejection be withdrawn.

Furthermore, the Examiner concedes that Stern "does not specifically teach a planar array of microparticles." (Office Action, page 96). It is respectfully submitted that Zaun also fails to disclose the use of microparticles in any manner. In discussing the microparticles of claim 1 with respect to Zaun, the Office Action appear to equate microparticles with nucleic acids ("planar array of amplified nucleic acids Imicroparticles" [sic], Office Action, page 96). The Patent Owner respectfully submits that there is no such equivalency, and that Zaun does not disclose or contemplate the use of "microparticles" as claimed in the '505 patent. The '505 patent clearly and repeatedly distinguishes "microparticles," which act as carriers of nucleotide sequences, from the analytes themselves. (*e.g.*, col. 10, lines 41-48; col. 11, lines 7-9; col. 14, lines 65-68). Moreover, the '505 patent discloses that "microparticles diameters may range from 0.1μm to 100μm." (Col. 10, lines 56-57). Thus, even the smallest microparticles contemplated by the '505 patent are far larger than nucleic acids the TPR mistakenly conflates with microparticles. Finally, equating nucleic acids and microparticles ignores the disclosure of the '505 patent relating to suitable microparticle materials. (*See* col. 10, lines 6-67). Because Zaun does not disclose or contemplate the use of microparticles, and the Examiner has acknowledged that Stern also fails to do so, claim 1 is allowable over the combination of Stern and Zaun. Claims 2-4 depend on claim 1, and are allowable for at least the same reasons as claim 1. Withdrawal of the rejection is respectfully requested.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made. Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 74:  Claims 1-2 are rejected under 35 U.S.C. 103(a) as being unpatentable over Stern in view of DiMilla.**

Claims 1-2 stand rejected under 35 U.S.C. § 103(a) over Stern in view of DiMilla. Stern was published on November 20, 1997, and claims priority to May 16, 1996, after the '505 patent's corrected priority date of October 13, 1994. Because Stern does not constitute prior art under 35 U.S.C. § 102 to independent claim 1, from which claim 2 depends, it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Stern and DiMilla is not proper.  For the reasons set forth in the response to SNQ 6, the Patent Owner does not concede that the microparticles claimed in the '505 patent are equivalent to the biological cells imaged by DiMilla.  As such, neither the Stern reference nor the DiMilla reference is directed to "microparticles" as claimed in the '505 patent.

Additionally, Stern teaches an improved technique for imaging known locations on a fixed, ordered array.  In contrast, DiMilla is directed to tracking the positions of cells moving on a microscope slide to study characteristics of the cells.  Although the TPR asserts employing the techniques taught by DiMilla to the teachings of Stern could "increase the effectiveness of [Stern's] scanning and detection capabilities," Stern is scanning known locations for the presence or absence of fluorescent markers, indicating the presence or absence of a particular nucleotide strand in a sample. (Stern, page 5, lines 6-12; page 10, line 37 through page 11, line 14).  Thus, Stern is not directed to determining positions of objects, or classifying different types of objects in a single image, and the "help" suggested by the TPR is completely unnecessary to the accomplish the goals of the Stern reference.  Because the goals and methods of the Stern and Luck references are so dissimilar,  there would be no motivation to combine the two references.

Moreover, DiMilla does not disclose, and teaches away from, the subject matter of claims 1 and 2.  In particular, the technique taught by DiMilla is inappropriate for a preferred embodiment of the '505 patent.  The '505 patent teaches that "[p]referably, microparticles are disposed in flow chamber (100) in a closely packed planar array."  (Col. 5, lines 56-57).  However, DiMilla specifically notes that the method employed to track moving cells was applied only to "isolated and spread cells" (DiMilla, page 731, col. 2), and the reference does not indicate that the method would be applicable to cells in close proximity.  Thus, DiMilla would not be relevant to "closely packed" microparticles, and there would be no motivation to combine the teachings of the Stern and DiMilla references.

