# EXHIBIT C

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:        Macevicz, Stephen C.

Title:            METHOD AND COMPOSITIONS FOR ORDERING RESTRICTION
                  FRAGMENTS

Reexam.           95/000,527
Appl. No.:

Reexam.           01/13/2010
Filing Date:

Examiner:         Turner, Sharon L.

Art Unit:         3991

Confirmation      8412
Number:

### TRANSMITTAL OF AMENDMENT AND REPLY IN *INTER PARTES* REEXAMINATION AND PETITION FOR SUSPENSION OF *INTER PARTES* REEXAMINATION PURSUANT TO 37 C.F.R. § 1.987

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

        Transmitted herewith a response in the above-identified application.  Enclosed please

find:

        [ **X** ]    Amendment and Reply in Inter Partes Reexamination (45 pages).

        [ **X** ]    Petition for Suspension of *Inter Partes* Reexamination Pursuant to 37 C.F.R. §
1.987 (6 pages).

        [ **X** ]    Certificate of Service (1 page).

*Reexamination of U.S. Patent No. 7,598,035*  　　　　　　*Atty. Dkt. No. 088947-0141*

[ **X** ]  The fee required for additional claims is calculated below:

| | Claims As Amended | | Previously Granted Claims | | Extra Claims Present | | Rate | | Additional Claims Fee |
|---|---|---|---|---|---|---|---|---|---|
| Total Claims: | 41 | - | 5 | = | 36 | x | $52.00 | = | $1872.00 |
| Independent Claims: | 2 | - | 2 | = | 0 | x | $220.00 | = | $0.00 |
| First presentation of any Multiple Dependent Claims: | | | | | | + | $390.00 | = | $0.00 |
| | | | | | CLAIMS FEE TOTAL | | | = | $1872.00 |

[ ]  Applicant hereby petitions for an extension of time under 37 C.F.R. §1.136(a) for the total number of months checked below:

| | | |
|---|---|---|
| [ ] Extension for response filed within the first month: | $130.00 | $0.00 |
| [ ] Extension for response filed within the second month: | $490.00 | $0.00 |
| [ ] Extension for response filed within the third month: | $1,110.00 | $0.00 |
| [ ] Extension for response filed within the fourth month: | $1,730.00 | $0.00 |
| [ ] Extension for response filed within the fifth month: | $2,350.00 | $0.00 |
| EXTENSION FEE TOTAL: | | $0.00 |
| [ ] Statutory Disclaimer Fee under 37 C.F.R. 1.20(d): | $140.00 | $0.00 |
| CLAIMS, EXTENSION AND DISCLAIMER FEE TOTAL: | | $1872.00 |
| [ X ] Petition Fee For Suspension of Inter Partes Reexamination: | | $400.00 |
| [ ] Small Entity Fees Apply (subtract ½ of above): | | $0.00 |
| Extension Fees Previously Paid: | | $0.00 |
| TOTAL FEE: | | $2272.00 |

The above-identified fees of $2272.00 are being paid by credit card via EFS-Web.

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741.  Should no proper payment be enclosed herewith, as by the credit card payment instructions in EFS-Web being incorrect or absent, resulting in a rejected or incorrect credit card transaction, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.

If any extensions of time are needed for timely acceptance of papers submitted herewith, applicant hereby petitions for such extension under 37 C.F.R. §1.136 and authorizes payment of any such extensions fees to Deposit Account No. 19-0741.

Please direct all correspondence to the undersigned attorney or agent at the address indicated below.

Respectfully submitted,

Date ____MAY 21, 2010____                    By _____

FOLEY & LARDNER LLP                    Charles G. Carter
777 East Wisconsin Ave.                    Attorney for Applicant
Telephone:     (414) 297-5842                    Registration No. 35,093
Facsimile:     (414) 297-4900

*Reexamination of U.S. Patent No. 7,598,035*          *Atty. Dkt. No. 088947-0141*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicant: | Macevicz, Stephen C. |
| Title: | METHOD AND COMPOSITIONS FOR ORDERING RESTRICTION FRAGMENTS |
| Reexam. Appl. No.: | 95/000,527 |
| Reexam. Filing Date: | 01/13/2010 |
| Examiner: | Turner, Sharon L. |
| Art Unit: | 3991 |
| Confirmation Number: | 8412 |

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2010, a true and correct copy of the Amendment and Reply to the Office Action in *Inter Partes* Reexamination, Petition for Suspension of *Inter Partes* Reexamination Pursuant to 37 C.F.R. § 1.987 and related Transmittal Form filed in the above-identified matter, was sent by first class United States mail to:

> Vinson & Elkins, LLP
> Attn: Carolin Spiegel
> First City Tower
> 1001 Fannin Street, Suite 2500
> Houston, Texas 77002-6760

By _____

Charles G. Carter
Reg. No. 35,093

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicant: | Macevicz, Stephen C. |
| Title: | METHOD AND COMPOSITIONS FOR ORDERING RESTRICTION FRAGMENTS |
| Reexam. Appl. No.: | 95/000,527 |
| Reexam. Filing Date: | 01/13/2010 |
| Examiner: | Turner, Sharon L. |
| Art Unit: | 3991 |
| Confirmation Number: | 8412 |

## <u>AMENDMENT AND REPLY TO OFFICE ACTION IN<br>*INTER PARTES* REEXAMINATION</u>

Mail Stop *Inter Partes Reexam*
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

This paper is submitted in response to the Office Action dated March 24, 2010, and the Patent Office Communication dated March 24, 2010.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this document.

**Remarks/Arguments** begin on page 8 of this document.

Please amend the application as follows.

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.  (Original)  A method of forming a linked pair of segments from each fragment of a population of polynucleotide fragments, wherein each said fragment is in a vector, said vector comprises two type IIs restriction endonuclease recognition sites, one of said type IIs restriction endonuclease recognition sites is adjacent to one end of the fragment and another of said type IIs restriction endonuclease recognition sites is adjacent to another end of the fragment, and one or more type IIs restriction endonucleases recognizing said type IIs restriction endonuclease recognition sites have two cleavage sites within the interior of the fragment, the method comprising: treating each said vector and fragment with said one or more type IIs restriction endonucleases recognizing said type IIs restriction recognition sites, such that each fragment is cleaved at said cleavage sites, thereby removing the region of the fragment between said cleavage sites, whereby a pair of segments from said fragment remain connected to each other via said vector after said removing and each of said segments has a cleaved end; and ligating together the cleaved ends produced by said removing thereby forming a linked pair of segments from each said fragment.

2.  (Original)  The method of claim 1 wherein the two type IIs recognition sites are recognized by the same type IIs restriction endonuclease.

3.  (Original)  A method of forming linearized vectors having pairs of segments from a population of polynucleotide fragments, the method comprising the steps of: i) inserting each of said polynucleotide fragments from said population into a vector having two type IIs restriction endonuclease recognition sites and forming vectors containing said polynucleotide fragments such that each of the vectors containing said polynucleotide fragments comprises a fragment

MILW_10087667.1

from said population of polynucleotide fragments, one of said type IIs restriction endonuclease recognition sites in each of the vectors containing said polynucleotide fragments is adjacent to one end of the fragment and another of said type IIs endonuclease recognition sites in each of the vectors containing said polynucleotide fragments is adjacent to another end of the fragment, and one or more type IIs restriction endonucleases recognizing said type IIs restriction endonuclease recognition sites have two cleavage sites within the interior of the fragment; and ii) treating each of the vectors containing said polynucleotide fragments with said one or more type IIs restriction endonucleases recognizing the type IIs restriction endonuclease recognition sites and producing linearized vectors having pairs of segments wherein each of said linearized vectors having pairs of segments has a pair of segments of the fragment, one of said pair of segments is located at one end of each of the linearized vectors, and another of said pair of segments is located at another end of each of the linearized vectors.

4.  (Original)  The method of claim 3, wherein said type IIs recognition sites are recognized by the same type IIs restriction endonuclease.

5.  (Original)  The method of claim 3, further comprising the step of re-circularizing each of the linearized vectors, by ligating the pair of segments together.

6.       (New)  The method of claim 3, wherein the polynucleotide fragments in the population are fragments of a target polynucleotide.

7.       (New)  The method of claim 6, wherein each segment includes a sequence of at least eight nucleotides from the inserted polynucleotide fragment.

8.       (New)  The method of claim 6, wherein the polynucleotide fragments in the population have an average fragment size of at least about one kilobase.

9.       (New)  The method of claim 6, wherein each segment includes a sequence of five to eighteen nucleotides from the inserted polynucleotide fragment.

10.     (New)  The method of claim 6, wherein the population of polynucleotide fragments is formed by multiple enzyme digests of a target polynucleotide.

11.     (New)  The method of claim 6, further comprising amplifying each of the pairs of segments.

12.     (New)  The method of claim 3, wherein each segment includes a sequence of at least eight nucleotides from an end of the corresponding polynucleotide fragment.

13.     (New)  The method of claim 3, wherein producing the linearized vectors comprises producing linearized vectors such that each of said linearized vectors has a blunt ended segment located on each end.

14.     (New)  The method of claim 13, wherein each segment includes a sequence of at least eight nucleotides from the inserted polynucleotide fragment.

15.     (New)  The method of claim 13, wherein the polynucleotide fragments in the population have an average fragment size of at least about one kilobase.

16.     (New)  The method of claim 13, wherein each segment includes a sequence of five to eighteen nucleotides from the inserted polynucleotide fragment.

17.     (New)  The method of claim 3, wherein the polynucleotide fragments in the population have an average fragment size of at least about one kilobase.

18.     (New)  The method of claim 17, wherein each segment includes a sequence of at least eight nucleotides from the inserted polynucleotide fragment.

19.     (New)  The method of claim 17, further comprising amplifying each of the pairs of segments.

20.     (New)  The method of claim 17, wherein each segment includes a sequence of five to eighteen nucleotides from the inserted polynucleotide fragment.

-4-

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

21.     (New)  The method of claim 3, wherein each segment in the pair is a blunt ended segment, which includes a sequence of at least five nucleotides from an end of the inserted polynucleotide fragment.

22.     (New)  The method of claim 21, wherein each segment includes a sequence of at least eight nucleotides from the inserted polynucleotide fragment.

23.     (New)  The method of claim 3, wherein each segment includes a sequence of five to eighteen nucleotides from the inserted polynucleotide fragment.

24.     (New)  The method of claim 3, wherein each segment includes a sequence of at least eight nucleotides from the inserted polynucleotide fragment.

25.     (New)  The method of claim 24, wherein the segments are blunt ended segments.

26.     (New)  The method of claim 3, further comprising amplifying each of the pairs of segments.

27.     (New)  The method of claim 3, wherein the population of polynucleotide fragments is formed by multiple enzyme digests of a target polynucleotide.

28.     (New)  The method of claim 27, wherein the polynucleotide fragments in the population have an average fragment size of at least about one kilobase.

29.     (New)  The method of claim 28, wherein the segments are blunt ended segments including a sequence of at least five nucleotides from the inserted polynucleotide fragment.

30.     (New)  The method of claim 3, wherein the population of polynucleotide fragments is a population of cDNA molecules.

31.    (New)  The method of claim 3, wherein the vector having two type IIs restriction endonuclease recognition sites is a pUC-based plasmid vector or lambda-based phage vector.

32.    (New)  The method of claim 31, wherein each segment in the pair is a blunt ended segment, which includes a sequence of at least five nucleotides from an end of the same inserted polynucleotide fragment.

33.    (New)  The method of claim 31, wherein the polynucleotide fragments in the population have an average fragment size of at least about one kilobase.

34.    (New)  The method of claim 31, wherein producing the linearized vectors comprises, after treating the vectors with the one or more type IIs restriction endonucleases, extending any recessed strands to produce the blunt ended segments.

35.    (New)  The method of claim 31, wherein producing the linearized vectors comprises, after treating the vectors with the one or more type IIs restriction endonucleases, digesting any protruding strands to produce the blunt ended segments.

36.    (New)  The method of claim 31, wherein each linearized vector has a pair of segments from the same polynucleotide fragment, and each segment includes a sequence of at least eight nucleotides from an end of the corresponding polynucleotide fragment.

37.    (New)  The method of claim 3, wherein treating each said vector with said one or more type IIs restriction endonucleases cleaves the inserted polynucleotide fragment at the two cleavage sites, thereby removing a region of the fragment between said cleavage sites, such that the pair of segments from ends portions of the fragment remain connected to each other via the vector.

38.    (New)  The method of claim 1, wherein prior to the ligating step, the cleaved ends are treated to produce blunted ended segments.

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

39.     (New)  The method of claim 1, wherein ligating the cleaved ends of the segments together forms a re-circularized vector; and each linked pair of segments comprises one segment including a nucleotide sequence from one end of the inserted polynucleotide fragment and a second segment includes a nucleotide sequence from an opposite end of the same inserted polynucleotide fragment.

40.     (New)  The method of claim 1, wherein the polynucleotide fragments in the population are fragments of a target polynucleotide.

41.     (New)  The method of claim 1, wherein the polynucleotide fragments in the population are cDNA molecules.

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

## REMARKS

Applicants respectfully request that the foregoing amendments be made prior to re-examination of the present application.

## I.    Notice of Concurrent Proceedings

Pursuant to 37 C.F.R. § 1.985(a), Patent Owner hereby notifies the Examiner that U.S. Pat. No. 7,598,035 is the subject of concurrent litigation in *Life Technologies Corp. v. Illumina, Inc.*, No. 1:09-cv-00706-RK (D.Del., filed Sept. 21, 2009).

Life Technologies filed a Motion to Stay on Apr. 16, 2010, which is fully briefed and awaiting a ruling. The claim construction hearing is scheduled for July 26, 2010, Motions for Summary Judgment are to be filed by Feb. 4, 2011, and trial is scheduled to commence on Jul. 11, 2011.

## II.    Status of the claims

Claims 1 - 5 are original.

Dependent claims 6-41 have been added. Support for these claims may be found in the originally filed application and claims. Particular support for specific newly added claims may be found in the specification of U.S. Pat. No. 7,598,035 ("the '035 Patent") as indicated in the table attached hereto as Appendix A. The amendments add no new matter. Entry and examination thereof is respectfully requested.

Original claims 1-5 and newly submitted claims 6-41 are pending in the reexamination.

## III.    Pending claims

The presently claimed methods provide paired oligonucleotide segments derived from each of the polynucleotide fragments in a population of fragments, such as a population of cDNA molecules or fragments formed by multiple enzyme digests of a target polynucleotide. The

-8-

paired segments can be used to order the polynucleotide fragments and produce a map of a target polynucleotide.  For example, this may be done by ordering the nucleotide sequences of the paired segments, e.g., by matching the nucleotide sequences between pairs, to form a map of the target polynucleotide.

The pending claims provide a method of forming pairs of "segments" derived from each polynucleotide "fragment" in the population.  The segments within any given pair are small pieces from the opposite ends of a single polynucleotide fragment from the population.  The segments have a nucleotide sequence with a sufficient number of nucleotides to have a significant probability that each end nucleotide sequence will be meaningful (within the total set of paired segments).  Where the polynucleotide fragments in the population have been formed by multiple enzyme digests of a target polynucleotide, this end sequence is present in the region adjacent to the terminal restriction site sequence used to generate the polynucleotide fragments via the enzyme digestion.[1]

With respect to claim construction, "[d]uring reexamination, as with original examination, the PTO must give claims their broadest reasonable construction consistent with the specification." (*In re Suitco Surface, Inc.,* __ F.3d __ (Fed. Cir. 2010); citations omitted). However, any construction must "reasonably reflect the plain language and disclosure of the … patent," and that "any such construction be 'consistent with the specification, …and that claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art" (*id.*, citations omitted).  The court emphasized that for claim interpretation, "[t]he broadest-construction rubric coupled with the term 'comprising' *does not give the PTO and unfettered license to interpret claims to embrace anything remotely related to the claimed invention*," and that "*claims should always be read* in light of the specification *and teachings of the underlying patent*." (*Id.*, emphasis added).

Thus, the "segments" recited in the present claims cannot be merely a single nucleotide derived from a "fragment" of only 2 or 3 nucleotides as suggested in the Claim Interpretation section of the Reexam Office Action (see page 5).  A segment of 1-3 bases is repeated so often in

---

[1] U.S. Patent 7,598,035 at column 6, lines 1 - 14.

the human genome and/or in expressed products of a cell that such a small set of nucleotides would not provide any meaningful information, and thus could not provide any meaningful information.[2]   The construction proposed in the Reexam Office Action might be theoretically possible based purely on broadest possible the literal interpretation of thee words.  Such a construction does not make sense, however, when viewed in the context of these terms when read in light of the specification as it would be interpreted by one of ordinary skill in the art.  When properly construed, a "segment" includes a nucleotide sequence with a sufficient number of nucleotides to provide a sequence with a significant probability of being meaningful (within the set of such sequences derived from the end portions of the polynucleotide fragments in the population).

The present vector-segment constructs are formed using a vector having two type IIs restriction endonuclease recognition sites.  *Each polynucleotide fragment* from the *population* is inserted into a vector (see, e.g., the illustration provided in Figure 2 of the '035 Patent – reproduced below).  *For each polynucleotide fragment*, the result is a corresponding vector, which includes two type IIs restriction endonuclease recognition sites (**204**, **212**) which are located adjacent to each end of the inserted polynucleotide fragment (**208**).  As acknowledged by the Claim Interpretation section of the Reexam Office Action (at page 4), the *inserted polynucleotide fragment* is *flanked by* the two type IIs restriction endonuclease *recognition sites*, which were already present on the vector.  The type IIs restriction endonuclease recognition sites are positioned and oriented such that one or more type IIs restriction *endonucleases*[3] recognize the two IIs *recognition sites* and have two corresponding cleavage sites *within the interior* of the inserted fragment.

---

[2]  See, e.g., U.S. Patent 7,598,035 at column 5, line 62 through column 6, line 5.

[3]  Claims 1 and 3 refer to "*one or more* type IIs restriction endonucleases" since the  two type IIs restriction endonuclease recognition sites, which flank the inserted polynucleotide fragment, may be recognized by either the same restriction endonuclease (see Claims 2 and 4) or by two different type IIs restriction endonucleases.



**Figure 2**

Treatment of the vector with one or more restriction endonucleases, which recognize the restriction recognition sites, results in cleavages within the fragment to produce a linearized vector having an end segment (**218**, **220**) of the fragment on each if its ends (with corresponding removal of an interior region of the inserted fragment - **208**).  The reach of the type IIs restriction endonuclease(s) determines the distance of each cleavage site from its corresponding recognition site and consequently determines the size of the nucleotide sequence from the end of the inserted fragment that remains in the resulting segment.  These segments, which remain connected by the linearized vector, may be ligated directly together, generally after treatment to blunt end the cleaved ends of the segments (e.g., with a nuclease such as Mung bean nuclease), thereby forming a "linked pair" of segments derived from the same fragment in a single vector.

To form the segments, in the language of independent Claim 3, each of the vectors is treated with "***said*** one or more type IIs restriction <u>endonucleases</u>" recognizing ***the*** type IIs restriction endonuclease recognition <u>sites</u>.[4]  In other words, the vectors are treated with the same "*one or more type IIs restriction endonucleases*" defined in the previous inserting step as recognizing the two type IIs recognition sites and having two corresponding cleavage sites within the interior of the inserted polynucleotide fragment.  It is thus inherent in the recitation of claim 3 that for each vector having an inserted fragment, treatment with "<u>said</u> one or more type IIs

---

[4] The only antecedent for "<u>said</u> one or more type IIs restriction endonucleases" recited in the treating step of claim 3, is the "one or more type IIs the restriction endonucleases" recited in the last two lines of the inserting step of this claim.

restriction endonucleases," results in cleavage occurring at the two recited cleavage sites *within the interior of the inserted fragment*.   This removes an interior region between the two cleavage sites from the inserted polynucleotide, thereby leaving a pair of segments from the opposite ends of the inserted fragment connected to each other via the vector.  The "treating" step of independent Claim 1 contains similar language producing a similar polynucleotide construct following the type IIs restriction endonuclease cleavage.[5]

Patent Owner notes that neither Claim 1 or Claim 3 recites a vector having "one or more" restriction endonuclease recognition sites, as contended in the Reexam Office Action at page 4. Both independent claims recite a vector having "two type IIs restriction endonuclease recognition sites."  For the reasons discussed above, these two type IIs recognition sites flank and are positioned adjacent to each end of the inserted polynucleotide fragment.  The only recitation of "one or more" in claims 1 and 3 is with respect to the type IIs restriction endonucleases that recognize (i.e., are capable of binding to) the previously recited "two type IIs restriction endonuclease recognition sites."  Contrary to the erroneous assertion in the Claim Interpretation section of the Reexam Office Action (at page 4), nowhere do either Claim 1 or Claim 3 of the '035 Patent contain any recitation of "one or more sites."  The only use of "one or more" in Claims 1 and 3 is with respect to the type IIs restriction endonucleases. [6]

IV.   **Claim rejections – Grounds 1-6**

Claims 1-5 are rejected under 35 U.S.C. § 102(a) as allegedly being anticipated by Mandecki (Ground 1), Szybalski (Ground 2), Cease I (Ground 3), Cease II (Ground 4), Dobrynin (Ground 5) and Kuznedelov (Ground 6).  Applicants respectfully traverse these grounds for rejection.

---

[5] "… cleaved at said cleavage sites, thereby removing the region of the fragment between said cleavage sites, whereby a pair of segments from said fragment remain connected to each other via said vector..."

[6] Claims 1 and 3 include the recitation of "*one or more* type IIs restriction endonucleases," since the two type IIs restriction endonuclease recognition sites, which flank the inserted polynucleotide fragment, may be recognized by either the same restriction endonuclease (see Claims 2 and 4) or by different type IIs restriction endonucleases.

"A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference," and "[t]he identical invention must be shown in as complete detail as is contained in the … claim." (MPEP § 2131, citations omitted.)

Applicants respectfully submit that none of the cited references discloses each and every element of the either Claim 1 or Claim 3 of the '035 Patent. Specifically, none of Mandecki (Ground 1), Szybalski (Ground 2), Cease I (Ground 3), Cease II (Ground 4), Dobrynin (Ground 5) and Kuznedelov (Ground 6) disclose the formation of a plurality of vectors, which collectively provide *pairs of oligonucleotide end segments* derived from each polynucleotide fragment in a *population* of *polynucleotide fragments*.

Instead, as discussed in more detail below for each ground, the references cited as the basis of Grounds 1- 6 are directed to cloning and regenerating pieces of a gene from a vector for use in subsequent ligation to reassemble the full length gene. To achieve such a result, in the methods disclosed in these six references, it is necessary to regenerate the entire sequence of the gene fragment in its original form. In order to regenerate the original polynucleotide sequence (or some specifically mutated version of the original sequence) via type IIs restriction endonuclease cleavage, the entire inserted polynucleotide sequence must be excised from the vector construct. This will not be accomplished if the cleavages occur within the interior of the gene fragment completely cutting off end portions of the gene fragment, which are then left behind attached to the resulting linearized vector. Each of the six cited references positions the type IIs recognition site relative to the inserted gene sequence, such that the portion excised by the type IIs cleavages <u>retains</u> the *entire sequence of the inserted gene fragment*.

Cease I and Cease II (as well as the approach shown in Figure 5 of Szybalski) go even further and teach introducing specifically designed sequences onto the ends of the gene fragment to be cloned. As with the other cited references, the process described in Cease I and II is designed to reversibly clone a DNA fragment and "*regenerate the original blunt fragment regardless of its sequence*."[7] The terminus of the gene fragments are synthesized to have a designer terminal 4 base

---

[7] See, e.g., Cease II, U.S. Patent 5,827,704 at column 2, lines 56-63.

pair designed sequence, which determines the sequence of the short, single strand overhangs resulting from the type IIs enzyme cleavage (i.e., the overhang is not a random sequence resulting from the particular gene fragment, but rather a predetermined sequence).

Not only are the claims not anticipated by the references cited in Grounds 1-6, there is no motivation to modify these references to include the missing feature. In each of the references cited in Grounds 1-6, a linearized vector is formed, which is merely a <u>byproduct</u> of the type IIs restriction endonuclease cleavage reaction. The focus of each reference is entirely on the subsequent use of the <u>excision product</u> (the regenerated gene fragment). The linearized vector is an unwanted byproduct and simply discarded. The six references provide no teaching motivation or suggestion for the subsequent use of the linearized vector for any specific purpose or to retain end pieces of the gene fragment on the linearized vector.

In contrast, present Claims 1 and 3 are <u>not</u> directed to construction of vector for cloning and regeneration of a specific excision product – but instead are directed to providing a large number of vectors, which all together contain <u>each</u> of the polynucleotide fragments <u>from a population</u> of polynucleotides inserted in at least one of the vector constructs. For each vector having an inserted fragment, a region is *removed* from the *interior* of the inserted fragment by treatment with "*said* one or more type IIs restriction endonucleases." The type IIs restriction endonucleases recognize the two type IIs endonuclease recognition sites flanking the inserted fragment in the vector and are oriented to have their corresponding cleavage sites within the interior of the inserted fragment. For each vector construct, the excision process leaves two "segments" derived from opposite ends of the same inserted polynucleotide fragment, attached to a single linearized vector. The segments are of sufficient length so that the number of nucleotides in the end "segments" remaining from the inserted fragment is such that each segment has "a significant probability that each end sequence would be unique."[8] The linearized vector formed in Claim 3 may be re-circularized via ligation,[9] such that the cleaved ends of the two paired segments are ligated directly together (*i.e.*, are linked directly to each other).

