IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LIFE TECHNOLOGIES CORPORATION; | : | CIVIL ACTION |
| APPLIED BIOSYSTEMS, LLC; INSTITUTE | : | |
| FOR PROTEIN RESEARCH; ALEXANDER | : | |
| CHETVERIN; HELENA CHETVERINA; and | : | |
| WILLIAM HONE | : | |
| | : | |
| Plaintiffs/Counterclaim Defendants | : | |
| | : | |
| vs. | : | |
| | : | |
| ILLUMINA, INC. and SOLEXA, INC. | : | NO. 09-706-RK |
| | : | |
| Defendants/Counterclaim-Plaintiffs | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                    **DECEMBER  15, 2010**

**BACKGROUND**

Plaintiffs Life Technologies Corp., Applied Biosystems, LLC (collectively

"LifeTech"), Institute for Protein Research, Alexander Chetverin, Helena Chetverina, and

William Hone filed this suit alleging that Illumina's Genome Analyzer® DNA-sequencing system

infringes claims 1, 3, 6, 7, 11, 12, 14, 15 and 16 of U.S. Patent No. 5,616,478 ("the '478 patent"),

claims 1, 2, 3, 6, 12, 15, 16, 17, 18, 20, 21 and 23 of U.S. Patent No. 5,958,698 ("the '698

patent"), and claims 1, 2, 4, 10, and 16 of U.S. Patent No. 6,001,568 ("the '568 patent") ("the

Chetverin patents").

Illumina filed counter-claims alleging that LifeTech's SOLiD™ DNA-sequencing

systems infringe claims 1, 2, 3, 5, and 6 of the U.S. Patent No. 6,654,505 ("the '505 patent"),

claims 1-4 of U.S. Patent No. 6,831,994 ("the '994 patent"), claims 1-4 and 7 of U.S. Patent No.

7,232,656 ("the '656 patent"), and claims 1-5 of U.S. Patent No. 7,598,035 ("the '035 patent") (collectively "the Illumina patents").

On My 2, 2010, the parties exchanged their proposed claim constructions. On May 7, 2010, the parties filed their Joint Claim Construction Chart and Statement (D.I.-57), and on May 13, 2010, the parties filed their Amended Joint Claim Construction Chart and Statement (D.I.-58) setting out their current proposed constructions. The Claim Construction hearing was held on July 26, 2010.

## STANDARDS FOR CLAIM CONSTRUCTION

In order to prevail in a patent infringement action, a plaintiff must show that the patent claim "covers the alleged infringer's product or process." Markman v. Westview Instruments, Inc., 517 U.S. 370, 374 (1996). Thus, the initial step in an infringement analysis focuses on determining the meaning and the scope of the claims of the patent. Wyeth v. Abbott Labs., No. 08-230, 2010 WL 3001913, at *1 (D.N.J. July 28, 2010) (citing Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 988 (Fed. Cir. 1995)). Notably, "[c]laim construction is a matter of law . . . therefore, it is '[t]he duty of the trial judge . . . to determine the meaning of the claims at issue.'" Id. (citing Exxon Chem. Patents, Inc. v. Lubrizoil Corp., 64 F.3d 1553, 1555 (Fed. Cir. 1995)).

In Phillips v. AWH Corp., the United States Court of Appeals for the Federal Circuit ("Federal Circuit") emphasized that "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d 1303, 1312 (internal quotations omitted) (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves . . . to define

2

the scope of the patented invention.").  Generally, the words of a claim are given their "ordinary and customary meaning," which is defined as "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  Phillips, 415 F.3d at 1312-13 (citations omitted).  In this regard, the Federal Circuit has noted the following:

> It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed.  Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field.  The inventor's words that are used to describe the invention-the inventor's lexicography-must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology.  Thus the court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history.

Id. (quoting Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998)).

Importantly, in determining the meaning of a claim as understood by a person of ordinary skill in the art, the court may look to various sources from which the proper meaning may be discerned.  Wyeth, 2010 WL 3001913, at *2.  Specifically, "[t]hese sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art .'"  Phillips, 415 F.3d at 1314 (citations omitted).  "While a court is permitted to turn to extrinsic evidence, such evidence is generally of less significance and less value in the claim construction process.  Extrinsic evidence would include evidence that is outside the patent and prosecution history, and may include expert testimony, dictionaries and treatises."  Wyeth, 2010 WL 3001913, at *2.  As courts have explained, "[s]uch evidence, though 'shed[ding] useful light on the relevant art,' is 'less significant than the intrinsic record in determining the legally operative meaning of claim language,' and 'is unlikely to result in a reliable interpretation of

3

patent claim scope unless considered in context of the intrinsic evidence.'" <u>Eppendorf AG v. Nanosphere, Inc.</u>, No. 09-0504, 2010 WL 2757097, at *2 (D. Del. July 12, 2010) (citing <u>Phillips</u>, 415 F.3d at 1317-19).

1. "Amplification system" ('478 patent, all claims; '698 patent, all claims; '568 patent, claim 16)

"Polymerase enzyme system" ('568 patent, claims 1, 2, 4, 10)

| Term(s) | LifeTech's Construction | Illumina's Construction |
|---|---|---|
| "amplification system"<br><br>"polymerase enzyme system" | a set of components that together can amplify a nucleic acid | a set of components (including a buffer, a nucleic acid amplification enzyme, nucleotide substrates, and, where required, oligonucleotide primers) that together can amplify a nucleic acid |

LifeTech and Illumina both agree that the amplification system is a set of components that together can amplify a nucleic acid. This language is contained in both parties proposals. LifeTech's view is that beyond this no further construction is required. Illumina's construction would add the additional words (including a buffer, a nucleic acid amplification enzyme, nucleotide substrates, and where required, oligonucleotide primers).

After reviewing the arguments advanced by the parties the Court concludes that Plaintiffs' construction, i.e., " a set of components that together can amplify a nucleic acid" should be adopted. Supporting this we note that several dependent claims specify particular amplification or polymerase enzyme systems to be used, indicating that the independent claims containing the claim terms at issue are broader and do not require the specific recitation of individual components. *See, e.g.*, JA18 ('478 patent) at claim 12 (claiming particular nucleotides)

and claims 4, 5, 6 (claiming the use of VRP, 3SR and PCR systems); JA38 ('698 patent) at claims 13, 14, 15 (same); JA57 ('568 patent) at claims 6, 7, 10 (same).  Furthermore, the specification refers generally to various examples of amplification or polymerase enzyme system without requiring any specific components to be used with the invention so long as the combination of components that is used can accomplish the necessary amplification.  *See, e.g.*, JA8-9 ('478 patent) at 4:66-5:1.  ("The method can employ any system of exponential amplification of nucleic acid in vitro, such as VRP reaction, PCR, or 3SR reaction."); JA8 at 4:52-54.  ("The immobilized medium contains an amplification system comprising a cell-free enzyme system capable of exponentially amplifying the nucleic acids."); JA10 at 7:40-44 ("The immobilized medium according to our invention also contains the components of an amplification and/or an expression system comprising the components of a cell-free enzyme system capable of exponential amplification and/or of expression of nucleic acids respectively.")

The prosecution history of the '478 patent shows that the patentee explained that "amplification systems are not the claimed invention, that a wide variety are disclosed, and that there is no teaching that the invention is limited to a particular system."  *See* JA615 (paper 22 at 7); JA574 (paper 18 at 15) (explaining that the claimed invention is not about an amplification per se, but about a way to apply amplification techniques generally); id.  ("Whatever exponential enzymatic nucleic acid amplification is selected for use in applicant's method, the necessary components for that amplification system must be provided so that templates for that system will be amplified.").  The PTO office agreed that specific components need not be recited in the claims.  *See* JA614 (paper 22 at 6) ("Given the extensive teaching, applicant maintains that individual components need not be recited.  The Examiner accepted the applicant's

explanation.").

One skilled in the art would agree that amplification systems or polymerase enzyme systems would generally contain certain components such as a buffer, enzyme, and substrates, the claims are not defined in that manner.

Amplification system and polymerase enzyme system are a set of components that together can amplify a nucleic acid.

2.   "Aqueous liquid phase that includes a cell-free, enzymatic, exponential nucleic acid amplification system" ('478 patent, claims 1, 2, 6, 7, 11, 12; '698 patent, claims 17, 18, 20, 21, 23)

"Aqueous liquid phase that includes a cell-free nucleic acid polymerase enzyme system" ('568 patent, claims 1, 2, 4, 10)

| Term(s) | LifeTech's Construction | Illumina's Construction |
|---|---|---|
| "aqueous liquid phase that includes a cell-free, enzymatic, exponential nucleic acid amplification system"<br><br>"aqueous liquid phase that includes a cell-free nucleic acid polymerase enzyme system" | *No construction necessary. Should the Court determine that construction is required, Plaintiffs propose:*<br><br>aqueous liquid portion that includes a set of components that together can perform cell-free, enzymatic, exponential amplification of a nucleic acid<br><br>aqueous liquid portion that includes a cell-free nucleic acid polymerase enzyme system | a solution dissolved in water containing a buffer, a nucleic acid amplification enzyme, nucleotide substrates, and where required, oligonucleotide primers |

The Court finds no support for Illumina's construction "a solution dissolved in water . . .". We find nothing in the specifications or the prosecution history that would limit the term "aqueous liquid phase . . ." in that manner.

The alternative offered by LifeTech is no help since it does not even appear to deal with the meaning of the term "aqueous liquid phase". The intrinsic evidence does supply some help in that the specifications make a distinction between a solution and the liquid phase of the immobilized medium. JA9 at 6:47-50. ("According to our invention, exponential amplification of nucleic acids and/or their expression . . . is carried out in an immobilized medium rather than a solution as is done in prior art, . . . .") The specification instead describes the aqueous liquid phase as simply a "liquid water-based phase." Id. at 6:53-55. ("An immobilized medium suitable for the reaction according to the invention comprises a liquid water based phase entrapped within a solid matrix."). The intrinsic record further establishes that the components of the amplification system included in the aqueous liquid phase do not have to be fully dissolved or even suspended in liquid. Dependent claim 8 of the '568 patent expressly requires an enzyme linked to the matrix rather than dissolved in water. See JA57. The '478 patent prosecution history explains that "[c]laim [1] requires that the enzymes be in the aqueous phase but does not require that the enzymes be totally free in solution in the aqueous phase. The specification teaches that enzymes may be linked to the matrix." JA587 (paper 18 at 28). Therefore the disputed terms are to be read as water-based liquid phase that includes a cell-free enzymatic, exponential nucleic acid amplification system.

