1   MATTHEW D. MURPHEY (SBN 194111)
    TROUTMAN SANDERS LLP
2   11682 El Camino Real, Suite 400
    San Diego, CA  92130
3   Telephone:  (858) 509-6000

4   BRADFORD PAUL SCHMIDT (SBN 174440)
    LIFE TECHNOLOGIES CORPORATION
5   5791 Van Allen Way
    Carlsbad, CA 92008
6   Telephone:  (760) 603-7200

7   NICHOLAS GROOMBRIDGE (*pro hac vice*)
    CATHERINE NYARADY (*pro hac vice*)
    PETER SANDEL (*pro hac vice*)
8   JENNY C. WU (*pro hac vice*)
    REBECCA FETT (*pro hac vice*)
9   ROBERT LIN (*pro hac vice*)
    PAUL, WEISS, RIFKIND, WHARTON &
10  GARRISON LLP
    1285 Avenue of Americas
11  New York, NY 10019
    Telephone: (212) 373-3000

12  Attorneys for Plaintiffs/Counterclaim Defendants
13  LIFE TECHNOLOGIES CORPORATION,
    APPLIED BIOSYSTEMS, LLC, INSTITUTE
14  FOR PROTEIN RESEARCH, ALEXANDER
    CHETVERIN, HELENA CHETVERINA, and
15  WILLIAM HONE

16              **UNITED STATES DISTRICT COURT**

17            **SOUTHERN DISTRICT OF CALIFORNIA**

18  LIFE TECHNOLOGIES CORPORATION,          Case No.  3:11-cv-00703-CAB (DHB)
    APPLIED BIOSYSTEMS, LLC, INSTITUTE
19  FOR PROTEIN RESEARCH, ALEXANDER         **[REDACTED] MEMORANDUM OF**
    CHETVERIN, HELENA CHETVERINA, and       **POINTS AND AUTHORITIES IN**
20  WILLIAM HONE,                           **OPPOSITION TO ILLUMINA AND**
                                            **SOLEXA'S MOTION TO EXCLUDE**
21          Plaintiffs/Counterclaim Defendants,  **THE TESTIMONY OF ANNELISE E.**
                                            **BARRON, PH.D. REGARDING**
22                                          **"EXPONENTIAL AMPLIFICATION"**
    v.                                      **LIMITATIONS**
23
    ILLUMINA, INC. and SOLEXA, INC.,        **[FILED UNDER SEAL]**
24
          Defendants/Counterclaim Plaintiffs.   Date:        January 17, 2013
25                                          Time:        2:30 p.m.
                                            Courtroom:  2
26                                          Judge:      Hon. Cathy Ann Bencivengo
27
28

1

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................. 3

II.     LEGAL STANDARD ............................................................................................... 4

III.    FACTUAL BACKGROUND ................................................................................... 4

     A.      Dr. Barron's Qualifications ............................................................................ 4

     B.      Exponential Nucleic Acid Amplification ...................................................... 5

IV.     ARGUMENT ........................................................................................................... 6

     A.      Dr. Barron's Expertise Qualifies Her To Opine On Whether Illumina's
           Accused Products Meet The "Exponential" Limitations Of The Chetverin
           Patents ........................................................................................................... 6

     B.      Dr. Barron's Opinion Is Based On A Definition Of "Exponential Nucleic
           Acid Amplification" Generally Accepted By Those Of Ordinary Skill ................ 8

           1.      Illumina's Motion Is Really A Belated And Improper Attempt To
                   Construe The Term "Exponential Nucleic Acid Amplification" ............... 8

           2.      The Scientific Community Defines "Exponential Nucleic Acid
                   Amplification" As Amplification Where The  Amplification
                   Products Can Serve As Templates For The Next Round Of
                   Amplification ......................................................................................... 10

           3.      Illumina's Alternate Proposed "Categories" Of Nucleic Acid
                   Amplification Have Not Been Generally Accepted By The
                   Scientific Community ............................................................................ 11

     C.      Dr. Barron Reliably Applied The Commonly-Accepted Scientific
           Principles of Exponential Nucleic Acid Amplification To Sufficient Facts
           And Data Regarding Illumina's Accused System ................................................. 16

V.      CONCLUSION ...................................................................................................... 18

1

2

### TABLE OF AUTHORITIES

3

4 CASES

5 *350 W.A. LLC v. Chubb Group of Ins.*,
   No. 05CV75 WQH (CAB), 2007 WL 4365502 (S.D. Cal. Dec. 5, 2007) ................................ 2
6
7 *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
   03-C-7713, 2005 WL 4034698 (N.D. Ill. Dec. 21, 2005) ..................................................... 16

8 *Byrne v. Wood, Herron & Evans, LLP*,
   450 Fed. App'x 956 (Fed. Cir. 2011) ........................................................................ 5
9
10 *Calhoun v. Yamaha Motor Corp., USA*,
    350 F.3d 316 (3rd Cir. 2003) ................................................................................ 5

11 *Carnegie Mellon University v. Hoffmann-LaRoche, Inc.*,
    55. F. Supp. 2d 1024 (N.D. Cal. 1999) .................................................................... 5
12
13 *U.S. v. Chang*,
    207 F.3d 1169 (9th Cir. 2000) ............................................................................... 5

14 *Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .................................................................................. 2, 4, 16
15
16 *Kearns v. Chrysler Corp.*,
    32 F.3d 1541 (Fed. Cir. 1994) ............................................................................. 16