The Examiner concedes that Stern does not teach a planar array of microparticles and does not teach determining the approximate center of each microparticle.  DiMilla states that an "image processing system" was used to track the centroid position of cells.  However, DiMilla does not actually disclose how the centroids were determined.  In fact, the reference states only that individual fields were selected for analysis with a joystick,  and that the algorithm used by the system to track cell centroids was "semiautomated," that implying that human intervention was

required to perform the image processing.  Thus, DiMilla does not necessarily disclose or contemplate a "program of instructions comprising instructions for ... correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images" as provided by claim 1, and "determining the approximate center of each microparticle" as provided by claim 2.  Accordingly, withdrawal of the rejection is respectfully requested.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

**SNQ 75:  Claims 1-6 are rejected under 35 U.S.C. 103(a) as unpatentable over Stern in view of Luck.**

Claims 1-6 stand rejected under 35 U.S.C. § 103(a) over Stern in view of Luck.  Stern was published on November 20, 1997, and claims priority to May 16, 1996, after the corrected priority date of October 13, 1994.  Because Stern does not constitute prior art under 35 U.S.C. § 102 to independent claim 1, from which claims 2-6 depend, it is respectfully requested that the rejection be withdrawn.

Furthermore, it is respectfully submitted that the combination of Stern and Luck is not proper.  Stern teaches an improved technique for imaging known locations on a fixed, ordered array.  Specifically, Stern is directed to scanning known locations for the presence or absence of a fluorescent marker, indicating the presence or absence of a particular nucleotide strand in a sample.  In contrast, Luck is directed to determining the positions of randomly placed cells on a static microscope slide so that successive images of the slide can be compared, and then using filtering techniques to classify dissimilar cells and identify a subpopulation of cells having particular morphological criteria.

Although the TPR asserts employing the techniques taught by Luck could "help increase the effectiveness of [Stern's] scanning and detection system," Stern is scanning known locations for the presence or absence of fluorescent markers.  (Stern, page 5, lines 6-12; page 10, line 37 through page 11, line 14).  Thus, Stern is not directed to determining positions of objects, or classifying different types of objects in a single image, and the "help" suggested by the TPR is completely unnecessary to the accomplish the goals of the Stern reference.  Because the goals and methods of the Stern and Luck references are so dissimilar,  there would be no motivation to combine the two references.

Atty. Dkt. No.: 11236

Additionally, for the reasons set forth in the response to SNQ 6, the Patent Owner does not concede that the microparticles claimed in the '505 patent are equivalent to the biological cells imaged by Luck.  As such, neither the Stern reference nor the Luck reference is directed to "microparticles" as claimed in the '505 patent.  Even if the combination is proper, all claims of the '505 patent are allowable over Stern in view of Luck.

Furthermore, based upon the failure of the Office Action to make any determination of the level of ordinary skill in the art, no *prima facie* case of obviousness under 35 U.S.C. § 103(a) to which the Patent Owner can fully respond has been made.  Patent Owner reserves the right to further respond if the Examiner makes a *prima facie* case of obviousness in the future.

## V. NEW CLAIMS 7-30 ARE PATENTABLE OVER THE PRIOR ART

It is respectfully submitted that claims 7-30 are patentable over the prior art cited by the Examiner for at least the same reasons as independent claims 1-6.  Furthermore, independent claims 10, 14, 15, 16, 17, 28, 29, and 30 are directed to more specific sequences of processing steps which, in combination with the other limitations of these respective claims, are not taught, disclosed or suggested by the prior art relied upon by the Examiner in making the rejections discussed above.

## VI. CONCLUSION

In view of the foregoing amendments and remarks, reconsideration is respectfully requested. This reexamination should now be in condition for allowance; a notice to this effect is respectfully requested.

Respectfully submitted,

*Illumina Inc., Patent Owner*


  _/ James G. Morrow  /_
James G. Morrow
Attorney for Applicants
Registration No. 32,505


Reinhart Boerner Van Deuren s.c.
Attn:  Linda Kasulke, Docket Coordinator
1000 North Water Street, Suite 1700
Milwaukee, WI  53202
(414) 298-8317