---

[8] U.S. Patent 7,598,035 at column 5, line 62 through column 6, line 5.

[9] See recitation of dependent Claim 5 of U.S. Patent 7,598,035.

None of these six cited prior art references teach or suggest such a method.

<u>Ground 1 - Mandecki</u>

Mandecki discloses a method for "synthesis of a gene, or any DNA sequence with a defined sequence." (Mandecki at page 101). The method involves designing and synthesizing oligonucleotides of clonable size ("approx. 100 bp long") and having a 4-nt overlap with their neighboring fragments on the gene. (Mandecki at pages 101, 102, 105). The goal of Mandecki is to synthesize a set of gene fragments that can simply be pooled and then ligated together via unique 4-nt protruding ends of the fragments to provide the corresponding full-length gene sequence. Since the goal of Mandecki is to be able to reassemble the gene from the regenerated oligonucleotide pieces, the cleavage reaction described by Mandecki must regenerate the entire sequence originally inserted into the vector.

Mandecki specifically discloses cloning the oligonucleotides ("gene fragments") cloned between two Fok I sites of a "pWM" vector. (Mandecki at page 102, 104, describing vectors pMW500, 501, 502 and 507). Digestion with Fok I "results in reach over cleavage such that the insert is cut … producing gene fragments with unique 4-nt protruding ends." (Mandecki at 102). Figure 1 of Mandecki (reproduced below) is used to illustrate this portion of the method. As shown in Figure 1, the Fok I sites are positioned such that the protruding ends constitute the last four nucleotides from the end of the inserted gene fragment sequence. As noted in the Office Action and in Figure 1, "*the [pMW] vector also retains a portion of the interior fragment*." (Office Action at page 8, emphasis added). However, this fragment is not designed to serve the function of the "segments" which form the paired segments in the present claims.



**Figure 1**

To synthesize a full-length sequence from the cleaved fragments, the fragments having the 4-nt protruding ends *are separated from the Fok I vector*, the various isolated synthetic fragments are pooled and are then are simply ligated together (*See* Mandecki at 103). As described in Mandecki, of the synthetic fragment excision products allow for the ordered ligation of several gene fragments to reconstruct the desired gene (Mandecki at page 102, 105). The protruding end design assures that during the assembly of the final full-length sequence, the subsequences generated by excision with FokI anneal to each other in the proper arrangement. (Mandecki at page 105). Once these gene fragments are ligated together, the full-length sequence can be cloned into an appropriate vector for further analysis (*see e.g*., Mandecki at page 102, 106).

Additionally, Mandecki does not describe a population of polynucleotides, let alone treating each of the vectors of the mixture of polynucleotides with a Type IIs restriction enzyme. Rather, Mandecki describes synthesizing individual nucleotide sequences, individually putting those sequences in a vector, individually removing the sequence from the vector, and isolating those individual sequences. The set of sequences that form the gene are not combined in any form in Mandecki until after the sequences are purified from the vectors. To find that sequences formed in completely separate reactions and that are processed in completely separate operations (which formation and reactions could be performed days apart) meets the definition of "population" is an improperly broad interpretation of the claim that is inconsistent with the specification of the '035 Patent.

As discussed above, Mandecki is only interested in the *fragments* cut out of (and removed from) from the vectors with Fok I. After the fragment is cleaved from a given pMW vector, Mandecki does not disclose, either expressly or inherently, ligating together the cleaved ends of the segments remaining on the vector to form a linked pair of segments from each said fragment.

Accordingly, Mandecki does not anticipate or suggest the methods recited in pending independent Claims 1 and 3. Reconsideration and withdrawal of the rejection under 35 U.S.C. § 102(a) is respectfully requested.

-16-

Ground 3 and 4 – Cease I and II

Cease I (U.S. patent 5,827,704) describes methods similar to those discussed in Mandecki, where a polynucleotide sequence of interest is inserted into a vector (*e.g.*, an "RPM vector") between type IIs restriction endonuclease recognition sites present in the vector (Cease I at col. 3, lines 1-5, lines 26-42). By selecting and positioning the IIs recognition sites, cleavage with the IIs enzymes results in reversibly cloning the inserted DNA fragment in a manner that can "*precisely regenerate the original blunt end fragment regardless of its sequence.*" In other words, the cleavage in Cease I is designed to excise a polynucleotide fragment so that it retains the entire sequence of the original inserted fragment.

The Reexam Office Action focuses on the disclosure in Cease I that by design the excised fragment has a specific "four-base 5' overhang in the reading fame of choice," for subsequent cloning into an expression vector. (Office Action at page 12; Cease I at col. 2, lines 31-39; and Figure 2). As illustrated by Figure 2, this is the result of the addition of four base pair ds adapters onto the ends of a fragment of unknown sequence.

More specifically, Cease I starts with a fragment and then adds four bases to each end of the fragment by amplifying the fragment with a primer having a four base sequence at the end where the four base sequence does not correspond to any sequence of the fragment.



When cut with the restriction enzymes, it is these four bases that form the four base overhang. Thus, no sequence of the original fragment is part of the four base overhang. The cleavage reactions are designed to leave the entire original unknown sequence intact.

There is no reason or motivation to modify Cease I to supply this element of the present claims that is missing from Cease I. Similar to Mandecki, Cease I is focused on subsequent use of the fragments *cut out of* the vector with the IIs enzyme(s). Once the fragment is removed from the vector, Cease I does not disclose using the linearized vector in any further steps. In particular, Cease I does not disclose the formation of "a re-circularized vector which includes two segments from the same fragments which are ligated directly together in a single vector" by

-17-

ligating the cleaved ends of the linearized vector.  In fact, Cease I makes no mention of further use of the linearized vector.  The only ligations discussed in Cease I involve the *excised* fragments.

Additionally, Cease I does not anticipate the claims because the "gene construction strategies, reversible cloning, and excising and fill-in reaction to generate the original fragments" allegedly taught by Cease I (*see* Office Action at page 12)  do not disclose a vector for such techniques which is a "linearized vector having a first segment of the fragment on one end and a second segment of the fragment on the other end," and no construct intermediate is described which fits this description and which is then re-circularized.  For example, performing PCR on a vector using two primers will result in a linearized amplified product which will then be cut into three pieces if cut at two locations.  Further, no construct intermediate is described which fits this description and which is then re-circularized.

Additionally, Cease I provides no teaching or motivation to treat each of the vectors of the mixture of polynucleotides with a type IIs restriction enzyme.  Rather, Cease I teaches selecting a single polynucleotide at a time that has been separated from the other polynucleotides. (See, e.g., Cease I at 7:3-9 and 8:50-58).

Cease II fails to anticipate or render obvious the claims of the present patent for the same reasons as Cease I.  As noted in the Office Action, "the teachings of Cease II are similar to that of Cease I."  (Office Action at page 13).  In fact, the authors of Cease II and the inventors of Cease I are identical.  Cease II (Gene, 100, 13-26 (1991)) also describes methods similar to those discussed in Mandecki, where a polynucleotide sequence of interest is inserted into a vector (*e.g.*, an "RPM vector") between type IIs restriction endonuclease recognition sites present in the vector.  The IIs recognition sites are positioned so that cleavage with the IIs enzymes results in reversibly cloning the inserted DNA fragment in a manner that can regenerate the original blunt end fragment regardless of its sequence.  In other words, the cleavage is designed to excise a polynucleotide fragment which retains the entire sequence of the original inserted fragment.

Cease II discloses RPM vectors, and methods of generating individual excised fragments with a "4-base 5' overhang of any desired sequence, in the reading frame of choice, without the

-18-

addition of an extraneous sequence." (Cease II at page 250). Like Cease I, Cease II is directed to cloning a fragment of interest into a vector, such as an RPM vector, and then removing the individual fragment from the vector by cleavage with a type IIs restriction enzyme. Again, it is the cleaved *fragment* that is the focus of Cease II. After cleavage, there is no description or disclosure of "a re-circularized vector which includes two segments from the same fragment which are ligated directly together in a single fragment."

And, like Cease I, the "gene construction strategies, reversible cloning, and excising and fill-in reaction to generate the original fragments" do not anticipate the present claims. Again, no vector is disclosed in Cease II for such techniques which is a "linearized vector having a first segment of the fragment on one end and a second segment of the fragment on the other end," and no construct intermediate is described which fits this description and which is then re-circularized.

Accordingly, for at least the reasons stated above, neither Cease I nor Cease II anticipate or suggest pending independent Claims 1 and 3. Reconsideration and withdrawal of the rejections under 35 U.S.C. § 102(b) is respectfully requested.

Ground 2 - Szybalski

Szybalski (Gene, <u>100</u>, 13-26 (1991)) presents a review of class-IIs restriction enzymes, and describes "cloning applications using vectors with type IIs restriction endonuclease sites as well as inserting or excising DNA fragments using Fok I site and/or cleavage." (Office Action at page 10). The Office Action particularly points to Figure 5 of Szybalski which allegedly describes "cloning and precise excision of DNA fragments with unique cohesive ends," and that for the vectors used in these methods "cleavage with Fok I cuts the vector such that segments of the DNA insert are retained (remain connected to each other) in the vector." (Office Action at page 10-11).

Figure 5 of Szybalski is a summary of the pMW vectors and gene synthesis methods described in Mandecki, above (*see* Szybalski at page 20, and Figure 5). The blunt-ended DNA insert depicted in Figure 5, as with the approach described in Cease I and II, includes predetermined short sequences on its ends. Szybalski does not anticipate the claims for the same

reasons as discussed above with regard to Mandecki and Cease I and II. Vectors utilizing type IIs restriction endonucleases other than Fok I are also described in Szybalski (Szybalski at page 20). The process depicted in Figure 5 shows insertion of the same blunt-ended DNA construct disclosed in Cease I and II. The blunt-ended DNA construct has 4 base pair adapter sequences attached to the ends of the unknown fragment sequence so that upon excision from the vector, the resulting excision product has 4-base 5' overhangs with a sequence that can be designed to match specific restriction enzyme sites and facilitate subsequent cloning into an expression vector having corresponding restriction enzyme sites.

With respect to Figure 5, the Office Action alleges that "the method includes forming linked pairs of segments (for example when constructing a gene) from such vectors comprising treating with one or more IIs endonucleases and ligating the cleaved ends." (Office Action at page 11). The Office Action further alleges that the cloning methods of Figure 5 also "includes re-circularization by ligation." (Id.) The only ligations discussed with respect to Figure 5 of Szybalski are ligations of the excised gene fragments to construct a gene.[10] The discussion of the procedure illustrated in Figure 5 makes no mention of any ligation or use of the residual vector construct ("linearized vector") that is a byproduct of the excision step.

Szybalski would also fail to anticipate or render the claims obvious for the same reasons discussed above for Mandecki and Cease. The embodiments reviewed in Szybalski either do not describe a population of polynucleotides and/or do not describe treating each of the vectors of the mixture of polynucleotides with a Type IIs restriction enzyme.

Accordingly, patentees respectfully submit Szybalski and, in particular, Figure 5, the description of Figure 5, and the discussion of Figure 5 in Szybalski fails to anticipate or suggest independent Claims 1 and 3 of U.S. 7,598,035. Withdrawal of the rejection under 35 U.S.C. § 102(b) is respectfully requested.

Ground 5 – Dobrynin

Like the previous four references, Dobrynin describes cloning vectors which are useful for the generation of fragment with unique ends, specifically fragments with "any end nucleotide

---

[10] See discussion at end of the figure legend for Figure 5 in Szybalski.

sequence." (Dobrynin at page 1002; see also Office Action at page 15).  The method disclosed in Dobrynin is designed to permit DNA fragments to be cloned and *regenerated* in their initial form (or as a closely related specifically modified variant).  Nowhere does Dobrynin teach or suggest the formation of a plurality of vectors, which collectively provide <u>pairs of</u> oligonucleotide end <u>segments</u> derived from <u>each</u> polynucleotide <u>fragment</u> in a <u>population</u> of fragments.

Dobrynin describes a family of vectors which include two BbvII sites flanking a blunt-ended cloning site for the insertion of the fragment (see Figure 2 at page 1004).  As stated in Dobrynin, "the main purpose of these plasmids is to clone blunt-end DNA fragments by insertion into a central restriction site between the recognition sections of BbvII." (Dobrynin at pages 1004-1005).  However Dobrynin also discloses cloning into "sticky end" sites as well (*see e.g.*, Dobrynin at page 1005, describing the use of XmaI and SalI sites).  Cleavage using BbvII results in an excised fragment having "sticky ends" useful for cloning into another vector for further analysis. (*See e.g.*, Dobrynin at page 1002).  However, both variations of the method disclosed by Dobrynin are designed for the subsequent regeneration of the inserted fragment from a recombinant plasmid.

In contrast to the Office Action assertion, Dobrynin <u>*does not*</u> disclose re-circularizing the vector including the BbvII sites after the fragment of interest has been removed.  The Office Action points to Figure 1 of Dobrynin and contends that Dobrynin "also notes this circular nature where cleaved vector is subsequently religated." (Office Action at page 15).  Applicants respectfully submit that the Examiner has misconstrued the Figure 1 and the related disclosure.  Figure 1 is a diagram of fragment insertion at site "R" followed by excision with BbvII.  No further use of the vector subsequent to the cleavage is depicted.  Dobrynin states that "[t]he central site R is intended for inserting the fragment to be cloned…and the BbvII sites serves to chip the cloned fragment from the vector." Dobrynin at page 1004.  The description of Figure 1 is reproduced in full, below:

Fig. 1. General structure of pBBV vectors and the principal plan of their use for cloning and ***regenerating DNA fragments***.

Designations for restriction sites: *Bbv*) BBVII (2/6 and 6/2:

locations of upper/lower DNA chain split); *Bam*) BamHI; *Eco*)
EcoRI.

(Dobrynin at page 1003, emphasis added).  In other words, it is clear from the Dobrynin
disclosure that the term "regeneration" relates to the excised fragment, not to the byproduct
linearized pBBV vectors.

Thus, while Dobrynin describes methods of cloning and fragment regeneration, Dobrynin
*does not* disclose re-circularizing the cleaved BBV vectors.  Moreover, Dobrynin does not
disclose "a re-circularized vector which includes two segments from the same fragment which
are ligated directly together in a single vector."

Additionally, Dobrynin does not describe a population of polynucleotides, let alone
treating each of the vectors of the mixture of polynucleotides with a Type IIs restriction enzyme.
Rather, Dobrynin describes synthesizing individual nucleotide sequences, individually putting
those sequences in a vector, individually removing the sequence from the vector, and isolating
those individual sequences.  See, e.g., page 1005 (last two paragraphs).  The set of sequences that
form the gene are not combined in any form in Dobrynin until after the sequences are purified
from the vectors.  To find that sequences formed in completely reactions and that are processed
in completely separated reactions (which formation and reactions could be performed days apart)
meets the definition of "population" is an improperly broad interpretation of the claim that is
inconsistent with the specification of the '035 Patent.

Accordingly, for at least the reasons stated above, Dobrynin does not anticipate the
pending claims, and reconsideration and withdrawal of the rejection under 35 U.S.C. § 102(b) is
respectfully requested.

Ground 6 - Kuznedelov

Kuznedelov discloses the use of the vectors for synthetic DNA fragment for use in
gene assembly (see Kuznedelov at page 842), the same use as described in Mandecki, Szybalski,
and Dobrynin.  As with the five other references discussed above, Kuznedelov describes vectors
which are useful for the cloning and regeneration of synthetic DNA polynucleotides with "unique
terminal nucleotide sequence."  (Kuznedelov at page 842).  This is accomplished by cloning a

-22-

fragment between two type IIs restriction endonuclease recognition sites in the vector.  The vector/fragment is then treated with the IIs restriction enzyme resulting in an *excised fragment* with ends of any arbitrary sequence, e.g., tetra- or pentanucleotide 5'-overhanging ends designed to match a sequence on an adjacent piece of a synthetic gene.

 Additionally, the embodiments of Kuznedelov do not describe a population of polynucleotides and/or treating each of the vectors of the mixture of polynucleotides with a Type IIs restriction enzyme.  Rather, Kuznedelov describes synthesizing individual nucleotide sequences, individually putting those sequences in a vector, individually removing the sequence from the vector, and isolating those individual sequences, or, alternatively, purifying an individual nucleotide out of a mixture for subsequent treatment.  See, e.g., page 842 (first paragraph).  In the first method (like Mandecki), the set of sequences that form the gene are not combined in any form in Kuznedelov until after the sequences are purified from the vectors, and in the second (like Cease) the process is carried out on only a single purified fragment.  Neither of these embodiments meet the elements of the claim.

 The Office Action also asserts that Kuznedelov somehow discloses re-ligation of the cleaved vectors after the fragment of interest has been removed.  For example, the Office Action asserts that "Kuznedelov teaches the general method of claim 1-2 involving linking pairs of segments via cutting such vectors with BbvII Is endonucleases and ligating the cleaved ends" (Office Action at page 16), and that gene assembly, as described in Mandecki, Szybalski and Kuznedelov somehow anticipates the pending claims. (Office Action at page 17).  Again, Applicants respectfully contend that the Examiner misconstrues both Kuznedelov and the other cited references.

 Similar to the previous five references, Kuznedelov *does not* disclose re-circularizing the vector including the type IIs recognition sites after the fragment of interest has been removed.  Instead, Kuznedelov discloses ligation of DNA fragments excised from the vector to controllably forn longer DNA (genes).  Kuznedelov does not disclose a "re-circularized vector which includes two segments from the same fragment that are ligated directly together in a single vector." And, as discussed above, gene assembly methods involving the ligation of a plurality of excision

fragments with unique sticky ends does not anticipate the present claims. Such ligations do not involve a linearized vector, which is produced as a byproduct of the regeneration (excision) of a cloned DNA fragment, in any way.

Accordingly, for at least the reasons stated above, reconsideration and withdrawal of the rejection under 35 U.S.C. § 102(b) over Kuznedelov is respectfully requested.

## V.     Claim rejections – Grounds 7-9

Claims 1-5 are rejected as allegedly being anticipated[11] by Palzkill (Ground 7), Botstein (Ground 8) and Mormeneo (Ground 9). Applicants respectfully traverse these grounds for rejection.

A claim is anticipated only if each and every element as set forth in the claim is found in a single prior art reference. The present claims are not directed to vectors having a particular defined structure. Independent Claims 1 and 3 are directed to *methods* of forming paired oligonucleotide segments derived from each polynucleotide fragment in a population of fragments. The mere fact that a prior art reference may describe a vector construct whose end product of its method is loosely similar in structure to the end products formed in the present methods is totally insufficient to establish anticipation of the present claims, particularly where intermediate products claimed in the claims are not found in the cited references. Pending Claims 1 and 3 are not composition or product by process claims directed to vectors.

Each of Palzkill, Botstein and Mormeneo discloses the use of excision linkers to introduce a modification into a single predetermined site in the interior of a target DNA sequence. The excision linkers, which contain two back-to-back type IIs restriction endonuclease recognition sites ("type IIs recognition sites"), are inserted into the target DNA at single interior site (not adjacent to the ends of the fragments as claimed). The method described in these three references uses digestion of the resulting construct with cognate type IIs restriction

---

[11] Claims 1-5 are rejected under 35 U.S.C. § 102(b) over Palzkill, under 35 U.S.C. § 102(e) over Botstein and under 35 U.S.C. § 102(b) over Mormeno.

endonucleases to modify the target DNA at the predetermined site via the deletion, substitution or insertion of nucleotides in the interior of the target DNA.

In contrast, the language of Claim 3 includes the following recitations:

"…<u>inserting each</u> of said <u>polynucleotide fragment</u>s from said population into a <u>vector having two type IIs restriction endonuclease recognition sites</u>…"

"…such that…<u>one of said</u> type IIs restriction endonuclease recognition <u>sites</u> in each of the vectors containing said polynucleotide fragments is <u>adjacent to one end of the fragment</u> and <u>another of</u> said type IIs endonuclease recognition <u>sites</u> in each of the vectors containing said polynucleotide fragments is <u>adjacent to another end of the fragment</u>…"

Claim 3 thus recites formation of a population of vector constructs each having an inserted polynucleotide fragment flanked by the two type IIs recognition sites in the vector. The method of Claim 1 includes a similar recitation.

A noted above, the three references cited as the basis of Grounds 7-9 describe an entirely different type of method. These three references disclose mutagenesis methods in which two type IIs recognition sites are inserted next to each other at a particular point in the <u>middle</u> of a target polynucleotide fragment. The structure of the excision product described in these references is irrelevant to the elements recited in the present claims, since if anything, the excision product would be the counterpart of the interior region removed from the inserted polynucleotide fragment by the type IIs restriction endonuclease cleavages in the present claims.[12]   The structure of an excised interior region has no relevance to the structure formed in the present method claims, which includes retained end segments from the inserted polynucleotide fragment still connected to each other via the linearized vector.

As a result of the differences discussed above neither Palzkill, Botstein nor Mormeneo disclose or suggest the presently claimed methods, which include cleavage at type IIs cleavage

---

[12]   The excised interior region removed by the type IIs restriction endonuclease cleavages in the present claims does not provide an antecedent basis for any elements subsequently recited in the claims.

sites adjacent flanking either end of a polynucleotide fragment to remove an interior region from the fragment (i.e., this interior region is thus constitutes an excision product) and leave segments from either end of the polynucleotide fragment remaining attached to the resulting linearized vector.

Ground 7 – Palzkill

Palzkill (Proteins, 14:29-44(1992)) describes a mutagenesis technique involving the use of excision linkers to introduce mutations into a gene sequence. (*See* Palzkill at page 31; Figure 2). The excision linkers include two BspM1 recognition sites. (*See* Palzkill at Figures 1 and 2). In the mutagenesis method, the excision linker is inserted into a gene of interest, here the *bla* gene. (See Palzkill at page 30, Figure 2). The Requestor acknowledges that Palzkill's method discloses a technique to "create defined deletions in a target gene DNA sequence." (See Third Party Request at page 26).

The two BspM1 recognition sites described in Palzkill are oriented on the excision linker in "back-to-back" fashion, such that cleavage with BspM1 results in excision of the linker itself together with removal of a set number of bases, which are located immediately adjacent to either end of the inserted excision linker. (See Palzkill at Figure 1B, page 33). These excised gene segments are derived from a short contiguous sequence from the interior of the gene bracketing the predetermined insertion site. Thus, the excised linker includes short *interior segments* of the *bla* gene on each end (at most 8 bases from each end in the example shown in Figure 1). Moreover, two BspM1 recognition sites are also removed as part of the excision product.

The cleaved vector, including the remaining portions of the *bla* gene, may be blunt ended and a second linker ("R-lac linker") may be inserted into the gap in the *bla* gene formed by the BspM1 cleavage. (see Palzkill at page 31, Figure 2). This second linker replaces the short contiguous interior sequence removed by the excision linker with a predetermined sequence. Depending on nature of the second linker, this replacement process can result in a deletion, substitution or insertion of nucleotides in the interior of the *bla* gene.

This insertion of a replacement nucleotide sequence between the cleaved ends is not the same as the ligation, recited in present Claim 1, of the cleaved ends of the two fragment

-26-

segments, which remained attached to the vector after the type IIs restriction endonuclease cleavages.

Accordingly, it is respectfully submitted that Palzkill cannot anticipate or suggest the pending claims. Reconsideration and withdrawal of the rejection under 35 U.S.C. § 102(b) is therefore requested.

Ground 8 – Botstein

Botstein (U.S. Patent No. 5,677,153) is essentially a more detailed version of Palzkill and discloses the same mutagenesis method. The two inventors of the Botstein patent are, in fact, the authors of the Palzkill reference. Botstein discloses mutation methods which also involve inserting an excision linker into a predetermined site of a gene or sequence of interest ("target DNA") (Botstein at col. 3, lines 10-43). The mutation is accomplished by "(1) insertion and removal of a bidirectionally cleaving Class IIS excision linker to remove target nucleotides…[or] (2) insertion and removal of a bidirectionally cleaving Class IIs mutation linker to add mutation nucleotides, and (3) ligation to form modified target DNA." (Botstein at col. 3, lines 15-19). Like Palzkill, the method disclosed in Botstein is entirely different from the presently claimed methods. The recombinant vector constructs disclosed in Botstein do not have type IIs recognition sites adjacent to and flanking the ends of the gene or sequence of interest (target DNA). Instead Botstein's type IIs recognition sites are part of the excision linker inserted at a predetermined site in the middle of the target DNA.

Botstein describes excision linkers in which "[t]he two Class IIS recognition sequences are oriented and positioned such that cleavage sites for cognate Class IIS restriction endonuclease do not lie within the excision linker itself," and that "the cleavage sites lie within the first and second portions of the target DNA on <u>either side of the excision linker insertion site</u>." (Botstein at col. 3, lines 27-34; emphasis added). Thus, Botstein does not anticipate the pending claims for at least the same reasons as Palzkill. Like Palzkill, Botstein does not disclose methods which include forming a vector construct having two type IIs restriction endonuclease recognition sites, which flank a polynucleotide fragment inserted into the vector, as recited in the present claims.

-27-

Rather, the only IIs recognition sites described in Botstein are within the inserted and subsequently removed excision linker (Botstein Figure 2).

Accordingly, Botstein does not anticipate or suggest the pending claims. Reconsideration and withdrawal of the rejection under 35 U.S.C. § 102(b) is respectfully requested.