3.      "Forming a liquid mixture of the sample and said amplification system" ('698 patent, claims 1-3, 6, 12, 15, 16)

| Term | LifeTech's Construction | Illumina's Construction |
|------|------------------------|-------------------------|

| "forming a liquid mixture of the sample and said amplification system" | *No further construction necessary.  Should the Court determine that construction is required, Plaintiffs propose:*<br><br>combining the sample and the amplification system together in a liquid | mixing the sample and every component of the amplification system into solution (i.e., not linked to the water-insoluble matrix) |
| --- | --- | --- |

LifeTech takes the position that no construction is required beyond "amplification system", that was dealt with earlier.  In the event that the Court concludes that the term does require construction LifeTech offers the alternative construction as "combining the sample and the amplification system together in a liquid,".  LifeTech argues that Illumina's proposed construction "mixing the sample and every component of the amplification system into solution (i.e. not linked to the water insoluble matrix), would introduce an additional limitation that the sample and every component of the amplification system be in solution.  LifeTech argues that this contradicts the teaching of the intrinsic record that allow for individual components of the amplification system to be linked to the matrix.  *See, e.g.*, JA587 ('478 PH Paper 18 at 28) ("The specification teaches that enzymes may be linked to the matrix.").  Further, the dictionary definition of "mixture" supports LifeTech's position.  See the Academic Press Dictionary of Science and Technology at 1395 (1992) ("*Science*.  The mass that results from the thorough blending of two or more substances."); the Am. Heritage Dictionary of the English Language at 1159 (1992) ("5. *Chemistry*.  A composition of two or more substances that are <u>not chemically combined</u> with each other and are <u>capable of being separated</u>.").  Exhs. A and B to Plaintiffs' Responsive Claim Construction Brief.

In the Court's view LifeTech's interpretation is more persuasive and the term

8

"forming a liquid mixture of the sample and said amplification system" means "combining the sample and the amplification system together in a liquid".

4.      "Entrapping" (all claims)

| Term | LifeTech's Construction | Illumina's Construction |
|------|------------------------|-------------------------|
| "entrapping" | *No further construction necessary.  Should the Court determine that construction is required, Plaintiffs propose:*<br><br>Keeping within limited zones | continuously holding substantially motionless and preventing any convection and intermixing |

LifeTech takes the position that the term "entrapping" requires no construction because it is readily understandable based on the claim language and the specifications.  After reviewing all of the briefs and reply briefs we conclude that construction of this term under the circumstances would be helpful to a jury.  LifeTech in the alternative argues that if we conclude that the term should be construed then it should be read as "keeping within limited zones,".  The specification explains: "According to our invention, exponential amplification of nucleic acids and/or their expression (herein after referred to as a 'reaction') is carried out in an immobilized medium, rather than in solution as it is done in the prior art, <u>in order to keep the templates and the reaction products within **limited zones** at fixed locations</u> of the reaction volume."  JA9 at 6:47-52. The specifications further explain that the "liquid phase matrix" is entrapped in a manner such that "**different zones** of the liquid phase" do not undergo convection or intermixing.  *See* JA8 at 4:46-51; see also, JA11 at 9:14-20 (immobilized medium allows the contaminating nucleic acids to be amplified at, and their competition to growth of the desired nucleic acids to be restricted to, **different zones** of an immobilized medium where the contaminating templates were originally entrapped"); JA9 at 5:2-5 ([D]ifferent colonies occupy **separate zones** within the immobilized

9

medium, and this allows the respective clones to be observed and handled separately"). Based upon this LifeTech argues that their construction of "entrapping" as "keeping within limited zones" should be adopted.

Illumina argues that its construction of "entrapping" mirrors the definition provided by the Chetverins in defining the term by describing the characteristics of the matrix in "our invention":

> According to our invention, the immobilized medium . . . comprises a liquid phase entrapped within a solid matrix that possesses a highly expanded surface with the average pore size ranging from 100μm to 5nm, and therefore is capable of preventing convection **and** intermixing of **different zones of the liquid phase**.[1]

Illumina argues that LifeTech's proposed construction leaves out "preventing convection."

To this LifeTech replies: that Illumina's use of the above paragraph ignores the highlighted words that tie convection and intermixing to the fundamental goal of entrapping to prevent convection and intermixing across different zones of the liquid phase, i.e., to prevent cross contamination.

In further support of its construction LifeTech argues that the specifications expressly contemplate the movement of liquid provided that the amplification reactions are kept within limited zones. *See* JA11 at 10:13-14; D.I. at 75.

Based upon the foregoing discussion we find that the term "entrapping" shall be construed to mean keeping within limited zones.

---

[1]JA8 ('478 patent), col. 4, lines 46-52 (emphasis added); see also JA9 ('478 patent), col. 6 lines 53-60 (stating the matrix "penetrates the liquid phase so that the liquid phase gets substantially motionless (lack of convection and intermixing of different zones of the liquid phase)").

5.     "Completely entrapping" ('478 patent, all claims; '698 patent, claims 17, 18, 20, 21, 23; '568 patent, all claims)

| Term | LifeTech's Construction | Illumina's Construction |
|------|------------------------|-------------------------|
| "completely entrapping" | *No further construction necessary.  Should the Court determine that construction is required, Plaintiffs propose:*<br><br>completely keeping within limited zones | entrapping all (i.e., the entirety or whole) of [the thing listed after the term] |

LifeTech takes the position that no further construction is necessary.  The parties do not seem to disagree as to the meaning of the words "completely entrapping", what they don't agree to is what is to be "completely entrapped".  Illumina offers the construction, "entrapping all (i.e., the entirety or whole) of [the thing listed after the term].  Putting this in the context of the patents involved we conclude that there is no requirement that <u>all liquid</u> must be entrapped within  a solid matrix.  The specifications note that the avoidance of mobile liquid outside of the immobilized medium is merely "preferabl[e]" - as opposed to mandatory - and establishes that the invention permits mobile liquid outside of the immobilized medium.  "[Any] mobile liquid outside the immobilized medium should preferably be eliminated, so that the nucleic acid or protein molecules cannot be transferred to another location during the reaction." JA10 at 8:36-41. The claims do not require that the solid matrix entrap <u>all</u> liquid, only the aqueous liquid phase that includes an amplification system (i.e., a set of components that are together capable of amplifying a nucleic acid).  *See,* i.e., '478 patent claim 1 [JA18].

Illumina argues that the prosecution history confirms that the Chetverins intended to exclude systems with free-flowing liquid outside the zone of entrapment.  They cited from the following excerpt from the '478 patent (JA546):

11

> "There is no disclosure in Stapleton of forming nucleic acid colonies.
> Nor is there any disclosure of a liquid phase completely entrapped
> within solid media: Stapleton allows migration of nucleic acids to
> different zones (e.g. Stapleton discloses a liquid film between the
> carrier and the matrix (p. 7, line 64-67; and also teaches using
> agarose during PCR amplification p. 12, which, as one skilled in
> the art would know, means that the agarose will liquify and nucleic
> acids in different pores will not be separated during amplification)."

In this paper, the applicants distinguished the invention from a reference

("Stapleton") disclosing "a device for processing biological samples" with a "liquid film between

the carrier and the matrix", and made no disavowal covering the mobile liquid outside the claimed

immobilized medium.  However, the applicants confirmed the importance of avoiding migration

of nucleic acids between zones by distinguishing Stapleton on the basis that it does not disclose a

liquid phase completely entrapped within a solid matrix because it allows for nucleic acids to

migrate between zones.

Illumina also argues that the Chetverins argued during the prosecution of the '568

patent that "the claimed invention" was an immobilized medium without a continuous fluid layer

on it, such that the polymerases and nucleic acid molecules can interact only by diffusion, not by

flow.  They argue that the Chetverins also distinguished prior art references on the basis that those

references disclosed matrices "in contact with a continuous fluid," whereas in the Cheverins

method "continuous fluid layers are to be avoided."

Illumina goes onto argue that these statements were made by the Chetverins in

order to distinguish the prior art and obtain patents and they constitute clear disavowals of any

medium in which polymerases and nucleic acid molecules interact by flow or in which the matrix

is in contact with a continuous fluid layer.  Because the Chetverins made those arguments to the

examiner to secure their patents, Illumina argues they disavowaled coverage of amplification

methods where liquid is outside the matrix or where the liquid undergoes mixing, and therefore they and LifeTech are estopped from arguing that their claims cover such methods.[2]

As with Stapleton, these statements distinguish the '568 patent on the basis that neither discloses entrapment of an aqueous liquid phase that includes an amplification system. The applicants stated that, unlike those references, "continuous layers are to be avoided" in their invention, tying their statement to the specification's explanation that "mobile liquid outside of the immobilized medium should preferably be eliminated, so that nucleic acid or protein molecules cannot be transferred to another location during the reaction."  (See JA10 at 8:36-49.) The applicants were not disclaiming continuous layers as such, but the inability to prevent migration of amplification reactions across zones to form nucleic acid colonies.

We agree with LifeTech's argument that prosecution history estoppel argument was laid to rest in the prosecution history of the '478 patent at JA587.  There, the applicants explained that, although the <u>aqueous liquid phase</u> (and thereby the <u>full amplification system</u>) is completely entrapped by the solid matrix, "<u>individual components</u>, e.g., nucleotides, need not be completely entrapped in the matrix."  JA587.  These words I believe establish that the invention encompasses a system in which individual components of an amplification system can be transported in and out of the matrix, e.g., by a mobile liquid, so long as the <u>set</u> of components that <u>together</u> can amplify a nucleic acid remains entrapped.  D.I.-75 at 15.

The term "completely entrapping" shall be construed to mean "completely keeping

---

[2] *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1326 (Fed. Cir. 2003) ("To balance the importance of public notice and the right of patentees to seek broad patent coverage, we have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope....  Consequently, for prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both ***clear and unmistakable***.").

within limited zones".

> 6.      "Thin Layer" ('698 patent, claims 1-3, 6, 12, 15, 16, 18; '568 patent, claims 1, 2, 4, 10)

| Term | LifeTech's Construction | Illumina's Construction |
|------|------------------------|-------------------------|
| "thin layer" | *No construction necessary* | A layer having a thickness of at least 1 millionth of a meter |

"Thin layer" does not require construction. Many of the asserted claims already specify ranges of thickness while others do not.[3]

Several claims reciting this term already separately define a specific range that the thin layer falls within. For example, independent claim 1 of the '568 patent (and claims 2 and 10, which depend from it) specifically recites a "thin layer, from 1μm to 10mm in thickness." JA57. Dependent claim 4 of '568 patent further recites that the thin layer "has a thickness in the range of 50μm to 10mm." Id. There is therefore no need to construe that term to include a specific range of thickness, it is already defined in those claims. Defendants proposed construction, which seeks to specify "a thickness of at least 1 millionth of a meter [i.e., 1μm]" would render redundant other terms in claims 1, 2, and 10 of the '568 patent that already specify the very same lower limit.