17 *Lucent Techs., Inc. v. Microsoft Corp.*,
    837 F. Supp. 2d 1107 (S.D. Cal. 2011) .................................................................... 2
18
19 *Micro Chemical, Inc. v. Lextron, Inc.*,
    317 F.3d 1387 (Fed. Cir. 2003) ........................................................................... 15

20 *Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................................... 12
21
22 *Sundance, Inc. v. Demonte Fabricating Ltd.*,
    550 F.3d 1356 (Fed. Cir. 2009) ............................................................................. 5

23 *Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ........................................................................... 12
24
25 *U.S. v. Vallejo*,
    237 F.3d 1008 (9th Cir. 2001) ............................................................................. 16

26 OTHER AUTHORITIES

27 Fed. R. Evid. 702 ........................................................................................ passim

28

Doc#: US1:8301419v1                                      11-cv-00703-CAB (DHB)

## I.     PRELIMINARY STATEMENT

Life Technologies Corporation, Applied Biosystems, LLC, Institute for Protein Research, Alexander Chetverin, Helena Chetverina, and William Hone (collectively, "Plaintiffs") submit this memorandum of points and authorities in opposition to the motion of Illumina, Inc. and Solexa, Inc. (collectively, "Illumina") to exclude the testimony of Plaintiffs' infringement expert, Dr. Annelise E. Barron, regarding whether the nucleic acid amplification system used by Illumina's accused products is "exponential" as recited in the claims of Plaintiffs' patents-in-suit (collectively, the "Chetverin Patents").

Illumina's motion is nothing more than a belated and backdoor attempt to obtain a narrow construction of the claim term "exponential nucleic acid amplification."  The meaning of that term is manifestly a question of claim construction.  And back in the claim construction phase of this case both sides initially proposed constructions for it.  Those constructions were identical in substance, and—more importantly for this motion—also identical to the meaning of the term that Dr. Barron has employed.  Because there was no dispute between the parties, Illumina withdrew its request for  construction and, as a consequence, the term was not addressed in Judge Kelly's claim construction order.

Now, at the eleventh hour, Illumina wishes to offer a new definition of "exponential nucleic acid amplification," a definition that is contrary to its own original proposal.  Moreover, Illumina seeks to do this by means of a *Daubert* motion rather than by fairly and squarely framing the issue as what it is—a question of claim construction.  Illumina's attempt is untimely and wrong on the merits.  Illumina faults Dr. Barron for using a definition that is identical in substance to Illumina's own original proposal, and now asserts that definition is so outlandish that it should not even be allowed into evidence.  Claim construction in this case is over and Illumina cannot reopen it through the guise of a *Daubert* motion.  Dr. Barron's expertise is more than sufficient to permit her to opine on the issue of what is "exponential" amplification; her methodology and application of that methodology to the facts are consistent with well-accepted scientific principles and beyond reproach.  Accordingly the motion should be denied.

1  **II.     LEGAL STANDARD**

2       Expert testimony is admissible under Rule 702 of the Federal Rules of Evidence so long

3  as "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact

4  to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

5  facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

6  expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702;

7  *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). When an "expert meets

8  the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury

9  decides how much weight to give that testimony." *Lucent Techs., Inc. v. Microsoft Corp.*, 837 F.

10  Supp. 2d 1107, 1123 (S.D. Cal. 2011) (citing *United States v. Sandoval-Mendoza*, 472 F.3d 645,

11  654 (9th Cir. 2006)). The requirement of Rule 702 "is not intended to authorize a trial court to

12  exclude an expert's testimony on the ground that the court believes one version of the facts and

13  not the other." *Id.* The law is clear that "the weakness [or strength] in the underpinnings of

14  expert opinions may be developed upon cross-examination, as such weakness [or strength] goes

15  to the weight and credibility of the testimony as opposed to its admissibility." *350 W.A. LLC v.*

16  *Chubb Group of Ins.*, No. 05CV75 WQH (CAB), 2007 WL 4365502, at *21 (S.D. Cal. Dec. 5,

17  2007) (citing *Bergen v. F/V St. Patrick*, 816 F.3d 1345, 1352 n.5 (9th Cir. 1987)) (internal quotes

18  omitted). As the Supreme Court noted "vigorous cross-examination, presentation of contrary

19  evidence, and careful instruction on the burden of proof" are the "traditional and appropriate"

20  mechanism by which a party may challenge opposing evidence that it considers to be incorrect.

21  *Daubert*, 509 U.S. at 596.

22  **III.    FACTUAL BACKGROUND**

23       **A.     Dr. Barron's Qualifications**

24       Dr. Barron has been a professor for over 15 years. She is currently the W.M. Keck

25  Associate Professor of Bioengineering at Stanford University. Prior to her current position, Dr.

26  Barron was a professor of chemical and biological engineering at Northwestern University. Her

27  research and expertise have focused on four particular areas: (1) polymer, co-polymer, and

28  hydrogel physics and chemistry, (2) the biophysics of DNA molecules in aqueous salt solutions;

1  (3) molecular biologic manipulations of DNA by methods such as PCR amplification; and, (4) the

2  behavior of DNA molecules within polyacrylamide solutions and hydrogels.  [Declaration of

3  Robert Lin in Support of Memorandum of Points and Authorities in Opposition to Illumina and

4  Solexa's Motion to Exclude the Testimony of Annelise E. Barron, Ph.D. regarding "Exponential

5  Amplification" Limitations (hereinafter "Lin Decl.") Exh. 1 (8/3/2012 Barron Report) at ¶ 4; *see*

6  *also* 12/21/2012 Edwards Decl. ¶ 14 (explaining that amplification is part of the sequencing

7  workflow).]  As outlined in her report, Dr. Barron's understanding of nucleic acid amplification

8  processes is derived from over 20 years of experience in molecular biology and related fields,

9  regularly performing nucleic acid amplification during the course of her research, all of which

10  spans from the present day back to the time period during which the Chetverin Patents were filed.