Ground 9 - Mormeneo

Mormeneo (Gene, 61:21-30 (1987)) also discloses a mutagenesis method using excision linkers which contain "two back-to-back recognition sites for class-IIS restriction endonucleases," and that "[f]ollowing insertion of these linkers into host DNA, digestion with the cognate class-IIS enzyme results in a cleavage upstream and downstream from the adjoining enzyme recognition sites." (Mormeneo at abstract). The excision linkers described in Mormeneo are designed "for the directed *deletion* of a predetermined number of nucleotides *within* a *gene*." (*See e.g.*, Mormeneo at page 24; emphasis added).

For the reasons discussed above with respect to the Palzkill and Botstein references, Mormeneo does not anticipate or suggest the pending claims. Like Palzkill and Botstein, Mormeneo does not disclose a method, as recited in the present claims, which involves binding one or more type IIs restriction endonucleases to two type IIs recognition sites *located in a vector* adjacent to the ends of an *inserted polynucleotide fragment* and cleaving the inserted fragment at the corresponding type IIs cleavage sites within the interior of the inserted fragment. This cuts out the middle region from the inserted fragment leaving the end portions ("segments") of the inserted fragment connected to each other via the vector, which retains the type IIs recognition sites.

Accordingly, nowhere does Mormeneo disclose or suggest a method of forming paired oligonucleotide segments derived from each polynucleotide fragment in a population of fragments. Reconsideration and withdrawal of the rejection under 35 U.S.C. § 102(b) is respectfully requested.

## VI.    **Claim rejections – Grounds 10-31**

Claims 1-5 are rejected under 35 U.S.C. § 103 as allegedly being obvious over Poustka I in view of Mandecki (Ground 10), Szybalski (Ground 11), Cease I (Ground 12), Cease II

(Ground 13), Dobrynin (Ground 14), Kuznedelov (Ground 15), Palzkill (Ground 16), Botstein (Ground 17), Mormeneo (Ground 18), Sapolsky I and Mandecki (Ground 19), and Sapolsky II and Mandecki (Ground 20).

Claims 1-5 are rejected under 35 U.S.C. § 103 as allegedly being obvious over Poustka II in view of Mandecki (Ground 21), Szybalski (Ground 22), Cease I (Ground 23), Cease II (Ground 24), Dobrynin (Ground 25), Kuznedelov (Ground 26), Palzkill (Ground 27), Botstein (Ground 28), Mormeneo (Ground 29), Sapolsky I and Mandecki (Ground 30), and Sapolsky II and Mandecki (Ground 31).

As an initial point, Patent Owner respectfully notes that Poustka II as well as another article authored by Poustka[13] describing "chromosome jumping libraries" were both considered during the original prosecution of the '035 Patent. Poustka I is directed to the same subject matter and is cumulative to these two references. Moreover, for the reasons discussed below it is respectfully submitted that the Poustka articles neither teach nor suggest Claims 1 and 3 of the '035 Patent.

Moreover, the Office Action's stated reason for combining the other references with Poustka I and II is severely deficient. The reason for combining recited in the office action appears to simply be 'a person of skill in the art *could* combine the references.' See, e.g., the Office Action at p. 18 for ground 10 which incorporates the request for reexamination at pages 67-68. However, the office action provides no rationale as to why a person of skill in the art *would* combine the references. This is an insufficient basis to find claims obvious. See MPEP 2143.01. Not only does the office action not provide a rationale for combining the references, Poustka I and II actually contain disclosure that would teach a person of skill in the art away from making the combination. Additionally, even when combined with Poustka I and II, the combinations of references still do not teach or suggest the claimed methods, as discussed in more detail below.

---

[13]   See first page of U.S. 7,598,035 re: citation of Poustka and Lehrach, "Jumping libraries and linking libraries: the next generation in molecular tools in mammalian genetics," *Trends in Genetics*, 2:174-179 (1986) ("Poustka II"); and Poustka and Lehrach, "Chromosome jumping: a long range cloning technique, in *Genetic Engineering: Principles and Methods*, J.K. Setlow, Editor, 10:169-193 (1988).

Poustka I discloses methods of construction and use of "chromosome jumping libraries" for large scale mapping of genomic DNA (Poustka I at abstract, and generally at page 353). As described in Poustka I, the jumping library is constructed by a method that involves circularizing large genomic fragments by a ligation which incorporates a "tag plasmid" (Poustka I at page 353).[14]   The circularized construct is then cleaved with a restriction enzyme, which does not have a cleavage site within the tag plasmid.[15]   Since the location of recognition sites for this restriction enzyme in any given genomic fragment is completely unknown, this effectively results in random cleavage of the genomic fragment. Poustska I teaches that the resulting "arms," i.e., sequences derived from the end pieces of the genomic fragment remaining attached to the tag plasmid after restriction enzyme cleavage, should not have a size less than 500 base pairs, since such relatively short residual sequences could complicate subsequent analysis. (See, e.g., Poustka I at page 354).   The goal of Poustka I is to generate relatively large end sequences from the genomic DNA fragment for subsequent insertion ("cloning") into another vector. .   The use of restriction sites such as those described in Mandecki, Szybalski, Cease I and II, Dobrynin, Kuznedelov, Palzkill, Botstein, Mormeneo, and Sapolsky I and II would entirely frustrate this purpose since those types of restriction sites generate fragments that are orders of magnitude smaller than 500 bases long.

Moreover, Poustka I nowhere mentions or suggests the use of type IIs restriction endonucleases to cleave the genomic fragment. Nor does Poustka I disclose ligating the cleaved ends of the segments of the genomic fragment, which remain connected by the plasmid, thereby re-circularizing the linearized plasmid. Instead, the goal of Poustka I is to clone the cleavage product into another vector using the sticky ends on the arms generated by the restriction enzyme digest.

---

[14]  Poustka I notes that the size of the genomic fragments can be "over hundreds of kb" (*see* Poustka I at 353).

[15]  "The circle is then cleaved at many points by a restriction enzyme not cleaving within the tag plasmid." (Poustka I at page 353).

The disclosure of Poustka II[16] is essentially the same as Pouskta I.  Methods of constructing and using "chromosome jumping libraries" for large scale mapping of genomic DNA are described (see, e.g., Poustka II at abstract, page 174).  The jumping libraries of Poustka II are constructed using the same sequence of steps as described in Poustka I (*see* Pouskta II at pages 174-175, and Figure 2).   As with Poustka I, Poustka II nowhere discloses, teaches or suggests the use of a type IIs restriction endonuclease recognition sites, located on a vector into which the genomic DNA has been inserted, to effect the cleavage reactions within the inserted genomic DNA.  Moreover, Poustka II also teaches that the length of the end fragments, which remain attached to the marker (or "tag") plasmid after restriction enzyme cleavage are limited by the length of a DNA sequence that could subsequently be cloned into another vector (using technology available at the time the reference was published in 1986), i.e., are of substantially greater length than the end fragments generated by the type IIs restriction endonuclease cleavages in the present references attempted to be combined with Poustka I and II.

Moreover, a person of skill in the art would not have been motivated to combine Poustka I and II with the other cited references because, as discussed above, the portion of the cleavage product retained by Poustka I and II is the part discarded as an irrelevant by-product of the other references.  The Office Action provides no credible reason why a person of skill in the art would have looked to references that are directed at recreating the inserted sequence (and discarding the vector) when modifying Poustka I or II.

For the reasons discussed above with respect to Grounds 1-9, none of the secondary references cited in Grounds 10-31 cure the deficiencies in the teachings of Poustka I and II.  The six references discussed above with respect to grounds 1-6, Mandecki, Szybalski, Cease I, Cease II, Dobrynin and Kuznedelov, all disclose the insertion of gene sequences into vectors having type IIs recognition site positioned relative to the inserted gene sequence such that subsequent IIs cleavage <u>retains</u> the *entire sequence of the inserted gene fragment* in the *excision product*.  These methods make no further use of the cleavage byproduct, which retains both of the type IIs

---

[16]    As noted above Poustka II was submitted to the Examiner during the original prosecution of the '035 Patent and listed on its face as a <u>cited reference</u>.  Thus, it is incorrect for the Requestor to state that the disclose of Poustka II "was not cited" during the prosecution of the '035 Patent.

restriction endonuclease recognition sites.  In view of the focus of the secondary references on the *excision product*, one of ordinary skill in the art would have no motivation to combine any of these six references with either Poustka I or II.  Thus these references fail to remedy the deficiencies of Poustka I and II.

     As noted above, the disclosure of Palzkill, Botstein and Mormeneo is directed to the use of excision linkers to introduce a modification into a <u>single</u> <u>predetermined</u> <u>site</u> in the <u>interior</u> of a target DNA.  Neither of these three references mentions or suggests methods of forming <u>paired</u> oligonucleotide <u>segments</u> derived from <u>each</u> polynucleotide <u>fragment</u> in a <u>population</u> of fragments and thus cannot remedy the deficiencies of Poustka I and II with respect to the methods recited in Claims 1 and 3 of the '035 Patent.

     Moreover, as discussed more fully below,  Sapolsky I and Sapolsky II also fail to cure the deficiencies of Poustka I and II.  Sapolsky I and II (also collectively referred to as "Sapolsky") disclose a method for identifying and mapping genomic markers (*see e.g.*, Sapolsky I at 446; Sapolsky II at abstract), which includes capturing a *single* short piece of a genomic fragment between two *adaptors*.  Neither Sapolsky I or Sapolsky II disclose the use of pairs of gene segments in their mapping methods, and nor do these two references disclose (1) a vector having two type IIs restriction endonuclease recognition sites which flank an inserted genomic fragment (i.e., where the gene fragment is inserted into a vector so as to be positioned between the two IIs restriction endonuclease recognition sites on the vector); or (2) a linearized vector having a first segment of a gene fragment on one end and a second segment of the same gene fragment on its other end.

     Accordingly, Poustka I and/or Poustka II and the various secondary references cited in Grounds 10-31 do not anticipate or suggest the methods recited in pending independent Claims 1 and 3.  Reconsideration and withdrawal of the rejection under 35 U.S.C. § 102(a) is respectfully requested.

## VII.  <u>Claim rejections – Grounds 32-49</u>

     Claims 1-5 are rejected under 35 U.S.C. § 103 as allegedly being obvious over Sapolsky I in view of Mandecki (Ground 32), Szybalski (Ground 33), Cease I (Ground 34), Cease II

(Ground 35), Dobrynin (Ground 36), Kuznedelov (Ground 37), Palzkill (Ground 38), Botstein (Ground 39), and Mormeneo (Ground 40).

Claims 1-5 are also rejected under 35 U.S.C. § 103 as allegedly being obvious over Sapolsky II in view of Mandecki (Ground 41), Szybalski (Ground 42), Cease I (Ground 43), Cease II (Ground 44), Dobrynin (Ground 45), Kuznedelov (Ground 46), Palzkill (Ground 47), Botstein (Ground 48), and Mormeneo (Ground 49).

Patent Owners respectfully traverse each of these grounds for rejection. There is no reason to combine the disparate elements of the cited references in the manner asserted by the Requestor. As discussed below, no combination of the cited references results in or suggests the claimed methods.

Patent Owner respectfully disagrees with the assertion that Sapolsky I and II raise a Substantial New Question of Patentability. As acknowledged by the Requestor, Sapolsky I was considered by the Examiner during the original prosecution of the '035 Patent.[17] As with Sapolsky II, Sapolsky I is directed to a method for characterizing gene expression that involves the generation of *only one* 4 bp sequence marker for each clone in a cosmid library. Sapolsky I and II do not teach or suggest the formation of paired nucleotide segments derived from the same polynucleotide fragment in a population. For the reasons discussed below, it is respectfully submitted that the Sapolsky articles do not teach or suggest Claims 1 and 3 of the '035 patent.

Sapolski I and Sapolski II (collectively referred to as "Sapolski") disclose a method for identifying and mapping genomic markers (*see e.g.*, Sapolski I at 446; Sapolski II at abstract). The method involves the generation of *a single* 4 bp sequence marker for each clone in a cosmid library. No pairs of connected marker sequences are generated by the method disclosed in Sapolski. The sequence of these short marker can be determined by hybridization to an oligonucleotide array. (*See e.g.*, Sapolski I at page 448, 450; Sapolski II at Figures 2-4; col. 11, lines 56-57). Each set of 4 bp sequence markers can be used to generate a hybridization profile

---

[17] See first page of U.S. 7,598,035 re: citation of Sapolsky and Lipshultz, "Mapping genomic library clones using oligonucleotide arrays," *Genomics*, 33:445-456 (1996) ("Sapolsky I").

characteristic of the input clone. Each short marker sequence is generated by the following procedure (illustrated in Figure 1 of Sapolsky I, which is reproduced below):[18]



1)   Complete digestion of genomic DNA with a first type IIs restriction endonuclease, such as EarI.

2)   The 5' overhanging ends on the resulting genomic fragments are end filled to create blunt ends.

3)   A first adaptor ("adapter H"), which includes a second type IIs restriction endonuclease recognition site (*e.g.*, HhgaI), is ligated to the blunt ends of the genomic fragment.

4)   Cleavage of the adapter-fragment ligation product with the second IIs restriction endonuclease creates a staggered cut overlying the first IIs recognition site and releases a 31 bp adapter H/marker ds-DNA from the genomic fragment.

5)   A second adaptor is ligated to the unique, 5' overhang created by HhgaI cleavage.

---

[18] *See e.g.*, Sapolski I 447-448; Sapolski II at col. 6, lines 16-35.

The result described in Sapolsky is a 62 bp construct, which contains a very short marker sequence flanked by adaptors H and E (each 26 base pairs long). The captured marker sequence (a nucleotide tetramer, *i.*e., 4 base pair marker sequence, in the example shown in Sapolski) is adjacent to the 6 base pair EarI recognition site in the second adapter (adapter E in Figure 1). (Sapolski I at 447; Table 1; Figure 1). Sapolski II indicate that the range of sizes for this captured marker sequence is from 4 to 10 base pairs. (Sapolski II at Figure 1 and col. 7, lines 51-54).

Nowhere does Sapolski teach or suggest the insertion of a genomic fragment into a vector between two IIs restriction endonuclease recognition sites. Instead, Sapolski creates a construct in which a very short end portion of a genomic fragment is bracketed by two IIs restriction endonuclease recognition sites located on adaptors. One of the IIs recognition sites (on "adapter H") is used to cleave the construct in a manner that releases both IIs recognition sites. The cleavage does not produce a vector having residual nucleotide segments connected to each other via the vector.

Sapolski describes ligation of the *excision product* with a second adapter having a complementary overhang sequence to generate a 62-bp product having the marker tetramer captured between the two adapters. The adapters are each designed to have a PCR primer site to permit subsequent amplification of the *excision product*.

In contrast, the method recited in present Claims 1 and 3 removes the middle ("interior") portion of the inserted polynucleotide and discards this excision product ("interior region" of the inserted polynucleotide fragment). Claims 1 and 3 make no further use or mention of this excision product. It is the residual linearized vector, which is used to generate the paired end segments derived from a single polynucleotide fragment from the population.

Neither Sapolski I nor Sapolski II discloses (1) a vector having two type IIs restriction endonuclease recognition sites which flank a relatively large inserted polynucleotide fragment (i.e., the inserted fragment is positioned between the two IIs restriction endonuclease recognition sites); or (2) a linearized vector having a first segment of the inserted fragment on one end and a second segment of the same inserted fragment on its other end.

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

The Reexam Request asserts, virtually *verbatim*, the same alleged reason to combine the Sapolsky I or Sapolsky II references with Mandecki, Szybalski, Cease I, Cease II, Dobpynin, Kuznedelov, Palzkill, Botstein or Mormeno.   The argument with respect to the Sapolski I / Mandecki combination is reproduced below.

> A person of ordinary skill in the art at the relevant time would have been motivated to modify Sapolsky I as taught by Mandecki, because Sapolsky I taught the advantages of capturing end DNA sequences adjacent to type IIs restriction sites in high-molecular – weight DNA, and Mandecki taught an efficient method for capturing such end DNA sequences.  Sapolsky I discloses a method of capturing end sequences adjacent to restriction sites in high-molecular-weight DNA.  Sapolsky I at 445, Abstract; 446, col.1; Fig. 1.  Specifically, Sapolsky I ligates a DNA adaptor having a type IIs restriction endonuclease recognition site to the ends of restriction fragments such that a type IIs cleaves within the adjacent DNA fragment to produce a linear adaptor attached to an end segment of the DNA fragment. Id. Like Sapolsky I, Mandecki discloses production of a linearized vector with a pair of segments from the ends of an inserted gene fragment.  Mandecki at 102, col. 2, Fig. 1.  Mandecki produces these vectors by using a type IIs restriction endonuclease, thereby capturing both of the end segments of the gene fragment.  Id. at 102, col. 2, Fig. 1. Because Sapolsky I and Mandecki both use type IIs restriction endonucleases to capture end segments of a DNA fragment, it would have been obvious to a person of ordinary skill in the art to modify Sapolsky I to capture end segments as taught by Mandecki.[19]

To begin with, Patent Owner respectfully assert that the Requestor has mischaracterized Sapolsky.  Sapolski *does not* disclose the "production of a linearized vector with a pair of segments from the ends of an inserted gene fragment" as alleged in the Reexam Request.  In fact, Sapolsky *does not disclose, teach or suggest the insertion of a gene fragment into a vector* in the scheme illustrated by the Figure of Sapolski I.  Instead, the Sapolsky methods disclose *capturing a **single** genomic* fragment between two *adaptors*.   Sapolsky does not teach generating a

---

[19] See Re-exam request at pages 204-205, emphasis added.  (*See also* re-exam request at pages 210-211, 216-217, 223, 229, 234-235, 240-241, 247, 253-254).

MILW_10087667.1

connected "pair of segments" derived from opposite ends of a single polynucleotide fragment. Rather the Sapolsky method only involves capturing a *single marker sequence* from one end of a genomic fragment. There is no disclosure, teaching or suggestion in Sapolsky of the capture of two paired nucleotide segments.

The Requester attempts to assert that because Sapolsky I and II and the cited secondary references are merely in the same field, they should be combined. However, the respective teachings are non-overlapping and, as shown by the discussion of the secondary references above, even when combined do not teach the claimed method.

As the Supreme Court held in *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727 (2007), the proper standard for obviousness is "whether there was an apparent reason to combine the know elements in the fashion claimed." KSR, 127 S.Ct. at 1741. The Reexam Requestor states that "[b]ecause Sapolsky I and Mandecki both use type IIs restriction endonucleases to capture end segments of a DNA fragment, it would have been obvious to a person of ordinary skill in the art to modify Sapolsky I to capture end segments as taught by Mandecki." Applicants disagree.

The six references discussed above with respect to grounds 1-6, Mandecki, Szybalski, Cease I, Cease II, Dobrynin and Kuznedelov, all disclose the insertion of gene sequences into vectors having type IIs recognition site positioned relative to the inserted gene sequence such that subsequent IIs cleavage retains the *entire sequence of the inserted gene fragment* in the *excision product*. These methods make no further use of the linearized cleavage byproduct, which retains both of the a type IIs restriction endonuclease recognition sites. The method described in these six references is totally different from Sapolsky's capture between two adapters of a short end sequence from a genomic fragment. In view of this substantial difference in approach, one of ordinary skill in the art would have no motivation to combine the method of any of these six references with either Sapolsky I or II.

The disclosure of Palzkill, Botstein and Mormeneo is directed to the use of excision linkers to introduce a modification into a single predetermined site in the interior of a target DNA. Neither of these three references mentions or suggests methods of forming paired oligonucleotide segments derived from each polynucleotide fragment in a population of

fragments and thus cannot remedy the deficiencies of Sapolsky I and II with respect to the methods recited in Claims 1 and 3 of the '035 Patent.

Accordingly, Sapolsky I and/or Sapolsky II and the various secondary references cited in Grounds 32-49 do not suggest the methods recited in pending independent Claims 1 and 3. Reconsideration and withdrawal of the rejections under 35 U.S.C. § 102(a) based on Sapolsky I and/or Sapolsky II is respectfully requested.


## VIII.   Claim rejections – Grounds 50-58

Claims 1-5 are rejected under 35 U.S.C. § 103 as allegedly being obvious over Velculescu  in view of Mandecki (Ground 50), Szybalski (Ground 51), Cease I (Ground 52), Cease II (Ground 53), Dobrynin (Ground 54), Kuznedelov (Ground 55), Palzkill (Ground 56), Botstein (Ground 57), and Mormeneo (Ground 58).  Applicants respectfully traverse each of these grounds for rejection.

As with Sapolsky I and II, Velculescu fails to disclose (a) a vector having two type IIs restriction endonuclease recognition sites which flank an inserted fragment (i.e., the inserted fragment is positioned between the two IIs restriction endonuclease recognition sites); or (b) a linearized vector having a first segment of a fragment on one end and a second segment of the same fragment on its other end.

Velculescu describes a method for characterizing gene expression that involves the generation of a *single* short (e.g., 9 to 10 bp) nucleotide sequence *tag* for *each cDNA* in a mixture (Velculescu at page 484).  The cDNA, which is biotinylated on its 3' end, is cleaved with a restriction enzyme ("anchoring enzyme") having a 4-bp recognition site.  The 3'-end fragments from the digested cDNA are bound to streptavidin beads to provide anchored fragments which include "a unique site on each transcript that corresponds to the restriction site located closest to the polyadenylated [poly(A)] tail."  The fragment end bearing the restriction site is then ligated to a linker, which includes one type IIs restriction site (for a "tagging enzyme").  The linker is designed so that cleavage of the ligation product with the corresponding tagging enzyme results in release of the linker with a short piece from one end of the cDNA fragment remaining

-38-

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

attached, i.e., the short piece of the cDNA fragment immediately adjacent to the anchoring

enzyme site used to generate the cDNA fragment.  The larger piece of the cDNA fragment,

containing most of the sequence and including its opposite end, remains bound to the streptavidin

bead and is not utilized anywhere the other operations disclosed in Velculescu.  Figure 1 of

Velculescu, illustrating this process is reproduced below.

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*



Velculescu also describes blunt ending the released linker-tags and then ligating the blunt-ended released linker-tags to form dimer products containing two tags (a "ditag") linked tail to tail. This is done to facilitate subsequent PCR amplification, cloning and sequencing operations. Although the ditags are constructs with a type IIs restriction site on the linker portion at each end, since such structures are formed from random ligation of pools of the released linker-tags, the ditags are each made up of ligated short sequences from two different cDNA molecules.[20]   Moreover, the two cDNA segments in these ditags formed from tail to tail ligation of their blunt ended termini and are not connected to each other via a linearized vector.

Thus, Velculescu's method is entirely different from the methods recited in Claims 1 and 3 of the '035 Patent. Velculescu does not disclose or even remotely suggest the formation of a vector, which contains a *pair* of *oligonucleotide end segments,* derived from opposite ends of the

---

[20]  Velculescu states that the "probability of any two tags being coupled in the same ditag is small, even for abundant transcripts. (Velculescu at page 485).

-40-

*same* polynucleotide *fragment*.  The constructs described in Velculescu only have only a *single tag sequence* derived from any *given cDNA molecule.*

For the reasons discussed above with respect to Grounds 1-9, none of the secondary references cited in Grounds 1-9 cure the deficiency in the teachings of Velculescu.  Accordingly, none of the combinations of references asserted as the basis for Grounds 50-58 suggest or render obvious the methods recited in Claims 1 and 3 of the '035 Patent.  Reconsideration and withdrawal of the various rejections under 35 U.S.C. § 103 in view of Velculescu is respectfully requested.

## IX.    Conclusion

For the reasons discussed above, it is respectfully submitted that none of the references cited in the re-examination anticipates or suggests unamended independent Claims 1 and 3 of U.S. 7,598,035.   Claims 2, 4-5 and newly added claims 6-41 all depend from one of these independent claims.  The dependent claims are allowable at least for depending from an independent claim that is not taught or suggested by the cited art of record.  Entry of the additional dependent claims presented herein and favorable consideration of the '035 patent is respectfully requested.

Respectfully submitted,

*Illumina Inc., Patent Owner*

Date ___MAY 27, 2010___          By ___[signature]___

FOLEY & LARDNER LLP                        Charles G. Carter
Customer Number: 26371                     Attorney for Patent Owner
Telephone:    (414) 297-5842               Registration No. 35,093
Facsimile:    (414) 297-4900

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

**CERTIFICATE OF TRANSMISSION UNDER 37 C.F.R. § 1.8(a)**

The undersigned hereby certifies that this document is being electronically filed in accordance with §
1.6(a)(4), on the 2 ˡst day of May, 2010.