Claim 6 of the '698 patent expressly recites that the thin layer "has a thickness from 1μm to 10mm." JA38. But, independent claim 1 of the '698 patent from which claim 6 depends does not recite a specific numeral range for the claimed "thin layer". The same is true for dependent claim 18 of the '698 patent. The proposed construction would have us

---

[3] *See Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001) ("[T]he same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims.")

14

incorporating redundant language where a numerical range is specified (such as for the claims of the '568 patent),[4] and importing limitations into claims containing no such limitation (e.g., claims 1 and 18 of the '698 patent) in violation of the doctrine of claim differentiation in which "the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."[5]  As the Federal Circuit has stated,[6] "[t]hat presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and a dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim").

Plaintiffs point out, the proposal to read "1 millionth of a meter" as the lower thickness limit into the claims is contradicted by the claim language and by the specifications. Claim 16 of '568 patent specifies a thickness of the matrix of  $0.1\mu m$  as a lower limit, which is a ten-fold lower limit than that which defendants seek to impose.  The specification expressly teaches that the thinner the layer, the better "as this increases the resolving power of the method and reduces costs."  *See* JA11 at 10:62-64.  The specification additionally explains that "the lower limit of the thickness depends on the mechanical strength of the solid matrix, on the possibility to prevent its drying during manipulation and during the reaction, and on the sensitivity of the method used for detecting the reaction products".  Id. at 10:64-11:1.  As the Federal Circuit has noted, "when a claim term is expressed in general descriptive words, [the Court] will not

---

[4]*See Stumbo v. Eastman Outdoors, Inc.,* 508 F.3d 1358, 1362 (Fed. Cir. 2007) (rejecting construction of a claim term that would render other language in the claim redundant).

[5]*Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 910 (Fed. Cir. 2004) concluding that an independent claim lacking any reference to a requirement added by a dependent claim is properly construed as not requiring that limitation).

[6]*Sunrace Roots Enter. Co. v. SRAM Corp.,* 336 F.3d 1298, 1303 (Fed. Cir. 2003).

ordinarily limit the term to a numerical range that may appear in the written description or in other claims.[7]

Illumina argues that the prosecution history confirms that "thin layer" excludes layers thinner than 1 micrometer.  During the prosecution of the '478 patent the Examiner rejected a pending claim for indefiniteness due to the use of the term "thin layer", stating "[i]ts not clear how thin layer is defined and what does or does not constitute thin layers."

In response to this applicants wrote

"Applicants respectfully disagree that 'thin' is indefinite, particularly when that term is read in conjunction with applicants' specification. At page 22, bottom, applicants' specification states that use of layers from 1mm to 5 micrometers gives satisfactory results, and that, thicker (e.g. 10mm) and thinner, (down to 1 micrometer), layers can also be used. In view of applicants' specification, as well as skill in the art with respect to 'thin' and 'thick' films, applicants submit that the term 'thin' is sufficiently well defined."

Illumina argues that this constitutes a disavowal of the claim scope, relying on the use of the phrase, "down to 1μm" to describe examples of layer thickness that "can" be used in the invention.  The applicants explanation that the term "thin layer" was definitely based on the example in the specification of layers ranging from 1 micron to 10mms does not constitute a "clear and unmistakable disavowal"[8] we think this especially true in view of the fact that claim 16 of the '698 patent expressly recites a limit lower than 1 micron.  We therefore decline to accept Illumina's construction and rule that no construction of the term "thin layer" is necessary.

---

[7]*Conoco, Inc. v. Energy & Environmental Int'l, L.C.,* 460 F.3d 1349, 1358 (Fed. Cir. 2006).

[8]*See ACTV  Inc. v. Walt Disney Co.,* 346 F.3d 1082, 1092 (Fed. Cir. 2003) (because the written descriptions of the patents lack an indication of the patentees clear intent to limit the term URL to absolute URLs, and because the written descriptions further support a broader interpretation, we decline to impose such a limit").

7.  "Incubating said immobilized medium" ('478 patent, claims 1, 3, 6, 7, 11, 12; '698 patent, claims 17, 18, 20, 21, 23); and

8.  "Incubating said trapped mixture" ('698 patent, claims 1-3, 6, 12, 15)

| Term's | LifeTech's Construction | Illumina's Construction |
|--------|-------------------------|-------------------------|
| "incubating said immobilized medium" | *No further construction necessary. Should the Court determine that construction is required, Plaintiffs propose:*<br><br>maintaining the immobilized medium under conditions that promote the claimed reaction | maintaining all of the immobilized medium provided in step (a) under conditions that promote exponential amplification |
| "incubating said trapped mixture" | *No further construction necessary. Should the Court determine that construction is required, Plaintiffs propose:*<br><br>maintaining the trapped mixture under conditions that promote the claimed reaction | maintaining all of the trapped medium provided in step (b) under conditions that promote exponential amplification |

Plaintiffs take the position that the meaning of these terms is apparent and that no further construction is warranted.  "The parties agree that 'incubating' means maintaining the claimed immobilized medium under conditions that promote a reaction, which is consistent with the common understanding of this term."[9]

Illumina states at page 19 of its Opening Claim Construction Brief, "the primary difference between the parties proposed constructions of the "incubating" term is that Illumina's proposal requires that <u>all</u> of the "immobilized medium" (or <u>all</u> of the "trapped mixture") that is recited in an earlier step and referred to explicitly in the "incubating" step must be maintained

_____

[9]See, the American Heritage Dictionary of the English Language (3d Ed. 1992) ("2. 3 . . . b.  to maintain (a chemical or biological system) under specific conditions in order to promote a particular reaction.) ([Exh. D] Plaintiffs' Opening Claim Construction Brief.)

under conditions that promote exponential amplification."

In its responsive Claim Construction Brief at page 22 Illumina contends that, "LifeTech mischaracterizes Illumina's proposal as requiring that there can be no change in what is being incubated".  But, Illumina's position is not that there can be "no change in what is being incubated" it is instead simply that none of 'said immobilized medium' can be lost."

We conclude from the above, that the only issue for us to decide is whether the word (all) should be written into the terms in question.  After considering the matter we conclude that we can find nothing in the specification or the prosecution history that would support the insertion of the word (all) in the terms "incubating said immobilized medium" or "incubating said trapped mixture".  The terms do not require further construction.

> 9.    "Wherein the average distance between the nearest solid surfaces is smaller than the distance which the synthesized nucleic acid product can migrate by diffusion during the reaction" ('698 patent, claims 1-3, 6, 12, 15)

| Term | LifeTech's Construction | Illumina's Construction |
|---|---|---|
| "wherein the average distance between the nearest solid surfaces is smaller than the distance which the synthesized nucleic acid product can migrate by diffusion during the reaction" | *No further construction necessary.  Should the Court determine that construction is required, Plaintiffs propose:*<br><br>wherein the average distance between the nearest solid surfaces is sufficiently small to prevent synthesized nucleic acid products from migrating between zones during the reaction | wherein the average distance between the nearest solid surfaces is less than the distance that any nucleic acid product synthesized during the accused reaction can move (*i.e.*, from one location in the matrix to another) during that reaction |

The purpose of this invention is the amplification and detection of nucleic acids as distinct colonies:

18

"Entrapment of nucleic acids in an immobilized medium according to the invention substantially prevents a competition between different templates, since their progeny is not allowed to spread all over the reaction volume." JA9 at 5:36-39.

This claim requirement achieves that goal by requiring that the average distance between the nearest solid surfaces of the matrix (i.e., size of the pores in the matrix (*see* id. at 6:62-63)) be less than the distance at which the synthesized products can migrate by diffusion during exponential amplification. (*See* id. at 6:64-67; 6:47-49). The matrix allows the creation of colonies of a single nucleic acid by physically constraining the migration of synthesized nucleic acid products so that amplification of the single nucleic acid occurs within a limited zone. *See* id. at 6:47-52 (explaining that reaction products are kept "within limited zones at fixed locations of the reaction volume"); JA8 at 4:61-64 (explaining that exponential amplification of entrapped nucleic acid molecules "results in a 'colony' within a limited zone surrounding the progenitor templates."). We find that one skilled in the art would be able to apply this term to achieve that goal and find that no further construction is necessary.

10. "Distributing in said aqueous liquid phase" ('478 patent, claims 1, 2, 6, 7, 11, 12; '698 patent, claims 17, 18, 20, 21, 23)

"Distributing in said amplification system" ('478 patent, claims 14, 15, 16)

| Term(s) | LifeTech's Construction | Illumina's Construction |
|---------|------------------------|-------------------------|

| "distributing in said aqueous liquid phase"<br><br>"distributing in said amplification system" | *No further construction necessary.  Should the Court determine that construction is required, Plaintiffs propose:*<br><br>separating nucleic acid molecules in the aqueous liquid phase<br><br>separating nucleic acid molecules in the amplification system | entirely dissolving in [the aqueous liquid phase/amplification system] (*i.e.,* not linking to the water-insoluble matrix) |
|---|---|---|

Plaintiffs' position is that no construction is necessary for the terms "distributing in said aqueous liquid phase" and "distributing in said amplification system".  (We have earlier dealt with the terms "amplification system" and "aqueous liquid  phase" in sections 1 and 2 above).  In the event that we determine that construction is necessary Plaintiff proposes that these terms be construed as "separating nucleic acid molecules in the aqueous liquid phase" and "separating nucleic acid molecules in the amplification system".

Defendants propose that we construe these terms as, "entirely dissolving in [the aqueous liquid phase/amplification system] (*i.e.,* not linking to the water-insoluble matrix").

Plaintiffs point out that a purpose of the invention is the formation of colonies of a single nucleic acid in immobilized media.  *See, e.g.*, JA8 at 4:43-45.  *See also*, <u>id.</u> at 4:64-67 "Each nucleic acid colony comprises individual clone, i.e. the progeny of a single molecule". "Distributing" in this context refers to including nucleic acid molecules in the aqueous liquid phase or the amplification system in such a way that the nucleic acid molecules are separate from each other.  This is also reflected at JA18 ('487 patent) at claim 1 ". . . wherein said step of distributing separates individual templates, resulting in nucleic acid amplification to form at least

20

one separate, detectible colony of said nucleic acid product in said medium."

Defendants definition of "distributing" as "entirely dissolving" and "not linking to the water-insoluble matrix" is not supported in the intrinsic record.  Nothing in the claims, specifications, or prosecution history requires that the method of distributing nucleic acid molecules in the aqueous liquid phase or amplification system be by dissolution.