11  [Lin Decl. Exh. 1 (8/3/2012 Barron Report) at ¶¶ 5-7.]  These qualifications meet, if not exceed,

12  the level of ordinary skill in the art set forth by both Illumina and Plaintiffs, as discussed further

13  below.

14           **B.      Exponential Nucleic Acid Amplification**

15           Dr. Barron's August 3, 2012 expert report details her opinion that Illumina's accused

16  systems infringe the asserted claims of the Chetverin Patents.  As one part of this opinion, Dr.

17  Barron sets forth her view that Illumina's accused systems employ an exponential nucleic acid

18  amplification system as recited in the Chetverin Patent claims.  [Lin Decl. Exh. 1 (8/3/2012

19  Barron Report) at ¶ 62-65.]

20           Nucleic acid amplification is the process by which nucleic acids, such as DNA, are

21  copied.  [Lin Decl. Exh. 2 (10/7/2011 Tutorial Tr.) at 9:17-24.]  When amplification is

22  "exponential," a copy of a nucleic acid can serve as a template for future rounds of copying.  In

23  other words, the original molecule and the copied molecule can both act as templates for

24  subsequent copying.  *Id.* at 19:13-23.  In this manner, under ideal circumstances, the exponential

25  nucleic acid amplification process yields more copies of the original nucleic acid than a process

26  where only the original nucleic acid molecule serves as a template.  [Lin Decl. Exh. 1 (8/3/2012

27  Barron Report) at ¶ 63.]

28

## IV.    ARGUMENT

In its motion to exclude Dr. Barron's expert testimony regarding exponential nucleic acid amplification systems, Illumina complains that (a) Dr. Barron lacks expertise in "nucleic acid amplification kinetics," which Illumina contends is necessary to understand exponential amplification reactions, (b) Dr. Barron's opinion applied an incorrect definition of "exponential amplification," and (c) Dr. Barron's opinion does not take into account supposedly conflicting facts.  Each of these arguments fail.  As discussed below, Dr. Barron unquestionably possesses scientific, technical, and specialized knowledge that will assist the jury with understanding the infringement issues in this case.  In reaching her opinion, Dr. Barron has reliably applied the well-accepted understanding of "exponential nucleic acid amplification" to Illumina's accused systems, as described by Illumina's own witnesses and explained in Illumina's own documents.  For these reasons, Dr. Barron's testimony meets the admissibility threshold established by Rule 702.

### A.    Dr. Barron's Expertise Qualifies Her To Opine On Whether Illumina's Accused Products Meet The "Exponential" Limitations Of The Chetverin Patents

There can be no question that Dr. Barron possesses the proper qualifications to help a fact finder determine whether the nucleic acid amplification system of Illumina's accused products is "exponential."  Fed. R. Evid. 702; *Daubert*, 506 U.S. at 597.  As noted in her expert report, Dr. Barron has expertise in, among others, "the biophysics of DNA molecules in aqueous salt solutions," "molecular biological manipulations of DNA by methods such as PCR [a nucleic acid amplification method]," "the behavior of DNA molecules within polyacrylamide solutions and hydrogels," and "fundamental and applied thermodynamics and kinetics"  [Lin Decl. Exh. 1 (8/3/2012 Barron Report) at ¶¶ 6, 8.]  Through this work, Dr. Barron understands and regularly practices various nucleic acid amplification techniques.  *Id.*

1 ████████████████████████████████████ █ ██████████████

2 █████████████████████████████████████████████████████████

3 ██████████████████████████████

4      There is no dispute that Dr. Barron far exceeds this threshold— she has nearly 20 years

5 experience in the relevant field— but even if she were of merely ordinary skill that would still be

6 sufficient for her to testify as an expert.  *See Byrne v. Wood, Herron & Evans, LLP*, 450 Fed.

7 App'x 956, 963 (Fed. Cir. 2011) ("[T]here is no suggestion that Rule 702 requires a witness to

8 possess something more than ordinary skill in the art to testify as an expert."); *see also Sundance,*

9 *Inc. v. Demonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2009) (explaining that, while

10 not automatic, "[a] witness possessing merely ordinary skill will often be qualified to present

11 expert testimony both in patent trials and more generally").

12      The cases cited by Illumina on pages 3-4 of its brief are all inapposite.  In each of those

13 cases, an expert was precluded because the expert lacked "any training or experience, practical or

14 otherwise" in the relevant field.  *See, e.g.*, *U.S. v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000)

15 (cited in Opening Br. at 3-4).  Qualification as an expert requires "that the witness possess

16 specialized experience" and courts have "interpreted this requirement liberally, holding that a

17 broad range of knowledge, skills, and training qualify an expert as such." *Calhoun v. Yamaha*

18 *Motor Corp., USA*, 350 F.3d 316, 321 (3rd Cir. 2003).  Here, Dr. Barron's CV clearly shows that

19 she has, at the very least, extensive practical experience working with exponential amplification.