Kimberly Vopal
Name

MILW_10087667.1

# APPENDIX A

| Newly Added Claim | Support May be Found in U.S. 7,598,035 at: |
|---|---|
| Claim 6 | Col. 2, lines 25-28 |
| Claim 7 | Col. 6, lines 5-8 |
| Claim 8 | Col. 5, line 66 – Col. 6, line 21 Table 1 (Col. 7) |
| Claim 9 | Col. 5, lines 1-15 |
| Claim 10 | Col. 2, lines 25-28 Col. 4, lines 12-14 |
| Claim 11 | Col. 8, lines 9-11 Col. 11, lines 50-52 |
| Claim 12 | Col. 6, lines 5-8 |
| Claim 13 | Col. 5, lines 30-36 Col. 11, lines 40-44 |
| Claim 14 | Col. 6, lines 5-8 |
| Claim 15 | Col. 5, line 66 – Col. 6, line 21 |
| Claim 16 | Col. 5, lines 1-15 |
| Claim 17 | Col. 5, line 66 – Col. 6, line 21 |
| Claim 18 | Col. 6, lines 5-8 |

## APPENDIX A (Cont.)

| **Newly Added Claim** | **Support May be Found in U.S. 7,598,035 at:** |
|---|---|
| Claim 19 | Col. 8, lines 9-11<br>Col. 11, lines 50-52 |
| Claim 20 | Col. 5, lines 1-15 |
| Claim 21 | Col. 5, lines 30-36<br>Col. 6, lines 1-5 |
| Claim 22 | Col. 6, lines 5-8 |
| Claim 23 | Col. 6, lines 1-17 |
| Claim 24 | Col. 6, lines 1-17 |
| Claim 25 | Col. 5, lines 30-36 |
| Claim 26 | Col. 8, lines 9-11<br>Col. 11, lines 50-52 |
| Claim 27 | Col. 2, lines 25-28<br>Col. 4, lines 12-14 |
| Claim 28 | Col. 5, line 66 –<br>Col. 6, line 21<br>Table 1 (Col. 7) |
| Claim 30 | Col. 2, lines 51-55 |
| Claim 31 | Col. 5, lines 15-18 |
| Claim 32 | Col. 5, lines 30-36<br>Col. 6, lines 1-5 |

# APPENDIX A (Cont.)

| Newly Added Claim | Support May be Found in U.S. 7,598,035 at: |
|---|---|
| Claim 33 | Col. 5, line 66 – Col. 6, line 21 Table 1 (Col. 7) |
| Claim 34 | Col. 5, lines 30-36 |
| Claim 35 | Col. 5, lines 30-36 |
| Claim 36 | Col. 4, lines 17-22 Col. 6, lines 1-17 |
| Claim 37 | Col. 5, lines 20-30 |
| Claim 38 | Col. 5, lines 30-36 |
| Claim 39 | Col. 4, lines 17-22 |
| Claim 40 | Col. 2, lines 25-28 |
| Claim 41 | Col. 2, lines 51-55 |

MILW_10087667.1

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 95000527 |
| **Filing Date:** | 13-Jan-2010 |
| **Title of Invention:** | METHOD AND COMPOSITIONS FOR ORDERING RESTRICTION FRAGMENTS |
| **First Named Inventor/Applicant Name:** | 7598035 |
| **Filer:** | Charles G. Carter/Kimmy Vopal |
| **Attorney Docket Number:** | INV850/4-047REUS |

Filed as Large Entity

### inter partes reexam Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| Reexamination claims in excess of 20 | 1822 | 36 | 52 | 1872 |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| Petition fee- 37 CFR 1.17(f) (Group I) | 1462 | 1 | 400 | 400 |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **2272** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 7666210 |
| **Application Number:** | 95000527 |
| **International Application Number:** | |
| **Confirmation Number:** | 8412 |
| **Title of Invention:** | METHOD AND COMPOSITIONS FOR ORDERING RESTRICTION FRAGMENTS |
| **First Named Inventor/Applicant Name:** | 7598035 |
| **Customer Number:** | 79975 |
| **Filer:** | Charles G. Carter/Kimmy Vopal |
| **Filer Authorized By:** | Charles G. Carter |
| **Attorney Docket Number:** | INV850/4-047REUS |
| **Receipt Date:** | 21-MAY-2010 |
| **Filing Date:** | 13-JAN-2010 |
| **Time Stamp:** | 19:56:05 |
| **Application Type:** | inter partes reexam |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $2272 |
| RAM confirmation Number | 7050 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

| 1 | Trans Letter filing of a response in a reexam | Transmittal.pdf | 410464<br><br>0883a04f0650f3dd0fb9d5a5488371e1bc6af9f0 | no | 3 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | Reexam Certificate of Service | Cert_of_Service.pdf | 124875<br><br>8fc2a3d2ef6dc3161a386124a09658d7fc835d8 | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 3 | Reexam Miscellaneous Incoming Letter | Petition.pdf | 1010280<br><br>a175df38e2761bbc36780115dca7622b671526b7 | no | 6 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 4 | Response after non-final action-owner timely | Amend_Reply.pdf | 393050<br><br>0f52a54067bcb990db03624fc812f1da1d4ff72c | no | 45 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 5 | Fee Worksheet (PTO-875) | fee-info.pdf | 31852<br><br>30e040ef80396ae4ce9eca5935d42119dd850296 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | | **Total Files Size (in bytes):** | 1970521 |
|---|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicant: | Macevicz, Stephen C. |
| Title: | METHOD AND COMPOSITIONS FOR ORDERING RESTRICTION FRAGMENTS |
| Reexam. Appl. No.: | 95/000,527 |
| Reexam. Filing Date: | 01/13/2010 |
| Examiner: | Turner, Sharon L. |
| Art Unit: | 3991 |
| Confirmation Number: | 8412 |

## <u>COMMUNICATION</u>

Mail Stop *Inter Partes Reexam*
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

      An AMENDMENT AND REPLY TO OFFICE ACTION IN *INTER PARTES* REEXAMINATION, was filed in the above-identified reexamination on May 21, 2010. In response to a request received via telephone from the U.S. Patent and Trademark Office earlier today, Patent Owner is hereby submitting a revised version of the first seven pages of the AMENDMENT AND REPLY. The AMENDMENT AND REPLY has been edited to underline newly submitted claims 6-41, in compliance with the request made by the U.S. PTO. Please replace pages three (3) through seven (7) of the AMENDMENT AND REPLY filed on May 21st with the corresponding pages submitted herewith.

Since the claims fee for the newly added claims was paid with the original submission of the AMENDMENT AND REPLY on May 21, 2010, Patent Owner believes that no additional fees are due for this submission. The Commissioner is, however, hereby authorized to charge any additional fees which may be required regarding this reexamination under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741. Should no proper payment be enclosed herewith, as by the credit card payment instructions in EFS-Web being incorrect or absent, resulting in a rejected or incorrect credit card transaction, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.

Respectfully submitted,

Date __MAY 21 2010__         By _____

FOLEY & LARDNER LLP                 Charles G. Carter
777 East Wisconsin Ave.             Attorney for Patentee Owner
Telephone:    (414) 297-5842        Registration No. 35,093
Facsimile:    (414) 297-4900

*Reexamination of U.S. Patent No. 7,598,035*                     *Atty. Dkt. No. 088947-0141*

---

**CERTIFICATE OF TRANSMISSION UNDER 37 C.F.R. § 1.8(a)**

The undersigned hereby certifies that this document is being electronically filed in accordance with § 1.6(a)(4), on the 24th day of May, 2010.

_____
Name

---

*Reexamination of U.S. Patent No. 7,598,035*          *Atty. Dkt. No. 088947-0141*

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:      Macevicz, Stephen C.

Title:          METHOD AND COMPOSITIONS FOR ORDERING RESTRICTION
                FRAGMENTS

Reexam.         95/000,527
Appl. No.:

Reexam.         01/13/2010
Filing Date:

Examiner:       Turner, Sharon L.

Art Unit:       3991

Confirmation    8412
Number:

### AMENDMENT AND REPLY TO OFFICE ACTION IN
### *INTER PARTES* REEXAMINATION

Mail Stop *Inter Partes Reexam*
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

  This paper is submitted in response to the Office Action dated March 24, 2010, and the

Patent Office Communication dated March 24, 2010.

  **Amendments to the Claims** are reflected in the listing of claims which begins on page 2

of this document.

  **Remarks/Arguments** begin on page 8 of this document.

  Please amend the application as follows.

-1-

*Reexamination of U.S. Patent No. 7,598,035*                 *Atty. Dkt. No. 088947-0141*

## Amendments to the Claims:

This listing of claims will replace all prior versions, and listings, of claims in the application.

## Listing of Claims:

1.    (Original)  A method of forming a linked pair of segments from each fragment of a population of polynucleotide fragments, wherein each said fragment is in a vector, said vector comprises two type IIs restriction endonuclease recognition sites, one of said type IIs restriction endonuclease recognition sites is adjacent to one end of the fragment and another of said type IIs restriction endonuclease recognition sites is adjacent to another end of the fragment, and one or more type IIs restriction endonucleases recognizing said type IIs restriction endonuclease recognition sites have two cleavage sites within the interior of the fragment, the method comprising: treating each said vector and fragment with said one or more type IIs restriction endonucleases recognizing said type IIs restriction recognition sites, such that each fragment is cleaved at said cleavage sites, thereby removing the region of the fragment between said cleavage sites, whereby a pair of segments from said fragment remain connected to each other via said vector after said removing and each of said segments has a cleaved end; and ligating together the cleaved ends produced by said removing thereby forming a linked pair of segments from each said fragment.

2.    (Original)  The method of claim 1 wherein the two type IIs recognition sites are recognized by the same type IIs restriction endonuclease.

3.    (Original)  A method of forming linearized vectors having pairs of segments from a population of polynucleotide fragments, the method comprising the steps of: i) inserting each of said polynucleotide fragments from said population into a vector having two type IIs restriction endonuclease recognition sites and forming vectors containing said polynucleotide fragments such that each of the vectors containing said polynucleotide fragments comprises a fragment

-2-

from said population of polynucleotide fragments, one of said type IIs restriction endonuclease recognition sites in each of the vectors containing said polynucleotide fragments is adjacent to one end of the fragment and another of said type IIs endonuclease recognition sites in each of the vectors containing said polynucleotide fragments is adjacent to another end of the fragment, and one or more type IIs restriction endonucleases recognizing said type IIs restriction endonuclease recognition sites have two cleavage sites within the interior of the fragment; and ii) treating each of the vectors containing said polynucleotide fragments with said one or more type IIs restriction endonucleases recognizing the type IIs restriction endonuclease recognition sites and producing linearized vectors having pairs of segments wherein each of said linearized vectors having pairs of segments has a pair of segments of the fragment, one of said pair of segments is located at one end of each of the linearized vectors, and another of said pair of segments is located at another end of each of the linearized vectors.

4.      (Original)  The method of claim 3, wherein said type IIs recognition sites are recognized by the same type IIs restriction endonuclease.

5.      (Original)  The method of claim 3, further comprising the step of re-circularizing each of the linearized vectors, by ligating the pair of segments together.

6.      (New)  The method of claim 3, wherein the polynucleotide fragments in the population are fragments of a target polynucleotide.

7.      (New)  The method of claim 6, wherein each segment includes a sequence of at least eight nucleotides from the inserted polynucleotide fragment.

8.      (New)  The method of claim 6, wherein the polynucleotide fragments in the population have an average fragment size of at least about one kilobase.

9.      (New)  The method of claim 6, wherein each segment includes a sequence of five to eighteen nucleotides from the inserted polynucleotide fragment.

10.    (New)  The method of claim 6, wherein the population of polynucleotide fragments is formed by multiple enzyme digests of a target polynucleotide.

11.    (New)  The method of claim 6, further comprising amplifying each of the pairs of segments.

12.    (New)  The method of claim 3, wherein each segment includes a sequence of at least eight nucleotides from an end of the corresponding polynucleotide fragment.

13.    (New)  The method of claim 3, wherein producing the linearized vectors comprises producing linearized vectors such that each of said linearized vectors has a blunt ended segment located on each end.

14.    (New)  The method of claim 13, wherein each segment includes a sequence of at least eight nucleotides from the inserted polynucleotide fragment.

15.    (New)  The method of claim 13, wherein the polynucleotide fragments in the population have an average fragment size of at least about one kilobase.

16.    (New)  The method of claim 13, wherein each segment includes a sequence of five to eighteen nucleotides from the inserted polynucleotide fragment.

17.    (New)  The method of claim 3, wherein the polynucleotide fragments in the population have an average fragment size of at least about one kilobase.

18.    (New)  The method of claim 17, wherein each segment includes a sequence of at least eight nucleotides from the inserted polynucleotide fragment.

19.    (New)  The method of claim 17, further comprising amplifying each of the pairs of segments.

20.    (New)  The method of claim 17, wherein each segment includes a sequence of five to eighteen nucleotides from the inserted polynucleotide fragment.

*Reexamination of U.S. Patent No. 7,598,035*                    *Atty. Dkt. No. 088947-0141*

21.     (New)  The method of claim 3, wherein each segment in the pair is a blunt ended segment, which includes a sequence of at least five nucleotides from an end of the inserted polynucleotide fragment.

22.     (New)  The method of claim 21, wherein each segment includes a sequence of at least eight nucleotides from the inserted polynucleotide fragment.

23.     (New)  The method of claim 3, wherein each segment includes a sequence of five to eighteen nucleotides from the inserted polynucleotide fragment.

24.     (New)  The method of claim 3, wherein each segment includes a sequence of at least eight nucleotides from the inserted polynucleotide fragment.

25.     (New)  The method of claim 24, wherein the segments are blunt ended segments.

26.     (New)  The method of claim 3, further comprising amplifying each of the pairs of segments.

27.     (New)  The method of claim 3, wherein the population of polynucleotide fragments is formed by multiple enzyme digests of a target polynucleotide.

28.     (New)  The method of claim 27, wherein the polynucleotide fragments in the population have an average fragment size of at least about one kilobase.

29.     (New)  The method of claim 28, wherein the segments are blunt ended segments including a sequence of at least five nucleotides from the inserted polynucleotide fragment.

30.     (New)  The method of claim 3, wherein the population of polynucleotide fragments is a population of cDNA molecules.

MILW_10089374.1

31.    (New)  The method of claim 3, wherein the vector having two type IIs restriction endonuclease recognition sites is a pUC-based plasmid vector or lambda-based phage vector.

32.    (New)  The method of claim 31, wherein each segment in the pair is a blunt ended segment, which includes a sequence of at least five nucleotides from an end of the same inserted polynucleotide fragment.

33.    (New)  The method of claim 31, wherein the polynucleotide fragments in the population have an average fragment size of at least about one kilobase.

34.    (New)  The method of claim 31, wherein producing the linearized vectors comprises, after treating the vectors with the one or more type IIs restriction endonucleases, extending any recessed strands to produce the blunt ended segments.

35.    (New)  The method of claim 31, wherein producing the linearized vectors comprises, after treating the vectors with the one or more type IIs restriction endonucleases, digesting any protruding strands to produce the blunt ended segments.

36.    (New)  The method of claim 31, wherein each linearized vector has a pair of segments from the same polynucleotide fragment, and each segment includes a sequence of at least eight nucleotides from an end of the corresponding polynucleotide fragment.

37.    (New)  The method of claim 3, wherein treating each said vector with said one or more type IIs restriction endonucleases cleaves the inserted polynucleotide fragment at the two cleavage sites, thereby removing a region of the fragment between said cleavage sites, such that the pair of segments from ends portions of the fragment remain connected to each other via the vector.

38.    (New)  The method of claim 1, wherein prior to the ligating step, the cleaved ends are treated to produce blunted ended segments.

39.    (New)  The method of claim 1, wherein ligating the cleaved ends of the segments together forms a re-circularized vector; and each linked pair of segments comprises one segment including a nucleotide sequence from one end of the inserted polynucleotide fragment and a second segment includes a nucleotide sequence from an opposite end of the same inserted polynucleotide fragment.

40.    (New)  The method of claim 1, wherein the polynucleotide fragments in the population are fragments of a target polynucleotide.

41.    (New)  The method of claim 1, wherein the polynucleotide fragments in the population are cDNA molecules.

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 95000527 |
| **Filing Date:** | 13-Jan-2010 |
| **Title of Invention:** | METHOD AND COMPOSITIONS FOR ORDERING RESTRICTION FRAGMENTS |
| **First Named Inventor/Applicant Name:** | 7598035 |
| **Filer:** | Charles G. Carter/Kimmy Vopal |
| **Attorney Docket Number:** | INV850/4-047REUS |

Filed as Large Entity

## inter partes reexam Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| Petition fee- 37 CFR 1.17(f) (Group I) | 1462 | 1 | 400 | 400 |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **400** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 7676631 |
| **Application Number:** | 95000527 |
| **International Application Number:** | |
| **Confirmation Number:** | 8412 |
| **Title of Invention:** | METHOD AND COMPOSITIONS FOR ORDERING RESTRICTION FRAGMENTS |
| **First Named Inventor/Applicant Name:** | 7598035 |
| **Customer Number:** | 79975 |
| **Filer:** | Charles G. Carter/Kimmy Vopal |
| **Filer Authorized By:** | Charles G. Carter |
| **Attorney Docket Number:** | INV850/4-047REUS |
| **Receipt Date:** | 24-MAY-2010 |
| **Filing Date:** | 13-JAN-2010 |
| **Time Stamp:** | 18:52:48 |
| **Application Type:** | inter partes reexam |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 400 |
| RAM confirmation Number | 8663 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

| 1 | Trans Letter filing of a response in a reexam | Transmittal.pdf | 362511<br>934842c8f7713b38c5496c9248b84ad1968c2d49 | no | 3 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | Reexam Miscellaneous Incoming Letter | Communication.pdf | 1363281<br>7471f1c57be577d361f0e44facd9f0209dafb4cc | no | 10 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 3 | Reexam Certificate of Service | Cert_of_Service.pdf | 124309<br>87632f804c9f14df79a26538ce3b5c97722153df | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 4 | Reexam Miscellaneous Incoming Letter | Petition.pdf | 28922<br>699715babda51be6609702aa2406e1960f76196f | no | 3 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 5 | Fee Worksheet (PTO-875) | fee-info.pdf | 30165<br>2d4ea54d55edc02f4d9bb52d84a5c9092e22953a | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | **Total Files Size (in bytes):** | 1909188 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

# EXHIBIT D

# THE

# AMERICAN

# HERITAGE®

# DICTIONARY

## OF THE

### ENGLISH LANGUAGE

THIRD EDITION



**HOUGHTON MIFFLIN COMPANY**

*Boston · New York*

CHET01439264

Words are included in this Dictionary on the basis of their usage. Words that are known to have current trademark registrations are shown with an initial capital and are also identified as trademarks. No investigation has been made of common-law trademark rights in any word, because such investigation is impracticable. The inclusion of any word in this Dictionary is not, however, an expression of the Publisher's opinion as to whether or not it is subject to proprietary rights. Indeed, no definition in this Dictionary is to be regarded as affecting the validity of any trademark.

American Heritage® and the eagle logo are registered trademarks of Forbes Inc. Their use is pursuant to a license agreement with Forbes Inc.

Houghton Mifflin Company gratefully acknowledges Mead Data Central, Inc., providers of the LEXIS®/NEXIS® services, for its assistance in the preparation of this edition of *The American Heritage® Dictionary.*

Copyright © 1996, 1992 by Houghton Mifflin Company. All rights reserved.

No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, or by any information storage or retrieval system without the prior written permission of Houghton Mifflin Company unless such copying is expressly permitted by federal copyright law. Address inquiries to Reference Permissions, Houghton Mifflin Company, 222 Berkeley Street, Boston, MA 02116.

*Library of Congress Cataloging-in-Publication Data*

The American heritage dictionary of the English language. —3rd ed.
  p.   cm.
  ISBN 0-395-44895-6
  1. English language—Dictionaries.
PE1628.A623   1992          92-851
423—dc20                 CIP

Manufactured in the United States of America

For information about this and other Houghton Mifflin trade and reference books and multimedia products, visit The Bookstore at Houghton Mifflin on the World Wide Web at http://www.hmco.com/trade/.

CHET01439265



of regular additions or contributions: *accumulating a fund by increments.* **5.** *Mathematics.* A small positive or negative change in the value of a variable. [Middle English, from Latin *incrēmentum,* from *incrēscere,* to increase. See INCREASE.] **—in′cre·men′tal** (-měn′tl) *adj.* **—in′cre·men′tal·ly** *adv.*

**in·cre·men·tal·ism** (ĭn′krə-měn′tl-ĭz′əm) *n.* Social or political gradualism. **—in′cre·men′tal·ist** *n.*

**in·cres·cent** (ĭn-krěs′ənt) *adj.* Showing a progressively larger lighted surface; waxing: *the increscent moon.* [Latin *incrēscēns, incrēscent-,* present participle of *incrēscere,* to increase. See INCREASE.]

**in·cre·tion** (ĭn-krē′shən) *n.* **1.** The process of internal secretion characteristic of endocrine glands. **2.** The product of this process; a hormone. [IN−[2] + (SE)CRETION[1].]

**in·crim·i·nate** (ĭn-krĭm′ə-nāt′) *tr.v.* **-nat·ed, -nat·ing, -nates.** **1.** To accuse of a crime or other wrongful act. **2.** To cause to appear guilty of a crime or fault; implicate: *testimony that incriminated the defendant.* [Late Latin *incrīmināre, incrīmināt-* : Latin *in-,* causative pref.; see IN−[2] + Latin *crīmen, crīmin-,* crime; see CRIME.] **—in·crim′i·na′tion** *n.* **—in·crim′i·na·to′ry** (-nə-tôr′ē, -tōr′ē) *adj.*

**in·crust** (ĭn-krŭst′) *v.* Variant of **encrust.**

**in·crus·ta·tion** (ĭn′krŭ-stā′shən) also **en·crus·ta·tion** (ěn′-) *n.* **1. a.** The act of encrusting. **b.** The state of being encrusted. **2.** A material encrusted on a surface. **3.** *Biology.* A coating of hardened exudate or other material on a body or body part; a scale or scab.



**incubator**

**in·cu·bate** (ĭn′kyə-bāt′, ĭng′-) *v.* **-bat·ed, -bat·ing, -bates.** *—tr.* **1.** To sit on (eggs) to provide heat, so as to promote embryonic development and the hatching of young; brood. **2. a.** To maintain (eggs, organisms, or living tissue) at optimal environmental conditions for growth and development. **b.** To maintain (a chemical or biochemical system) under specific conditions in order to promote a particular reaction. **3.** To form or consider slowly and protectively, as if hatching: *incubated the idea for a while, then announced it.* *—intr.* **1.** To brood eggs. **2.** To develop and hatch. **3.** To undergo incubation. [Latin *incubāre, incubāt-,* to lie down on : *in-,* on; see IN−[2] + *cubāre,* to lie down.] **—in′cu·ba′tive** *adj.*

**in·cu·ba·tion** (ĭn′kyə-bā′shən, ĭng′-) *n.* **1. a.** The act of incubating. **b.** The state of being incubated. **2.** *Medicine.* The development of an infection from the time the pathogen enters the body until signs or symptoms first appear. **3.** *Medicine.* The maintenance of an infant, especially a premature infant, in an environment of controlled temperature, humidity, and oxygen concentration in order to provide optimal conditions for growth and development. **—in′cu·ba′tion·al** *adj.*

**in·cu·ba·tor** (ĭn′kyə-bā′tər, ĭng′-) *n.* **1.** An apparatus in which environmental conditions, such as temperature and humidity, can be controlled, often used for growing bacterial cultures, hatching eggs artificially, or providing suitable conditions for a chemical or biological reaction. **2.** *Medicine.* An apparatus for maintaining an infant, especially a premature infant, in an environment of controlled temperature, humidity, and oxygen concentration. **3.** A place or situation that permits or encourages the formation and development, as of new ideas: *the college campus as an incubator of radical new sociological concepts.*

**in·cu·bus** (ĭn′kyə-bəs, ĭng′-) *n., pl.* **-bus·es** or **-bi** (-bī′). **1.** An evil spirit believed to descend upon and have sexual intercourse with women as they sleep. **2.** A nightmare. **3.** An oppressive or nightmarish burden. [Middle English, from Late Latin, from Latin *incubō,* from *incubāre,* to lie down on. See INCUBATE.]

**in·cu·des** (ĭng-kyōō′dēz) *n.* Plural of **incus.**

**in·cul·cate** (ĭn-kŭl′kāt′, ĭn′kŭl-) *tr.v.* **-cat·ed, -cat·ing, -cates.** **1.** To impress (something) upon the mind of another by frequent instruction or repetition; instill: *inculcating sound principles.* **2.** To teach (others) by frequent instruction or repetition; indoctrinate: *inculcate the young with a sense of duty.* [Latin *inculcāre, inculcāt-,* to force upon : *in-,* on; see IN−[2] + *calcāre,* to trample (from *calx, calc-,* heel).] **—in′cul·ca′tion** *n.* **—in·cul′ca·tor** *n.*

**in·cul·pa·ble** (ĭn-kŭl′pə-bəl) *adj.* Free of guilt; blameless.

**in·cul·pate** (ĭn-kŭl′pāt′, ĭn′kŭl-) *tr.v.* **-pat·ed, -pat·ing, -pates.** To incriminate. [Latin *inculpāre, inculpāt-* : *in-,* on; see IN−[2] + *culpāre,* to blame (from *culpa,* fault).] **—in′cul·pa′tion** *n.* **—in·cul′pa·to′ry** (-pə-tôr′ē, -tōr′ē) *adj.*

**in·cult** (ĭn-kŭlt′) *adj.* Not cultured; coarse. [Latin *incultus* : *in-,* not; see IN−[1] + *cultus,* past participle of *colere,* to till, cultivate; see **k[w]el-**[1] in Appendix.]

**in·cum·ben·cy** (ĭn-kŭm′bən-sē) *n., pl.* **-cies.** **1.** The quality or condition of being incumbent. **2.** Something incumbent; an obligation. **3. a.** The holding of an office or ecclesiastical benefice. **b.** The term of an office or a benefice.