Because we find that the intrinsic evidence is sufficient to determine the meaning of the terms we will not resort to the extrinsic evidence relied upon by the defendants.

It is the Court's conclusion that the terms in question should be further construed and that those terms be construed as "separating nucleic acid molecules in the aqueous liquid phase" and "separating nucleic acid molecules in the amplification system".

11.     "A preformed immobilized medium" ('568 patent, claims 1, 2, 4, 10)

| Term | LifeTech's Construction | Illumina's Construction |
|------|------------------------|-------------------------|
| "a preformed immobilized medium" | *No further construction necessary.  Should the Court determine that construction is required, Plaintiffs propose:*<br><br>an immobilized medium that is formed prior to amplification | an immobilized medium that is formed prior to addition of a template for amplification |

LifeTech argues that the claim requires no construction because it is specifically defined in claim 1 of the '568 patent as comprising the specific liquid phase of item (a) and the thin layer of item (b) of the claim.  The Court finds therefore that the phrase "a preformed immobilized medium" is specifically defined in claim 1 of the '568 patent and as far as the composition of the term is concerned it requires no further construction.  This does not resolve the dispute between the parties.  Illumina contends that the claimed medium must be formed prior to

the addition of the nucleic acids to be amplified (i.e., prior to addition of a template.)  D.I.-65 at

23.  LifeTech contends that the claimed immobilized medium is formed prior to amplification of

individual nucleic acid molecules.

In support of its position LifeTech argues that claim 9, for example, recites an

activatable reagent in the medium "for preventing nucleic acids from serving as templates for

enzymatic amplification."  JA57.  If nucleic acid molecules could only be added after the

formation of the immobilized medium for amplification, LifeTech argues, there would be no need

to include a reagent for preventing the nucleic acids from being amplified.  In addition, and even

more convincing, the specification teaches that "[n]ucleic acids intended for amplification . . .

should be introduced into the liquid phase of a layer . . . prior to its immobilization."  JA12 at

12:63-66.  We find this convincing evidence that the term "a preformed immobilized medium"

should be construed to read "an immobilized medium that is formed prior to amplification".

12.     "Nucleotide substrate" ('568 patent, claim 16)

| Term | LifeTech's Construction | Illumina's Construction |
|------|------------------------|-------------------------|
| "nucleotide substrate" | *No further construction necessary.  Should the Court determine that construction is required, Plaintiffs' propose:*<br><br>a substance comprising a nucleotide on which an enzyme acts | nucleotides, nucleotide analogs, or similar structures used as the building blocks of a new nucleic acid strand.  Nucleic acids, such as primers, are not nucleotide substrates |

LifeTech argues that "nucleotide substrate" is a readily-understandable term, i.e., a

substance comprising a nucleotide on which an enzyme acts and that no further construction is

necessary.  Should the Court determine that construction is necessary LifeTech suggests that the

construction should be "a substance comprising a nucleotide on which an enzyme acts".  D.I.- 67 at 26.

Illumina argues that "nucleotide substrate" refers to individual nucleotides "and similar molecules that can be used to form a nucleic acid strain", but does not encompass strings (polymers) of nucleotides such as primers or nucleic acids.  They argue further that "nucleotide substrate" is a building block for a nucleic acid strand, not a nucleic acid strand itself.  D.I.- 65 at 24.  In support of their position Illumina argues that the specification of the '568 patent supports their proposed construction.  When referring to the components of an amplification system, the patent lists primers separately from nucleotide substrates indicating, that primers are not nucleotide substrates.[10]

Illumina goes on to argue that the patent repeatedly refers to nucleotide substrates as being different from nucleic acids,[11] and the only examples of nucleotide substrates discussed in the patent are all single nucleotides.

Illumina also argues that the prosecution history confirms that "nucleotide substrates" does not include primers or nucleic acids.[12]

In the prosecution history the Chetverins responded to a restriction requirement by adding a number of claims including application claim 48, which issued as '568 claim 16.  In that response, they explained that even though the prior-art Stapleton reference disclosed an enzyme-

---

[10]JA7 ('478 patent), col. 1, lines 23-27 (stating that nucleotide substrates are included and primers are optional) and JA15, col. 18, lines 55-57 (referring to the nucleotide substrates simply as "substrates").

[11]JA10 ('478 patent), col. 7, lines 52-57 (stating that nucleic acid templates are shown in fig. 1 but nucleotide substrates are not) and JA11, col. 10, lines 6-9 (stating that nucleotide substrates are smaller than nucleic acids).

[12]JA983 ('568 Fil History 5-14-97 amendment at 9.)

free matrix containing "specimen [template] DNA standards and primer sets"[13] (which satisfied

LifeTech's proposed construction of "nucleotide substrate"), Stapleton did not disclose "the

subject matter of claims 48-50, namely a matrix containing nucleotide substrates."  We agree with

Illumina, that by acknowledging that the prior art disclosed primers and nucleic acids, but arguing

that these were not "nucleotide substrates," the Chetverins disclaimed any construction of

"nucleotide substrate" that would encompass primers or nucleic acids.  Consequently, we will

accept Illumina's construction of this term.  The term should be construed as "nucleotides,

nucleotide analogs, or similar structures used as the building blocks of a nucleic acid strand.

Nucleic acids, such as primers, are not nucleotide substrates."

## CONSTRUCTION OF DISPUTED TERMS IN THE ILLUMINA PATENTS

13. ""Optical characteristic of each/said microparticle"
('994 patent, claim 1; '505 patent, claim 2)

| Term(s) | Illumina's Construction | LifeTech's Construction |
|---|---|---|
| "optical characteristic of each microparticle"<br><br>"optical characteristic of said microparticle" | an optical characteristic of the microparticle | an optical quality of the microparticle itself, not the attached analyte |

The parties agree that the "optical characteristic" recited in the claims is a

characteristic of a microparticle.  The dispute over this term is whether the optical characteristic

of a microparticle must be a feature of the microparticle itself or whether it could refer to a feature

of an attached analyte.

The claim itself recites that the "optical characteristic" is of each "microparticle"

_____

[13]JA983 ('568 Fil History 5-14-97 amendment at 9.)

and is used to "determine the approximate center of <u>said microparticle</u>".  JA1101 ('994 patent) at

27:51-55; JA1075 ('505 patent) at 27:57-60.  LifeTech argues that this claim requirement could

not be met and the tracking purpose of the invention could not be satisfied by focusing on an

attachment to the microparticle (the analyte), because that would not locate the center of the

microparticle.

>        LifeTech argues that this construction is consistent with the specification which

explains that optical characteristics are used to track the microparticles:

> [a]n important feature ... of the invention is the ability to <u>keep track of individual microparticles</u> [by] periodically record[ing] <u>optical characteristics of individual microparticles</u> that <u>provide a close approximation [of] microparticle centers.</u>  Preferably, when trans-illumination, or "back lighting" of flow chamber (100) is possible, <u>the optical characteristic is the focused back light from the microparticles</u> ....  In an epiillumination system, light from flow chamber (100), i.e. "top light (610)," is directed from a vertical direction onto microparticles (602) where it scatters from <u>the top surface of the microparticles</u>.  In this configuration, <u>the optical characteristic is the scatter center of the microparticle</u> ....  As with focused back lighting, the image of the scatter centers provides a convenient way <u>to readily determine the approximate centers of the microparticles</u>.

JA1091-1092 at 8:48-9:5; *see also* JA1085 (Figs. 6a, 6b).  The specification nowhere references

an optical characteristic of an analyte.[14]

>        Illumina cites the following:

> An important feature of detection means (114) of the invention is the ability to keep track of individual microparticles through multiple process steps and/or cycles.  In connection with such tracking, detection means (114) periodically *records optical characteristics* of individual microparticles that provide a close approximation of microparticle centers.

---

[14]When the specification consistently describes a term in one manner, broader interpretations of the term that are unsupported by the specification should be rejected.  *See Pause Tech., LLC v. TiVo, Inc.,* 419 F.3d 1326, 1333 (Fed. Cir. 2005) ("Because this construction is driven by the use of [the term] in the context of the claim and is supported by the written description, a broader construction that lacks support in the intrinsic record must yield.").

JA1065 ('505 patent) at col. 8, lines 48-54; JA1091 ('994 patent) at col. 8, lines 48-54.

Illumina argues that this description in no way limits the recorded optical characteristics to only those that are inherent in the microparticle itself (e.g. would not exclude a characteristic that results from a fluorescently labeled piece of DNA attached to the microparticle.)

LifeTech responds that this argument ignores the fact that the claim recites that the "optical characteristic" is "of each <u>microparticle</u>" and is used to "determine the approximate center of <u>said microparticle</u>".  JA1101 ('994 patent) at 27:51-55; JA1075 ('505 patent) at 27:57-60.  Basing the center of the microparticle on an attachment to the microparticle would not be consistent with the primary purpose of the invention i.e. tracking positions of microparticles.

Illumina also argues that in claim 1 of the '994 patent, the "optical characteristic" term appears as part of the "optical train" which is "effective to . . .  record <u>at least one</u> optical characteristic of each microparticle which can be used to determine the approximate center of said microparticle.  Illumina argues further that the reference to "at least one" optical characteristic suggests that the "optical characteristic" is not limited to an inherent feature of the microparticle itself.  See  D.I.-65 at 31.

LifeTech responds that this argument assumes that a microparticle can have only one optical characteristic.  As LifeTech points out the specification explains that a microparticle can have at least two types of optical characteristics (produced by "back-lighting" and "top-lighting" see JA1091-92 at 8:48-9:5), and both are inherent to the microparticle not the attached analytes.  The "at least one" language refers to various characteristics of the microparticle itself and is consistent with the construction offered by LifeTech.  See D.I.-75 at 23-24.

Illumina also cites to col. 9, lines 6-9 of the '994 patent in support of its construction:

> In the preferred image processing approach, once microparticle centers (700) are determined, pixels (702) are assigned for determining characteristics, e.g. intensity, **of an optical signal** generated **at** each microparticle.

However, the quoted material highlights the difference between characteristics of signals generated by analytes <u>at</u> the microparticles and optical characteristics of the microparticles themselves. This passage describes characteristics "of the optical signal" - not an optical characteristic "of the <u>microparticle</u>" and makes clear that the signal is generated "at" the microparticle, rather than being an optical characteristic "of" the microparticle. This passage does not support Illumina's construction.

After considering all of the arguments of counsel we find that the term in question should be construed as, "an optical quality of the microparticle itself, not the attached analyte."