20 Illumina's arguments completely ignore this vast experience which, by itself, provides Dr. Barron

21 with the "knowledge, skills and training" to testify as an expert.  *Id*.

22      Illumina's contention in the present motion that one needs expertise in "nucleic acid

23 amplification kinetics" in order to opine on whether an amplification system is exponential is

24 simply unsupported attorney argument proffered by Illumina as part of an effort to try its luck in

25 _____

26 [1] Plaintiffs' experts, however, have provided their own definition of the level of ordinary skill in the art:  "advanced (graduate) students working toward a Ph.D. or similar degree, or who have

27 substantial experience in performing experiments equivalent thereof, in the field of chemistry, chemical engineering, biochemistry, molecular biology, biophysics, or a similar field." [Lin Decl.

28 Exh. 1 (8/3/2012 Barron Report at ¶ 18).]  Dr. Barron meets this definition as well.

attempting to exclude Dr. Barron's testimony. [Opening Br. (Doc. No. 330-1) at 4.]   In effect, what Illumina is trying to do here is to define the required area of expertise so narrowly that no one can satisfy it.   Notably, not one of Illumina's experts has suggested that expertise in "nucleic acid amplification kinetics" is necessary to understand the Chetverin Patents.   None of Illumina's experts has claimed that they even have such expertise themselves.   ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

### B.   Dr. Barron's Opinion Is Based On A Definition Of "Exponential Nucleic Acid Amplification" Generally Accepted By Those Of Ordinary Skill

#### 1.   Illumina's Motion Is Really A Belated And Improper Attempt To Construe The Term "Exponential Nucleic Acid Amplification"

The meaning of the term "exponential nucleic acid amplification," as used in the asserted claims of the Chetverin Patents, is plainly a question of claim construction.   What is really behind Illumina's assertions that Dr. Barron has employed an incorrect usage of this term is an effort by Illumina to obtain a construction more favorable to its own case.   This is belated and improper.

Illumina had its chance to propose a construction of "exponential nucleic acid amplification" during the actual *Markman* phase of this case.   During that phase, both parties initially proposed constructions for this term.   Both parties' proposed constructions were virtually identical and, more importantly for this motion, also identical in substance to the definition relied on by Dr. Barron as described below:

| Dr. Barron's Definition | Life's Proposed Construction | Illumina's Proposed Construction |
|---|---|---|
| "[An amplification] system[] in which the newly synthesized copies [of nucleic acids] can themselves serve as templates for subsequent [amplification] reactions." | No construction needed or, in the alternative: "Amplification of nucleic acids in which an amplification product serves as a template for one or more subsequent rounds of amplification." | "A reaction wherein the products of a round of amplification serve as templates, along with the original templates, in the next round of amplification." |

[*See* Lin Decl. Exh. 6 (Plaintiffs' Proposed Construction) at 1; Lin Decl. Exh. 7 (Illumina's Proposed Construction) at 1.]  As can readily be seen, the two definitions proposed by the parties and the one actually employed by Dr. Barron are essentially identical: they all require that an amplification product created in one round of amplification can serve as a template for the creation of further copies in subsequent rounds of amplification.

In view of the similarity between the two sides' proposals, Illumina ultimately conceded that the term did not require construction and thus no construction was entered by Judge Kelly. But now, at this late stage, Illumina seeks to suggest otherwise, proposing a new construction that it did not offer at any point earlier in the case and one that is, in fact, inconsistent with its own previously proposed construction.  Illumina's untimely attempt to change its strategy on the construction of this term under the guise of a *Daubert* motion is wholly improper and should be denied as such.[2]

---

[2]   Illumina's thinly veiled claim construction argument is also apparent from its reliance on the Federal Circuit's seminal case on claim construction canons in order to attack Dr. Barron's infringement opinion. [*See* Opening Br. (Doc. No. 330-1) at 5 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (Fed. Cir. 2005).]  In so doing, Illumina tacitly acknowledges that this motion is not about Dr. Barron's evidence or scientific authority, but rather about its desire for a claim construction that is different from what it previously proposed during the *Markman* phase of this case in a vain attempt now to escape liability.  In any event, Dr. Barron's opinion is consistent with the Chetverin Patents and well-accepted principles regarding exponential amplification and not, as Illumina suggests, a "conclusory, unsupported assertion[] . . . as to the definition of a claim term."  *See id.*  Further, as noted in Plaintiffs' opposition to Illumina's motion for summary judgment of noninfringement, Plaintiffs have presented evidence that the accused systems infringe even under Illumina's definition of "exponential."

9

1

2.      **The Scientific Community Defines "Exponential Nucleic Acid Amplification" As Amplification Where The  Amplification Products Can Serve As Templates For The Next Round Of Amplification**

2

3

█████████████████████████████████████████████████████

4

████████████████████████████████████████████████████████

5

████████████████     ████████████████████████████████████

6

████████████████████████████████████████████████████████

7

████████████████████████████████████     ████████████████

8

████████████████████████████████████████████████████████

9

████████████████████████████████████████████████████████

10

████████████████████████████████████████████████████████

11

████████████████████████████████████████████████████████

12

██████████████████

13        The definition used by Dr. Barron is widely accepted by those in the scientific community

14   with having a background in nucleic acid amplification.  For example, in the October 7, 2011

15   technology tutorial before the Court, Dr. Jeremy Edwards, a professor in Microbiology at the

16   University of New Mexico, explained that amplification is exponential when each copied strand

17   becomes a "template[] for the next round of the amplification."   [Lin Decl. Exh. 2 (10/7/2011

18   Tutorial Tr.) at 19:13-21; *see also* 12/21/2012 Edwards Decl. ¶¶ 26-28 ("It is my opinion that a

19   person of ordinary skill in the art in 1992 would have understood the term 'exponential

20   amplification' in the context of the Chetverin Patents to refer to amplification systems in which

21   the original template and newly synthesized copies can serve as templates in subsequent

22   reactions.").]   █████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████

26        The definition used by Dr. Barron is also consistent with the specification of the Chetverin

27   Patents, which describes three examples of exponential amplification systems in the same

28   manner:   viral RNA-directed RNA polymerases ("VRP"), DNA amplification in polymerase

1    chain reaction ("PCR"), and isothermal multienzyme amplification ("3SR").  [*See* Lin Decl. Exh.