**in·cum·bent** (ĭn-kŭm′bənt) *adj.* **1.** Imposed as an obligation or a duty; obligatory: *felt it was incumbent on us all to help.* **2.** Lying, leaning, or resting on something else: *incumbent rock strata.* **3.** Currently holding a specified office: *the incumbent mayor.* **—incumbent** *n.* A person who holds an office or ecclesiastical benefice: *defeated the incumbent in a close election.* [Middle English, holder of an office, from Medieval Latin *incumbēns, incumbent-,* from Latin, present participle of *incumbere,* to lean upon, apply oneself to : *in-,* on; see IN−[2] + *-cumbere,* to recline.] **—in·cum′bent·ly** *adv.*

**in·cu·na·ble** (ĭn-kyōō′nə-bəl) *n.* An incunabulum. [French, from New Latin *incūnābulum.* See INCUNABULUM.]

**in·cu·nab·u·lum** (ĭn′kyə-năb′yə-ləm, ĭng′-) *n., pl.* **-la** (-lə). **1.** A book printed before 1501; an incunable. **2.** An artifact of an early period. [New Latin *incūnābulum,* from sing. of Latin *incūnābula,* swaddling clothes, cradle : *in-,* in; see IN−[2] + *cūnābula,* cradle (from *cūnae,* cradle; see **kei-**[1] in Appendix).] **—in′cu·nab′u·lar** (-lər) *adj.*

**in·cur** (ĭn-kûr′) *tr.v.* **-curred, -cur·ring, -curs.** **1.** To acquire or come into (something usually undesirable); sustain: *incurred substantial losses during the stock market crash.* **2.** To become liable or subject to as a result of one's actions; bring upon oneself: *incur the anger of a friend.* [Middle English *incurren,* from Old French *encorir,* from Latin *incurrere,* to run upon : *in-,* on; see IN−[2] + *currere,* to run; see **kers-** in Appendix.]

**in·cur·a·ble** (ĭn-kyōōr′ə-bəl) *adj.* **1.** Being such that a cure is impossible; not curable: *an incurable disease.* **2.** Incapable of being altered, as in disposition or habits: *an incurable optimist; an incurable smoker.* **—in·cur′a·bil′i·ty, in·cur′a·ble·ness** *n.* **—in·cur′a·bly** *adv.*

**in·cu·ri·ous** (ĭn-kyōōr′ē-əs) *adj.* Lacking intellectual inquisitiveness or natural curiosity; uninterested. See Synonyms at **indifferent.** **—in·cu′ri·os′i·ty** (-ŏs′ĭ-tē), **in·cu′ri·ous·ness** *n.* **—in·cu′ri·ous·ly** *adv.*

**in·cur·rent** (ĭn-kûr′ənt, -kŭr′-) *adj.* Affording passage to an inflowing current. [Latin *incurrēns, incurrent-,* present participle of *incurrere,* to run upon. See INCUR.]

**in·cur·sion** (ĭn-kûr′zhən, -shən) *n.* **1.** An aggressive entrance into foreign territory; a raid or an invasion. **2.** The act of entering another's territory or domain. **3.** The act of entering or running into: *homes damaged by the incursion of floodwater.* [Middle English, from Old French, from Latin *incursiō, incursiōn-,* from *incursus,* past participle of *incurrere,* to run upon. See INCUR.]

**in·cur·vate** (ĭn-kûr′vāt′, ĭn′kûr-) *tr.v.* **-vat·ed, -vat·ing, -vates.** To cause to bend into an inward curve. **—incurvate** *adj.* Curved inward. **—in′cur·va′tion** *n.* **—in·cur′va·ture′** (-və-chŏŏr′, -chər) *n.*

**in·curve** (ĭn-kûrv′, ĭn′kûrv′) *tr. & intr.v.* **-curved, -curv·ing, -curves.** To cause to bend or to bend into an inward curve. **—incurve** (ĭn′kûrv′) *n.* An inward curve. [Middle English *incurven,* to twist, distort, from Latin *incurvāre,* to curve in, be crooked : *in-,* in; see IN−[2] + *curvus,* curve; see CURVE.]

**in·cus** (ĭng′kəs) *n., pl.* **in·cu·des** (ĭng-kyōō′dēz). **1.** *Anatomy.* An anvil-shaped bone between the malleus and the stapes in the mammalian middle ear. Also called **anvil.** **2.** A thunderhead. [Latin *incūs,* anvil, from *incūtus,* past participle of *incūdere,* to forge with a hammer : *in-,* intensive pref.; see IN−[2] + *cūdere,* to beat, forge; see **kau-** in Appendix.]

**in·cuse** (ĭn-kyōōz′, -kyōōs′) *adj.* Formed by hammering, stamping, or pressing: *an incuse design on a coin.* [Latin *incūdere, incūs-,* to forge with a hammer. See INCUS.]

**ind.** *abbr.* **1.** Independence; independent. **2.** Index. **3.** Indigo. **4.** Industrial; industry.

**Ind.** *abbr.* **1.** Indian. **2.** Indiana. **3.** Indies.

**in·da·ba** (ĭn-dä′bə) *n.* A conference of indigenous peoples of southern Africa. [Nguni (Zulu) *in-daba,* topic, conference.]

**in·da·mine** (ĭn′də-mēn′) *n.* Any of a group of organic bases forming unstable bluish or greenish salts and used in making dyes. [IND(IGO) + AMINE.]

**in·debt·ed** (ĭn-dět′ĭd) *adj.* Morally, socially, or legally obligated to another; beholden. [Middle English *endetted,* from Old French *endette,* past participle of *endetter,* to oblige : *en-,* causative pref.; see EN−[1] + *dette,* debt; see DEBT.]

**in·debt·ed·ness** (ĭn-dět′ĭd-nĭs) *n.* **1.** The state of being indebted. **2.** Something owed to another.

**in·de·cen·cy** (ĭn-dē′sən-sē) *n., pl.* **-cies.** **1.** The state or quality of being unseemly or immodest. **2.** Something indecent.

**in·de·cent** (ĭn-dē′sənt) *adj.* **1.** Offensive to good taste; unseemly. **2.** Offensive to public moral values; immodest. See Synonyms at **improper.** **—in·de′cent·ly** *adv.*

**in·de·ci·pher·a·ble** (ĭn′dĭ-sī′fər-ə-bəl) *adj.* Impossible to decipher: *indecipherable handwriting; an indecipherable message.* **—in′de·ci′pher·a·bil′i·ty, in′de·ci′pher·a·ble·ness** *n.* **—in′de·ci′pher·a·bly** *adv.*

**in·de·ci·sion** (ĭn′dĭ-sĭzh′ən) *n.* Reluctance or an inability to make up one's mind; irresolution.

**in·de·ci·sive** (ĭn′dĭ-sī′sĭv) *adj.* **1.** Prone to or characterized by indecision; irresolute: *an indecisive manager.* **2.** Inconclusive: *an indecisive contest; an indecisive battle.* **3.** Not clearly defined; indefinite: *indecisive boundaries running through mountainous terrain.* **—in′de·ci′sive·ly** *adv.* **—in′de·ci′sive·ness** *n.*

**in·de·clin·a·ble** (ĭn′dĭ-klī′nə-bəl) *adj.* **1.** Without grammatical inflection. **2.** Of, relating to, or being a word that lacks grammatical inflection though belonging to a form class whose members are usually inflected.

**in·de·com·pos·a·ble** (ĭn-dē′kəm-pō′zə-bəl) *adj.* That cannot be separated into components: *indecomposable matter.*

**in·dec·o·rous** (ĭn-dĕk′ər-əs) *adj.* Lacking propriety or good taste. See Synonyms at **improper.** **—in·dec′o·rous·ly** *adv.* **—in·dec′o·rous·ness** *n.*

**in·de·cor·um** (ĭn′dĭ-kôr′əm, -kōr′-) *n.* **1.** Lack of propriety or good taste; impropriety. **2.** An instance of indecorous behavior or action.



**incuse**
**1793 copper penny**

CHET01439266

sion of a septum or part of a septum, especially the nasal or atrial septum.

**Sep·tem·ber** (sĕp-tĕm′bər) n. Abbr. **Sept., Sept** The ninth month of the year in the Gregorian calendar. See table at **calendar.** The seventh month, from *septem,* seven. See at **calendar.** [Middle English *Septembre,* from Old French, from Latin *September,* the seventh month, from *septem,* seven. See **septm** in Appendix.]

**Sep·tem·brist** (sĕp-tĕm′brĭst) n. 1. A bloodthirsty revolutionist or terrorist. 2. One of the mob that massacred the imprisoned royalists in Paris, France, in September 1792.

**sep·te·nar·i·us** (sĕp′tə-nâr′ē-as) n., pl. **-i·i** (-ē-ī′). A Latin verse used only in comedy and consisting of seven iambic feet or a catalectic iambic tetrameter. [Latin *septēnārius,* of seven, from *septēnī,* seven each, from *septem,* seven. See **SEPTENNIAL.**]

**sep·ten·ni·al** (sĕp-tĕn′ē-al) adj. 1. Occurring every seven years. 2. Consisting of or continuing for seven years. —**septennial** n. An event that occurs every seven years. [From Late Latin *septennium,* period of seven years, from Latin *septennis,* of seven years : *septem,* seven; see **septm** in Appendix + *annus,* year; see **at-** in Appendix.] —**sep·ten′ni·al·ly** adv.

**sep·ten·tri·on** (sĕp-tĕn′trē-ŏn′, -an) n. Obsolete. Northern regions; the north. [Middle English, from Old French, from Latin *septentriōnēs,* seven plow oxen, the seven principal stars of Ursa Major : *septem,* seven; see **septm** in Appendix + *triōnēs* (pl. of *triō, triōn-,* plow ox; see **tere-**¹ in Appendix).] —**sep·ten′tri·o·nal** (-trē-a-nal) adj.

**sep·tet** also **sep·tette** (sĕp-tĕt′) n. 1. A group of seven. 2. *Music.* **a.** A composition for seven voices or instruments. **b.** The performers playing such a composition. [German *Septett,* from Latin *septem,* seven. See **septm** in Appendix.]

**sep·tic** (sĕp′tĭk) adj. 1. Of, relating to, having the nature of, or affected by sepsis. 2. Causing sepsis; putrefactive. [Latin *sēpticus,* putrefying, from Greek *sēptikos,* from *sēptos,* rotten, from *sēpein,* to make rotten.] —**sep·tic′i·ty** (-tĭs′ĭ-tē) n.

**sep·ti·ce·mi·a** (sĕp′tĭ-sē′mē-a) n. A systemic disease caused by pathogenic organisms or their toxins in the bloodstream. Also called *blood poisoning.* [SEPTIC + -EMIA.] —**sep′ti·ce′mic** (-mĭk) adj.

**sep·ti·ci·dal** (sĕp′tĭ-sīd′l) adj. Botany. Dehiscing by splitting along or through the septa. Used of a seed capsule. [SEPT(UM) + Latin *-cīdere,* to cut (from *caedere;* see CAESURA) + -AL¹.] —**sep′ti·ci′dal·ly** adv.

**septic sore throat** n. An infection of the throat, often epidemic, caused by hemolytic streptococci and characterized by fever and inflammation of the tonsils. Also called *strep throat.*

**septic tank** n. A sewage-disposal tank in which a continuous flow of waste material is decomposed by anaerobic bacteria.

**sep·tif·ra·gal** (sĕp-tĭf′ra-gal) adj. Botany. Dehiscing by the breaking away of the valves from its partitions. Used of a seed capsule. [SEPT(UM) + Latin *frangere,* to break; see **bhreg-** in Appendix.] —**sep·tif′ra·gal·ly** adv.

**sep·ti·lat·er·al** (sĕp′tə-lăt′ar-al) adj. Seven-sided. [Latin *septem,* seven; see SEPTET + LATERAL.]

**Sept Îles** (sĕt-ēl′) or **Sept-Îles** (sĕt-ēl′) also **Sev·en Isles** (sĕv′an). A city of eastern Quebec, Canada, on the St. Lawrence River near its mouth. Population, 29,262.

**sep·til·lion** (sĕp-tĭl′yan) n. 1. The cardinal number equal to 10²⁴. 2. Chiefly British. The cardinal number equal to 10⁴². [French : Latin *septem,* seven; see SEPTET + French *-illion* (as in *million,* million, from Old French *milion;* see MILLION).] —**sep·til′lion** adj.

**sep·til·lionth** (sĕp-tĭl′yanth) n. 1. The ordinal number matching the number septillion in a series. 2. One of a septillion equal parts. —**sep·til′lionth** adv. & adj.

**sep·tu·a·ge·nar·i·an** (sĕp′tōō-a-ja-nâr′ē-an, -tyōō-, -chōō-) n. A person who is 70 years old or between the ages of 70 and 80. —**septuagenarian** adj. 1. Being 70 years old or between the ages of 70 and 80. 2. Of or relating to a septuagenarian. [From Latin *septuāgēnārius,* of the number seventy, from *septuāgēnī,* seventy each, from *septuāgintā,* seventy. See SEPTUAGINT.]

**Sep·tu·a·ges·i·ma** (sĕp′tōō-a-jĕs′a-ma, -jā′za-, -chōō-) n. The third Sunday before Lent. [Middle English, from Old French, from Late Latin *septuāgēsima (diēs),* seventieth (day), feminine of Latin *septuāgēsimus,* from *septuāgintā,* seventy. See SEPTUAGINT.]

**Sep·tu·a·gint** (sĕp′tōō-a-jĭnt′, sĕp-tōō′a-jant, -tyōō′-) n. A Greek translation of the Old Testament made in the third century B.C. [Latin *septuāgintā,* seventy (from the traditional number of its translators) : *septem,* seven; see **septm** in Appendix + *-gintā,* ten times; see **dekm** in Appendix.]

**sep·tum** (sĕp′tam) n., pl. **-ta** (-ta). A thin partition or membrane that divides two cavities or soft masses of tissue in an organism: *the nasal septum; the atrial septum of the heart.* [Latin *saeptum,* partition, from neuter past participle of *saepīre,* to enclose, from *saepēs,* fence.]

**septum pel·lu·ci·dum** (pa-lōō′sĭ-dam) n., pl. **septa pellu·ci·da** (-da). Anatomy. A thin membrane of nervous tissue that forms the medial wall of the lateral ventricles in the brain. [New Latin *septum pellūcidum : septum,* septum + Latin *pellūcidus,* transparent.]

**sep·tu·ple** (sĕp-tōō′pal, -tyōō′-, -tŭp′al) adj. Consisting of or containing seven. Multiplied by seven. —**septuple** tr.v. **-pled, -pling, -ples.** To multiply by seven. [Late Latin *septu-*

---

*plus,* sevenfold : Latin *septem,* seven; see **septm** in Appendix + *-plus,* -fold; see **pel-**² in Appendix.]

**sep·tu·plet** (sĕp-tŭp′lĭt, -tōō′plĭt, -tyōō′-) n. 1. One of seven offspring delivered at a single birth. 2. **septuplets.** The seven offspring of one birth. 3. A group of seven persons or things. [SEPTU(PLE) + (TRI)PLET.]

**sep·ul·cher** (sĕp′al-kar) n. 1. A burial vault. 2. A receptacle for sacred relics, especially in an altar. —**sepulcher** tr.v. **-chered, -cher·ing, -chers.** To place into a sepulcher; inter. [Middle English *sepulcre,* from Old French, from Latin *sepulcrum,* from *sepultus,* past participle of *sepelīre,* to bury the dead.]

**se·pul·chral** (sa-pŭl′kral, -pōōl′-) adj. 1. Of or relating to a burial vault or a receptacle for sacred relics. 2. Suggestive of the grave; funereal. —**se·pul′chral·ly** adv.

**sep·ul·chre** (sĕp′al-kar) n. & v. Chiefly British. Variant of *sepulcher.*

**sep·ul·ture** (sĕp′al-chōōr′, -char) n. 1. The act of interment; burial. 2. A sepulcher. [Middle English, from Old French, from Latin *sepultūra,* from *sepultus,* past participle of *sepelīre,* to bury the dead.]

**seq.** abbr. 1. Sequel. 2. Latin. Sequens (the following).

**seqq.** abbr. Latin. Sequentia (the following [things]).

**se·qua·cious** (sĭ-kwā′shas) adj. 1. Persisting in a continuous intellectual or stylistic direction: *"I make these notes, but am tired of notes . . . I want something sequacious now & robust"* (Virginia Woolf). **2. a.** Disposed to follow another or others, as a leader. **b.** Slavishly unthinking and uncritical. [From Latin *sequāx, sequāc-,* pursuing, from *sequī,* to follow. See **sek**ʷ-¹ in Appendix.] —**se·qua′cious·ly** adv. —**se·qua′ci·ty** (-kwăs′ĭ-tē) n.

**se·quel** (sē′kwal) n. Abbr. **seq.** 1. Something that follows; a continuation. 2. A literary work complete in itself but continuing the narrative of an earlier work. 3. A result or consequence. See Synonyms at **effect.** [Middle English *sequele,* from Old French *sequelle,* from Latin *sequēla,* from *sequī,* to follow. See **sek**ʷ-¹ in Appendix.]

**se·quel·a** (sĭ-kwĕl′a) n., pl. **-quel·ae** (-kwĕl′ē). 1. A pathological condition resulting from a disease. 2. A secondary consequence or result. [Latin *sequēla,* sequel. See SEQUEL.]

**se·que·na·tor** (sē′kwa-nā′tar) n. See **sequencer** (sense 2). [SEQUEN(CER) + -ATOR.]

**se·quence** (sē′kwans, -kwĕns′) n. 1. A following of one thing after another; succession. 2. An order of succession, an arrangement. 3. A related or continuous series. See Synonyms at **series.** 4. *Games.* Three or more playing cards in consecutive order; a run. 5. A series of single film shots so edited as to constitute an aesthetic or dramatic unit; an episode. 6. *Music.* A melodic or harmonic pattern successively repeated at different pitches with or without a key change. 7. *Roman Catholic Church.* A hymn sung between the gradual and the Gospel. 8. *Mathematics.* An ordered set of quantities, as *x,* 2*x*², 3*x*³, 4*x*⁴. 9. *Biochemistry.* The order of constituents in a polymer, especially the order of nucleotides in a nucleic acid or of the amino acids in a protein. —**sequence** tr.v. **-quenced, -quenc·ing, -quenc·es.** 1. To organize or arrange in a sequence. 2. To determine the order of constituents in (a polymer, such as a nucleic acid or protein molecule). [Middle English, a type of hymn, from Old French, from Medieval Latin *sequentia,* hymn, that which follows, from Late Latin, from Latin *sequēla,* from *sequī,* to follow. See **sek**ʷ-¹ in Appendix.]

**se·quenc·er** (sē′kwan-sar, -kwĕn′-) n. 1. Computer Science. A device that sorts cards, data, or programs in a prearranged sequence. 2. An apparatus for determining the order of constituents in a biological polymer. In this sense, also called *sequenator.*

**se·quent** (sē′kwant) adj. 1. Following in order or time; subsequent. 2. Consequent as a result; consequent. —**sequent** n. A result; a consequence. [Latin *sequēns, sequent-,* present participle of *sequī,* to follow. See SEQUENCE.]

**se·quen·tial** (sĭ-kwĕn′shal) adj. 1. Forming or characterized by a sequence, as of units or musical notes. 2. Sequent. —**se·quen′ti·al′i·ty** (-shē-ăl′ĭ-tē) n. —**se·quen′tial·ly** adv.

**se·ques·ter** (sĭ-kwĕs′tar) v. **-tered, -ter·ing, -ters.** —tr. 1. To cause to withdraw into seclusion; seclude. 2. To remove or set apart; segregate. See Synonyms at **isolate.** 3. Law. **a.** To take temporary possession of (property) as security against legal claims. **b.** To requisition and confiscate (enemy property). —intr. Chemistry. To undergo sequestration. [Middle English *sequestren,* from Old French, from Late Latin *sequestrāre,* to give up for safekeeping, from Latin *sequester,* depositary, trustee. See **sek**ʷ-¹ in Appendix.]

**se·ques·tra** (sĭ-kwĕs′tra) n. Plural of *sequestrum.*

**se·ques·trant** (sĭ-kwĕs′trant) n. A chemical that promotes sequestration.

**se·ques·trate** (sē′kwĭ-strāt′, sĕk′wĭ-, sĭ-kwĕs′trāt′) tr.v. **-trat·ed, -trat·ing, -trates.** 1. Chiefly British. To seize; confiscate: *"The sheriffs . . . will be able to seize stock and other assets, and to sequestrate bank accounts belonging to defaulters"* (Daily Telegraph). 2. To seclude; sequester. [Middle English *sequestraten,* from Latin *sequestrāre, sequestrāt-,* to give up for safekeeping. See SEQUESTER.]

**se·ques·tra·tion** (sē′kwĭ-strā′shan, sĕk′wĭ-) n. 1. The act of sequestering; segregation. 2. Law. **a.** Seizure of property. **b.** A writ authorizing seizure of property. 3. Chemistry. The inhibition or prevention of normal ion behavior by combination with

CHET01439267

**trace²**  **1896**  **tracksuit**



**tracery**
South transept of the
Cathedral of Notre Dame,
Paris



**tracheid**



**track and field**
*Top:* Foot race
*Bottom:* Long jump by
Carl Lewis in 1987

deer; *tracing missing persons.* **2.** To ascertain the successive stages in the development or progress of: *tracing the life cycle of an insect; trace the history of a family.* **3.** To locate or discover by searching or researching evidence: *trace the cause of a disease.* **4.** To draw (a line or figure); sketch; delineate. **5.** To form (letters) with special concentration or care. **6.** To copy by following lines seen through a sheet of transparent paper. **7. a.** To imprint (a design) by pressure with an instrument on a superimposed pattern. **b.** To make a design or series of markings on (a surface) by such pressure on a pattern. **8.** To record (a variable), as on a graph. *—intr.* **1.** To make one's way along a trail or course: *traced through the files.* **2.** To have origins; be traceable: *linguistic features that trace to West Africa.* [Middle English, track, from Old French, from *tracier,* to make one's way, from Vulgar Latin *\*tractiāre,* from Latin *trāctus,* a dragging, course, from past participle of *trahere,* to draw.]  **—trace′a·bil′i·ty, trace′a·ble·ness,** *n.* **—trace′a·ble** *adj.* **—trace′a·bly** *adv.*

**SYNONYMS:** *trace, vestige, track, trail.* These nouns denote a visible sign or perceptible indication of the passage or former presence of something. *Trace* applies to both physical and immaterial evidence: *I immediately recognized the charred traces of a fire. Despite his excellent English, he still retains the faint trace of a French accent. Vestige* refers to a surviving remnant of what once existed or is past: *"long lines of edifices, vestiges of whose ruins may still be found"* (William Hickling Prescott); *"vestiges of a very universal custom"* (Henry Hallam). *Track* usually denotes a mark or succession of marks, as footprints, left by something that has passed: *Archaeologists excavated fossilized dinosaur tracks from the riverbed. Trail* can refer to the tracks of a person or an animal, especially one being hunted: *"We came across the recent trails of but two of the animals we were after"* (Theodore Roosevelt).

**trace²** (trās) *n.* **1.** One of two side straps or chains connecting a harnessed draft animal to a vehicle or whiffletree. **2.** A bar or rod, hinged at either end to another part, that transfers movement from one part of a machine to another. [Middle English *trais,* from Old French, pl. of *trait,* a hauling, harness strap, from Latin *trāctus,* a hauling, from past participle of *trahere,* to haul.]

**trace element** *n.* **1.** A chemical element required in minute quantities by an organism to maintain proper physical functioning. **2.** A minute quantity or amount: *"The trace elements of belief vanish when it becomes apparent that the . . . officer . . . never has suffered the indignity of combat"* (Lewis H. Lapham).

**trac·er** (trā′sər) *n.* **1. a.** One who is employed to locate missing goods or persons. **b.** An investigation or inquiry organized to trace missing goods or persons. **2.** Any of several instruments used in making tracings or in imprinting designs by tracing. **3.** A tracer bullet. **4.** *Chemistry.* An identifiable substance, such as a dye or a radioactive isotope, that is introduced into a biological or mechanical system and can be followed through the course of a process, providing information on the pattern of events in the process or on the redistribution of the parts or elements involved. In this sense, also called *label.*

**tracer bullet** *n.* A bullet that leaves a luminous or smoky trail.

**trac·er·y** (trā′sə-rē) *n., pl.* **-ies.** Ornamental work of interlaced and branching lines, especially the lacy openwork in a Gothic window. [From TRACE¹.]  **—trac′er·ied** *adj.*

**trache—** *pref.* Variant of **tracheo—.**

**tra·che·a** (trā′kē-ə) *n., pl.* **-che·ae** (-kē-ē′) or **-che·as.** **1.** *Anatomy.* A thin-walled tube of cartilaginous and membranous tissue descending from the larynx to the bronchi and carrying air to the lungs. Also called *windpipe.* **2.** *Zoology.* One of the internal respiratory tubes of insects and some other terrestrial arthropods. **3.** *Botany.* One of the tubular conductive vessels in the xylem of vascular plants. [Middle English *trache,* from Medieval Latin *trāchēa,* from Late Latin *trāchīa,* from Greek (artēria) *trakheia,* rough (artery), trachea, from feminine of *trakhus,* rough.]  **—tra′che·al** *adj.*

**tra·che·ate** (trā′kē-āt′, -ĭt) *adj.* Having tracheae. Used of arthropods.  **—tracheate** *n.* A tracheate arthropod.