14.    "With sufficient resolution for individual microparticles to be distinguished" ('994 patent, claim 1)

| Term | Illumina's Construction | LifeTech's Construction |
|---|---|---|
| "with sufficient resolution for individual microparticles to be distinguished" | the image resolution is sufficient to distinguish individual microparticles | the image resolution is sufficient to distinguish each individual microparticle from every other microparticle |

The issue as to this term is whether the imaging device must have sufficient resolution to distinguish each microparticle from each other.

Illumina's position is that the reference to "individual microparticles" to be distinguished refers to "a plurality of microparticles" in the preamble of claim 1. They argue that this phrase merely states that the imaging device is capable of resolving two (a "plurality" of )

microparticles from each other not that <u>each and every</u> microparticle must be resolvable from <u>each</u> <u>and every other</u> microparticle,  D.I.-65 at 34.

LifeTech's construction would require that the image resolution is sufficient to distinguish each individual microparticle from every other microparticle.

A review of the plain language and specification indicate that they require that the image resolution for the claimed invention must be sharp enough to distinguish individual microparticles from one another.  JA1090 ('994 patent) at 5:7-12; JA1101 at 28:44-45.  The specification establishes the need for each individual microparticle to be distinguishable from every other microparticle as the objects of the invention are achieved with "[a] detection means for detecting a sequence of optical signals from <u>each</u> of the microparticles in the population." JA1088 at 2:20-26.  The specification further indicates that interaction between microparticles was a problem in prior art.  JA1088 ('994 patent) at 1:40-56: "However, handling and manipulating large numbers of microparticles . . . gives rise to many difficulties, including . . . whether adjacent microparticles will interact e.g. to degrade or obscure a signal or to inhibit reagent access and the like."  In order to determine the sequence of optical signals from each microparticle, it is necessary to distinguish each microparticle from every other microparticle. This is not merely a preferred embodiment of the invention but is required in order to practice the invention.  See <u>Alloc, Inc. v. Int'l Trade Comm'n</u>, 342 F.3d 1361, 1369 (Fed. Cir. 2001).

Illumina's proposed construction would not fulfill this fundamental feature of the invention.

The term "with sufficient resolution for individual microparticles to be distinguished" shall be interpreted as "the image resolution is sufficient to distinguish each

28

individual microparticle from every other microparticle.

15.   "Signal tracking means effective to correlate the optical signals from each of the microparticles in each of the sequence of digital images with said center of said microparticle" ('994 patent, claim 1)

| Term | Illumina's Construction | LifeTech's Construction |
|------|------------------------|------------------------|
| "signal tracking means effective to correlate the optical signals from each of the microparticles in each of the sequence of digital images with said center of said microparticle" | This is a "means plus function" limitation subject to an analysis under 35 U.S.C. § 112, ¶6.  The claimed function is: correlating the optical signals from microparticles in a sequence of digital images with the centers of those microparticles. The disclosed structure is: a data processor that runs software that assigns pixels of the fluorescent images of the microparticles to the microparticle centers | This "means plus function" limitation requires the same or equivalent structure disclosed in the patent for performing the claimed function, which is to correlate the optical signals from each of the sequence of digital images with said center of said microparticle.  The disclosed structure is a microprocessor running software that performs the process shown in Fig. 8. |

The parties agree that this claim limitation is written in the form of a "means-plus-function" claim and must be construed in view of the requirements of 35 U.S.C. § 112, ¶6.  Two claim construction questions arise with elements expressed in means-plus-function form.   (1) What is the function claimed in that element?  (2) What structure or material disclosed in the specification performs the function claimed in that element?  JVW Enters.' Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir. 2005).  Once these questions are answered the mans-plus-function claim element can be construed in accordance with § 112, ¶6.

In order to satisfy the second element the structure must not only perform the claimed function, but the specification must clearly associate the structure with the performance of the function.  Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 296 F.3d 1113 (Fed. Cir.

29

2002).

The parties do not dispute the first element, that the claimed function is "to correlate the optical signals from each of the microparticles in each of the sequence of digital images with said center of said microparticle." JA1101 ('994 patent) at 28:46-49; D.I.-67 at 32; D.I.-65 at 36-37.

Both parties' proposed constructions agree that the structure is a processor that runs software but disagree about what the disclosed structure is.

Illumina's proposal set forth at D.I.-65, page 37 is as follows:

"The '994 patent describes the structure corresponding to the claimed function as the "data processor (818)" running software that assigns pixels in the fluorescent images of the microparticles to the centers of those microparticles:

> The image of microparticle centers is transferred to data server (812) where data processor (818) assigns pixels of the fluorescent image to each microparticle center, *as described above.*[15]

What is "described above" in the '994 patent is a detailed description of the pixel-assignment process exemplified in Figure 7:[16]

> In the preferred image processing approach, once microparticle centers (700) are determined, *pixels (702) are assigned for determining characteristics, e.g. intensity, of an optical signal generated at each microparticle (602). The size of microparticle (602) and pixel area determine how many pixels are assigned to each microparticle. . . .* In the preferred embodiment, an initial pixel is assigned which encloses the computed center of a microparticle, e.g. pixel "5" in FIG. 7. Thereafter, additional

---

[15]JA1092 ('994 patent) at col. 10, lines 16-20 (emphasis added).

[16]JA1089 ('994 patent) at col. 3, lines 13-14. As stated under the heading "Brief Description of the Drawings," Figure 7 "schematically illustrates the assignment of pixels to microparticles for data processing."

pixels are assigned, usually the immediately adjacent pixels.
Preferably, the value of the optical signal generated by a process
at the surface of a microparticle is the average value of the
optical signals collected by pixels assigned to that microparticle.[17]"

LifeTech argues that "the only disclosure in the specification that remotely

resembles an algorithm is the system depicted in Figure 8.[18]

We agree with Illumina that Figure 8 is "is a flow chart summarizing operation of

the system of the invention" and is not limited to the claimed "correlating" function.[19]  The only

structure in Figure 8 that is associated with the claimed "correlating" function is "data processor

(818)"[20] the remaining functions in Figure 8 are not required in order to perform the claimed

"correlating" function.

LifeTech also argues that Illumina's proposed construction simply describes the

function to be performed not the algorithm by which it is performed.  We disagree, the language

quoted above from Illumina's brief indicates that Illumina's proposed construction is supported

by an algorithm that is expressly disclosed in the specification.

In addition, Illumina's construction is supported by the prosecution history.

---

[17]JA1092 ('994 patent) at col. 9 lines 6-31 (emphasis added).  For additional disclosure of
corresponding structure, *see also* JA1088 ('994 patent) at col. 2, lines 31-36; JA1090 ('994 patent) at col.
5, lines 44-50; and JA1097 ('994 patent) at col. 19, lines 14-26.

[18]JA1089 ('994 patent) at col. 3, lines 13-14.  As stated under the heading "Brief Description of
the Drawings," Figure 7 "schematically illustrates the assignment of pixels to microparticles for data
processing."

[19]JA1089 ('994 patent) at col. 3, lines 16-17 ("Brief Description of Drawings"); *see also* JA1092
('994 patent) at col. 9, lines 32-33 ("The general operation of the system of the preferred embodiment is
summarized by the flow chart of FIG. 8.").

[20]JA1092 ('994 patent) at col. 10, lines 17-20 ("The image of microparticle centers is transferred
to data server (812) where data processor (818) assigns pixels of the fluorescent image to each
microparticle center, as described above.")

During the prosecution of the '994 patent, which considered part of the disclosure to assess the corresponding structure, the applicants stated that the "date processor" performs the "correlating" function:

> A data processor then assigns pixels of the fluorescent image of the microparticles to each microparticle center (lines 13-15); i.e., it 'correlate[s] the optical signals from each of the microparticles, in each of the sequence of digital images, with said center of each microparticle.'[21]

Based upon the foregoing we find that "data processor (818) running software that assigns pixels of the fluorescent images of the microparticles to the microparticle centers is the corresponding structure necessary to perform the "correlating" function. We will adopt Illumina's proposed construction.

16.    "Tracking positions of the microparticles" ('505 patent, claim 1)

| Term | Illumina's Construction | LifeTech's Construction |
|---|---|---|
| "tracking positions of the microparticles" | This preamble term is not a substantive limitation on claim 1, and thus does not require construction. One of ordinary skill would understand this term to relate only to the intended use of the claimed invention, and in that regard, to relate to the "correlating" term in the body of the claim. | Following the movement of microparticles during a sequence of processing steps |

The issue is whether the preamble term "tracking positions of the microparticles" is a substantive limitation of the claim.

PREAMBLE

---

[21]JA1432 ('994 File History, 12-19-03 Amendment and RCE at 4).

The claim "preamble" is the introductory portion of the claim that describes the invention in more general terms than the rest of the claim, typically appearing before the transition term "comprising".  There is no litmus test that defines precisely when a preamble should be construed as a claim limitation.  <u>Corning Glass Works v. Sumitomo Elec., U.S.A. Inc.</u>, 868 F.2d 1251, 1257, (Fed. Cir. 1989).  As a general rule, a preamble "limits the claimed invention if it . . . is 'necessary to give life, meaning and vitality' to the claim."  <u>In re: Cruciferis Sprout Litigation</u>, 301 F.3d 1343, 1347, (Fed. Cir. 2002).  (citations omitted).  Moreover, "[c]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art may indicate that the preamble is a claim limitation because the preamble is used to define the claimed invention."  <u>In re: Cruciferis Sprout Litigation</u>, 301 F.3d at 1347.  <u>BristolMyers Squibb Co. v. Ben Venue Labs., Inc.</u>, 246 F.3d 1368, 1375 (Fed. Cir. 2001).

The record is clear that the tracking function is emphasized throughout the specifications as a key aspect of the claimed invention.  See for example:

> However, handling and manipulating large numbers of microparticles, e.g. tens to hundreds of thousands, for carrying out specific chemical and/or biochemical analyses gives rise to many difficulties, including whether sufficient signal is generated on individual microparticles for detection, <u>how to track individual microparticles through multiple steps of a process</u>, . . . and the like.  <u>It would be especially desireable if such system and apparatus permitted the tracking and analysis of multiple analytes anchored to separate particles</u> through a sequence of several processing or analysis steps.

JA1062 ('505 patent) at 1:40-64.

In addition the Summary of the Invention recites "Accordingly, objects of our invention include, but are not limited to . . . providing an apparatus for simultaneously tracking the positions of individual microparticles in a population of microparticles disposed in a flow chamber

as a closely packed planar array . . . ." Id. at 1:66-2:19.  The specification further explains: "an important feature of detection means (114) of the invention is the ability to keep track of individual microparticles through multiple process steps and/or cycles."  JA1065 at 8:48-50.