2    9 ('478 patent) at col.1:10-15.]  The specification describes each of these exponential reactions in

3    terms of the amplification products acting as templates for subsequent rounds of copying.  For

4    example, "[i]n VRP reaction, exponential synthesis occurs because the product and template

5    RNAs remain single-stranded during RNA synthesis, and both serve as equally effective

6    templates in the next round of synthesis."  [*See, e.g.*, *id.* at col.1:30-33.]  Similarly, in PCR "the

7    templates and product strands have to be melted apart at elevated temperature . . . where each

8    strand anneals with one of the primers and serves as the template for additional replication.  The

9    process is repeated many times . . . resulting in an exponential amplification of the target region."

10   [*See id.* at col.2:8-15.]  3SR is characterized as a reaction where denaturing enzymes will "result[]

11   in the formation of single-stranded templates, allowing the amplification to proceed exponentially

12   without temperature cycling."  [*See id.* at col.2:54-57.]  Indeed, the scientific literature cited in the

13   Chetverin Patents discusses these same exponential amplification systems qualitatively as well.

14   *See, e.g.*, Paul M. Lizardi et al., *Exponential Amplification of Recombinant-RNA Hybridization*

15   *Probes*, 6 Bio/Technology 1197, 1197 (1988) ("[B]oth the product and the template are released

16   from the replication complex, and both strands are free to serve as templates in the next round of

17   synthesis.") [Lin Decl. Exh. 10]; Henry A. Erlich et al., *Recent Advances in the Polymerase*

18   *Chain Reaction*, Science 1643 (June 1991) ("This exponential amplification results because under

19   appropriate conditions the primer extension products synthesized in cycle 'n' function as

20   templates for the other primer in cycle 'n+1.'") [Lin Decl. Exh. 11].

21          **3.    Illumina's Alternate Proposed "Categories" Of Nucleic Acid**
               **Amplification Have Not Been Generally Accepted By The Scientific**
22             **Community**

23          Illumina complains that Dr. Barron's conclusion only recognizes two categorizations of

24   amplification—linear or exponential—and does not consider other models of nucleic acid growth,

25   a third type that Illumina calls "geometric amplification" and an unnamed fourth type.  [Opening

26   Br. (Doc. No. 330-1) at 6.]  This complaint is meritless, and does not call into question the solid

27   foundation upon which Dr. Barron's opinion rests.

28

1    First, as noted by Dr. Barron, the concept of exponential amplification is often explained

2    in contrast to linear amplification—that is, amplification wherein each generated copy serves as a

3    template for the next round of copying is compared to amplification wherein the original template

4    is the only template for each round of copying.  [Lin Decl. Exh. 1 (8/3/2012 Barron Report) at ¶

5    63.]  This is the distinction that the Chetverin Patents draw in order to explain the concept of

6    exponential nucleic acid amplification:

7    "***In contradistinction to linear amplification***, such as which takes place during
RNA synthesis with a DNA-directed RNA polymerase, the number of nucleic acid

8    molecules increases in an exponential amplification reaction as an exponential
function of the elapsed time, thus allowing a large amount of nucleic acid to be

9    obtained in a short time period starting with a low number of nucleic acid
templates."  [Lin Decl. Exh. 9 ('478 patent) at col.1:16-22 (emphasis added).]

10

11   Scientific literature from the relevant time period also draws this distinction.  *See, e.g.*, Howard

12   Ochman et al., *Genetic Applications of an Inverse Polymerase Chain Reaction*, 120 Genetics 621,

13   621 (Nov. 1988) ("Since the product of DNA synthesis of one primer serves as the template for

14   the other primer, the PCR procedure . . . results in an ***exponential*** increase in the number of

15   copies. . . . However . . . DNA sequences that lie immediately outside the primers . . . allow only a

16   ***linear*** increase in the number of copies.  The linear increase occurs because, for each primer,

17   there is no priming of DNA synthesis in the reverse direction.") [Lin Decl. Exh. 12]; Andre

18   Rosenthal & Stephen C. Jones, *Genomic walking and sequencing by oligo-cassette mediated*

19   *polymerase chain reaction*, 18 Nucleic Acids Research 3095, 3095 (1990) ("Since only one

20   primer is present the amplification . . . ***is linear and not exponential***.") [Lin Decl. Exh. 13]; [*see*

21   *also* 12/21/2012 Edwards Decl. ¶¶ 26-30 (confirming the same with additional articles).]