**tra·che·id** (trā′kē-ĭd, -kēd′) *n. Botany.* A cell in the xylem of vascular plants.  **—tra·che′i·dal** (trā-kē′ĭ-dl, -kēd′l) *adj.*

**tra·che·i·tis** (trā′kē-ī′tĭs) *n.* Inflammation of the trachea.

**tracheo—** or **trache—** *pref.* Trachea: *tracheid.* [New Latin *trāchēo-,* from Medieval Latin *trāchēa.* See TRACHEA.]

**tra·che·o·bron·chi·al** (trā′kē-ō-brŏng′kē-əl) *adj.* Of or relating to the trachea and the bronchi.

**tra·che·o·soph·a·ge·al** (trā′kē-ō′ĭ-sŏf′ə-jē′əl) *adj.* Of or relating to the trachea and the esophagus.

**tra·che·ole** (trā′kē-ōl′) *n.* One of the fine branching tubes of the trachea of an insect, which penetrate the tissues to provide oxygen. [TRACHE(A) + -ole, diminutive suff. (from French, Latin -olus).]  **—tra·che′o·lar** (-ə-lər) *adj.*

**tra·che·o·phyte** (trā′kē-ə-fīt′) *n.* Any of various vascular plants, including seed plants and ferns, having a conducting system of xylem and phloem. [From New Latin *Tracheophyta,* division name : TRACHEO- + Greek *phuta,* pl. of *phuton,* plant; see **bheuə-** in Appendix.]

**tra·che·os·co·py** (trā′kē-ŏs′kə-pē) *n., pl.* **-pies.** Examination of the interior of the trachea, as with a laryngoscope.  **—tra′che·o·scop′ic** (-ə-skŏp′ĭk) *adj.*

**tra·che·os·to·my** (trā′kē-ŏs′tə-mē) *n., pl.* **-mies.** **1. a.** Surgical construction of an opening in the trachea. **b.** The open-

ing so made. **2.** A tracheotomy performed in order to insert a catheter or tube into the trachea, especially to facilitate breathing.

**tra·che·ot·o·my** (trā′kē-ŏt′ə-mē) *n., pl.* **-mies.** The act or procedure of cutting into the trachea through the neck, as to make an artificial opening for breathing.

**tra·cho·ma** (trə-kō′mə) *n.* A contagious disease of the conjunctiva and cornea, caused by the gram-negative bacterium *Chlamydia trachomatis* and characterized by inflammation, hypertrophy, and formation of granules of adenoid tissue. It is a major cause of blindness in Asia and Africa. [New Latin *trachōma,* from Greek *trakhōma,* from *trakhus,* rough.]  **—tra·cho′ma·tous** (-kō′mə-təs) *adj.*

**tra·chyte** (trā′kīt′, trăk′īt′) *n.* A light-colored igneous rock consisting essentially of alkali feldspar. [French, from Greek *trakhus,* rough.]  **—tra·chyt′ic** (tra-kĭt′ĭk) *adj.*

**trac·ing** (trā′sĭng) *n.* **1.** A reproduction made by superimposing a transparent sheet and copying the lines of the original on it. **2.** A graphic record made by a recording instrument, such as a cardiograph or seismograph.

**track** (trăk) *n.* **1. a.** A mark or succession of marks left by something that has passed. See Synonyms at **trace¹.** **b.** A path, route, or course indicated by such marks: *an old wagon track through the mountains.* **2.** A path along which something moves; a course: *following the track of an airplane on radar.* **3. a.** A course of action; a method of proceeding: *on the right track for solving the puzzle.* **b.** An intended or proper course: *putting a stalled project back on track.* **4.** A succession of ideas; a train of thought. **5.** Awareness of something occurring or passing: *keeping track of the score; lost all track of time.* **6.** *Sports.* **a.** A course laid out for running or racing. **b.** Athletic competition on such a course; track events. **c.** Track and field. **7.** A rail or set of parallel rails upon which railroad cars or other vehicles run. **8.** A metal groove or ridge that holds, guides, and reduces friction for a moving device or apparatus. **9.** Any of several courses of study to which students are assigned according to ability, achievement, or needs: *academic, vocational, and general tracks.* **10. a.** A distinct path, as along a length of film or magnetic tape, on which sound or other information is recorded. **b.** A distinct selection from a sound recording, such as a phonograph record or compact disk, usually containing an individual work or part of a larger work: *the title track of an album.* **c.** One of the separate sound recordings that are combined so as to be heard simultaneously, as in stereophonic sound reproduction: *mixed the vocal track and instrumental track.* **—track** *v.* **tracked, track·ing, tracks.** *—tr.* **1.** To follow the tracks of; trail: *tracking game through the forest.* **2.** To pursue successfully: *"When, like a running grave, time tracks you down"* (Dylan Thomas). **3.** To move over or along; traverse. **4.** To carry on the shoes and deposit: *tracked mud on the rug.* **5.** To observe or monitor the course of (aircraft, for example), as by radar. **6.** To observe the progress of; follow: *tracking the company's performance closely.* **7.** To equip with a track. **8.** To assign (a student) to a curricular track. *—intr.* **1.** To move along a track. **2.** To follow a course; travel. **3.** To keep a constant distance apart. Used of a pair of wheels. **4.** To be in alignment. *—idiom.* **in (one's) tracks.** Exactly where one is standing. [Middle English *trak,* from Old French *trac,* perhaps of Germanic origin.]  **—track′a·ble** *adj.* **—track′er** *n.*

**track·age** (trăk′ĭj) *n.* **1.** Railway tracks. **2. a.** The right of one railroad company to use the track system of another. **b.** The charge for this right.

**track and field** *n. Sports.* Athletic events performed on a running track and the field associated with it. **—track′-and-field′** (trăk′ən-fēld′) *adj.*

**track·ball** (trăk′bôl′) *n. Computer Science.* A ball mounted in a stationary housing and rotated to control a pointer on a computer screen.

**track event** *n. Sports.* A running event at a track meet as distinguished from a field event.

**track·ing** (trăk′ĭng) *n.* The placing of students in any of several courses of study according to ability, achievement, or needs.

**tracking poll** *n.* An opinion poll in which the same sample, such as a small number of voters, is questioned periodically to measure shifts in opinion.

**tracking shot** *n.* A movie sequence made by a camera moving steadily on a track or dolly.

**tracking station** *n.* A station for observing the path of and maintaining contact with an object in the atmosphere or in space especially by means of radar or radio.

**track·less** (trăk′lĭs) *adj.* **1.** Not running on tracks or rails. **2.** Unmarked by trails or paths.

**trackless trolley** *n.* A trolley bus.

**track light** *n.* A light mounted on and movable along an electrified metal track. **—track lighting** *n.*

**track·man** (trăk′mən) *n.* A worker employed to maintain or inspect railroad tracks.

**track meet** *n. Sports.* A track-and-field competition between two or more teams.

**track record** *n. Informal.* A record of actual performance or accomplishment: *a job applicant with an excellent track record.*

**track·side** (trăk′sīd′) *n.* The area near a track, especially a racetrack.

**track·suit** (trăk′sōōt′) *n.* A loose-fitting jacket and pants worn by athletes and exercisers usually before and after workouts.



CHET01439268

# EXHIBIT E

# The
# Merriam-Webster
# Dictionary



**Merriam-Webster, Incorporated**
**Springfield, Massachusetts**

CHET01439269



### A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 2005 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data

The Merriam-Webster dictionary.
    p. cm.
  ISBN-13: 978-0-87779-636-7 (pbk. : alk. paper)
  ISBN-10: 0-87779-636-X (pbk. : alk. paper)
  1. English language—Dictionaries.   I. Merriam-Webster, Inc.
PE1628.M353 2005
423—dc22
                                      2005001286

All rights reserved. No part of this work covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, recording, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

2345RRDC070605

CHET01439270

**to·ward** \'tôrd, 'tō-ərd, tə-'wörd\ *or* **to·wards** \'tôrdz, 'tō-ərdz, tə-'wördz\ *prep* **1** : in the direction of ⟨heading ~ the river⟩ **2** : along a course leading to ⟨efforts ~ reconciliation⟩ **3** : in regard to ⟨tolerance ~ minorities⟩ **4** : so as to face ⟨turn the chair ~ the window⟩ **5** : close upon ⟨it was getting along ~ sundown⟩ **6** : for part payment of ⟨here's $100 ~ your tuition⟩

**tow-boat** \'tō-ˌbōt\ *n* : TUGBOAT

**tow·el** \'taú(-ə)l\ *n* : an absorbent cloth or paper for wiping or drying

**tow·el·ing** *or* **tow·el·ling** *n* : a cotton or linen fabric for making towels

**¹tow·er** \'taú(-ə)r\ *n* **1** : a tall structure either isolated or built upon a larger structure ⟨an observation ~⟩ **2** : a towering citadel **3** : a personal computer case that stands in an upright position — **tow·ered** *adj*

**²tower** *vb* : to reach or rise to a great height

**tow·er·ing** \'taú(-ə)r-iŋ\ *adj* **1** : LOFTY ⟨~ pines⟩ **2** : reaching high intensity ⟨a ~ rage⟩ **3** : EXCESSIVE ⟨~ ambition⟩

**tow-head** \'tō-ˌhed\ *n* : a person having whitish blond hair — **tow-head·ed** \-ˌhe-dəd\ *adj*

**to·whee** \'tō-ˌhē, 'tō-(ˌ)ē, tō-'hē\ *n* : a common finch of eastern No. America having the male black, white, and reddish; *also* : any of several closely related finches

**to wit** *adv* : NAMELY

**town** \'taún\ *n* **1** : a compactly settled area usu. larger than a village but smaller than a city **2** : CITY **3** : the inhabitants of a town **4** : a New England territorial and political unit usu. containing both rural and urban areas; *also* : a New England community in which matters of local government are decided by a general assembly **(town meeting)** of qualified voters

**town house** *n* **1** : the city residence of a person having a country home **2** : a single-family house of two or sometimes three stories connected to another house by a common wall

**town·ie** *or* **towny** \'taú-nē\ *n, pl* **townies** : a permanent resident of a town as distinguished from a member of another group

**towns·folk** \'taúnz-ˌfōk\ *n pl* : TOWNSPEOPLE

**town·ship** \'taún-ˌship\ *n* **1** : TOWN 4 **2** : a unit of local government in some states **3** : an unorganized subdivision of a county **4** : a division of territory in surveys of U.S. public land containing 36 square miles **5** : an area in the Republic of South Africa segregated for occupation by persons of non-European descent

**towns·man** \'taúnz-mən\ *n* **1** : a native or resident of a town or city **2** : a fellow citizen of a town

**towns·peo·ple** \-ˌpē-pəl\ *n pl* **1** : the inhabitants of a town or city **2** : town-bred persons

**towns·wom·an** \-ˌwú-mən\ *n* **1** : a woman who is a native or resident of a town or city **2** : a woman who is a fellow citizen of a town

**tow-path** \'tō-ˌpath, -ˌpäth\ *n* : a path (as along a canal) traveled esp. by draft animals towing boats

**tow truck** *n* : a truck equipped for towing vehicles

**tox·emia** \täk-'sē-mē-ə\ *n* : a bodily disorder associated with the presence of toxic substances in the blood

**tox·ic** \'täk-sik\ *adj* [LL *toxicus*, fr. L *toxicum* poison, fr. Gk *toxikon* arrow poison, fr. neut. of *toxikos* of a bow, fr. *toxon* bow, arrow] : of, relating to, or caused by poison or a toxin : POISONOUS — **tox·ic·i·ty** \täk-'si-sə-tē\ *n*

**tox·i·col·o·gy** \ˌtäk-si-'kä-lə-jē\ *n* : a science that deals with poisons and esp. with problems of their use and control — **tox·i·co·log·i·cal** \-kə-'lä-ji-kəl\ *also* **tox·i·co·log·ic** \-kə-'lä-jik\ *adj* — **tox·i·col·o·gist** \'kä-lə-jist\ *n*

**toxic shock syndrome** *n* : an acute disease associated with the presence of a bacterium that is characterized by fever, diarrhea, nausea, diffuse erythema, and shock and occurs esp. in menstruating females using tampons

**tox·in** \'täk-sən\ *n* : a poisonous substance produced by metabolic activities of a living organism that is usu. unstable, very toxic when introduced into the tissues, and usu. capable of inducing antibodies

**¹toy** \'tói\ *n* **1** : something trifling **2** : a small ornament : BAUBLE **3** : something for a child to play with

**²toy** *vb* **1** : to deal with something lightly : TRIFLE **2** : FLIRT **3** : to amuse oneself as if with a plaything

**³toy** *adj* **1** : DIMINUTIVE ⟨a ~ dog⟩ **2** : designed for use as a toy

**tp** *abbr* **1** title page **2** township

**tpk** *or* **tpke** *abbr* turnpike

**tr** *abbr* **1** translated; translation; translator **2** transpose **3** troop

**¹trace** \'trās\ *n* **1** : a mark (as a footprint or track) left by something that has passed **2** : a minute or barely detectable amount

**²trace** *vb* **traced; trac·ing** **1** : to mark out : SKETCH **2** : to form (as letters) carefully **3** : to copy (a drawing) by marking lines on transparent paper laid over the drawing to be copied **4** : to follow the trail of : track down **5** : to study out and follow the development of — **trace·able** *adj*

**³trace** *n* : either of two lines of a harness for fastening a draft animal to a vehicle

**trac·er** \'trā-sər\ *n* **1** : one that traces **2** : ammunition containing a chemical to mark the flight of projectiles by a trail of smoke or light

**trac·ery** \'trā-sə-rē\ *n, pl* **-er·ies** : ornamental work having a design with branching or interlacing lines



tracery

**tra·chea** \'trā-kē-ə\ *n, pl* **-che·ae** \-kē-ˌē\ *also* **-che·as** *or* **-chea** : the main tube by which air passes from the larynx to the lungs of vertebrates — **tra·che·al** \-kē-əl\ *adj*

**tra·che·ot·o·my** \ˌtrā-kē-'ä-tə-mē\ *n, pl* **-mies** : the surgical operation of cutting into the trachea esp. through the skin

**trac·ing** *n* **1** : the act of one that traces **2** : something that is traced **3** : a graphic record made by an instrument for measuring vibrations or pulsations

**¹track** \'trak\ *n* **1** : a mark left in passing **2** : PATH, ROUTE, TRAIL **3** : a course laid out for racing; *also* : track-and-field sports **4** : one of a series of paths along which material (as music) is recorded (as on a compact disc or magnetic tape) **5** : the course along which something moves; *esp* : a way made by two parallel lines of metal rails **6** : awareness of a fact or progression ⟨lost ~ of time⟩ **7** : either of two endless metal belts on which a vehicle (as a bulldozer) travels

**²track** *vb* **1** : to follow the tracks or traces of : TRAIL **2** : to observe the moving path of (as a missile) **3** : to make tracks on **4** : to carry (as mud) on the feet and deposit — **track·er** *n*

**track·age** \'tra-kij\ *n* : lines of railway track

**track–and–field** *adj* : of or relating to athletic contests held on a running track or on the adjacent field

**¹tract** \'trakt\ *n* **1** : an area without precise boundaries ⟨huge ~s of land⟩ **2** : a defined area of land **3** : a system of body parts or organs that act together to perform some function ⟨the digestive ~⟩

**²tract** *n* : a pamphlet of political or religious propaganda

**trac·ta·ble** \'trak-tə-bəl\ *adj* : easily controlled : DOCILE
**♦ Synonyms** AMENABLE, OBEDIENT, BIDDABLE

**tract house** *n* : any of many similar houses built on a tract of land

**trac·tion** \'trak-shən\ *n* **1** : the act of drawing : the state of being drawn **2** : the drawing of a vehicle by motive power; *also* : the particular form of motive power used **3** : the adhesive friction of a body on a surface on which it moves **4** : a pulling force applied to a skeletal structure (as a broken bone) by means of a special device; *also* : a state of tension created by such a pulling force ⟨a leg in ~⟩ — **trac·tion·al** \-shə-nəl\ *adj* — **trac·tive** \'trak-tiv\ *adj*

CHET01439271

# EXHIBIT F



# CONCISE DICTIONARY OF

# BIOMEDICINE
# AND
# MOLECULAR
# BIOLOGY

## PEI-SHOW JUO, Ph.D.
Professor of Biology
State University of New York
College at Potsdam
Potsdam, New York



**CRC Press**
**Boca Raton    New York    London    Tokyo**

CHET01439272

**Library of Congress Cataloging-in-Publication Data**

Juo, Pei-Show
    Concise dictionary of biomedicine and molecular biology / Pei-Show Juo.
        p.    cm.
    ISBN 0-8493-2460-2 (alk. paper)
    1.Medical sciences--dictionaries.   I. Title.
R121.J86  1995
610.3--dc20
                                                                95-38363
                                                                CIP

This book contains information obtained from authentic and highly regarded sources. Reprinted material is quoted with permission, and sources are indicated. A wide variety of references are listed. Reasonable efforts have been made to publish reliable data and information, but the author and the publisher cannot assume responsibility for the validity of all materials or for the consequences of their use.

Neither this book nor any part may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, microfilming, and recording, or by any information storage or retrieval system, without prior permission in writing from the publisher.

CRC Press LLC's consent does not extend to copying for general distribution, for promotion, for creating new works, or for resale. Specific permission must be obtained in writing from CRC Press for such copying.

Direct all inquiries to CRC Press LLC, 2000 Corporate Blvd., N.W., Boca Raton, FL 33431.

**Trademark Notice:** Product or corporate names may be trademarks or registered trademarks, and are used only for identification and explanation, without intent to infringe.

© 1996 by CRC Press LLC

No claim to original U.S. Government works
International Standard Book Number 0-8493-2460-2
Library of Congress Card Number 95-38363
Printed in the United States of America    2  3  4  5  6  7  8  9  0
Printed on acid-free paper

CHET01439273

locate or detect a gene with a complementary sequence.

**DNA Repair**   A process that repairs damage in DNA.

**DNA Replication**   A process in which the DNA duplex unwinds and serves as a template for the synthesis of progeny DNA.

**DNA Sequencing**   Determination of the order of nucleotides in a DNA molecule or DNA fragment by DNA sequencing techniques, e.g., Maxam-Gilbert's method or Sanger's method.

**DNA Supercoiling**   The coiling of DNA upon itself as a result of bending, underwinding, or overwinding of the DNA duplex.

**DNA Topoismerase**   A group of enzymes that catalyzes the breakage, passage, and joining of DNA leading to interconversion of topological isomers of DNA.

**DNA Vector**   A replicon (e.g., plasmid or phage) that transfers foreign DNA into a host organism.

**DNAase Protection**   See DNase protection.

**DNA-RNA Hybrid**   A double helix that consists of one chain of DNA hydrogen bonded to a chain of RNA by means of complementary base pairs.

**DNase**   Abbreviation for deoxyribonuclease.

**DNase I Hypersensitivity Site**   Specific location near an active gene that shows extreme sensitivity to digestion by DNase I.

**DNAse Protection**   A method for estimating the size of a DNA sequence that is protected from DAase hydrolysis by binding of an enzyme or a protein onto the DNA.

**DNCB**   Abbreviation for 2,4-dinitrochlorobenzene.

**DNFB**   Abbreviation for dinitrofluorobenzene.

**DNP**   Abbreviation for dinitrophenyl.

**Dobutamine (mol wt 301)**   A cardiotonic agent and an analog of isoproterenol that stimulates beta-1 receptors in the heart to increase myocardial contraction.



**Dobutrel**   A trade name for dobutamine, a cardiotonic agent and an analog of isoproterenol that stimulates beta-1 receptors in the heart to increase myocardial contraction.

**Dobutrex**   A trade name for dobutamine hydrochloride, a cardiotonic agent and an analog of isoproterenol that stimulates beta-1 receptors in the heart to increase myocardial contraction.

**DOCA**   Abbreviation for deoxycorticosterone acetate.

**Docking Protein**   Membrane protein in the rough endoplasmic reticulum that serves as the receptor for the SRP-blocked ribosomal complex, thereby overcoming the translation block (SRP: signal recognition protein).

**Docusate Calcium (mol wt 883)**   A stool softener.



**Docusate Sodium (mol wt 445)**   A stool softener.



**Dodecarbonium Chloride (mol wt 397)**   An antiinfective agent.



**Dodecyl-β-D-Glucopyranoside (mol wt 348)**   A nonionic detergent used for solubilization of membrane proteins.



**Dodecyl-D-Maltoside (mol wt 511)**   A nonionic detergent used for stabilization and activation of enzymes.

CHET01439274

**Vasodilator**   An agent capable of causing dilation of blood vessels.

**Vasodilator**   Any agent capable of causing dilation of a blood vessel.

**Vasodilator Nerve**   A nerve that causes dilation of a blood vessel.

**Vasoinhibitor**   Substance or drug that inhibits the action of vasomotor nerve.

**Vasomotor Nerve**   Nerves that cause constriction or dilatation of blood vessels.

**Vasopressin**   An antidiuretic peptide hormone (ADH) secreted by the posterior lobe of the pituitary that causes constriction of blood vessels. Arginine vasopressin and ornithine vasopressin have amino acid arginine and ornithine at position 8, respectively.

**Vasopressin Tennate**   A derivative of vasopressin that promotes reabsorption of water and produces concentrated urine.

**Vasopressor**   Any substance which causes constriction of blood vessels and increases blood pressure.

**Vasoprine**   A trade name for isoxsuprine hydrochloride, a vasodilator.

**Vasosulf**   A trade name for a combination drug containing sulfacetamide sodium and phenylephrine hydrochloride, used as an ophthalmic anti-infective agent.

**Vasostimulant**   Agent or substance capable of causing dilatation or constriction of blood vessels.

**Vasotec**   A trade name for enalaprilat maleate, an antihypertensive agent that inhibits the conversion of angiotensin I to angiotensin II.

**Vasotocin**   A cyclic peptide hormone secreted by the posterior lobe of the pituitary gland of birds and reptiles with a function similar to vasopressin.

**V-cillin K**   A trade name for penicillin V potassium, an antibiotic that inhibits bacterial cell wall synthesis.

**VD**   Abbreviation of venereal disease.

**VDAC**   Abbreviation for valtage-dependent anion channel, a porin channel in the mitochondrial outer membrane.

**VDRL Test**   Abbreviation for Venereal Disease Research Laboratory Test, a test for detecting syphilis that is performed on a slide employing fixed volumes of test antigen and inactivated patient serum.

**Vector**   1. A plasmid or viral DNA molecule into which another DNA molecule can be inserted without disruption of the ability of the molecule to replicate itself. 2. An organism that acts as carriers of pathogens and is involved in the spread of disease from one individual to another.

**Vectorial Group Translocation**   The directional translocation of a given molecular or ionic species across a membrane due to the presence of a fixed pathway across the membrane.

**Vectorial Synthesis**   Synthesis of protein destined for export from the cell.

**Vecuronium Bromide (mol wt 638)**   A neuromuscular blocker that prevents acetylcholine from binding to receptors on the muscle end plate, thus blocking depolorization.



**VEE**   Abbreviation for Venezuelan equine encephalomyelitis, an acute disease caused by an alphavirus.

**Veetids**   A trade name for penicillin V potassium, an antibiotic that inhibits bacterial cell wall synthesis.

**Vegetable Black**   A more or less pure carbon produced by the incomplete combustion of vegetable matter or wood.

**Vegetable Dye**   Referring to dyes that are derived from vegetable sources, e.g., logwood and indigo.

**Vegetative Cells**   Cells that are not specialized in reproductive or dormant function.

**Vegetative DNA**   The phage DNA that has not yet been packed into the capsid or assembled into the viral particle.

**Vegetative Reproduction**   An asexual reproduction, e.g., cloning of plants by asexual means.

**Vehicle Plasmid**   A plasmid containing a piece of passenger DNA, used in recombinant DNA experimentation.

CHET01439272

# EXHIBIT G



# Human Molecular Genetics 2

## Tom Strachan & Andrew P. Read

CHET01439276



# Human Molecular Genetics

*Second Edition*

Tom Strachan
BSc PhD
*Professor of Human Molecular Genetics*
*University of Newcastle*
*Newcastle-upon-Tyne, UK*

and

Andrew P. Read
MA PhD FRCPath FMedSci
*Professor of Human Genetics*
*University of Manchester*
*Manchester, UK*



## WILEY-LISS

A JOHN WILEY & SONS, INC., PUBLICATION
New York • Chichester • Weinheim • Brisbane • Singapore • Toronto

CHET01439277

**Published in the United States of America, its dependent territories and Canada by John Wiley & Sons, Inc., by arrangement with BIOS Scientific Publishers Ltd, 9 Newtec Place, Magdalen Road, Oxford OX4 1RE, UK.**

© **BIOS Scientific Publishers Ltd, 1999**

First published 1996
Second edition 1999

All rights reserved. No part of this book may be reproduced or transmitted, in any form or by any means, without permission.

A CIP catalogue record for this book is available from the British Library.

ISBN 0–471–33061–2

*Library of Congress Cataloging-in-Publication Data*
Strachan, T.
    Human molecular genetics / Tom Strachan and Andrew P. Read. — 2nd ed.
       p.      cm.
    Includes bibliographical references and index.
    ISBN 0–471–33061–2 (pbk.)
    1. Human molecular genetics.   I. Read, A. P. (Andrew P.)
II. Title.
QH442.S775                                                                          99–38373
6119.01816—dc21                                                                         CIP

**USA**
John Wiley & Sons Inc.,
605 Third Avenue, New York,
NY 10158–0012, USA

**Canada**
John Wiley & Sons (Canada) Ltd,
22 Worcester Road, Rexdale,
Ontario M9W 1L1, Canada

Production Editor: Fran Kingston
Typeset by J&L Composition Ltd, Filey, North Yorkshire, UK
Printed by The Bath Press Ltd, Bath, UK

CHET01439278

expanded cell cultures and selectively isolating the recombinant DNA.