In the pending reexamination of this patent in order to distinguish the claimed invention over prior art, Illumina stated to the PTO: "these groups of [prior art] references do not contain disclosures directed to the difficulties inherent in 'tracking positions of the microparticles during a sequence of the processing steps' as provided by claim 1 of the '505 patent."  See, D.I.-67 Exh. B at 11; see also, id. at 14 distinguishing a prior art reference that, in Illumina's view, does not contain the substantive limitation of "tracking positions of microparticles during a sequence of processing steps"; 35 (same).  Illumina has relied on this term as a claim limitation during the pendency of reexamination proceedings on this patent in an attempt to distinguish the invention over prior art.

The preamble term is a claim limitation that limits the scope of the claims where, "the written description and applicants statements during the prosecution emphasized this feature of the invention.  Computer Docking Station Corp., 319 F.3d 1366, 1375.

Illumina also argues that "the tracking" term simply recites an intended use or purpose of the claimed software.  D.I.-65 at 27.  However, the tracking function is described throughout the patent as a core aspect of the invention, see supra, pages 20 and 21.  See also, Catalina 289 F.3d at 808.

Illumina also argues that the "tracking" term is merely "duplicative of the 'processing . . . including correlating step in the body of the claim'".  D.I.-65 at 28.  However, as LifeTech points out at D.I.-75 at 29, Illumina's own proposed construction of the "processing"

34

step defeats that argument.  Not only does it fail to refer to tracking, but Illumina's explanation of its construction for this term fails to refer to tracking.  D.I.-65 at 28-30.

The claim requirement of "tracking positions of the microparticles" is a substantive claim limitation and should be construed as  "Following the movement of microparticles during a sequence of processing steps."  The Court finds that this construction is consistent with the specifications and with the statements made by Illumina to the PTO and is therefore adopted.

17.    "Processing the plurality of digital images, wherein said processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images"

| Term | Illumina's Construction | LifeTech's Construction |
|------|------------------------|-------------------------|
| "processing the plurality of digital images, wherein said processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images" | Processing the digital images so as to match the light that comes from each microparticle in one image with the light that comes from that microparticle in a second image | Analyzing the digital images so as to match the light signal that comes from each microparticle during each process step with the images showing the different positions of the microparticle during the sequence of processing steps |

Both parties agree that the "correlating" requirement of this claim should be construed as matching the light signal (i.e. optical signal) of the claim with <u>something</u>, the parties disagree over what that "something" is.  D.I.-67 at 36; D.I.-65 at 28.

LifeTech argues that, "the claim language central to the parties dispute is "correlating the optical signals generated at each microparticle with <u>its</u> corresponding image". LifeTech further argues that this language plainly recites the requirement that the optical signal must be matched with the image of each microparticle, not a later image of the optical signals. Had the latter been required, the claim would have recited, "correlating the optical signals

35

generated at each microparticle with their corresponding image".

LifeTech further argues that its position is supported by the specification, which explains that the correlating step involves determining the position of microparticles and then assigning (i.e., correlating) pixels to the microparticles that ultimately represent the optical signals emitted from the analytes attached to the microparticles citing JA1061-1071 ('505 patent) at 8:48-9:31; 10:3-20; 18:60-19:6; 19:38-20:15; fig. 8.

Illumina argues that the ordinary meaning of this term is readily apparent.  The "processing . . . images" step involves assembling the data relating to light signals from a single microparticle across multiple digital images of the microparticle.  Illumina contends that its construction is supported in the specification of the '505 patent.  The first passage cited is: "an important feature of detection means (114) of the invention is the ability to keep track of individual microparticles through multiple process steps and/or cycles." (JA1065 at 8:48-50).  But Illumina does not explain how using its construction, matching optical signals from one image with optical signals from another image would accomplish this.

Illumina also asserts that the following passage shows how optical signals in one image are matched with optical signals in another image: in the preferred image processing approach, once microparticle centers (700) are determined, pixels (702) are assigned to determine characteristics, e.g. intensity, of an optical signal generated at each microparticle (602). JA1066 at 9:6-9.  However, this passage describes how optical signals are matched to an image showing the microparticle centers (an image created by "top-lighting" or "back-lighting" the particles), as explained in the lines just preceding those quoted by Illumina, "top-light" and "back-light" are not the claimed optical signals but rather are the claimed optical characteristics of the microparticles.

This passage therefore does not support Illumina's construction.  See JA66 at 9:1-5.

After considering the merits of the parties' arguments, it is the Court's conclusion that the plain language of the claim, which is, "correlating the optical signals generated at each microparticle with its corresponding image" means that the corresponding image is of the microparticle, not of a light signal.  See JA1075 at 27:54-56; this construction is supported by the specification, see JA1061-1071 at 8:48-9:31; 10:3-20; 18:60-19:6; 19:38-20:15.

The term therefore should be construed as "analyzing the digital images so as to match the light signal that comes from each microparticle during each processing step with the images showing the different positions of the microparticle during the sequence of processing steps".

18.    "Generating sequence reads" (claims 1, 7)

| Term | Illumina's Construction | LifeTech's Construction |
| --- | --- | --- |
| "generating sequence reads" | determining the identity of at least two nucleotide bases | determining the identity and order of at least two nucleotide bases |

The only dispute on this term is whether "generating sequence reads" requires that the order, in addition to the identity of at least two nucleotides be determined.

The "plain and ordinary meaning" of a claim term governs absent the patentee defining the term differently.  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005).

The Oxford Dictionary of Biochemistry and Molecular Biology provides three definitions for "sequence", all use the word "order" or some derivative thereof.[22]

---

[22]Oxford Dictionary of Biochemistry and Molecular Biology (rev. ed.) (A.D. Smith, et al., eds., Oxford Univ. Press 2000) at 594 (attached as Exh. G to D.I.-75).

A sequence is the "[d]etermination of the <u>order</u> of nucleotides in a DNA molecule or DNA fragment by DNA sequencing technologies, e.g. Maxam-Gilbert's method or Sanger's method.[23]

The specification confirms this plain meaning, as all methods of sequencing described therein require some sort of order determination. For example, the specification explains:

> When the arrays are composed of polynucleotides they may be used in convention techniques for obtaining genetic sequence information. Many of these techniques rely on the <u>stepwise identification of suitably labeled nucleotides,</u> referred to in U.S. Patent No. 5,634,413 as 'single base' sequencing methods. . . .

JA1112 at 9:6-11.

Illumina argues that the patent does not require that this limitation be imposed on the term because the patent specifically states that the specific bases that are sequenced do not need to be next to each other: "The specific bases do not have to be contiguous," JA1113 ('656 patent) at col. 12, line 4; D.I.-65 at 40, and then provides an example of sequence reads that they argue do not necessarily determine the order of the bases in a given fragment:

> For example, the procedure may be carried out by the incorporation of non-labelled bases followed, at pre-determined positions, by the incorporation of a labeled base. Provided that the sequence of sufficient bases is determined, it should be possible to identify the fragment. Again, any SNPs occurring at the determined base positions, can be identified.[24]

LifeTech counters by arguing that Illumina's above quoted material stops short of the mark. If you read on

---

[23]Am. Heritage Dictionery 1646 (Houghton-Mifflin Co. 3d ed. 1992) [Exh. D - D.I.-67]; Concise Dictionary of Biomedicine and Molecular Biology 319 (1996) [Exh. F - D.I.-67].

[24]JA1113 ('656 patent) at col. 12, lines 4-7.

> For example, the method may be used to identify SNPs [(nucleotides)] that occur after cytosine [(C)]. . . .  <u>The addition of C is followed by monitoring the next base</u> incorporation (using a labeled base).  By repeating this process a sufficient number of times, a <u>partial sequence</u> is generated where <u>each base immediately following C is known</u>.

JA1113 at 12:11-24.

LifeTech goes on to argue that when you practice the method in this manner the resulting sequence is CA, CC, CG or CT and the order and identity of at least two nucleotide bases is determined.  Read in context, this reference provides further support for the construction that would read "order" into the term.

The ultimate aim of the invention is to align a sequence read with a known reference sequence.  JA1102 at Abstract; JA1111 at 8:24-30; JA1118-19 at claims 1, 7; see also JA1721 (explaining that the invention is meant to detect variations in the level of individual nucleotide sequences).  A sequence read cannot be aligned if the order of the nucleotide bases is unknown.

We therefore find that proper construction of the term "generating sequence reads" is "determining the identity and order of at least two nucleotide bases".

        19.     "An array of polynucleotide molecules" (claim 3)

| Term | Illumina's Construction | LifeTech's Construction |
|---|---|---|
| "an array of polynucleotide molecules" | an arrangement of different types of DNA fragments | an array of single DNA fragments, as opposed to clusters of many DNA fragments of the same type |

The parties agree that "polynucleotide fragments" are "DNA fragments".  D.I.-65 at 42; D.I.-67 at 41; D.I.-75 at 34.  The parties also agree that the meaning of the term "array" [and] "arraying," should be construed as meaning "an arrangement" D.I.-65 at 42-43; D.I.-75 at 34.

Beyond this the parties dispute whether the required "array" of the claims must be of single molecules as opposed to clusters of the same molecules.

LifeTech's proposal requires that the DNA fragments in the array be separated from one another so that each fragment can be distinguished from every other fragment. LifeTech argues that the patent describes this as a single molecule array as expressed in the claim requirement that the fragments be "individually resolved." J.A.1118-19 at 22:56-61 (claim 3), 23:10-21 (claim 7). LifeTech argues further, that the specifications expressly define arrays to be single molecule arrays, not cluster arrays. "The terms 'arrayed polynucleotides' 'polynucleotide arrays' are used herein to define a plurality of single molecules that are characterized by comprising a polynucleotide." J.A.1109 at 4:51-54. The specification further states that "[the] term 'single molecule' is used herein to distinguish from high density multi-molecule arrays in the prior art, which may comprise distinct clusters of many molecules of the same type." Id. at 4:33-36. The specification also defines "[t]he term 'individually resolved'[] to indicate that, when visualized, it is possible to distinguish one molecule on the array from its neighboring molecules." Id. at 4:37-39.

LifeTech further points to the following excerpts from the specifications to support its argument that the invention entails single molecule arrays, not cluster arrays:

- 3:13-23: "The arrays of the present invention comprise what are effectively single molecules. This has many important benefits for the study of the molecules and their interaction with other biological molecules. In particular, fluorescence events occurring on each molecule can be detected using an optical microscope linked to a sensitive detector, resulting in a distinct signal for each molecule. When used in a

multi-step analysis of a population of single molecules, the phasing problems that are encountered using high density (multi-molecule) arrays of the prior art, can be reduced or removed."

- 4:09-13: "According to the present invention, the single molecules immobilized onto the surface of a solid support should be capable of being resolved by optical means. This means that within the resolvable area of the particular imaging device used, there must be one or more distinct images each representing one molecule."