Doc#: US1:8301419v1

11-cv-00703-CAB (DHB)

1     ██████████████████████████████; ████████████████

2     ████████████████████████████████████████

3     ██████████

4         In short, there is abundant evidence that the art recognizes two basic types of

5 amplification—linear and exponential.   [*See also* 12/21/2012 Edwards Decl. ¶¶ 26-30

6 (confirming the same).]   Illumina's claim that there is a third type, so-called "geometric"

7 amplification, and an unnamed fourth type is not supported by *any* evidence of general

8 acceptance in the relevant scientific community, either now or at the time of the filing of the

9 Chetverin Patents in 1992.  To support its argument, Illumina cites to two papers from 2003 and

10 2005 that use the term "geometric amplification," both authored by its expert Dr. Slater. ██████

11 ████████████████████████████████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████████

14 ████████████████████████████████████████

15 ████████████████████████████████████████

16 ████████████████████████████ ████████████

17 ████████████████████████████████████████

18 ███████████████████████

19-28 ████████████████████████████████████████



Dr. Edwards also confirms that he has "not heard anyone in the field use the term 'geometric amplification.'"  [12/21/2012 Edwards Decl. ¶ 30.]

To the extent that Illumina is trying to bolster its position by relying on general purpose dictionaries, that approach is incorrect as a matter of law.[4]  For example, although Illumina cites several dictionaries regarding the mathematical definition of "exponential" or "exponential growth," none of these dictionaries define the meaning of "exponential" in the context of nucleic acid amplification processes.  These isolated dictionary definitions cannot trump generally accepted principles within the field of nucleic acid amplification.  *See, e.g., Phillips*, 415 F.3d at 1321 ("The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent.").

---

[4] Illumina also appears to suggest in this motion that the Chetverin Patents define exponential nucleic acid amplification differently than the definition employed by Dr. Barron.  [Opening Br. (Doc. No. 330-1) at 7.]  As discussed in more detail in Plaintiffs' opposition to Illumina's motion for summary judgment of noninfringement, this argument is simply wrong.  The specification characterizes exponential amplification reactions according to the availability of amplification products as future templates, just as Dr. Barron does.  *See supra* Section B.2.  Further, there is nothing in the specification that establishes the patentees were acting as their own lexicographers to define "exponential amplification" as something other than what was commonly understood by the scientific community at large.  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning…the patentee must clearly express an intent to redefine the term.")

Doc#: US1:8301419v1

11-cv-00703-CAB (DHB)

Indeed, Illumina has presented no evidence that the scientific community defines exponential nucleic acid amplification according to whether the actual yield is the "exponential function $2^n$ (i.e., doubling every round)." [Opening Br. (Doc. No. 330-1) at 8.] Illumina's definition is overly simplistic. The scientific community instead recognizes that, even though every newly synthesized copy may act as a template for further copying, an exponential nucleic acid amplification system generally does not achieve ideal doubling under real world conditions. [*See, e.g.*, 12/21/2012 Edwards Decl. ¶ 29 ("While the number of template molecules theoretically doubles after each round of exponential amplification, one of ordinary skill in the art would not use doubling after each round to define exponential amplification."); *id.* at ¶ 31 ("As long as each product is capable of amplification, the process is exponential.").]

This awareness that real

1    world conditions will prevent a true exponential yield in nucleic acid amplification reactions is

2    reflected in the Chetverin Patents. [Lin Decl. Exh. 9 ('478 patent) at col.2:66-3:3 ("Due to the

3    exponential nature of the amplification reactions discussed above, each of them can ***theoretically***

4    be employed to obtain in a short time a great number of progeny molecules starting with a single

5    nucleic acid template.") (emphasis added).]  It is also described as such in Illumina's '9871 App.

6    in which the amplification process used by Illumina is defined as "exponential" even though it

7    does not lead to the ideal yield of true doubling.  [*See* Lin Decl. Exh. 15 ('9871 Appl.) at ¶ 49

8    ("***[I]n an ideal amplification reaction*** of 30 rounds, one copy of template DNA will yield $2^{30}$ or

9    1,073,741,824 copies.  However, bridging amplification as described herein ***does not typically***

10   ***occur under ideal conditions***, and a 30 cycle 'exponential' reaction may only yield a few

11   hundred to a few thousand copies of the original template.") (emphasis added).][5]

12         The circumstances of this motion are nothing like those presented in *Carnegie Mellon*

13   *University v. Hoffmann-LaRoche, Inc*, as cited by Illumina.  [Opening Br. (Doc. No. 330-1) at

14   12.]  In that case, an expert was excluded from testifying because his opinion was "at odds with

15   the scientific findings in two learned treatises and 16 published studies, and are not supported by

16   plaintiffs' other experts."  55. F. Supp. 2d 1024, 1032 (N.D. Cal. 1999).  Here, Dr. Barron's

17   definition of "exponential nucleic acid amplification" is well-supported by scientific literature

18   from the time of filing of the Chetverin Patents and the general understanding of those involved

19   with nucleic acid amplification processes.  *See supra* Section B.2.