### Replicons and host cells

Cell cloning requires that the foreign DNA fragments which are introduced into a host cell must be able to replicate. If not, the foreign DNA would soon be diluted out as the host cell undergoes many rounds of cell division. However, foreign DNA fragments will generally lack an origin of replication that will function in the host cell. They require, therefore, to be attached to an independent replicon so that their replication is controlled by the replicon's origin of replication.

In principle, the necessary replicon could be provided in two ways. One possibility is to introduce the fragments into the host cells in such a way that in each cell one, or a very few, fragments integrate into a host cell chromosome and are propagated under the control of a host cell replicon. This is the way that retroviruses, for example, integrate their DNA into host cell chromosomes. However, as a general method for cloning, this approach suffers from numerous disadvantages, including the difficulty in retrieving the inserted DNA. Instead, cell-based cloning very largely relies on a different approach: the foreign DNA fragments are attached *in vitro* to a purified replicon and the resulting hybrid molecules are transferred into host cells, where they replicate *independently of the host cell chromosomes*. Because the foreign DNA fragments (target DNA) can be viewed as passengers of the replicon, replicons used for cloning are described as **vector** molecules. Notice that, although the resulting replication of the introduced DNA fragments is independent of the host chromosomes, the vector may have an origin of replication that originates from either a natural extrachromosomal replicon or, in some cases, a chromosomal replicon (as in the case of yeast artificial chromosomes, see Section 4.3.4).

Although some DNA cloning systems involve human and other mammalian cells as hosts, the great bulk of cell-based DNA cloning has used modified bacterial or fungal host cells. The former cells are widely used because of their capacity for rapid cell division. Bacterial cell hosts have a single circular double-stranded chromosome with a single origin of replication. Replication of the host chromosome subsequently triggers cell division so that each of the two resulting daughter cells contains a single chromosome like their parent cell (i.e. the copy number is maintained at one copy per cell). However, the replication of extrachromosomal replicons is not constrained in this way: many such replicons go through several cycles of replication during the cell cycle and can reach high copy numbers.

### Extrachromosomal replicons as vector molecules

Two basic types of extrachromosomal replicons are found in bacterial cells:

- **Plasmids** are small circular double-stranded DNA molecules which individually contain very few genes. Their existence is intracellular, being vertically distributed to daughter cells following host cell division, but they can be transferred horizontally to neighboring cells during bacterial conjugation. Natural examples include plasmids which carry the sex factor (F) and those which carry drug-resistance genes.

- **Bacteriophages** are viruses which infect bacterial cells. DNA-containing bacteriophages often have genomes containing double-stranded DNA which may be circular or linear. Unlike plasmids, they can exist extracellularly. The mature virus particle (**virion**) has its genome encased in a protein coat so as to facilitate adsorption and entry into a new host cell.

In order for naturally occurring replicons to be used as vector molecules for cell-based DNA cloning, various modifications need to be made. Similarly, the host cells that are used for cloning are specialized cells whose genotype has been selected to optimize their use in DNA cloning. Typically, cloning systems are designed to ensure that joining of the foreign DNA fragment occurs at a unique location in the vector molecule. Additionally, they have in-built selection systems so that cells which contain the relevant vector molecule can be specifically selected. In many cases, there are additional screening systems to ensure detection and propagation of cells containing recombinant DNA (see Section 4.2.5).

### 4.2.2 Restriction endonucleases enable the target DNA to be cut into pieces of manageable size and facilitate ligation to similarly cut vector molecules

A major boost to the development of cell-based DNA cloning was the discovery and exploitation of type II restriction endonucleases, enzymes which normally cleave DNA whenever a small, specific recognition sequence, usually 4–8 base pairs (bp) long occurs (see *Box 4.1* and *Table 4.1*).

The recognition sequences for the vast majority of type II restriction endonucleases are normally **palindromes**, that is the sequence of bases is the same on both strands when read in the $5' \rightarrow 3'$ direction, as a result of a twofold axis of symmetry. In some cases, the cleavage points occur exactly on the axis of symmetry, giving products (restriction fragments) which are **blunt-ended** (*Figure 4.3*). In most cases, however, the cleavage points do not fall on the symmetry axis, so that the resulting restriction fragments possess so-called $5'$ overhangs or $3'$ overhangs.

Overhanging ends generated by cleavage with a restriction nuclease are often described as **sticky ends** or **cohesive termini** because the two overhanging ends of each fragment are complementary in base sequence, and will have a tendency to associate with each other, or with any other similarly complementary overhang, by forming base pairs. Different fragments with the same sequences in their overhanging ends can be generated by: (i) cutting with the same restriction nuclease; (ii) cutting with different restriction endonucleases that happen to recognize

**Box 4.1**

### Restriction endonucleases and modification–restriction systems

Bacteriophages that are liberated from a bacterium of a particular strain can infect other bacteria of the same strain but not those of a different strain. This is because the phage DNA has the same modification pattern as the DNA of bacterial strains it can infect; the phage is 'restricted' to that strain of bacteria. The restriction is not an absolute one: some phages can escape restriction and can acquire the modification pattern of the new host.

The basis of modification–restriction systems is now known to involve two types of enzyme activity:

(i)   a sequence-specific DNA methylase activity provides the basis of the modification pattern;

(ii)  a sequence-specific restriction endonuclease activity underpins the restriction phenomenon by cleaving phage DNA whose modification (methylation) pattern is different from that of the host cell DNA.

The bacterial strain possesses a *DNA methylase activity with the same sequence specificity as the corresponding restriction endonuclease activity*. As a result, cellular restriction endonucleases will not cleave the appropriately methylated host cell DNA but may cleave incoming phage DNA, if not methylated appropriately. *Note*, however, that some plasmids and bacteriophages possess genes for modification and restriction systems so that their presence in a bacterium determines its specificity.

the same target sequence (**isoschizomers**); or (iii) by cutting with enzymes which have different recognition sequences but happen to produce compatible sticky ends, for example *Bam*HI and *Mbo*I (*Figure 4.3*).

The termini of restriction fragments which have the same type of overhanging ends can associate in a variety of different ways, either intramolecularly (cyclization), or between molecules to form linear **concatemers** or circular compound molecules. Intermolecular reactions occur most readily at high DNA concentrations. At very low DNA concentrations, however, individual termini on different molecules have less opportunity of making contact with each other, and intramolecular cyclization is favored.

Because the overhanging ends generated by restriction endonucleases are very short (typically four nucleotides or less), hydrogen bonding between complementary overhanging ends provides a rather weak contact between two molecules, and can only be maintained at low temperatures. However, it does facilitate subsequent covalent bonding between the two associated molecules (DNA ligation). This is performed using the enzyme DNA ligase. Ligation of blunt-ended fragments is also possible, although less efficient than sticky end ligation.

Generally, ligation reactions are designed to promote the formation of recombinant DNA (by ligating target DNA to vector DNA), although vector cyclization, vector–vector concatemers and target DNA–vector DNA ligation are also possible (see *Figure 4.4*). To achieve this, the vector molecules are often treated so as to prevent or minimize their ability to undergo cyclization. There are two common ways of achieving this.

**Table 4.1:** Restriction endonucleases

| Enzyme | Source | Sequence cut | Average expected fragment size (kb) in human DNA[a] |
|---|---|---|---|
| Alul | *Arthrobacter luteus* | AGCT | 0.3 |
| HaeIII | *Hemophilus aegyptus* | GGCC | 0.6 |
| Taql | *Thermus aquaticus* | TCGA | 1.4 |
| Mnll | *Moraxella nonliquefaciens* | CCTC/GAGG | 0.4 |
| HindIII | *Hemophilus influenzae* Rd | AAGCTT | 3.1 |
| EcoRI | *Escherichia coli* R factor | GAATTC | 3.1 |
| BamHI | *Bacillus amyloliquefaciens* H | GGATCC | 7.0 |
| Pstl | *Providencia stuartii* | CTGCAG | 7.0 |
| Msrl | *Microcoleus* species | CCTNAGG[c] | 7.0 |
| Smal | *Serratia marcescens* | CCCGGG | 78 |
| BssHII | *Bacillus stearothermophilus* | GCGCGC | 390[b] |
| Notl | *Norcadia otitidis-caviarum* | GCGGCCGC | 9766[b] |

[a] Assuming 40% G + C, and a CpG frequency 20% of that expected.

[b] Observed average sizes are often lower than these estimates.

[c] N = A, C, G or T.

*Note:* Names are normally derived from the first letter of the genus and the first two letters of the species name, e.g. *Pst*I is the first restriction nuclease to have been isolated from *Providencia stuartii*. *Mnl*I is an example of an enzyme whose recognition sequence is not palindromic. So-called rare-cutters often have recognition sequences containing one or more CpG dinucleotides and cut vertebrate DNA comparatively infrequently.

CHET01439280



**Figure 4.3:** Restriction endonucleases can generate blunt-ended fragments or fragments with 5′ or 3′ overhanging ends.

■ *Cutting of vectors with two different restriction endonucleases.* Often, vector molecules have multiple unique restriction sites, in which foreign DNA can be cloned, occurring in a short segment of the molecule. It is often convenient, therefore, to cut the vector with two restriction endonucleases which do not produce complementary overhanging ends (e.g. *Eco*RI and *Bam*HI), and remove the small vector fragment between the sites, resulting in a vector molecule whose two ends cannot religate. However, if target DNA is cut with the same enzyme combination, recombinant DNA can easily be formed.

■ *Vector dephosphorylation.* During DNA ligation *in vitro*, the enzyme DNA ligase will catalyze the formation of a phosphodiester bond only if one nucleotide contains a 5′ phosphate group and the other contains a 3′ hydroxyl group. If the 5′ phosphate groups at both ends of the vector DNA are removed by treatment with alkaline phosphatase, the tendency for the vector DNA to recircularize will therefore be minimized. A foreign DNA insert can, however, provide 5′-terminal phosphates which can then be joined to the 3′ hydroxyl groups provided by the vector. This method, therefore, increases the frequency of cells containing recombinant DNA.

### 4.2.3 Introducing recombinant DNA into recipient cells provides a method for fractionating a complex starting DNA population

The plasma membrane of cells is selectively permeable and does not normally admit large molecules such as long DNA fragments. However, cells can be treated in certain ways (e.g. by exposure to certain high ionic strength salts, short electric shocks, etc.) so that the permeability properties of the plasma membranes are altered. As a result, a fraction of the cells become **competent**, that is capable of taking up foreign DNA from the extracellular environment. Only a small percentage of the cells will take up the foreign DNA (DNA transformation). However, those that do will often take up only a single molecule (which can, however, subsequently replicate many times within a cell). *This is the basis of the critical fractionation step in cell-based DNA cloning;* the population of transformed cells can be thought of as a sorting office in which the complex mixture of DNA fragments is sorted by depositing individual DNA molecules into individual recipient cells (*Figure 4.5*).

Because circular DNA (even nicked circular DNA) transforms much more efficiently than linear DNA, most of the cell transformants will contain cyclized products rather than linear recombinant DNA concatemers and, if

CHET01439281



| BglII | BamHI | PstI | BglII + BamHI | BglII + PstI | BamHI + PstI |
|---|---|---|---|---|---|

**Figure 4.9:** Generating a restriction map.

The size patterns from double digests provide information on the relative locations of restriction sites. The example shows size fractionation by agarose gel electrophoresis of restriction fragments following incubation of a 6.2 kb DNA fragment with the indicated enzymes. New bands in the double digests (i.e. not found in the original single digests) are indicated by black boxes. In the *Bgl*II + *Bam*HI double digest, the original 1.7 kb and 0.3 kb bands from the *Bgl*II digest alone are maintained, suggesting that these fragments do not have a *Bam*HI site, while the 4.2 kb *Bgl*II fragment is replaced by 3.5 kb and 0.7 kb fragments, suggesting that there is a *Bam*HI site within 0.7 kb from one end of the 4.2 kb *Bgl*II fragment. Similarly, in the *Bam*HI + *Pst* I double digest, the 1.4 kb and 1.2 kb fragments seen in the *Pst*I digest alone are maintained, suggesting that they lack a *Bam*HI site, while the 3.6 kb *Pst*I fragment is replaced by a 2.6 kb + 1.0 kb fragment, as a result of possession of an internal *Bam*HI site located 1.0 kb from one end. By comparing all three patterns of double digestion, the restriction map at the bottom can be deduced. Note that restriction mapping is often helped by the use of partial digests and also by end-labeling (Section 5.1.1).

ever, the size of different DNA sequences of interest can vary enormously (e.g. human gene sizes are known to vary between 0.1 kb and 2.5 Mb). The first cell-based cloning systems to be developed could clone only rather small DNA fragments. Recently, however, there have been rapid developments in cloning systems that permit cloning of very large DNA fragments.

### 4.3.1 Plasmid vectors provide a simple way of cloning small DNA fragments in bacterial (and simple eukaryotic) cells

In order to adapt natural plasmid molecules as cloning vectors, several modifications are normally made:

■  Insertion of a multiple cloning site polylinker. This is a short (~30 bp) synthetic sequence which contains

unique restriction sites for a variety of common restriction nucleases (pre-existing restriction sites for these enzymes will be deleted from the plasmid if necessary to ensure the presence of unique cloning sites).

■  Insertion of an antibiotic resistance gene. The host cells that are used must naturally be sensitive to the antibiotic in question so that any vector molecule which transforms a host cell can confer antibiotic resistance. By plating transformed cells on a medium containing the antibiotic, only those cells that have been transformed by vector molecules survive.

■  Insertion of a selection system for screening for recombinants. Typically this involves arranging for the multiple cloning site polylinker to be inserted into an expressible gene or gene fragment within the plasmid (see Section 4.2.5).

The plasmid vector pUC19 contains a polylinker with unique cloning sites for multiple restriction nucleases and an ampicillin resistance gene to permit identification of transformed cells (*Figure 4.10*). In addition, selection for recombinants is achieved by insertional inactivation of a component of the β-galactosidase gene, a complementary portion of this gene being provided by using a specially modified *E. coli* host cell.

### 4.3.2 Lambda and cosmid vectors provide an efficient means of cloning moderately large DNA fragments in bacterial cells

The major disadvantage of plasmid vectors is that their capacity for accepting large DNA fragments is severely limited: most inserts are a few kilobases in length and inserts larger than 5–10 kb are very rare. Additionally, standard methods of transformation of bacterial cells with plasmid vectors are relatively inefficient. To address these difficulties, attention was focused at an early stage on the possibility of using bacteriophage lambda as a cloning vector. The wild-type λ virus particle (virion) contains a genome of close to 50 kb of linear double-stranded DNA packaged within a protein coat and has evolved a highly efficient mechanism of infecting *E. coli* cells. After the λ virion attaches to the bacterial cell, the coat protein is discarded and the λ DNA is injected into the cell. At the extreme termini of the λ DNA are over-hanging 5′ ends which are 12 nucleotides long and complementary in base sequence. Because these large 5′ overhangs can base-pair, they are effectively sticky ends, similar to, but more cohesive than, the small sticky ends generated by some restriction nucleases (see Section 4.2.2). Such cohesive properties are recognized in the name given to this sequence – the **cos** sequence. Once inside the bacterial cell, the cos sequences base-pair, and sealing of nicks by cellular ligases results in the formation of a double-stranded circular DNA. Thereafter the λ DNA can enter one of two alternative pathways (*Figure 4.11*):

■  **The lytic cycle**. The λ DNA replicates, initially bi-directionally, and subsequently by a rolling circle



**Figure 4.10:** Map of plasmid vector pUC19.

The origin of replication (ori) was derived originally from a ColE1-like plasmid, pMB1. The ampicillin resistance gene ($Ap^R$) was derived originally from the plasmid RSF 2124 and permits selection for cells containing the vector molecule. A portion of the *lacZ* gene is included and is expressed to give an amino-terminal fragment of β-galactosidase. This is complemented by a mutant *lacZ* gene in the host cell: the products of the vector and host cell *lacZ* sequences, although individually inactive, can associate to form a functional product. The 54 bp polylinker multiple cloning site (capital letters) is inserted into the vector *lacZ* (lower case letters) component in such a way as to preserve the reading frame and functional expression. However, cloning of an insert into the multiple cloning site (MCS) will cause insertional inactivation, and absence of β-galactosidase activity.

model which generates linear multimers of the unit length. Coat proteins are synthesized and the λ multimers are snipped at the cos sites to generate unit lengths of λ genome which are packaged within the protein coats. Some of the λ gene products lyse the host cell, allowing the virions to escape and infect new cells.

■ **The lysogenic state**. The λ genome possesses a gene *att* which has a homolog in the *E. coli* chromosome. Apposition of the two *att* genes can result in recombination between the λ and *E. coli* genomes and subsequent integration of the λ DNA within the *E. coli* chromosome. In this state, the λ DNA is described as a **provirus** and the host cell as a lysogen because, although the λ DNA can remain stably integrated for long periods, it has the capacity for excision from the host chromosome and entry into the lytic cycle (*Figure 4.11*). Genes required for lysogenic function are located in a central segment of the λ genome (*Figure 4.12*).

The decision to enter the lytic cycle or the lysogenic state is controlled by two regulatory genes, cI and *cro*. These two genes are mutually antagonistic: in the lytic state the *cro* protein dominates, leading to repression of cI, whereas in the lysogenic state the cI repressor dominates and suppresses transcription of other λ genes including *cro*. In normally growing host cells, the lysogenic state is favored and the λ genome replicates along with the host chromosomal DNA. Damage to host cells favors a transition to the lytic cycle, enabling the virus to escape the damaged cell and infect new cells.

In order to design suitable cloning vectors based on λ, it was necessary to design a system whereby foreign DNA could be attached to the λ replicon *in vitro* and for the resultant recombinant DNA to be able to transform *E. coli* cells at high efficiency. The latter requirement was achieved by developing an *in vitro* packaging system which mimicked the way in which wild-type λ DNA is packaged in a protein coat, resulting in high infection efficiency (*Figure 4.13*).

Several major types of cloning vector that have been developed by modifying phage λ, or utilizing the size selection imposed by cos sequences, are described in the following sections.

### Replacement λ vectors

Only DNA molecules from 37 to 52 kb in length can be stably packaged into the λ particle. The central segment of the λ genome contains genes that are required for the lysogenic cycle but are not essential for lytic function. As a result, it can be removed and replaced by a foreign DNA fragment. Using this strategy, it is possible to clone foreign DNA up to 23 kb in length, and such vectors are normally used for making genomic DNA libraries.

### Insertion λ vectors

Lambda vectors used for making cDNA libraries do not require a large insert capacity (most cDNAs are <5 kb long). Design of insertion vectors often involves modification of the λ genome to permit insertional cloning into the cI gene.



**Figure 4.11:** Phage λ can enter both lytic and lysogenic pathways.

### Cosmid vectors

Cosmid vectors contain cos sequences inserted into a small plasmid vector. Large (~30–44 kb) foreign DNA fragments can be cloned using such vectors in an *in vitro* packaging reaction because the total size of the cosmid vector is usually only about 8 kb (see *Figure 4.14*).

### 4.3.3 Large DNA fragments can be cloned in bacterial cells using vectors based on bacteriophage P1 and F factor plasmids

Because the human and other mammalian genomes are so large, and because many individual genes can be very large (see *Figure 7.7*), there was a need for the development of new cloning vectors that could accept large DNA inserts. A number of such vectors have been developed recently (see *Table 4.2*) and have found immediate uses in general physical mapping of genomes and in permitting the characterization and expression of large genes or gene complexes. Examples of such vectors are discussed below.

### Bacterial artificial chromosome (BAC) vectors

Many vectors which are popularly used for DNA cloning in bacterial cells contain high to medium copy number replicons. The advantage of vectors which contain such replicons is the high yield of DNA they afford: each cell in which a vector molecule is propagated will have several to multiple copies of the vector molecule, depending on the replication efficiency of its replicon. However, an important disadvantage is that such vectors often show structural instability of inserts, resulting in deletion or rearrangement of portions of the cloned DNA. Such instability is particularly common in the case of DNA inserts of eukaryotic origin where repetitive sequences occur frequently and, as a result, it is difficult to clone and maintain intact large DNA in bacterial cells.

In order to overcome this limitation, attention has recently been focused on vectors based on low copy number replicons, such as the *E. coli* fertility plasmid, the F-factor. This plasmid contains two genes, *parA* and *parB*, which maintain the copy number of the F factor at 1–2 per *E. coli* cell. Vectors based on the F factor system are able to

CHET01439284

# EXHIBIT H



Express Mail Label No. EV 326 990 549 US                    Attorney Docket No.: 55525.8045.US01

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of:  Macevicz          Examiner:  F. Lu

Serial No.:  10/706,118                 Art Unit:  1634

Filed:  November 12, 2003               Conf. No.  8171

For:  **Method and Compositions for Ordering Restriction Fragments**

## Amendment

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

In response to the Office action mailed November 2, 2005 in the above-identified application, please amend the application as indicated below.

No fees are believed due with this communication. However, the Commissioner is hereby authorized and requested to charge any deficiency in fees herein to Deposit Account No. 50-2207.

1

Express Mail Label No. EV 326 990 549 US                    Attorney Docket No.: 55525.8045.US01

## **Amendments to the Claims:**

1-22. (Cancelled)

23. (Withdrawn)  A method of ordering pairs of sequence tags, the method comprising the steps of:

a) providing a population of pairs of sequence tags of restriction fragments, produced by digesting a fragment of genomic DNA with a plurality of combinations of restriction endonucleases;

b) removing duplicate pairs of sequence tags from the population;

c) selecting a pair of sequence tags from the population;

d) comparing each sequence tag of the selected pair with each sequence tag of a first pair and a last pair of a candidate ordering;

e) adding the selected pair to an end of the candidate ordering whenever a sequence tag of the selected pair matches the sequence tag of the first pair or the last pair of the candidate ordering, to form a new candidate ordering; and

f) repeating steps c) through e) until all pairs of the population have been selected.

24. (Withdrawn)  The method of claim 23, wherein each population of pairs of sequence tags consists of n pluralities of pairs of sequence tags, each plurality being formed by digesting said fragment of genomic DNA in n separate reactions, each with a different n-1 combination of restriction endonucleases, wherein each pair of sequence tags is formed by ligating a portion of each end of each restriction fragment together.

25. (Withdrawn)  The method of claim 24, wherein said population of pairs of sequence tags consists of samples of pairs of sequence tags from each of said n pluralities.

26. (Withdrawn)  The method of claim 25, wherein each of said samples has the same size.

27. (Withdrawn)  The method of claim 26, wherein n =3 and each said restriction

2

Express Mail Label No. EV 326 990 549 US            Attorney Docket No.: 55525.8045.US01

endonuclease has a six-basepair recognition site.

28. (Currently amended)  A plurality of oligonucleotides derived from restriction fragments of a polynucleotide,

each said oligonucleotide containing first and second end segments from opposite ends of one such restriction fragment, wherein

said first end segment consists of a first end sequence, having 5 to 12 basepairs, immediately adjacent to a cleaved restriction site,

said second end segment consists of a second end sequence, having 5 to 12 basepairs, immediately adjacent to a cleaved restriction site,

and said first end sequence and said second end sequence[[s]] are ligated directly together;

wherein each end sequence contains the same number of basepairs;

and wherein each end sequence in the plurality of oligonucleotides is unique.

29. (Previously presented)  The oligonucleotide composition of claim 28, wherein each said restriction fragment has ends produced by digestion with different restriction endonucleases.

30. (Previously presented)  The oligonucleotide composition of claim 29, wherein each said restriction fragment has ends produced by digestion of two different restriction endonucleases selected from a group consisting of three different restriction endonucleases.

31. (Previously presented)  The oligonucleotide composition of claim 30, wherein each of said three different restriction endonucleases has a six-basepair recognition site.

32-33.   (Cancelled)

3

Express Mail Label No. EV 326 990 549 US                    Attorney Docket No.: 55525.8045.US01

## REMARKS

Reconsideration of the rejections set forth in the Office action mailed November 2, 2005 is respectfully requested.  Claims 23-31 are pending.  Claims 28-31 are under examination, claims 32-33 have been cancelled, and claims 23-27 are currently withdrawn from consideration.

## I.   Amendments

Claim 28 is amended to recite "said first end sequence and said second end sequence" in place of "said first and second end sequences", so that explicit antecedent support is provided.

Claim 28 is also amended, for emphasis, to state that the end sequences are ligated "directly" together.

Claim 28 is also amended to more particularly point out the features of the invention, by reciting that each end sequence in the plurality of oligonucleotides is unique.  Support is found, for example, at page 7, lines 18-35.  See, for example, lines 24-25 ("...the number of nucleotides determined could be as low as five or six, and still have a significant probability that each end sequence would be unique"), and 27-28 ("for polynucleotides less than or equal to 10 megabases, 9-12 nucleotides are preferably determined to ensure that the end sequences are unique").  This feature ensures that each end sequence is effective to uniquely identify the restriction fragment from which it was derived.  See e.g. page 9, lines 31-33: "In a polynucleotide having a random sequence of nucleotides, a 9-mer appears on average about once every 262,000 bases. Thus, 9-mer sequences are quite suitable for uniquely labeling restriction fragments...".

Claim 32 is cancelled.