- 9:41-46: "Because sequencing is performed at the single molecule level, the sequencing can be carried out on the different polynucleotide sequences at one time without the necessity for separation of the different sample fragments prior to sequencing. This sequencing also avoids the phasing problems associated with prior art methods."

- 1:33-45 (describing the arrays in the prior art): "Typically, these arrays may be described as 'many molecule' arrays, as distinct regions are formed on the solid support comprising a high density of one specific type of polynucleotide;" 2:18-29 (describing problems with prior art arrays): "the use of high-density arrays in a multi-step analysis procedure can lead to problems with phasing . . . . This problem is recognized in the sequencing procedure described in U.S. Patent No. 5,302,509."

- 4:33-36:  "The term 'single molecule' is used herein to distinguish from high density multi-molecule arrays in the prior art, which may comprise distinct clusters of many molecules of the same type."

- 4:66-5:2:  "These high density arrays [of the present invention] are in contrast to other arrays which may be described in the art as 'high density' but which are not necessarily as high and/or which do not allow single molecule resolution."

- 4:32-39:  "The term 'individually resolved' is used herein to indicate that, when visualized, it is possible to distinguish one molecule on the array from its neighboring molecules."

- 5:54-57:  "Single molecules may be arrayed by immobilization to the surface of a solid support.  This may be carried out by any known technique, provided that suitable conditions are used to ensure adequate separation of the molecules."  JA 1108-12.

Illumina argues that the patentee used the term "array" to describe both single molecule and cluster arrays (that is, arrays that comprise clusters of many molecules of the same type) citing JA1108 ('656 patent) at col. 1, lines 42-45 and col. 2, lines 52-54 and 59-62; JA1109 ('656 patent) at col. 3, lines 20-24 and 54-57 and col. 4, lines 33-36, and therefore the claims should not be limited to single molecule arrays.  However, as LifeTech points out, when the

patentee referred to cluster arrays it specifically labeled them as such and distinguished cluster arrays from the arrays of single DNA fragments citing as an example col. 3, :20-24.[25]

Based on the foregoing we find that the patentee specifically defined its arrays as single-molecules, and expressly disclaimed multi-molecule (cluster) arrays.

The term is to be construed as "an arrangement of single DNA fragments as opposed to clusters of many DNA fragments of the same type."

20.     "Which molecules can be individually resolved by optical microscopy" (claim 3)

| Term | Illumina's Construction | LifeTech's Construction |
|------|------------------------|-------------------------|
| "which molecules can be individually resolved by optical microscopy" | wherein the polynucleotides having different sequences can be distinguished from each other using a microscope | each DNA molecule in the array can be distinguished from every other molecule by optical microscopy |

The parties agree that the words "optical microscopy" should be construed as "using a microscope".  D.I.-75 at 35; D.I.-65 at 40-41.

The issue here is similar to that presented in the prior construction of the "array" term: must the DNA molecules be distinguishable from one another or can molecules having the same sequence be clustered together and viewed as one?  Consistent with the decision and discussion of the preceding term the answer to that question is no.

The term "which molecules can be individually resolved by optical microscopy" is to be construed as "each DNA molecule in the array can be distinguished from every other molecule by using a microscope."

_____

[25]"When used in a multi-step analysis of a population of single molecules, the phasing problems that are encountered using high density (multi-molecule) arrays of the prior art, can be reduced or removed."

21.  "Arraying the fragments such that different fragments can be individually resolved by optical microscopy" (claim 7)

| Term | Illumina's Construction | LifeTech's Construction |
|------|------------------------|------------------------|
| "arraying the fragments such that different fragments can be individually resolved by optical microscopy" | arranging the fragments so that the fragments having different sequences can be distinguished from each other using a microscope | separating single DNA fragments (as opposed to clusters of DNA fragments) on a support so that each fragment can be distinguished from every other fragment by optical microscopy |

Consistent with the rulings in the two, immediately prior, constructions and for the same reasons set forth therein, we construe the term "arraying the fragments such that different fragments can be individually resolved by optical microscopy" as "arranging single DNA fragments (as opposed to clusters of DNA fragments) on a support so that each fragment can be distinguished from every other fragment using a microscope."

22.  "Population of polynucleotide fragments" (claims 1, 3)

| Term | Illumina's Construction | LifeTech's Construction |
|------|------------------------|------------------------|
| "population of polynucleotide fragments" | a collection of polynucleotide fragments | the collection of every fragment that is made when DNA is digested by a restriction enzyme |

The two disputes on this term are whether the "population of nucleotide fragments" required by independent claims 1 and 3 (i) must include each and every fragment of DNA that results from (ii) the fragmentation of a polynucleotide by restriction enzyme digestion (and not by another method).[26]

_____

[26]A restriction enzyme is an enzyme that recognizes a particular DNA sequence (usually 4-8 bases in length and cuts the DNA at or near the sequence.  See Tom Strachan and Andrew P. Read, Human Molecular Genetics at 4.2.2 (2d ed. 1999), available at

As to (i) the requirement of "every fragment" is based on claim 1, which requires the use of "each fragment of a population of polynucleotide fragments, wherein each said fragment is in a vector," and on claim 3 which requires "inserting each of said polynucleotide fragments from said population into a vector."  JA1135.  Both the claim language and the specifications, emphasize that the population includes each fragment created.  See e.g., JA1127 at 2:30-34 ("In accordance with the invention a polynucleotide is separately digested with different combinations of restriction endonucleases and the ends of the restriction fragments are sequenced so that pairs of sequences from each fragment  are produced.").  Although LifeTech uses the term "every", in its proposed construction, as viewed in the context of the claims there is no difference between "each" and the word "every".

The second dispute involved in this term is the fragmentation of a polynucleotide by restriction enzyme digestion.  The specification states:

> In accordance with the invention, a polynucleotide is separately digested with different combinations of restriction endonucleases and the ends of restriction fragments are sequenced so that pairs of sequences from each fragment are produced.  A physical map of the polynucleotide is constructed by ordering the pairs of sequences by matching the identical sequences among such pairs resulting from all of the [restriction] digestions.

JA1127 at 2:30-37.

In addition, LifeTech argues that the following excerpts from the specification re-enforces the position that the invention to be practiced requires the use of restriction fragments:

- 1:14-18:  "This invention relates . . . to a method of providing high resolution physical maps by sequence analysis of concatenations of segments of restriction fragments ends."

---

http://www.ncbi.nlm.nih.gov/bookshelf/br.fcgi?book=hmg [Exh. G, D.I.-67 at 45].

- 2:7-9:  "Another object of my invention is to provide <u>a method of ordering restriction fragments from multiple enzyme digests</u> by aligning matching sequences of their ends."

- 2:25-50:  My invention achieves these and other objects by providing methods and materials for determining the nucleotide sequences of both ends of <u>restriction fragments obtained from multiple enzymatic digests of a target polynucleotide</u> . . . ."

- 2:59-62:  "<u>This invention</u> provides a means for generating a high density physical map of target polynucleotides based on the positions of the restriction sites of predetermined restriction endonucleases."

- 4:12-15:  "In accordance with <u>the present invention</u>, segments of nucleotides at each end of <u>restriction fragments</u> produced from multiple digestions of a polynucleotide are sequenced and used to arrange the fragments in a physical map."

JA1127-28.

LifeTech concludes by arguing that there is no reference in the specification for fragments generated by any mechanism other than restriction enzyme digestion.  D.I.-67 at 46. Illumina responds that, "the fragments play a nominal role in each method".  That argument is contradicted by the patent, which explains that the purpose of the claimed method is to obtain end segments of each fragment so that those segments can be sequenced and mapped.  The fact that the fragments are restriction fragments is important to the mapping function.  JA1127 at 2:30-37; and JA1127-28.  Without the known sequences resulting from restriction enzyme digestion the mapping purpose would be compromised.  *See* <u>supra</u>.

Illumina also argues that the restriction enzyme digestion of polynucleotides is not "at the core of the invention" as LifeTech asserts because the '035 patent describes an embodiment of the invention that is directed to monitoring the expression of genes using concatenations of fragments of DNA called "cDNAs" inserted into the claimed vectors:

46

Another aspect of the invention is the monitoring of gene expression by providing pairs of segments excised from cDNAs. In this embodiment, segments from each end of each cDNA of a population of cDNAs are ligated together to form pairs, which serve to identify their associated cDNAs. Concatenations of such pairs are sequenced by conventional techniques to provide information on the relative frequencies of expression in the population.[27]

LifeTech's position on this issue is that cDNA is never referred to as a fragment in the specification, and therefore this embodiment falls outside of the claims. Citing TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc., 529 F3d 1364, 1373 (Fed. Cir. 2008). ("[T]he mere fact that there is an alternative embodiment disclosed in the . . . patent that is not encompassed by the district court's claim construction does not outweigh the language of the claim, especially when the court's construction is supported by the intrinsic evidence."). Illumina has confirmed this distinction in the pending reexamination of this patent. See, Exh. C at 40-41 ("Velculescu does not disclose or even remotely suggest the formation of a vector which contains a "pair of oligonucleotide end segments", derived from opposite ends of the "same" polynucleotide "fragment". The constructs described in Velculescu only have only [sic] a "single tag sequence" derived from any given "cDNA molecule.") (emphasis in original).

After considering the arguments and counter-arguments of the parties we conclude that the term "population of polynucleotide fragments" should be construed as "the collection of every fragment that is made when DNA is digested by a restriction enzyme".

23.   "Vector" (claims 1, 3, 5)

| Term | Illumina's Construction | LifeTech's Construction |
|------|------------------------|-------------------------|

---

[27]JA1127 ('035 patent) at col. 2, lines 51-59; JA1131 ('035 patent) at col. 9, lines 16-26.

| | | |
|---|---|---|
| "vector" | a nucleic acid molecule which may be employed to introduce a nucleic acid sequence or gene into a cell | a self-replicating nucleic acid molecule which may be employed to introduce a nucleic acid sequence or gene into a cell; such nucleic acid molecules are designated as vectors and may be in the form of a plasmid, hybrid plasmid, cosmid, viral vector, bacteriophage vector, etc. |

Both sides agree that the '035 patent does not define the term "vector". D.I.-67 at 47; D.I.-65 at 46; and that a "vector" must be capable of introducing a nucleic acid sequence into a cell. D.I.-67 at 47; D.I.-65 at 47.

Both sides construe a vector as "a nucleic acid molecule which may be employed to introduce a nucleic acid sequence or gene into a cell." LifeTech's definition seeks to impose an additional limitation on the scope of the term. LifeTech's construction requires that the vector is "self-replicating." LifeTech supports this limitation by arguing that, the specification discloses preferred vectors pUC19, λ-based phages, or like vectors, which are capable of both self-replication and introducing nucleic acid sequences into cells.