20

21

22         C.    **Dr. Barron Reliably Applied The Commonly-Accepted Scientific Principles of**
               **Exponential Nucleic Acid Amplification To Sufficient Facts And Data**
23             **Regarding Illumina's Accused System**

24

---

25   [5]  Illumina asserts that the word "exponential" was not used in its ordinary sense because it was
     in quotation marks.  [Opening Br. (Doc. No. 330-1) at 9.]  English grammar suggests that the
26   quotation marks were more likely used to acknowledge that the amplification, like all
     amplification methods, cannot and does not achieve its ideal theoretical yield—i.e., "exponential"
27   amplification in the pure and strict mathematical sense of literally each and every newly
     synthesized strand necessarily being copied in each and every round.
28

16

1        Illumina also attacks Dr. Barron's conclusion on the basis that she allegedly "ignore[d]

2   contradictory evidence."  [Opening Br. (Doc. No. 330-1) at 12.] ███████████████████

3   ████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████

6   ████████████████████████████

7      ███████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████

9   █████████████████████████████████████████████

10    ███████████████████████████████████████████████████████████

11    ██████████████████████████████████

12  ██ █████████████████████████████████████████████████████ ██████████

13  ████████████████████████████████████████████████████████████████████

14  ██████████████████████████  [Opening Br. (Doc. No. 330-1) at 12-13], this is not contrary to Dr.

15  Barron's opinion.  As noted above, Dr. Barron and the relevant scientific community do not

16  define exponential nucleic acid amplification according to its theoretical yield in an ideal world,

17  but rather according to whether copied molecules can act as templates for additional copying. *See*

18  *supra* Section B.2.  Indeed, the proposition that Illumina advances is manifestly wrong—it cannot

19  be a basis for precluding expert opinions simply because there exists some contrary evidence that

20  the expert allegedly "ignored."  If that were so, no expert opinion would ever be admissible in any

21  case where there were two opposing viewpoints that the fact finder was called upon to decide.

22  *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("Defendants

23  confuse the requirement [of Rule 702] for sufficient facts and data with the necessity for a reliable

24  foundation in principles and method…When, as here, the parties' experts rely on conflicting sets

25  of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one

26  expert's testimony."); *see also* Advisory Committee Note to Rule 702.

27       And contrary to Illumina's arguments, there is nothing improper about Dr. Barron relying

28  on technical documents, such as Illumina's patent application, for explaining how Illumina's

17

1   products work.  *See Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1548 (Fed. Cir. 1994) (upholding

2   district court's finding that expert testimony together with admissions in [defendant's] documents

3   describing the accused products constitutes substantial evidence to support infringement verdict).

4   ████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████

6   █████████████████████████████████

7          Finally, to the extent that Illumina suggests that Dr. Barron is required to conduct

8   independent testing of Illumina's amplification process, this is not required by the facts or by the

9   law.  [Opening Br. (Doc. No. 330-1) at 5.]  The "exponential amplification" limitation is not

10  defined quantitatively such that it can be subject to testing.  To that end, courts recognize that not

11  all expert opinions need to be based on independent testing.  *See Daubert*, 509 U.S. at 593-94

12  (explaining that testing is only one factor for determining admissibility of an expert opinion, and

13  that there is no "definitive checklist" for determining admissibility); *see also U.S. v. Vallejo*, 237

14  F.3d 1008, 1021 (9th Cir. 2001) (allowing expert testimony because "it consisted of her

15  observations of typical characteristics drawn from many years of experience."); *Baldwin Graphic*

16  *Sys., Inc. v. Siebert, Inc.*, 03-C-7713, 2005 WL 4034698, *5 (N.D. Ill. Dec. 21, 2005) ("*Daubert*

17  does not mandate that an expert engage in any specific amount of independent research").  An

18  expert witness is permitted wide latitude to offer opinions, including those that are not based on

19  firsthand knowledge or observation so long as the expert's opinion has a reliable basis in the

20  knowledge and experience of her discipline.  *Daubert*, 509 U.S. at 592.

21  **V.    CONCLUSION**

22         For the foregoing reasons, Plaintiffs respectfully request that this Court deny Illumina's

23  motion to preclude Dr. Barron from testifying at trial regarding "exponential nucleic acid

24  amplification."

25

26

27

28

1    Dated: December 21, 2012       Respectfully Submitted,

2

3                             By:   /s/ Jenny C. Wu

4                             Jenny C. Wu

5                             Bradford Paul Schmidt

6                             LIFE TECHNOLOGIES CORPORATION

                                 5791 Van Allen Way

7                             Carlsbad, CA 92008

                                 Telephone:  (760) 603-7200

8                             Nicholas Groombridge (*pro hac vice*)

9                             Catherine Nyarady (*pro hac vice*)

                                 Peter Sandel (*pro hac vice*)

10                           Jenny C. Wu (*pro hac vice*)

                                 Rebecca Fett (*pro hac vice*)

11                           Robert Lin (*pro hac vice*)

12                           PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

                                 1285 Avenue of Americas

13                           New York, NY 10019

                                 Telephone: (212) 373-3000

14

15                           Matthew D. Murphey

                                 TROUTMAN SANDERS LLP

16                           11682 El Camino Real, Suite 400

                                 San Diego, CA  92130

17                           Telephone:  (858) 509-6000

18

19                           *Attorneys for Plaintiffs*

                                 LIFE TECHNOLOGIES CORPORATION,

20                           APPLIED BIOSYSTEMS, LLC, INSTITUTE FOR

                                 PROTEIN RESEARCH, ALEXANDER

21                           CHETVERIN, HELENA CHETVERINA, and

                                 WILLIAM HONE

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 21, 2012, a true and correct copy of the document entitled:

**[REDACTED] MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ILLUMINA AND SOLEXA'S MOTION TO EXCLUDE THE TESTIMONY OF ANNELISE E. BARRON, PH.D. REGARDING "EXPONENTIAL AMPLIFICATION" LIMITATIONS**

was transmitted to the parties and counsel of record listed below via the Court's CM-ECF system

as a result of the electronic filing of these documents.