No new matter is added by any of the amendments.

## II.   Rejections under 35 U.S.C. §112, Second Paragraph

Claim 28 was rejected under 35 U.S.C. §112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

Claim 28 has been amended to recite "said first end sequence and said second end

4

sequence" in place of "said first and second end sequences", so that explicit antecedent support is provided.

In view of the foregoing, the applicants submit that amended claim 28 complies with the requirements of 35 U.S.C. §112, second paragraph.

III.  Rejections under 35 U.S.C. §102(b)

Independent claim 28 and its dependent claims were rejected under 35 U.S.C. §102(b) as being anticipated by New England Biolabs 96/97 Catalog, pages 19, 37, 108 and 109. This rejection is respectfully traversed for the following reasons.

A.  The Claims

Independent claim 28 recites a plurality of oligonucleotides derived from restriction fragments of a polynucleotide, each said oligonucleotide containing first and second end segments from opposite ends of one such restriction fragment, wherein

said first end segment consists of a first end sequence, having 5 to 12 basepairs, immediately adjacent to a cleaved restriction site,

said second end segment consists of a second end sequence, having 5 to 12 basepairs, immediately adjacent to a cleaved restriction site,

and said first end sequence and said second end sequence are ligated directly together;

wherein each end sequence contains the same number of basepairs;

and wherein each end sequence in the plurality of oligonucleotides is unique.

B.  The Prior Art

The Examiner refers in particular to a primer on page 109 of the cited catalog, having the following sequence:  5'd(**ATTGTTG**<u>CCGGG</u>AAG<u>CTAG</u>AGTA**AGTAGTT**)3', where the underlined regions are restriction enzyme recognition sites.  The boldfaced areas are stated by the Examiner to represent the same-length "end sequences" of the claim.

This structure does not meet the limitations of independent claim 28, for at least the following reasons.

5

Express Mail Label No. EV 326 990 549 US          Attorney Docket No.: 55525.8045.US01

As stated above, claim 28 recites that each "end sequence" is "immediately adjacent to a cleaved restriction site", and that "said first end sequence and said second end sequence are ligated directly together".

(1) The restriction sites in the cited structure are not <u>cleaved</u> restriction sites.

(2) The "end sequence" **AGTAGTT** is not "immediately adjacent" to the CTAG restriction site, whether it is cleaved or uncleaved. It is unclear to the applicant how two sequences that are four nucleotides apart could be considered "immediately adjacent".

(3) In the prior art structure, the first "end sequence" **ATTGTTG** and the second "end sequence" **AGTAGTT** are not ligated together, but rather are separated by a sequence of sixteen nucleotides.

Point (3) was actually addressed in the previous response, filed August 17, 2005, in addressing the reference Morgante *et al.*:

> "Morgante *et al.* teach the ligation of synthetic oligonucleotide adaptors to the ends of DNA restriction fragments.... the adaptors are not ligated to each other, but to both ends of a DNA fragment.
>
> The Examiner asserts that the claims as previously presented did not require that the pair of ligated sequence tags (now termed end sequences) be directly connected to each other (page 7 of Office Action).
>
> The independent claim as amended now clearly recites that "said first and second end sequences are ligated together"."

It is the applicant's view that two sequences that are separated by sixteen nucleotides, as in the prior art structure, would not be considered "ligated together", especially by one skilled in the art. Nonetheless, the claim has been amended, for emphasis, to state that the end sequences are ligated "directly" together.

The cited reference clearly does not disclose all of the elements set out above in claim 28 and inherently present in dependent claims 29-33. Accordingly, the applicant respectfully requests the Examiner to withdraw the rejection under 35 U.S.C. §102(b).

6

## IV.  Further Rejections under 35 U.S.C. §102(b)

Independent claim 28 and its dependent claims were rejected under 35 U.S.C. §102(b) as being anticipated by Howard *et al.*, *BioTechniques* 7:940-2 (1989).

### A.  The Claims

The subject matter of independent claim 28 is described above.

### B.  The Prior Art

The Examiner specifically refers to the vector shown in "Table 1" of the reference, which has the following sequence:

5'-**GAATTC**GCGGCCGCCATGGAGATCTCGAGGCCTATCGATCCGCGG**AAGCTT**-3',

where the underlined regions are restriction enzyme cleavage sites.  The boldfaced areas are stated by the Examiner to represent the same-length "end sequences" of the claim.

This structure does not meet the limitations of claim 28, for at least the following reasons.

Claim 28 recites that each "end sequence" is "immediately adjacent to a cleaved restriction site", and that "said first end sequence and said second end sequence are ligated directly together".

(1) The restriction sites in the structure are not <u>cleaved</u> restriction sites.

(2)  In the prior art structure, the first "end sequence" **GAATTC** and the second "end sequence" **AAGCTT** are separated by a sequence of 33 nucleotides.  It is unclear to the applicant how two segments that are separated by 33 nucleotides could be considered "ligated together", much less "ligated directly together".

The reference does not disclose all of the elements set out above in claim 28 and its dependent claims 29-33.  In view of this, the applicant respectfully requests the Examiner to withdraw the rejection under 35 U.S.C. §102(b).

## V.  Conclusion

Applicant would like to note that this is the fourth response filed in this application, and that the current Office Action appeared to raise issues that had been addressed earlier in prosecution, as noted above.  Moreover, the assertion regarding claim 32 on page 4 of the

Express Mail Label No. EV 326 990 549 US                    Attorney Docket No.: 55525.8045.US01

Office Action, though moot in view of the cancellation of this claim, referred to claim language ("having a size") which had been removed by amendment earlier in prosecution. Applicant respectfully requests more expedited prosecution of the claims.

In view of the foregoing, the applicant submits that the claims under examination are in condition for allowance. A Notice of Allowance is, therefore, respectfully requested.

If in the opinion of the Examiner a telephone conference would expedite the prosecution of the subject application, the Examiner is encouraged to call the undersigned at (650) 838-4403.

Respectfully submitted,

Date: Feb. 2, 2006

LeeAnn Gorthey
Registration No. 37,337

**Correspondence Address**:
CUSTOMER NO. 22918
PHONE: (650) 838-4403
FAX: (650) 838-4350

8

# EXHIBIT I

## CLASS 435,  CHEMISTRY:  MOLECULAR BIOLOGY AND MICROBIOLOGY

## SECTION I - CLASS DEFINITION

### STATEMENT OF CLASS SUBJECT MATTER

This class provides for the following subject matter when not provided for elsewhere:

A.  A process of using a microorganism or enzyme to synthesize a chemical product.

B.  A process of treating a material with a microorganism or enzyme to separate, liberate, or purify a preexisting substance.

C.  An in vitro process of measuring and testing in which: (1)  A microorganism or enzyme is used to determine the presence or identity of a compound or composition in a sample; (2) A microorganism is identified by propagation; (3) An enzyme is identified by its catalytic activity; (4) The presence of microorganisms is detected; (5) A live microorganism is used in an antigen antibody test as an antigen; (6) Fixed or stabilized non-living microorganisms, cells, or tissues are involved.

D.  A process of propagating a microorganism.

E.  A process in which the genetic structure of a microorganism or extrachromosomal genetic structure is altered.

F.  A process of organ or tissue maintenance.

G.A process of mashing or malting.

H.  Apparatus claimed or solely disclosed as for A-G.

I.  Microorganisms, per se, or the subcellular parts thereof.

J. Enzymes, immobilized enzymes or enzyme containing compositions not otherwise provided for and the processes for purifying enzymes or forming immobilized enzymes.

K. Compositions claimed or solely disclosed as for the propagation of microorganisms or for measuring and testing processes in C above.

L. Using microorganisms to destroy hazardous or toxic waste.

### CLASSIFICATION GUIDELINES FOR THIS CLASS

#### APPARATUS

This class takes only apparatus claimed or solely disclosed as for fermentation or enzymology, organ, and tissue maintenance or genetic engineering not otherwise provided for. Apparatus by name only which is claimed as a collection of compounds or compositions in a kit without structure is classified as described below in Lines With Other Classes and Within This Class.

#### COMPOSITIONS

In general, this class will not provide for compositions other than an immobilized or insolubilized enzyme or a test or culture media.

#### COMPOUNDS

In general, this class does not provide for compounds other than an immobilized or insolubilized enzyme or an enzyme, per se. Production of metal or ammonium salts of a compound are classified with the production of that compound.

#### AMINO ACID RESIDUES

If upon hydrolysis of an unidentified product the only residues are amino acids, it should be presumed that the product is a protein or peptide. If other organic moieties are present after hydrolysis of the product then placement should be made upon the basis of the presence of such structure in the product.

#### PRESUMPTION

In the absence of a clearly claimed step of killing or inactivating a microorganism in an antigen-antibody test the microorganism should be treated as a living antigen.

## SECTION II - LINES WITH OTHER CLASSES AND WITHIN THIS CLASS

See References to Other Classes, below, for lines with classes providing for the use of a microorganism, an enzyme and the apparatus therefor and the composition classes providing for the products of a microorganism or enzyme and for lines with other related classes.

The rules for determining Class placement of the Original Reference (OR) for claimed chemical compositions

CHET01439285

means for physically removing material as a sample.

SEE OR SEARCH THIS CLASS, SUB-CLASS:
286.3,   for an automatically controlled plater, streaker, or spreader apparatus.

**309.2   Means for inoculation or sampling of a closed vessel:**
This subclass is indented under subclass 309.1. Apparatus including means to penetrate a closed vessel for the purpose of inoculation or sampling.

**309.3   Loop or wire streaker:**
This subclass is indented under subclass 309.1. Apparatus of wire or plastic material specifically adapted to pick-up and move colonies of microorganisms or small amounts of liquid containing microorganisms.

**309.4   Replica plate:**
This subclass is indented under subclass 309.1. Apparatus including a means specifically adapted to sample from a first plate, and transfer and inoculate to a second plate so that an identical pattern of colonies forms on the second plate.

**317.1   MISCELLANEOUS (E.G., SUBCELLULAR PARTS OF MICROORGANISMS, ETC.):**
This subclass is indented under the class definition. Subject matter not otherwise provided for and including subcellular parts of microorganisms such as organelles, i.e., mitochondria, microsomes, chloroplasts, etc.

SEE OR SEARCH THIS CLASS, SUB-CLASS:
1,        for apparatus for maintaining a tissue or organ in a viable state.
284+,    for apparatus for the propagation of tissue.
820,     for subcellular parts of microorganisms.

SEE OR SEARCH CLASS:
422,     Chemical Apparatus and Process Disinfecting, Deodorizing, Preserving, or Sterilizing, subclass 105 for control elements responsive to a sensed operating condition; subclasses 150+ for

chemical analytical apparatus; subclass 162 for automatic analytical monitor and control of chemical processes; and subclasses 163+ for chemical analytical apparatus with continuous sample movement.
536,     Organic Compounds, subclass 27 for DNA fragments, genes, etc.

**320.1   VECTOR, PER SE (E.G., PLASMID, HYBRID PLASMID, COSMID, VIRAL VECTOR, BACTERIOPHAGE VECTOR, ETC.):**
This subclass is indented under the class definition. Subject matter directed to self-replicating nucleic acid molecules which may be employed to introduce a nucleic acid sequence or gene into a cell; such nucleic acid molecules are designated as vectors and may be in the form of a plasmid, hybrid plasmid, cosmid, viral vector, bacteriophage vector, etc.

(1)   Note. Vectors or vehicles may be used in the transformation or transfection of a cell. Transformation is the acquisition of new genetic material by incorporation of exogenous DNA. Transfection is the transfer of genetic information to a cell using isolated DNA or RNA.

(2)   Note. A plasmid is an autonomously replicating circular extrachromosomal DNA element. A hybrid plasmid is a plasmid which has been broken open, has had DNA from another organism spliced into it, and has been resealed. A cosmid is a plasmid into which phage lambda "cos" sites have been inserted.

(3)   Note. A viral vector (e.g., SV40, etc.) is a plant or animal virus which is specifically used to introduce exogenous DNA into host cells. A bacteriophage vector (e.g., phage lambda, etc.) is a bacterial virus which is specifically used to introduce exogenous DNA into host cells.

SEE OR SEARCH CLASS:
536,     Organic Compounds, subclass 27 for DNA fragments, genes, etc.

**325   ANIMAL CELL, PER SE (E.G., CELL LINES, ETC.); COMPOSITION THEREOF; PROCESS OF PROPAGAT-**

# EXHIBIT J



Corporate funding provided by

Sequence for Yourself
## Part I: Fragmentation of Chromosomes
**next**

**One Set of Chromosomes**
*Displayed here are 23 pairs of chromosomes -- one copy of the human genome. How is the genome sequenced? Let's do a little sequencing ourselves to find out...*





Thanks to our corporate funders for helping to make NOVA's Season 37 out of this world.

Watch the best science on television Tuesdays at 8:00 PM on most PBS stations

NOVA

Current technology lets us read only 500 bases at a time, which means that we can't start reading the A's, G's, C's, and T's at one end of a chromosome and continue until we get to its other end. So the first thing we need to do is to cut these chromosomes into small fragments.

**Start with Many Sets of Chromosomes**
To help us in piecing the fragments back together later on (explained in Part V), the fragments need to overlap. To create the overlap, we'll have to cut up many copies of the chromosomes, but at different locations.

We start with numerous cells from one person to obtain many sets of the chromosomes.



**Add Restriction Enzymes**
Restriction enzymes will cut up, or cleave, DNA molecules wherever they encounter a specific sequence of bases.

For example, one type of enzyme will cleave DNA wherever it encounters the sequence AAGCTT.



CHET01439287

**Potential Cleavage Sites**
Shown here are three identical chromosomes. The lines show all of the locations that one type of restriction enzyme might target.

However, we don't want the enzymes to cut at every possible location because then there would be no overlap.



**Limiting Cleavage**
To limit the cutting, we need to use a low concentration of the enzyme. With a low concentration, there just isn't enough of the enzyme available to cut the DNA at every possible site.



What we end up with are many overlapping fragments. At this point each fragment is about 150,000 base pairs long.

**Continue: Part II: Cloning**

Watch the Program Here | Our Genetic Future (A Survey)
Manipulating Genes: How Much is Too Much? | Understanding Heredity
Explore a Stretch of Code | Nature vs Nurture Revisited
Sequence for Yourself | Journey into DNA | Meet the Decoders
Resources | Update to Program | Teacher's Guide | Transcript
Site Map | Cracking the Code of Life Home

Editor's Picks | Previous Sites | Join Us/E-mail | TV/Web Schedule | About NOVA
Watch NOVAs online | Teachers | Site Map | Shop | Search | To Print
PBS Online | NOVA Online | WGBH

© | Updated April 2001

CHET01439288



Corporate funding provided by



Thanks to our corporate funders for helping to make NOVA's Season 37 out of this world.

Watch the best science on television Tuesdays at 8:00 PM on most PBS stations

NOVA

**Sequence for Yourself**
## Part II: Cloning
previous | next

**Mix Human Fragments to Vectors**
*To clone DNA, we isolate the fragments from one another, then make many copies, or clones, of each one of the fragments. This work is most often done in bacterial host cells.*



We have mixed our DNA fragments with cloning vectors. (A vector is a short piece of DNA that is capable of replicating on its own when inside a cell.) Vectors are usually circular, but these have been cut open by a restriction enzyme.

**Fragments and Vectors Combine**
With the help of a DNA ligase, which is an enzyme that helps to connect pieces of DNA, the human DNA fragments and the DNA of the vectors combine.



The vectors have become circular again.

**Vectors Shocked Into Bacteria**
Next, we bring together the vectors and bacteria cells and expose the mixture to a brief electrical shock. The shock forces some of the vectors into the cells of the bacteria.



If a cell takes in more than one vector (they almost never do), that cell will not go on to replicate.

**Let Cells Multiply**
The cells are spread out thinly on a growth medium and allowed to multiply. The cells are far enough away from one another to establish their own distinct colonies.



As the cells multiply and duplicate their own chromosomes, they duplicate the vectors as well. Each bacterial daughter cell ends up with a copy of the vector, which includes the human DNA fragment. Each colony on the plate will contain copies of a different piece of cloned DNA.

CHET01439289

**Pick a Colony**
When a colony has grown to about the size of a period in a book, it will contain a million cells. At this point we place the colony in a liquid culture, where it multiplies further.



Soon there are billions of copies of the original cell. Each cell contains a copy of the vector and within that vector the original human DNA fragment.

**Recover Cloned DNA**
We then expose all of the cells to a detergent, which ruptures the cells' walls, and to sodium hydroxide, which causes the bacteria's chromosomes to deteriorate and fall away from the vectors.



The circular vectors are affected by this treatment, too, but they quickly recover.

**Repeat**
So we now have billions of copies of human DNA (still attached to the vector), all derived from a single DNA fragment.



Each copy of this human DNA is 150,000 base pairs long, which is still too long for determining the sequence of its code. To get a batch of smaller fragments, we repeat the entire process just described. We end up with billions of copies of a fragment 2,000 to 4,000 base pairs long.

**Continue: Part III: Preparing DNA for Detection**

Watch the Program Here | Our Genetic Future (A Survey)
Manipulating Genes: How Much is Too Much? | Understanding Heredity
Explore a Stretch of Code | Nature vs Nurture Revisited
Sequence for Yourself | Journey into DNA | Meet the Decoders
Resources | Update to Program | Teacher's Guide | Transcript
Site Map | Cracking the Code of Life Home

Editor's Picks | Previous Sites | Join Us/E-mail | TV/Web Schedule | About NOVA
Watch NOVAs online | Teachers | Site Map | Shop | Search | To Print
PBS Online | NOVA Online | WGBH

© | Updated April 2001



NOVA
O N L I N E    Home | Search | Site Map | Shop | E-mail

CRACKING the CODE of LIFE

Home | Code Site Map

Sequence for Yourself
### Part III: Preparing DNA for Detection
previous | next

**Clones to Sequence**
*We now have billions of identical copies of a stretch of DNA 2,000 to 4,000 base pairs long. From these we need to create copies with special bases that our machines will be able to read. Instead of all being exactly alike, though, these new copies will have varying lengths and will be tagged with colored markers.*



vector          human DNA

Here is one of our many DNA clones, still attached to the vector. We have exposed the vector to heat, which has separated its double strand of DNA into two single strands.

**Add Material needed to Build new DNA**
We next add some of the material needed to construct the complement of the DNA clone. This includes the "regular" nucleotides (bases) of A's, G's, C's, and T's, an enzyme known as polymerase (which will help to connect the free nucleotides to the single strand of cloned DNA), and DNA primers.

primer
regular nucleotide

A DNA primer is a single-stranded piece of DNA of known sequence, generally about 20 bases long, that will initiate the building of a new DNA strand that is complementary to the cloned DNA.

**Another Ingredient: "Special" Nucleotides**
To the mix of regular nucleotides, polymerase, and primers we add a small amount of "special" nucleotides. Because of its molecular structure, whenever one of these special nucleotides adds itself to a growing DNA strand, the growth of that strand stops.

primer
regular nucleotide
special nucleotide



Corporate funding provided by



Thanks to our corporate funders for helping to make NOVA's Season 37 out of this world.

Watch the best science on television Tuesdays at 8:00 PM on most PBS stations

NOVA

CHET01439291

These nucleotides are special in another way, too. They fluoresce when struck by a laser beam. Each type of nucleotide is marked with its own color: A is marked with green, G with yellow, C with blue, and T with red.

**Build New Sequences**
The primer attaches itself to a complementary sequence on the vector and initiates the building of a new DNA strand.



To separate the new strand from the vector, we expose them to heat. With the new strand separated, the building of yet another strand along the original DNA fragment can begin again. This process is often repeated many times (around 40) to get the most mileage from each of the billions of vectors present.

**Many Copies of Various Lengths**
Initiated by the primer and with the help of the polymerase, sequence after sequence is built. Because of the special nucleotides, which get added occasionally at random locations, the lengths of the new copies range in size from one to the total number of bases in the vector.



We end up with billions of DNA strands of various lengths, each ending with a marked nucleotide. Every possible length of the human DNA will have many, many copies.

**Continue: Part IV: Detecting the Sequence**

Watch the Program Here | Our Genetic Future (A Survey)
Manipulating Genes: How Much is Too Much? | Understanding Heredity
Explore a Stretch of Code | Nature vs Nurture Revisited
Sequence for Yourself | Journey into DNA | Meet the Decoders
Resources | Update to Program | Teacher's Guide | Transcript
Site Map | Cracking the Code of Life Home

Editor's Picks | Previous Sites | Join Us/E-mail | TV/Web Schedule | About NOVA
Watch NOVAs online | Teachers | Site Map | Shop | Search | To Print
PBS Online | NOVA Online | WGBH

© | Updated April 2001

CHET01439292





Corporate funding provided by



### Sequence for Yourself
### Part IV: Detecting the Sequence
previous | next

**Add DNA to Capillary**
*So now we have billions of copies of a unique DNA strand, of various lengths, and each marked with a color. To get the sequence of A's, G's, C's, and T's, all we need to do is sort the strands according to length, then read the color of the bases of the pieces that are the same length to determine the last base for that length.*



We place our latest batch of DNA at one end of a capillary -- a thin plastic tube -- that is filled with a gel.

**Initiate Electrophoresis**
We apply an electric field to the gel -- positive at one end and negative at the other. This causes the negatively charged DNA pieces to migrate to the positive end.



Because of the gel's resistance, the smaller pieces of DNA travel faster through the gel than do the larger pieces. The movement of the pieces is very precise: For example, a piece that is 396 base pairs long will move ever so slightly faster than a piece that is 397 base pairs long.

**Detection**
As the DNA pieces move past the machine's detector, a laser causes the marker on the special nucleotide to fluoresce. There will be many copies of a DNA fragment of the exact same

CHET01439293

length passing the detector at the same time.

The combination of all of their tags will produce a reaction to the laser that is intense enough for the detector to read.

**Data Collection**
The greens, yellows, blues, and reds scanned by the detector are sent to a computer, which converts the colors into A's, G's, C's, and T's. Because the sequence of the primer is known, the computer can determine the first base of the cloned DNA strand and then the subsequent 500 bases.



Shown here are only a few strands worth of data. Keep in mind that the lengths of many strands are much longer and that there are perhaps thousands of copies for each specific length.

**Determine Sequence of 500 bp Reading**
With information about both the lengths of the DNA strands and the strands' final bases, the computer can easily determine the sequence of the strand.



Next, we need to piece together 500 bp sections to reconstruct the 2,000 to 4,000 bp fragment.

**Continue: Part V: Assembly and Finishing**

Watch the Program Here | Our Genetic Future (A Survey)
Manipulating Genes: How Much is Too Much? | Understanding Heredity
Explore a Stretch of Code | Nature vs Nurture Revisited
Sequence for Yourself | Journey into DNA | Meet the Decoders
Resources | Update to Program | Teacher's Guide | Transcript
Site Map | Cracking the Code of Life Home

Editor's Picks | Previous Sites | Join Us/E-mail | TV/Web Schedule | About NOVA
Watch NOVAs online | Teachers | Site Map | Shop | Search | To Print
PBS Online | NOVA Online | WGBH

© | Updated April 2001

CHET01439294





NOVA ONLINE          Home | Search | Site Map | Shop | E-mail

Home
CRACKING the CODE of LIFE
Code Site Map



Corporate funding provided by

Thanks to our corporate funders for helping to make NOVA's Season 37 out of this world.

Watch the best science on television Tuesdays at 8:00 PM on most PBS stations

NOVA

Sequence for Yourself
## Part V: Assembly and Finishing
previous

**Assembly of 500-Base Segments**

*Perhaps you noticed in the last section that the human DNA incorporated in the vector is 4,000 base pairs long and that the 500 bases of human DNA we can read has to be adjacent to the vector DNA. So how do we read the rest of the human DNA? The answer is by piecing together overlapping sequences.*



Because we have many overlapping pieces, we also have many starting points for the 4,000-base sequences -- enough to allow us to read every base.

**Assembly of 150,000-Base Segments**
With the help of computers, we assemble the 500-base sequences into the 150,000-base segments from which they were derived.



**Rebuilding the Chromosomes**
Finally, we determine the chromosome that the 150,000-base segment belongs to as well as where along the chromosome it belongs. We do this by looking for overlaps and by looking for matches in banding between the segments and chromosomes.

Using this approach -- called the "map-based shotgun approach" -- we can sequence the entire genome. To learn about the differences between this approach and the "whole genome shotgun" approach, check out the links in our Resources section.

**Final Notes**

5/27/2010 4:12 PM

CHET01439295

Although the job of piecing together overlapping fragments sounds straightforward, the task is a challenging one. Many gaps will need to be filled in, and there are areas where sequences are repeated many times, making it almost impossible to determine where some of the fragments belong.

In this explanation, some of the descriptions of the techniques used were simplified. Also, for each of the processes described here, researchers can use a variety of techniques to get the same results.

Watch the Program Here | Our Genetic Future (A Survey)
Manipulating Genes: How Much is Too Much? | Understanding Heredity
Explore a Stretch of Code | Nature vs Nurture Revisited
Sequence for Yourself | Journey into DNA | Meet the Decoders
Resources | Update to Program | Teacher's Guide | Transcript
Site Map | Cracking the Code of Life Home

Editor's Picks | Previous Sites | Join Us/E-mail | TV/Web Schedule | About NOVA
Watch NOVA online | Teachers | Site Map | Shop | Search | To Print
PBS Online | NOVA Online | WGBH

© | Updated April 2001

CHET01439296