Illumina's response to this argument is that the "vector is readily constructed from commercially available materials using conventional recombinant DNA techniques, e.g., as disclosed in Sambrook, et al. Molecular Cloning, 2d Ed. (Cold Spring Harbor Laboratory, NY, NY 1989)."[28] Illumina also argues that nowhere in the patent does it state that the vector to be used in the invention must be "self-replicating".

Illumina argues that LifeTech's reference, supra, to vectors that are self-replicating

---

[28]JA1129 "035 patent" at 5:9-13.

and disclosed in the specifications as being "preferred" vectors, rather than support LifeTech's position, that the claim is limited to self-replicating vectors, actually suggests the position that the claims encompass vectors that are not self-replicating.  The Court is inclined to agree, if the patentee meant to limit the patent to "self-replicating" vectors that was a perfect time to say it.[29]

LifeTech points to the definition employed by the PTO in support of its position that the vector must be self-replicating.  D.I.-48, n. 52.  Illumina argues contra that the PTO definition applies to a different sub-class, not the sub-class to which the PTO assigned the '035 patent.  D.I.-73 at 39, n. 156.

LifeTech cites to a technical dictionary at D.I.-67 at 49, n. 53, which defines vector as a "plasmid or viral DNA molecule into which another DNA molecule can be inserted without disruption of the ability of the molecule to replicate itself" [Exh. F].  Illumina counters with a citation to a dictionary of its own D.I.-65 at 47, n. 144, defining vector as "any DNA molecule that can incorporate foreign DNA and transfer it from one organism to another."  [Exh. J to the Pendleton Decl.]

After considering the arguments and counter-arguments of the parties I am not persuaded that the term "vector" should be limited by the addition of the words "self-replicating". We will adopt the construction proposed by Illumina that the term vector should be construed as "a nucleic acid molecule which may be employed to introduce a nucleic acid sequence or gene into a cell".

24.     "Ligating together the cleaved ends produced by said removing"
        (Claim 1); "Ligating the pair of segments together" (Claim 5)

---

[29]Liebel-Flarsheim, 358 F3d at 906 ("Even when the specification describes only a single embodiment the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction'").

| Term(s) | Illumina's Construction | LifeTech's Construction |
|---|---|---|
| "ligating together the cleaved ends produced by said removing"<br><br>"ligating the pair of segments together" | Connecting the cut ends | For a piece of DNA that was cut by a restriction enzyme, connecting one of the cut ends directly to the other cut end. |

The only dispute about this term is whether the ends must be "directly" connected or whether they can be connected via a piece of linking DNA.  D.I.-75 at 40; D.I.-73 at 40.[30]

LifeTech argues that the requirement of "ligating together the cleaved ends" or "ligating the pair of segments together" does require that the ligation (connection) be directly between the cleaved fragments of DNA.  LifeTech supports this position by arguing that the claim language and specification indicate that the "ligating" requirement of the patent involves the connection-ligation-of the two fragments that were cut apart by a restriction enzyme.  *See*, e.g., JA1128-30 ('035 patent) at 4:18-23 ("Excised segments from the same fragment are ligated together to form a pair of segments."); 5:28-30 ("The vector is then recircularized by ligating the two ends together thereby forming a pair of segments."); 8:4-7 ("The fragments comprising the vector and ends (i.e. segments) of the restriction fragment insert are isolated e.g. by gel electrophoresis blunted (316) and recircularized  (320).")  Illumina D.I.-65 at 48 states: "The parties appear to agree that the plain and ordinary meaning of 'ligating together' in clauses 1 and 5 is 'connecting the cut ends'.  The dispute concerns the additional limitations proposed by LifeTech."  Illumina further argues that the claims are open-ended, through their use of the term

---

[30]LifeTech's construction would require that the words "for a piece of DNA that was cut by a restriction enzyme" be included.  Illumina believes this is unnecessary because the claim already expressly requires that.  We agree.

"comprising", a well understood transitional claim term which means that the claimed elements are essential to the invention, but that other elements may be added.[31]

LifeTech in its responsive construction brief D.I.-75 at 40 argues that it does not dispute that the claims are open-ended and that LifeTech's proposal allows for the claimed process to be supplemented with other steps such as modification of fragment ends prior to ligation. What its construction does exclude is: "that which was disclaimed in the prosecution history - the indirect connection of two ends of a fragment via a pair of linking DNA." LifeTech is referring to an amendment during the prosecution of the parent application no. 10\706,118, the patent stated: "It is the applicant's view that two sequences that are separated by 16 nucleotides . . . would not be considered 'ligated together.'" Exh. H at 6 D.I.-67. Also in its papers in the pending re-examination proceedings on this patent, Illumina states "these segments, which remain connected by the linearized vector, may be ligated <u>directly</u> together, generally after treatment to blunt end the cleaved ends of the segments . . . ., thereby forming a 'linked pair' of segments derived from the same fragment in a single vector." *See* Exh. C at 14 D.I.-67 ("the linearized vector formed in claim 3 maybe recircularized via ligation, such that the cleaved ends of the two paired segments are ligated <u>directly</u> together (i.e., are linked directly to each other)."); <u>id.</u> at 26. (The insertion of a replacement nucleotide sequence between the cleaved ends is not the same as the ligation recited in present claim 1 of the cleaved ends of the two fragment segments, which remain attached to the vector after the type IIs restriction endonuclease cleavages.").

After considering the arguments of counsel we find that the intrinsic evidence and

---

[31]*Genentech, Inc. v. Chiron Corp.,* 112 F.3d 495, 501 (Fed. Cir. 1997) ("the open-ended term comprising ... means that the named elements are essential, but other elements may be added"); *CIAS Inc. v. Alliance Gaming Corp.,* 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'").

the patentees disclaimer of ligation via linking DNA in the prosecution and re-examination of the patent require that the ends be ligated directly together, we find that the term should be construed as, "connecting one of the cut ends directly to the other cut end".

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LIFE TECHNOLOGIES CORPORATION; | : | CIVIL ACTION |
| APPLIED BIOSYSTEMS, LLC; INSTITUTE | : | |
| FOR PROTEIN RESEARCH; ALEXANDER | : | |
| CHETVERIN; HELENA CHETVERINA; and | : | |
| WILLIAM HONE | : | |
| | : | |
| Plaintiffs/Counterclaim Defendants | : | |
| | : | |
| vs. | : | |
| | : | |
| ILLUMINA, INC. and SOLEXA, INC. | : | NO. 09-706-RK |
| | : | |
| Defendants/Counterclaim-Plaintiffs | : | |

## <u>O R D E R</u>

**AND NOW,** this   15th   day of December, 2010, it is **ORDERED** that the

following claim constructions are adopted:

The claim terms "amplification system" and "polymerase enzyme system" are to be

construed as a set of components that together can amplify a nucleic acid.

The claim terms "aqueous liquid phase that includes a cell-free, enzymatic,

exponential nucleic acid amplification system" and "aqueous liquid phase that includes a cell-free

nucleic acid polymerase enzyme system" are to be construed as water-based liquid phase that

includes a cell-free enzymatic, exponential nucleic acid amplification system.

The claim term"forming a liquid mixture of the sample and said amplification

system" is to be construed as combining the sample and the amplification system together in a

liquid.

The claim term "entrapping" is to be construed as keeping within limited zones.

The claim term "completely entrapping" shall be construed to mean completely

keeping within limited zones.

The claim term "thin layer" needs no further construction.

The claim term "incubating said immobilized medium" needs no further construction.

The claim term "incubating said trapped mixture" needs no further construction.

The claim term "wherein the average distance between the nearest solid surfaces is smaller than the distance which the synthesized nucleic acid product can migrate by diffusion during the reaction" needs no further construction.

The claim terms "distributing in said aqueous liquid phase" and "distributing in said amplification system" are to be construed as separating nucleic acid molecules in the aqueous liquid phase and separating nucleic acid molecules in the amplification system.

The claim term "a preformed immobilized medium" is to be construed an immobilized medium that is formed prior to amplification.

The claim term "nucleotide substrate" shall be construed as nucleotides, nucleotide analogs, or similar structures used as the building blocks of a nucleic acid strand.  Nucleic acids, such as primers, are not nucleotide substrates.

The claim terms "optical characteristic of each microparticle" and "optical characteristic of said microparticle" should be construed as an optical quality of the microparticle itself, not the attached analyte.

The claim term "with sufficient resolution for individual microparticles to be distinguished" shall be construed as the image resolution is sufficient to distinguish each individual microparticle from every other microparticle.

The claim term "signal tracking means effective to correlate the optical signals from

each of the microparticles in each of the sequence of digital images with said center of said microparticle" is to be construed as a "means plus function" limitation subject to an analysis under 35 U.S.C. § 112, ¶6.  The claimed function is: correlating the optical signals from microparticles in a sequence of digital images with the centers of those microparticles.  The disclosed structure is: a data processor that runs software that assigns pixels of the fluorescent images of the microparticles to the microparticle centers.

The claim term "tracking positions of the microparticles" is construed as, following the movement of microparticles during a sequence of processing steps.

The claim term "processing the plurality of digital images, wherein said processing includes correlating the optical signals generated at each microparticle with its corresponding image in each of the plurality of digital images" is construed as, analyzing the digital images so as to match the light signal that comes from each microparticle during each processing step with the images showing the different positions of the microparticle during the sequence of processing steps.

The claim term "generating sequence reads" is construed to mean, determining the identity and order of at least two nucleotide bases.

The claim term "an array of polynucleotide molecules" is construed as an arrangement of single DNA fragments as opposed to clusters of many DNA fragments of the same type.

The claim term "which molecules can be individually resolved by optical microscopy" is to be construed as each DNA molecule in the array can be distinguished from every other molecule by using a microscope.

The claim term "arraying the fragments such that different fragments can be

individually resolved by optical microscopy" is to be construed as arranging single DNA fragments (as opposed to clusters of DNA fragments) on a support so that each fragment can be distinguished from every other fragment using a microscope.

The claim term "population of polynucleotide fragments"  should be construed as the collection of every fragment that is made when DNA is digested by a restriction enzyme.

The claim term "vector" should be construed as a nucleic acid molecule which may be employed to introduce a nucleic acid sequence or gene into a  cell.

The claim terms "ligating together the cleaved ends produced by said removing" and "ligating the pair of segments together" shall be construed as connecting one of the cut ends directly to the other cut end.

BY  THE  COURT:


 /s/ Robert F. Kelly
ROBERT  F. KELLY
SENIOR  JUDGE