     I also certify that true and correct copies of the following sealed lodged proposed

documents entitled:

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ILLUMINA AND SOLEXA'S MOTION TO EXCLUDE THE TESTIMONY OF ANNELISE E. BARRON, PH.D. REGARDING "EXPONENTIAL AMPLIFICATION" LIMITATIONS [FILED UNDER SEAL]**

will be transmitted to the parties and counsel of record listed below via e-mail:

| | |
|---|---|
| Bradford P. Schmidt<br>LIFE TECHNOLOGIES CORPORATION<br>5791 Van Allen Way<br>Carlsbad, CA 92008<br>Telephone:  (760) 603-7200<br>Email:<br>bradford.schmidt@lifetech.com | *Attorneys for Plaintiffs*<br>LIFE TECHNOLOGIES CORPORATION, APPLIED BIOSYSTEMS, LLC, INSTITUTE FOR PROTEIN RESEARCH, ALEXANDER CHETVERIN, HELENA CHETVERINA, and WILLIAM HONE |
| Nicholas Groombridge  (*pro hac vice*)<br>Catherine Nyarady (*pro hac vice*)<br>Peter Sandel  (*pro hac vice*)<br>Rebecca Fett (*pro hac vice*)<br>Jenny C. Wu  (*pro hac vice*)<br>Robert Lin (*pro hac vice*)<br>PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP<br>1285 Avenue Of Americas<br>New York, NY 10019<br>Telephone:  (212) 373-3000<br>Email:<br>ngroombridge@paulweiss.com | *Attorneys for Plaintiffs*<br>LIFE TECHNOLOGIES CORPORATION, APPLIED BIOSYSTEMS, LLC, INSTITUTE FOR PROTEIN RESEARCH, ALEXANDER CHETVERIN, HELENA CHETVERINA, and WILLIAM HONE |

           11-cv-00703-CAB (DHB)

| | |
|---|---|
| cnyarady@paulweiss.com<br>psandel@paulweiss.com<br>rfett@paulweiss.com<br>jcwu@paulweiss.com<br>rlin@paulweiss.com | |
| Matthew D. Murphey<br>TROUTMAN SANDERS LLP<br>11682 El Camino Real, Suite 400<br>San Diego, CA 92130<br>Telephone: (858) 509-6000<br>Email:<br>matt.murphey@troutmansanders.com | *Attorneys for Plaintiffs*<br>LIFE TECHNOLOGIES<br>CORPORATION, APPLIED<br>BIOSYSTEMS, LLC, INSTITUTE<br>FOR PROTEIN RESEARCH,<br>ALEXANDER CHETVERIN,<br>HELENA CHETVERINA, and<br>WILLIAM HONE |
| E. Joseph Connaughton<br>PAUL, PLEVIN, SULLIVAN & CONNAUGHTON<br>LLP<br>101 West Broadway, Ninth Floor<br>San Diego, CA 92010<br>Telephone: (619) 744-3645<br>Email:<br>connaughton@paulplevin.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |
| Mark H. Izraelewicz *(pro hac vice)*<br>Kevin M. Flowers *(pro hac vice)*<br>Matthew C. Nielsen *(pro hac vice)*<br>Cullen N. Pendleton *(pro hac vice)*<br>John R. Labbe *(pro hac vice)*<br>Amanda Antons *(pro hac vice)*<br>MARSHALL, GERSTEIN & BORUN LLP<br>233 South Wacker Drive<br>6300 Willis Tower<br>Chicago, IL 60606<br>Telephone: (312) 474-6300<br>Email:<br>mizraelewicz@marshallip.com<br>kflowers@marshallip.com<br>mnielsen@marshallip.com<br>cpendleton@marshallip.com<br>jlabbe@marshallip.com<br>aantons@marshallip.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |
| Ronald M. Wawrzyn *(pro hac vice)*<br>Matthew M. Wawrzyn *(pro hac vice)*<br>WAWRZYN LLC<br>233 South Wacker Drive, 84th Floor, Willis Tower<br>Chicago, IL 60606<br>Telephone: (312) 283-8330<br>Email: | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |

| matt@wawrzynlaw.com<br>ron@wawrzynlaw.com | |
|---|---|
| Jeffrey N. Costakos *(pro hac vice)*<br>Rebecca J. Pirozzolo-Mellowes *(pro hac vice)*<br>FOLEY & LARDNER, LLP<br>777 East Wisconsin Avenue<br>Milwaukee, WI 53202<br>Telephone:  (414) 297-5717<br>Email:<br>jcostakos@foley.com<br>jpirozzolo-mellowes@foley.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA INC. and SOLEXA, INC. |
| Steven J. Balick<br>Andrew Dieter Cordo<br>Lauren E. Maguire<br>Tiffany Geyer Lydon<br>ASHBY & GEDDES<br>500 Delaware Avenue, 8th Floor<br>PO Box 1150<br>Wilmington, DE  19899<br>Telephone:  (302) 654-1888<br>Email:<br>sbalick@ashby-geddes.com<br>acordo@ashby-geddes.com<br>lmaguire@ashby-geddes.com<br>tlydon@ashby-geddes.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |

I declare under penalty of perjury under the laws of the State of California and the United States of America, that the above is true and correct, and that I executed this Certificate of Service on December 21, 2012, at New York, New York.

/s/ Jenny C. Wu
JENNY C. WU (*pro hac vice*)
Email:  JCWu@paulweiss.com

Doc#: US1:8301419v1

3

11-cv-00703-CAB (DHB)