1   PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
    101 West Broadway, Ninth Floor
2   San Diego, CA 92101
    (619) 619-237-5200
3   jconnaughton@paulplevin.com

4   Kevin M. Flowers (*pro hac vice*)
    Matthew C. Nielsen (*pro hac vice*)
5   Mark H. Izraelewicz (*pro hac vice*)
    Cullen N. Pendleton (*pro hac vice*)
6   MARSHALL, GERSTEIN & BORUN LLP
    233 South Wacker Drive
7   Chicago, IL 60606-6357
    (312) 474-6300
8

9   Ronald M. Wawrzyn (*pro hac vice*)
    Matthew M. Wawrzyn (*pro hac vice*)
10  WAWRZYN LLC
    233 South Wacker Drive
11  Chicago, IL 60606
    (312) 283-8330
12

13  Jeffrey N. Costakos (*pro hac vice*)
    Kimberly K. Dodd (SBN 235109)
14  FOLEY & LARDNER LLP
    777 East Wisconsin Avenue
15  Milwaukee, WI 53202-5306
    (414) 271-2400
16

17  *Attorneys for Defendants/Counterclaim Plaintiffs*
    *Illumina, Inc. and Solexa, Inc.*

18              **UNITED STATES DISTRICT COURT**

19            **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LIFE TECHNOLOGIES CORPORATION; APPLIED BIOSYSTEMS, LLC; INSTITUTE FOR PROTEIN RESEARCH; ALEXANDER CHETVERIN; HELENA CHETVERINA and WILLIAM HONE,<br><br>Plaintiffs,<br><br>v.<br><br>ILLUMINA, INC. and SOLEXA, INC.,<br><br>Defendants. | Case No. 3:11-cv-00703-CAB (DHB)<br><br>**ILLUMINA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT DURING THE PROSECUTION OF THE CHETVERIN PATENTS**<br><br>Date: January 17, 2013<br>Time: 2:30 p.m.<br>Ctrm: 2<br>Judge: Hon. Cathy Ann Bencivengo<br><br>**ORAL ARGUMENT REQUESTED SUBJECT TO COURT APPROVAL** |

20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.      Introduction ...................................................................................................................1

II.     Illumina's response to Plaintiffs' Statement of "Undisputed Material Facts" ..................3

III.    Illumina's statement of disputed material facts..................................................................3

     A.    Dr. Chetverin disclosed his claimed method for creating nucleic-acid
          colonies in his prior-art publications ......................................................................4

     B.    The prior-art Stapleton '500 patent also disclosed nucleic-acid colonies ..............6

     C.    Dr. Chetverin understood his duty of disclosure and its application to his
          prior-art publications and the Stapleton '500 patent ...............................................6

     D.    Dr. Chetverin communicated with Mr. Hone about the prior art and
          arguments to the PTO ..............................................................................................7

     E.    Dr. Chetverin engaged in a pattern of misleading the PTO.....................................8

     F.    Dr. Chetverin continued to withhold his prior-art publications and the
          Stapleton '500 patent, even as it affected the issuance of his patents ..................11

     G.    Dr. Chetverin knew his prior-art publications were relevant to the
          technology at issue in the Chetverin patents as evidenced by the fact that
          he cited them in other scientific documents covering the same subject
          matter.....................................................................................................................12

     H.    Dr. Chetverin knew his prior-art publications and the prior-art Stapleton
          '500 patent were material ......................................................................................13

     I.    Dr. Chetverin selectively disclosed information to the PTO.................................14

     J.    Dr. Chetverin made deliberate decisions to withhold information from and
          mislead the PTO ....................................................................................................15

IV.     Applicable legal standards................................................................................................16

     A.    Inequitable conduct................................................................................................16

     B.    Summary judgment................................................................................................17

V.      Argument ..........................................................................................................................18

     A.    Plaintiffs have failed to satisfy their initial burden of showing there is no
          genuine issue of disputed material fact.................................................................18

     B.    Dr. Chetverin knew that his own prior-art publications and other
          information were material ......................................................................................19

i

C.      Dr. Chetverin made deliberate decisions to withhold material information from and mislead the PTO ................................................................................ 21

D.      Plaintiffs' remaining arguments lack merit ............................................................. 23

VI.    Conclusion ............................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*1st Media, LLC v. Elec. Arts, Inc.,*
   694 F.3d 1367 (Fed. Cir. 2012) ........................................................................23, 24

*Adickes v. S.H. Kress & Co.,*
   398 U.S. 144 (1970) ........................................................................17, 18, 20

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................20

*Aventis Pharma S.A. v. Hospira, Inc.,*
   675 F.3d 1324 (Fed. Cir. 2012) ........................................................................passim

*Carl Zeiss Vision Int'l GmbH v. Signet Armorlite, Inc.,*
   2011 WL 6372785 (S.D. Cal. Dec. 19, 2011) ........................................................................25

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ........................................................................17, 18

*Clark v. Coats & Clark, Inc.,*
   929 F.2d 604 (11th Cir. 1991) ........................................................................18

*Kathrein-Werke KG v. Radiacion y Microondas S.A.,*
   2011 WL 4460393 (N.D. Ill. Sept. 26, 2011) ........................................................................20, 23

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.,*
   863 F.2d 867 (Fed. Cir. 1988) ........................................................................17

*Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.,*
   559 F.3d 1317 (Fed. Cir. 2009) ........................................................................17

*Mitsubishi Heavy Indus., Ltd. v. General Elec. Co.,*
   2012 WL 4336208 (M.D. Fla. Sept. 21, 2012) ........................................................................23

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.,*
   210 F.3d 1099 (9th Cir. 2000) ........................................................................2, 18

*Rohm & Haas Co. v. Crystal Chem. Co.,*
   722 F.2d 1556 (Fed. Cir. 1983) ........................................................................22

*Schering Corp. v. Mylan Pharma., Inc.,*
   2011 WL 3736503 (D.N.J. Aug. 22, 2011) ........................................................................21

*Smith v. Marsh,*
   194 F.3d 1045 (9th Cir. 1999) ........................................................................3

*Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*,
  537 F.3d 1357 (Fed. Cir. 2008) ........................................................................17

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011) ...........................................1, 17, 20, 22

**Statutes**

35 U.S.C. § 102 ...........................................................................................4

35 U.S.C. § 103 ...........................................................................................4

**Rules**

FED. R. CIV. P. 56 ........................................................................17, 18

1  **I.  Introduction**

2    Of the two elements required to establish inequitable conduct (materiality and intent),

3  Plaintiffs do not dispute materiality; they only argue that there is no evidence of intent. But there

4  is actually extensive evidence of Dr. Chetverin's intent to deceive the U.S. Patent and Trademark

5  Office ("PTO") – nearly all of which Plaintiffs ignore – by having engaged in a pattern of (i)

6  withholding material prior-art reference and other information from the PTO; (ii) selectively

7  disclosing only less-relevant references and information to the PTO; (iii) making misleading

8  arguments to the PTO that were contradicted by the withheld information; and (iv)

9  acknowledging the significance of the withheld prior art and information in other scientific

10  documents. This evidence at the very least raises genuine issues of material fact concerning Dr.

11  Chetverin's intent, including his knowledge that his own prior-art publications and other

12  information were material to patentability, and his deliberate decisions to withhold that

13  information from and mislead the PTO. Accordingly, Plaintiffs' motion should be denied.

14    Intent to deceive may be proven by evidence like this. Although the Federal Circuit

15  tightened the standards for proving inequitable conduct in *Therasense, Inc. v. Becton, Dickinson*

16  *& Co.*, 649 F.3d 1276 (Fed. Cir. 2011), it reiterated its earlier holdings that "[b]ecause direct

17  evidence of deceptive intent is rare, a district court may infer intent from indirect and

18  circumstantial evidence." *Id.* at 1290-91 (citation omitted). And the Federal Circuit more

19  recently affirmed judgment of inequitable conduct where the evidence of the patentee's intent to

20  deceive the PTO was similar to the evidence here: selective disclosures to the PTO and

21  withholding prior art that the patentee cited in a contemporaneous publication. *Aventis Pharma*

22  *S.A. v. Hospira, Inc.*, 675 F.3d 1324 (Fed. Cir. 2012). As Plaintiffs' own proposed patent-law

23  expert has testified

24  

25  

26         Exh. 1, Chambers Dep. Tr. at 137:12-143:10.[1]

27    There is abundant evidence here to support a finding that Dr. Chetverin intended to

28  _____

[1] All exhibits cited herein are submitted with the accompanying Declaration of Matthew Nielsen.

1   deceive the PTO. For example, Dr. Chetverin only disclosed those of his own articles regarding

2   methods for making nucleic-acid colonies to the PTO (first in 1992, and then again in 1997) that

3   he knew were published too late to be considered prior art to his claims. Yet during the same

4   period of time, he chose to withhold those of his articles discussing his work that were published

5   early enough to be invalidating prior art to his claims. He considered those prior-art articles that

6   he withheld from the PTO to be material to his claimed methods, because he cited them in his

7   Ph.D. thesis (in 1995) and in another scientific article (in 1998) regarding those methods.

8   Worse still, throughout that same time period (from 1993 through 1997), Dr. Chetverin

9   repeatedly argued to the PTO (through instructions to his attorney, Mr. Hone, a co-plaintiff here)

10  that the prior art that was before the PTO did not even *suggest* nucleic-acid colonies. Dr.

11  Chetverin also selectively disclosed Dr. Stapleton's earlier work on nucleic-acid colonies to the

12  PTO, but withheld her later, more-comprehensive description of her invention found in the prior-

13  art '500 patent (in which she described how she had solved the issues in her earlier work that Dr.

14  Chetverin had criticized in arguments to the PTO). Dr. Chetverin also criticized the problems of

15  the prior art and touted his own work as having overcome those problems, yet he withheld his

16  own failures in attempting to practice an embodiment that he was claiming.

17       Plaintiffs fail to address (much less rebut) any of this evidence, despite the fact that

18  Illumina described most of it in great detail in its Amended Answer and Counterclaims (nearly

19  60 pages of which were devoted to Dr. Chetverin's inequitable conduct) filed months before

20  Plaintiffs filed their instant motion. In the face of that evidence, Plaintiffs offer no alternative

21  explanation for Dr. Chetverin's conduct, and identify no "undisputed material facts" that actually

22  support granting their motion.

23       Instead, Plaintiffs address only a fraction of the evidence of record, misrepresent that

24  Illumina relies on no other evidence, and argue that Illumina can therefore not satisfy its burden.

25  But "[a] moving party may not require the nonmoving party to produce evidence supporting its

26  claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire*

27  *& Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1105-06 (9th Cir. 2000). Here,

28  Plaintiffs' motion ignores the lion's share of the evidence. As a result, Plaintiffs have failed to

2

CASE No. 11-cv-00703-CAB (DHB)
ILLUMINA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

1   satisfy their initial burden of showing there is no genuine issue of disputed material fact such that

2   they could be entitled to summary judgment.[2]

3          Ultimately, the only reasonable conclusion that can be drawn from the evidence,

4   combined with Plaintiffs' inability to offer a credible explanation for Dr. Chetverin's conduct, is

5   that he obtained his patents by inequitable conduct because he knew his prior-art publications

6   and other information were material, and he made deliberate decisions to withhold that

7   information from and mislead the PTO. This record at the very least raises genuine issues of

8   disputed material fact, and this Court should deny Plaintiffs' motion for summary judgment.

9   **II.     Illumina's Response to Plaintiffs' Statement of "Undisputed Material Facts"**

10         None of Plaintiff's five "Undisputed Material Facts" support granting Plaintiffs' motion

11  or are otherwise material. Additionally, No. 1 is incorrect[3], and No. 4 omits evidence of Dr.

12  Chetverin's intent to deceive the PTO. The material disputes concerning Dr. Chetverin's intent to

13  deceive the PTO are addressed throughout this memorandum.

14  **III.    Illumina's Statement of Disputed Material Facts**

15         The following material facts, most of which Plaintiffs fail to address, raise genuine issues

16  of disputed material fact concerning Dr. Chetverin's knowledge that his prior-art publications

17  and other information were material, and his deliberate decisions to withhold that information.[4]

18  / / /

19  / / /

---

20  [2] Because Plaintiffs could have addressed this evidence but instead chose to ignore it in their ten-page-

21  long brief, this Court should disregard any argument about it that Plaintiffs might attempt in their reply
    brief. *See, e.g., Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]rguments not raised by a party

22  in its opening brief are deemed waived.").

23  [3] Contrary to Plaintiffs' "Undisputed Material Fact No. 1," Illumina has alleged only the following
    grounds of inequitable conduct. Dr. Chetverin committed inequitable conduct by: (i) withholding his own
    1989 and 1991 prior-art publications from the PTO, making related misleading arguments to the PTO,

24  and selectively disclosing his non-prior-art publications to the PTO; (ii) withholding the prior-art
    Stapleton '500 patent, making (and maintaining) the same misleading arguments to the PTO, and

25  selectively disclosing a less-comprehensive Stapleton patent; (iii) selectively disclosing problems with the
    prior art while concealing how he had tried and mostly failed to practice one claimed embodiment, and

26  had significant "technical problems" with another; and (iv) concealing that he had publicly disseminated a
    publication disclosing his claimed method more than one year before filing his first patent application.

27  [4] Illumina discussed most of this evidence in its Amended Answer and Counterclaims (D.I. 293) (Exhibit
    2 hereto), which it relies on in opposition to Plaintiffs' motion. This statement of facts both summarizes

28  and supplements the evidence set forth in that pleading.

**A.    Dr. Chetverin disclosed his claimed method for creating nucleic-acid colonies in his prior-art publications**

1.      More than one year before Dr. Chetverin filed his first patent application that led to the issuance of each of his patents-in-suit (*i.e.*, before October 26, 1991), he publicly disclosed his method for creating nucleic-acid colonies in two scientific articles he co-authored, the first published in 1989, and the second published in 1991.[5]

2.      In their motion, Plaintiffs do not dispute that Dr. Chetverin's prior-art publications (or any other information that he withheld) were material to patentability. In fact, his prior-art publications were material, *i.e.*, claims in each of the Chetverin patents-in-suit are invalid as anticipated by and obvious over those publications (under 35 U.S.C. §§ 102(b) and 103, respectively), and the PTO would have rejected and not allowed those claims to issue if Dr. Chetverin had disclosed either of his prior-art publications to the PTO.

3.      In each of his prior-art publications, Dr. Chetverin and his co-authors proclaimed that their research on "cell-free biotechnology" stood to revolutionize biotechnology by permitting it to be performed without the need for living cells.[6]

4.      In his 1989 prior-art publication, Dr. Chetverin then discussed nucleic-acid colonies, how to make cell-free colonies in immobilized media, and potential applications of such colonies. For example, he discussed: diluting nucleic acids to obtain single molecules; (ii) combining nucleic-acid molecules with a solid matrix such as agar (to prevent mixing by "convection"), a polymerase enzyme, and ribonucleotide substrates that the enzyme could use to make new nucleic acid molecules; (iii) growing colonies where the single nucleic-acid molecules had been

---

[5] Exh. 3, Spirin *et al.*, "*Protein Biosynthesis and the Future of Cell-Free Technology*," NEWS OF USSR ACADEMY OF SCIENCES 11:30-38 (1989) (ILMN_2008059-ILMN_2008070); Exh. 4, ILMN_2008071-ILMN_2008081 (translation); Exh. 5, Spirin *et al.*, "*Protein Biosynthesis and the Prospects of Cell-Free Technology*," PRIRODA 5:10-19 (May 1991) (ILMN_2007013-ILMN_2007025); Exh. 6, ILMN_2007225-ILMN_2007235 (translation).

[6] *See, e.g.*, Exh. 6, ILMN_2007226-29 ("The present article describes the development of a cell-free biotechnology. . . Now there are premises for the rise of an essentially new and exceptionally promising area: entirely cell-free biotechnology. . . . But recently the situation has changed dramatically. A serious breakthrough was achieved, not least of all due to the successes of our national science. In effect, biology is on the threshold of a new biotechnology revolution."); *see also* Exh. 4, ILMN_2008073-76 (making similar claims).

4

CASE NO. 11-cv-00703-CAB (DHB)
ILLUMINA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

1  immobilized in the solid matrix, the colonies being identical to the original immobilized

2  molecules ("clones"); and (iv) screening the resulting colonies, all of which would permit one to

3  "solve the problem of cell-free reproduction and cloning of genetic material":

> All of this gives one the possibility of carrying out the biological
> process of cloning genetic material outside of a cell. What is the
> point of cloning? Why does genetic engineering, after introducing
> genes into cells, then try cloning countless numbers of cells until it
> picks out the needed one? This is because one needs to obtain
> massive identical progeny of single cells possessing the needed
> gene. Here, we are speaking of obtaining massive progeny not of
> separate cells, but of separate RNA molecules. Let us assume that
> we have a certain mixture of various copies of genes in the form of
> RNA molecules. This mixture is initially diluted to the degree that
> a test tube has, in a fashion, singular RNA molecules "swimming"
> in it. The mixture is then combined with a medium (e.g., agar) to
> prevent mixing by convection. The medium also contains an
> enzyme (Qβ replicase) and the substrates needed for the replication
> process. Under these conditions a colony of molecules grows at the
> site where a single molecule is located (and such a molecule is, in a
> certain way, immobilized in the agar); these molecules are
> identical to the initial one, i.e., they are clones in the full meaning
> of the word. Following that, one can select the needed genes and
> reproduce them individually. This is the basic process by which
> one can solve the problem of cell-free reproduction and cloning of
> genetic material.[7]

17  5.     Not content with publishing this information in his 1989 prior-art publication, Dr.

18  Chetverin published it again in 1991, when he repeated much of what he said in the 1989 article,

19  and trumpeted that "[t]he method described opens up unprecedented capabilities for cloning

20  genetic material outside a cell," and illustrated the method and resulting nucleic acid colonies:[8]

---

[7] Exh. 4, ILMN_2008076-77.

[8] Exh. 6, ILMN_2007229-30 ("The method described opens up unprecedented capabilities for cloning genetic material outside a cell. In genetic engineering, the reason for cloning is to obtain a massive number of genetically identical direct descendants (clones) of a single cell containing the desired gene. Using a cell-free system one would be able to produce not only descendants of a single cell but also of a single RNA molecule. This is done by using a mixture of various copies of genes in the form of mRNA, and greatly diluting them (to make sure that a test tube has, so to speak, singular RNA molecules "swimming" in it). The mixture is then combined with, e.g., agar, which prevents mixing by convection; and which also contains an enzyme (Qβ replicase) and substrates needed for the replication process. Under these conditions a colony of molecules grows at the site where a single molecule is located (and such a molecule is, in a certain way, immobilized in the agar); these molecules are identical to the initial one, i.e., they are clones in the full meaning of the word. Following that, one can select the needed genes and reproduce them individually. This is the basic process of the method which solves the problem of cell-free reproduction and cloning of genetic material.").



Production of cellular mRNA

Transferring mRNA
to a replicating form

Replicating and seeding mRNA onto
a solid substrate;
growth of mRNA "colonies"

Identifying mRNA clones
using the translation products

Replicating the separated clone
of an individual mRNA

**The cloning and replication process for
individual mRNA outside of a cell**

**B.** **The prior-art Stapleton '500 patent also disclosed nucleic-acid colonies**

6.     U.S. Patent No. 5,451,500 to Dr. Marilyn Stapleton also disclosed amplification of single nucleic-acid molecules to form colonies, including in an agarose matrix.[9] In their motion, Plaintiffs do not dispute that, like Dr. Chetverin's prior-art publications, the Stapleton '500 patent was material to patentability, *i.e.*, the PTO would not have allowed Dr. Chetverin's claims to issue if he had disclosed the Stapleton '500 patent to the PTO.

**C.** **Dr. Chetverin understood his duty of disclosure and its application to his prior-art publications and the Stapleton '500 patent**

7.     Dr. Chetverin personally prepared the patent application directed to the same subject matter as his 1989 and 1991 prior-art publications, which he filed in October 1992 and which led to the issuance of the patents-in-suit.[10] Upon filing that application, Dr. Chetverin acknowledged his duty of candor and disclosure to the PTO in a declaration. Exh. 9, CHET2336-41.

8.     Dr. Chetverin's patent attorneys also repeatedly reminded him of his duty of candor and disclosure by telling him, generally each time they filed a patent application on his behalf, that

---

[9] *See, e.g.*, Exh. 7, Stapleton '500 patent, col. 20, lines 1-12 ("colon[ies]" of "nucleic acid target[s]"); col. 12, line 63-col. 13, line 2 ("clusters of specific genetic targets").
[10] Exh. 8, Chetverin Dep. Tr. at 16:8-6 (explaining his preparation of his application).

1   his own publications, published overseas and more than one year before he filed his earliest

2   application, could be material to patentability and should be disclosed to his attorneys.[11] Dr.

3   Chetverin also was advised of this duty in connection with other patent applications.[12]

4   9.      Dr. Chetverin specifically understood that articles published more than one year before

5   the filing of an application were prior art, and that articles published less than one year before

6   filing an application were not prior art, as he explained in correspondence specifically in regard

7   to the application that led to the issuance of the Chetverin patents-in-suit.[13]

8   **D.    Dr. Chetverin communicated with Mr. Hone about the prior art and arguments to**
        **the PTO**
9

10  10.     Dr. Chetverin and the attorney who signed papers submitted to the PTO (Mr. Hone, a co-

11  plaintiff here) communicated any time prior art was at issue: "[T]he general rule was [for Mr.

12  Hone] to take direction from Dr. Chetverin on what any reference says and means," and the

13  "policy" was that Dr. Chetverin knew about arguments made to the PTO.[14]

14

15  [11] Exh. 10, Hone Dep. Tr. at 33:9-45:5 (*e.g.*, "Q. So Dr. Chetverin was notified that publication anywhere
    and activity in the United States, even if it was attributable to Dr. Chetverin himself, could qualify as
16  prior art if it were more than one year before the filing of the patent application. Is that fair? A. Yeah,
    certain – certain activities. So, yeah, the letter says what it says, but I think that's basically what it says.");
17  Exh. 11, FR_PROD192-93 (January 2, 1997 letter from lawyer to Dr. Chetverin explaining specific types
    of documents that were subject to duty of disclosure).
18  [12] Exh. 10, Hone Dep. Tr. at 169:2-21 ("Q. [I]n connection with all of those families, you informed Dr.
    Chetverin of the duty of disclosure to the patent office, correct? A. As I say, that would have been the
19  practice, and I have no reason to believe the practice was not followed. I should say that with respect to
    this patent, Exhibit 23 [not a patent-in-suit], my recollection is that Dr. Chetverin was not substantively
20  involved in the prosecution, as far as I know.").
    [13] Exh. 8, Chetverin Dep. Tr. at 156:12-160:10 (discussing email from Dr. Chetverin (Exh. 12,
21  CHET1963805) acknowledging that a U.S. patent application may be filed "within a year" of a
22  publication, and agreeing that correspondence was in regard to "the molecular colony method").
    [14] *See* Exh. 10, Hone Dep. Tr. at 108:10-114:17, 154:20-155:24, 157:11-25 and 159:3-162:7 (*e.g.*, "Q.
23  Any time that prior art was being discussed in an office action or in a response to that office action, you
    communicated with Dr. Chetverin about that, right? A. I'm sure I did, absolutely."; "Q. You earlier said
24  that you had difficulty, so to speak, getting a handle on the technology. So it's fair to say that any time the
    subject matter being claimed was discussed in a paper that you were going to file with the patent office,
25  you would have received his input prior to that filing, right? A. Correct."; "Q. So Dr. Chetverin had to
    have known about the positions that you were taking on his behalf before the patent office in the
26  prosecution of the Chetverin patents, right? A. That was the policy, and I cannot think of an exception
    where Dr. Chetverin did not know."; "Q. So during prosecution of the Chetverin patents, you always had
27  to check with Dr. Chetverin in order to determine whether a prior art reference should be disclosed to the
    patent office, right? A. There may be exceptions to that, but the general rule was to take direction from
28  Dr. Chetverin on what any reference says and means.").

1   11.     Correspondingly, Dr. Chetverin and his attorneys communicated in writing more than 90

2   times about prosecution (including more than 40 communications from Dr. Chetverin to his

3   attorneys), often in connection with PTO Office Actions or responses in which the question of

4   whether the prior art disclosed or suggested nucleic acid colonies was directly at issue (as

5   evidenced by Mr. Hone's testimony, discussed above, and the number of communications in

6   between Office Actions and responses, which is set forth in detail below).[15]

7   **E.      Dr. Chetverin engaged in a pattern of misleading the PTO**

8   12.     On multiple occasions during prosecution, the question of whether the prior art disclosed

9   or suggested nucleic-acid colonies was directly at issue before the PTO. As set forth above, Dr.

10  Chetverin directed Mr. Hone on what the prior art disclosed, was in communication with him

11  about related arguments to the PTO, and knew about the final arguments. As set forth below,

12  those were misleading arguments that the prior art did not disclose or even suggest nucleic-acid

13  colonies, all while Dr. Chetverin withheld his prior-art publications.

14  13.     For example, in a July 16, 1993 Office Action, the PTO rejected Dr. Chetverin's

15  application claims as anticipated by and obvious over his own *"On the Nature of Spontaneous*

16  *RNA Synthesis by Qβ Replicase"* publication ("the *On the Nature* publication"). Exh. 13,

17  CHET2625-29. In doing so, the Examiner indicated that the *On the Nature* publication was

18  material because it taught, among other things, nucleic-acid colonies.[16]

19  14.     In response (on November 16, 1993), Dr. Chetverin represented to the PTO that his *On*

20  *the Nature* publication did not qualify as prior art because it reflected his own work and was

21  published less than one year before the filing of his application. He then misled the PTO by

22  saying that without that publication, the "cited" prior art failed to disclose or even suggest

23

24

15 *See, e.g.,* Exh. 14, Plaintiffs' Second Revised First Privilege Log (*passim*) and various correspondence
forwarding prosecution papers to Dr. Chetverin, Exh. 15 (*e.g.,* CHET1425480; CHET1425481;
CHET1425482; CHET1425484; CHET1425874; CHET1425875; CHET1425876; CHET1425877;
CHET1425878).
16 Exh. 13, CHET2627 (*e.g.,* "It would have been prima facie obvious to one of ordinary skill in the art at
the time the invention was made to develop a method of amplification of nucleic acids in an immobilized
medium as disclosed by Stapleton combined with nucleic acid colony growth in agarose-containing
reaction medium as taught by Chetverin et al. . . . .").

1  amplifying nucleic acids in immobilized media to form colonies.[17]

2  15.   When Dr. Chetverin said that to the PTO, he of course knew he had disclosed (or at the

3  very least suggested) precisely that subject matter in his 1989 and 1991 prior-art publications.[18]

4  16.   Dr. Chetverin also misled the PTO on November 16, 1993, when he repeatedly argued

5  that Dr. Stapleton's U.S. Patent No. 5,188,963 failed to disclose or even suggest forming

6  colonies of single nucleic-acid molecules.[19] As before, he knew that his own 1989 and 1991

7  prior-art publications disclosed (or at the very least suggested) precisely that subject matter.

8  17.   Dr. Chetverin also misled the PTO on November 16, 1993, when he argued that other

9  prior-art amplification methods failed to prevent "convection," which he had similarly disclosed

10  as a feature of his own nucleic-acid amplification method in both of his prior-art publications.[20]

11  18.   Dr. Chetverin knew about and communicated with his attorneys about the PTO's July 16,

12  1993 prior-art-based rejections and the November 16, 1993 arguments set forth above, and he

13  directed them on how to address the prior art. This is demonstrated by Mr. Hone's testimony (set

14  forth above) and the 22 written communications between Dr. Chetverin and his attorneys

15  (between July 16 and November 16, 1993) that are identified on Plaintiffs' privilege log.[21]

---

[17] Exh. 16, CHET2726-38 ("Without Chetverin et al. the cited art contains no teaching or suggestion of amplifying nucleic acids in an immobilizing medium . . . the matrix being capable of preventing convection and intermixing of different zones, by amplifying separated single nucleic acid molecules in those zones to form colonies consisting essentially of copies of single nucleic acid molecules as recited in independent claim 14, as amended.").

[18] Exh. 6, ILMN_2007229-30 (1991 prior-art publication) (*e.g.*, "This is done by using a mixture of various copies of genes in the form of mRNA, and greatly diluting them (to make sure that a test tube has, so to speak, singular RNA molecules 'swimming' in it). The mixture is then combined with, e.g., agar, which prevents mixing by convection; and which also contains an enzyme (Qβ replicase) and substrates needed for the replication process. Under these conditions a colony of molecules grows at the site where a single molecule is located (and such a molecule is, in a certain way, immobilized in the agar); these molecules are identical to the initial one, i.e., they are clones in the full meaning of the word."); Exh. 4, ILMN_2008076-77 (1989 prior-art publication).

[19] Exh. 16, CHET2735 ("Stapleton nowhere discloses or suggests forming colonies of single nucleic acid molecules, as claimed. . . . Stapleton contains no disclosure or suggestion of applicants' claimed method of forming colonies consisting essentially of copies of single nucleic acid molecules, by separating individual nucleic acid molecules into different zones prior to amplification. . . . Applicants claimed method of forming colonies consisting essentially of copies of single nucleic acid strands is nowhere disclosed or suggested.").

[20] Exh. 16, CHET2736 ("Applicants respectfully disagree that Giese et al. can be combined with the other cited references, because Giese et al. nowhere teaches how to prevent convection and intermixing of different zones of the liquid phase entrapped in the solid matrix . . . .").

[21] Exh. 14 (*see, e.g.*, the September 6, September 21, September 27, September 30, October 5, October

9

19. Dr. Chetverin misled the PTO again on May 25, 1994. Relying on his November 16, 1993 arguments, the PTO withdrew its rejections of his claims over his *On the Nature* publication, but rejected his claims (on February 25, 1994) as obvious over the Stapleton '963 patent in combination with other prior art. Exh. 17, CHET2755-62.

20. In response, Dr. Chetverin repeatedly argued that the Stapleton '963 patent failed to disclose nucleic-acid colonies, including as generated from single nucleic-acid molecules.[22]

21. Dr. Chetverin knew about and communicated with Mr. Hone about the PTO's February 25, 1994 prior-art-based rejections and the misleading arguments to the PTO on May 25, 1994, and he directed Mr. Hone on how to address the prior art. This is demonstrated by Mr. Hone's testimony (set forth above) and the 10 written communications between Dr. Chetverin and his attorney (between February 25 and May 25, 1994).[23]

22. Dr. Chetverin misled the PTO again on May 14, 1997, in the prosecution of the '568 patent, when he argued that the Stapleton '963 patent and U.S. Patent No. 5,382,511 (also to Stapleton) failed to disclose or even suggest the media that he claimed.[24] As demonstrated by Mr. Hone's testimony (discussed above), Dr. Chetverin knew about and communicated with Mr. Hone about this argument, and he directed Mr. Hone on how to address the prior art.

23. Dr. Chetverin again misled the PTO on December 24, 1997 when, in response to a PTO rejection of his claims (in a June 24, 1997 Office Action in the prosecution of the '568 patent) as obvious (Exh. 20, CHET3324-27), he repeatedly argued that the cited prior-art references failed to disclose or even suggest media containing a nucleic-acid polymerase or in which colonies of

---

14, November 4, November 14, and November 15, 1993 entries regarding correspondence that Dr. Chetverin sent to his patent attorneys, and the July 27, August 23, September 24, September 29, October 1, October 13, October 25, October 26, November 9, November 10, November 12, November 13, and November 16, 1993 entries regarding correspondence that Dr. Chetverin's patent attorneys sent to him).
[22] Exh. 18, CHET2793-94 (*e.g.*, "There is no disclosure in Stapleton of forming nucleic acid colonies. . . . In addition, in Stapleton no single nucleic acid molecules are provided . . . . Nor is there any disclosure in Stapleton of introducing the single nucleic acid molecules into separate zones.").
[23] Exh. 14 (*see, e.g.*, the March 31, May 11, and May 24, 1994 entries regarding correspondence that Dr. Chetverin sent to his patent attorneys, and the March 23, April 27, May 10, May 17, May 23, May 24, and May 25, 1994 entries regarding correspondence that Dr. Chetverin's patent attorneys sent to him).
[24] Exh. 19, CHET3208-09 (*e.g.*, "Nor is either Stapleton patent seen to disclose or render obvious the subject matter of claims 48-50, namely, a matrix containing nucleotide substrates . . . .").

10

1   immobilized and exponentially-amplified nucleic acids could be formed.[25]

2   24.     Dr. Chetverin knew about and communicated with Mr. Hone about the PTO's prior-art-

3   based rejections and the misleading arguments made in response, and he directed Mr. Hone on

4   how to address the prior art. This is demonstrated by Mr. Hone's testimony (discussed above)

5   and contemporaneous correspondence identified on Plaintiffs' privilege log.[26]

6   **F.      Dr. Chetverin continued to withhold his prior-art publications and the Stapleton**
        **'500 patent, even as it affected the issuance of his patents**
7

8   25.     In response to Dr. Chetverin's misleading November 16, 1993 and May 25, 1994

9   arguments, the PTO withdrew its rejections of his claims over the Stapleton '963 patent (Exh. 21,

10  CHET2802), and made no rejections over it in the prosecution of the '698 and '568 patents. And

11  in response to Dr. Chetverin's misleading May 14, 1997 and December 24, 1997 arguments, the

12  PTO withdrew its rejections of his claims over the prior art (Exh. 22, CHET3341-44), and made

13  no further prior-art rejections in the prosecution of the '698 or '568 patents.

14  26.     After the PTO withdrew its prior-art rejections during the prosecution of the '478 patent,

15  it told Dr. Chetverin in a March 25, 1996 Notice of Allowance that his claims were allowed

16  because the Examiner thought (based on Dr. Chetverin's misleading arguments and the prior art

17  that he selectively disclosed, as discussed below) that the prior art of record did not disclose or

18  suggest exponential amplification of nucleic acids in immobilized media.[27]

19  27.     Dr. Chetverin knew of the PTO's stated reason for allowance (*see, e.g.*, Mr. Hone's

20  testimony discussed above and the April 2, 1996 entry on Plaintiffs' privilege log regarding

21  correspondence from Mr. Hone's law firm to Dr. Chetverin), and that each of his prior-art

22  publications disclosed (or at the very least suggested) that subject matter.

23

---

24  [25] Exh. 38, CHET3336-39 (*e.g.*, "There is no disclosure [in the cited prior art] of any matrix containing a
    nucleic acid polymerase, no suggestion of immobilizing an aqueous liquid phase containing a nucleic acid

25  polymerase, . . . None of [the cited prior art references] discloses a medium containing nucleic acid
    polymerase enzyme or renders such a medium obvious for a number of reasons. . . .").

26  [26] *See* Exh. 14 (*e.g.*, the September 12, 1997 entry regarding correspondence that Dr. Chetverin sent to
    Mr. Hone, the August 7, 1997 entry regarding correspondence that Mr. Hone sent to him) and the letter

27  forwarding a copy of the December 24, 1997 Amendment to Dr. Chetverin (Exh. 15, CHET1425482).
    [27] Exh. 23, CHET2898 ("The prior art does not teach or suggest exponential nucleic acid amplification in

28  an immobilized media such as an agarose containing reaction medium, carried out in a thin layer of
    agarose of the defined pore size recited the claims.").

11

28.     The same happened during prosecution of the '568 and '698 patents. The PTO told Dr. Chetverin in Notices of Allowance (dated March 31, 1998 and December 7, 1998) that his claims were allowed because the Examiner thought (again, based on his misleading arguments and the prior art that he selectively disclosed) that the prior art of record did not disclose or suggest detection and/or exponential amplification of nucleic acids in immobilized media.[28]

29.     Each time, Dr. Chetverin knew of the PTO's stated reason for allowance (*see, e.g.,* Mr. Hone's testimony (discussed above) and Exh. 15, CHET1425875 (letter forwarding copy of '698 patent Notice of Allowance to Dr. Chetverin)), and that each of his prior-art publications and the Stapleton '500 patent, disclosed (and at the very least suggested) precisely that subject matter.[29] But each time, Dr. Chetverin continued to withhold that prior art.

**G.     Dr. Chetverin knew his prior-art publications were relevant to the technology at issue in the Chetverin patents as evidenced by the fact that he cited them in other scientific documents covering the same subject matter**

30.     While Dr. Chetverin made misleading arguments to the PTO and withheld his prior-art publications, he was aware of those publications, their content, and their importance to his claimed method. For example, in his 1995 Ph.D. thesis, Dr. Chetverin discussed nucleic-acid colonies as one the results of his thesis ████████████████████████ ████████████████████████████████████████████████ , and cited publications, including both of his prior-art publications, as including those results ████████

---

[28] Exh. 24, CHET3547 ("The prior art does not teach or suggest exponential nucleic acid detection via amplification in an immobilized media such as an agarose-containing reaction medium or water-insoluble matrix, therefore these claims are allowable."); Exh. 22, CHET3343 ("The prior art does not teach or suggest exponential nucleic acid amplification in an immobilized media such as an agarose-containing reaction medium or water-insoluble matrix, therefore these claims are allowable.").

[29] Exh. 8, Chetverin Dep. Tr. at 204:23-206:9 ("Q. Now you said you were aware of this patent some time during the prosecution of your patent applications, right? A. Right. Q. And did you review the Stapleton patent when you were in Russia in the course -- at some point during the course of the prosecution of your patent application? A. Yes, I did." . . . "Q. I just want to be absolutely clear that we were -- you were aware of this patent during the prosecution of -- at some point during the prosecution of your patents? A. I was aware about the existence of these patents. Q. Okay. A. At some point.") (objection omitted).

12

CASE No. 11-cv-00703-CAB (DHB)
ILLUMINA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

And in a 1998 publication, he cited his 1989

prior-art publication in regard to "[t]he reproduction system of the Qβ phage has been used to

create effective systems for extracellular reproduction, expression and cloning of RNA, which

are the prerequisites for developing biotechnology that is completely without cells."[31]

**H.      Dr. Chetverin knew his prior-art publications and the prior-art Stapleton '500 patent were material**

31.      As the evidence discussed above demonstrates, Dr. Chetverin knew his prior-art

publications disclosed his method for making nucleic-acid colonies and were material to the

prosecution of his patents, *e.g.*, (i) as the co-author of those publications, he knew that he had

disclosed his methods for creating nucleic-acid colonies in each publication (*see* evidence set

forth in ¶¶1-5); (ii) he cited both publications as reflecting his work on nucleic-acid colonies in

his 1995 Ph.D. thesis and one in a 1998 publication (*see* evidence set forth in ¶30); (iii) he knew

the question of whether the prior art disclosed or suggested nucleic-acid colonies was at issue in

prosecution from communicating with Mr. Hone about responding to PTO Office Actions (*see*

evidence set forth in ¶¶10-24); (iv) he directed Mr. Hone on what the prior art disclosed and how

to address it, knew about the misleading arguments that were repeatedly made to the PTO, and

he knew that the PTO relied on those arguments (*see* evidence set forth in ¶¶10-29); (v) he was

repeatedly told by his patent attorneys that his own publications (even if published outside the

U.S.) could be material to patentability (*see* evidence set forth in ¶¶7-8); and (vi) he knew that

his own articles published more than one year before he filed his application were prior art (*see*

evidence set forth in ¶9).

/ / /

---

[30] Exh. 25, CHET1730655-82 (*see, e.g.*, CHET1730669-70; CHET1730676-78; CHET01730680-81); Exh. 26 (translation) ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ; Exh. 8, Chetverin Tr. at 95:18-96:9 (identifying thesis).

[31] Exh. 27, CHET853194-231 (*see, e.g.*, CHET853224 (regarding colonies), CHET853226-27 (discussing cell-free technology and citing 1989 prior-art publication ); Exh. 28 (translation of pertinent parts).

32.     As the evidence discussed above also demonstrates, Dr. Chetverin similarly knew that the Stapleton '500 patent disclosed a method of making nucleic-acid colonies and was material to the prosecution of the Chetverin patents. For example: (i) at some point during prosecution, Dr. Chetverin reviewed the Stapleton '500 patent (*see* evidence set forth in ¶29); (ii) he knew the question of whether the prior art disclosed or suggested nucleic-acid colonies was at issue during prosecution (*see* evidence set forth in ¶¶10-29); (iii) he had argued to the PTO that the prior art did not disclose or suggest nucleic-acid colonies (*see* evidence set forth in ¶¶10-29), but he knew that the Stapleton '500 patent disclosed such nucleic-acid colonies; and (iv) he also argued the Stapleton '963 patent "teaches using agarose during PCR amplification . . . which, as one skilled in the art would know, means that the agarose will liquify and nucleic acids in different pores will not be separated during amplification" (Exh. 18, CHET2793), yet he knew that the Stapleton '500 patent taught how to solve that problem.[32]

## I.     Dr. Chetverin selectively disclosed information to the PTO

33.     Dr. Chetverin also engaged in a pattern of selectively disclosing information to the PTO. For example, he selectively disclosed information in 1992 when he disclosed his *On the Nature* publication. Exh. 29, CHET2712-21. As discussed above, Dr. Chetverin knew that because it was published less than one year before he filed his application, it would not count as prior art against his claims.[33] At the same time, he withheld both of his 1989 and 1991 publications, which he knew were prior art.

34.     Dr. Chetverin also selectively disclosed information by disparaging the prior art as having "severe practical problems" (Exh. 30, CHET2282), while withholding information about his own failed attempts to practice at least one of his claimed embodiments. Through most of prosecution, Dr. Chetverin thought his claimed method would generally not work with

---

[32] Exh. 7, '500 patent, at, *e.g.*, col. 23, lines 1-5 ("A logical outgrowth of these observations would be to find a matrix material that did not have a sol phase at the denaturation temperature of nucleic acids or use an isothermal amplification protocol.").

[33] Exh. 8, Chetverin Dep. Tr. at 156:12-159:24 (discussing contemporaneous correspondence from Dr. Chetverin (Exh. 12, CHET1963805) acknowledging that a U.S. patent application may be filed "within a year" of a publication). *See also* Exh. 11, FR_PROD192-93 ████████

14

CASE NO. 11-cv-00703-CAB (DHB)
ILLUMINA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

1   messenger RNA ("mRNA"), as is evident from admissions in his own publications, published

2   after prosecution had closed.[34] He never disclosed this to the PTO, and repeatedly

3   misrepresented in his patent applications how the claimed method would work with mRNA.[35]

4   35.     Dr. Chetverin again selectively disclosed information during the prosecution of the '478

5   patent in 1996,  when he disclosed the Stapleton '511 patent to the PTO (Exh. 31, CHET2918-

6   20), but withheld the more-comprehensive Stapleton '500 patent, which disclosed nucleic-acid

7   colony growth, and which he had reviewed during prosecution (as discussed above).[36]

8   36.     Dr. Chetverin also selectively disclosed information to the PTO during the prosecution of

9   the '568 and '698 patents (in 1997 and 1998), when he disclosed his 1993 publication on

10   nucleic-acid colonies, which, as discussed above, he knew was published too late to be prior art.

11   Exh. 32, CHET3211; Exh. 33, CHET3551-52. Yet he continued to withhold his 1989 and 1991

12   prior-art publications (while citing them in other scientific documents, as discussed above).

13   37.     Dr. Chetverin also selectively disclosed information to the PTO during the prosecution of

14   the '568 and '698 patents (also in 1997 and 1998) when he disclosed the Stapleton '963 and '511

15   patents, but continued to withhold the more-comprehensive Stapleton '500 patent that disclosed

16   nucleic-acid colonies. Exh. 32, CHET3211-13; Exh. 33, CHET3551-52.

17   38.     Given that Mr. Hone relied on Dr. Chetverin to decide whether the disclosures in any

18   given prior-art reference required disclosure to the PTO (Hone Dep. Tr. at 155:16-24), it was Dr.

19   Chetverin who decided to selectively disclose information to the PTO.

20   **J.      Dr. Chetverin made deliberate decisions to withhold information from and mislead
     the PTO**

21

22   39.     As the evidence discussed above demonstrates, Dr. Chetverin made deliberate decisions

23   to withhold his prior-art publications, the prior-art Stapleton '500 patent, and his failed

24

25   [34] *See, e.g.,* Exh. 34, CHET854150 ("The use of this approach for mRNA cloning was fully hopeless
     [citing 1993 publication], because RQ mRNA are incapable of exponential amplification, and

26   spontaneous deletions of mRNA inserts result in formation of efficiently replicating RQ RNA. [citing

27   1999 publication ]"); Exh. 35, CHET854100-101 (referring to the same problems, and citing 1993, 1995,
     and 1999 publications in connection with problems); Exh. 37, CHET 854077 (same).
     [35] *See, e.g.,* Exh. 39, '478 patent, col. 6, lines 5-16 and 19-27; col. 14, lines 22-25; 21:59-60.

28   [36] Exh. 8, Chetverin Dep. Tr. at 204:23-206:9 (pertinent portion quoted above).

15

1  experiments from the PTO. For example, (i) he selectively disclosed information to the PTO

2  (*e.g.*, disparaging the prior art's "severe practical problems," disclosing only those of his own

3  publications that he knew were not prior art, disclosing only the less-comprehensive Stapleton

4  '511 patent, *etc.*), while withholding the most-material prior art and other information, including

5  his own prior-art publications and the Stapleton '500 patent (*see* evidence set forth in ¶¶33-38);

6  (ii) despite admonitions from his patent attorneys that his own publications could be material to

7  patentability, and his stated understanding that his own articles published more than one year

8  before the filing of his patent application were prior art, he made these selective disclosures and

9  withheld the most-material prior art (*see* evidence set forth in ¶¶7-9 and 33-38); (iii) he

10 nevertheless cited both of his prior-art publications in his 1995 Ph.D. thesis, and one of those

11 publications in a 1998 publication, in regard to the results of his work on nucleic-acid colonies

12 and cell-free technology (*see* evidence set forth in ¶30); and (iv) he knew about the many

13 occasions in prosecution where question of whether the prior art disclosed or suggested nucleic-

14 acid colonies was at issue, where he directed Mr. Hone on what the prior art disclosed, and knew

15 of the misleading arguments that were made to the PTO (*see* evidence set forth in ¶¶10-29).

16 **IV.    Applicable legal standards**

17 **A.    Inequitable conduct**

18        "To prevail on the defense of inequitable conduct, the accused infringer must prove that

19 the applicant misrepresented or omitted material information with the specific intent to deceive

20 the PTO." *Therasense*, 649 F.3d at 1287 (citing *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*,

21 537 F.3d 1357, 1365 (Fed. Cir. 2008)). With respect to intent (the only element that Plaintiffs

22 dispute in their motion), a defendant "must prove [for an allegation of inequitable conduct based

23 solely on withholding prior art] by clear and convincing evidence that the applicant knew of the

24 reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* at 1290.

25 "A district court should not use a 'sliding scale,' where a weak showing of intent may be found

26 sufficient based on a strong showing of materiality, and . . . may not infer intent *solely from*

27 *materiality*. Instead, a court must weigh the evidence of intent to deceive independent of its

28 analysis of materiality." *Id.* (citing *Star*, 537 F.3d at 1366) (emphasis added).

1   "Because direct evidence of deceptive intent is rare, a district court may infer intent from

2   indirect and circumstantial evidence." *Id.* (citing *Larson Mfg. Co. of S.D., Inc. v. Aluminart*

3   *Prods. Ltd.*, 559 F.3d 1317, 1340 (Fed. Cir. 2009)). "[T]o meet the clear and convincing

4   evidence standard, the specific intent to deceive must be 'the single most reasonable inference

5   able to be drawn from the evidence.'" *Id.* (quoting *Star*, 537 F.3d at 1366). "[T]he evidence

6   'must be sufficient to require a finding of deceitful intent in the light of all the circumstances.'"

7   *Id.* (quoting *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 873 (Fed. Cir.

8   1988)). "[T]he 'patentee need not offer any good faith explanation unless the accused infringer

9   first ... prove[s] a threshold level of intent to deceive by clear and convincing evidence.'" *Id.* at

10   1291 (quoting *Star*, 537 F.3d at 1368). "The absence of a good faith explanation for withholding

11   a material reference does not, *by itself*, prove intent to deceive." *Id.* (emphasis added).

12   **B.    Summary judgment**

13   Summary judgment is appropriate only "if the movant shows that there is no genuine

14   dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

15   CIV. P. 56(a). A movant bears the initial burden of making this showing. *Adickes v. S.H. Kress &*

16   *Co.*, 398 U.S. 144, 158-61 (1970). To meet this burden, the movant must identify "'the

17   pleadings, depositions, answers to interrogatories, and admissions on file, together with the

18   affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

19   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting earlier version of FED. R. CIV. P.

20   56(c). If the movant satisfies this initial burden, the burden shifts to the opposing party to show

21   that summary judgment is not appropriate. *Id.* at 330.

22   When a movant contends an opposing party lacks evidence to establish an element of its

23   claim, it must do more than simply argue there is no evidence. "A moving party may not require

24   the nonmoving party to produce evidence supporting its claim or defense simply by saying that

25   the nonmoving party has no such evidence. 'Even after *Celotex* it is never enough simply to state

26   that the non-moving party cannot meet its burden at trial.'" *Nissan Fire*, 210 F.3d at 1105-06

27   (quoting *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (vacating summary

28   judgment and explaining how, under *Adickes* and *Celotex*, a party seeking summary judgment of

17

CASE NO. 11-cv-00703-CAB (DHB)
ILLUMINA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

1    a non-moving party's claim must "point to materials on file that demonstrate that the party

2    bearing the burden of proof at trial will not be able to meet that burden.")). *See also Adickes*, 398

3    U.S. at 157 (reversing summary judgment for failure of moving party to meet in its initial

4    burden, where moving party relied on deposition and affidavits but failed to rebut specific

5    circumstantial evidence of alleged conspiracy alleged in opposing party's complaint).

6    **V.    Argument**

7    **A.    Plaintiffs have failed to satisfy their initial burden of showing there is no genuine
          issue of disputed material fact**

8

9            Plaintiffs have failed to satisfy their initial burden of showing there is no genuine issue of

10   material fact such that they are entitled to summary judgment, because they have ignored nearly

11   all of the evidence of Dr. Chetverin's knowledge that certain withheld information was material,

12   and his deliberate decisions to withhold that information from and mislead the PTO. Illumina

13   described most of that evidence in detail in its Amended Answer and Counterclaims, and Mr.

14   Goolkasian discussed it in his expert statement. Yet Plaintiffs ignore nearly all of that evidence.

15           For example, Plaintiffs failed to even acknowledge that Dr. Chetverin personally co-

16   authored his prior-art 1989 and 1991 publications and therefore knew that each publication

17   disclosed or at least suggested making nucleic-acid colonies. Plaintiffs also failed to address Dr.

18   Chetverin's pattern of making misleading arguments to the PTO that the prior art failed to

19   disclose or even suggest nucleic-acid colonies, Dr. Chetverin's contribution to and knowledge of

20   those arguments, and how Mr. Hone took direction from Dr. Chetverin on how to address the

21   prior art. Plaintiffs also failed to address Dr. Chetverin's having withheld his prior-art

22   publications from the PTO during the same time that he was making misleading arguments that

23   caused the PTO to withdraw its prior-art rejections, or how those publications were important

24   enough to Dr. Chetverin to cited in his 1995 Ph.D. thesis and (one) in a 1998 publication.

25   Plaintiffs also failed to address how on at least two different occasions (in 1992 and 1997), Dr.

26   Chetverin selectively disclosed his own publications that he knew were not prior art because of

27   their late publication dates, and selectively disclosed a less-comprehensive Stapleton patent.

28   ///

1    The only evidence Plaintiffs address (but fail to adequately address, much less rebut, as

2    explained below) is Plaintiffs' privilege log, a few snippets from Mr. Goolkasian's deposition,

3    and a few snippets from Mr. Hone's deposition. Plaintiffs' Brief at 3, 7, and 8. That is only a

4    small fraction of the relevant evidence here. Because Plaintiffs failed to address (much less

5    rebut) nearly all of the evidence on file, they have failed to satisfy their initial burden of showing

6    there is no genuine issue of material fact that would entitle them to summary judgment, and this

7    Court should accordingly deny their motion.

8    **B.    Dr. Chetverin knew that his own prior-art publications and other information were**
9    **material**

10   The evidence in this case shows – and at the least raises genuine issues of material fact –

11   that Dr. Chetverin knew that his own withheld prior-art publications were material to the

12   prosecution of his patents. For example: (i) having co-authored his prior-art publications, Dr.

13   Chetverin knew that each disclosed methods for making nucleic-acid colonies; (ii) he knew the

14   question of whether the prior art disclosed or suggested nucleic-acid colonies was at issue in

15   prosecution from communicating with Mr. Hone about responding to PTO Office Actions; (iii)

16   he directed Mr. Hone on how to address the prior art, knew that misleading arguments were

17   presented to the PTO, and knew that the PTO relied on those arguments; (iv) he was repeatedly

18   told by his patent attorneys that his own publications could be material to patentability, and knew

19   articles published more than one year before his application was filed were prior art; and (v), lest

20   there be any possible remaining doubt that Dr. Chetverin knew his publications were material, he

21   cited both in his Ph.D. thesis (1995) and one in a publication (1998) regarding his method.

22   In view of this evidence, Plaintiffs cannot seriously suggest that Dr. Chetverin did not

23   know (or that there is no evidence of him having known) that his very own prior-art publications

24   disclosing nucleic-acid colonies were material.

25   The evidence similarly shows (or at the least raises genuine issues of related material

26   fact) that Dr. Chetverin knew the prior-art Stapleton '500 patent was material: (i) during

27   prosecution, he reviewed the Stapleton '500 patent; (ii) he knew the question of whether the prior

28   art disclosed nucleic-acid colonies was directly at issue in prosecution, including with respect to

19

CASE NO. 11-cv-00703-CAB (DHB)
ILLUMINA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

1  another Stapleton patent; and (iii) he accordingly knew the Stapleton '500 patent disclosed the

2  specific subject matter (*e.g.*, "each colony becoming visible," "the nucleic acid target may be

3  amplified 'in situ,'" and "clusters of specific genetic targets") that he had argued to the PTO was

4  not disclosed or suggested in the cited prior art.

5       A fact finder could reasonably infer from this evidence that Dr. Chetverin knew his prior-

6  art publications and the Stapleton '500 patent were material to patentability. *See Anderson v.*

7  *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes*, 398 U.S. at 158-159) ("The

8  evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

9  favor.").[37]

10       And as discussed above, there can be no reasonable doubt that the evidence in this case is

11  legally sufficient to establish that Dr. Chetverin knew the information he withheld was material.

12  For example, in *Aventis*, the Federal Circuit affirmed a judgment of inequitable conduct based on

13  evidence similar to the evidence here, under the heightened standards announced in *Therasense*.

14  675 F.3d at 1333-37. There was no direct evidence of intent to deceive the PTO in *Aventis*, but

15  (i) one of the two intentionally withheld prior-art references (the "GV reference") had to be

16  approved by an inventor/project leader for publication, (ii) the inventor reviewed it "with some

17  care" before publication, (iii) he later (within six months of signing a declaration to be submitted

18  to the PTO) took steps to ensure that the withheld prior-art reference was cited in a company

19  brochure, and (iv) his testimony attempting to explain the withholding was found not to be

20  credible. *Id.* at 1336-37. This evidence was sufficient to establish the inventor's knowledge of

21  materiality and his deliberate decision to withhold the prior-art reference from the PTO. *Id. See*

22  *also id.* at 1335-36 (affirming separate finding of inequitable conduct where there was evidence

23  of, *inter alia*, selective disclosure to the PTO and withholding of "Vidal" reference).

24  / / /

25

26  [37] *See also Kathrein-Werke KG v. Radiacion y Microondas S.A.*, No. 07-Civ-2921, 2011 WL 4460393, at

27  *9 (N.D. Ill. Sept. 26, 2011) ("[I]n order to survive Kathrein's partial summary judgment motion on [inequitable conduct], non-movant RYMSA need not establish its claim by clear and convincing evidence

28  and instead must merely provide evidence that could succeed in proving both materiality and intent.") (citations omitted).

1    The evidence in this case is similar to (and in certain respects more compelling than) the

2    evidence in *Aventis*. Dr. Chetverin co-authored and therefore knew the content of his prior-art

3    1989 and 1991 publications; he cited both publications in his Ph.D. thesis (1995) and one in a

4    publication (1998) regarding his method (*i.e.*, during the time he made misleading arguments to

5    the PTO that the "cited" prior art failed to disclose or even suggest what he knew was disclosed

6    in his withheld prior-art publications), and Plaintiffs have not even attempted to offer an

7    exculpatory explanation. In addition, Dr. Chetverin instructed Mr. Hone on how to address the

8    prior art, and knew of the corresponding arguments made to the PTO. *See* Exh. 1, Chambers

9    Dep. Tr. at 137:12-143:10 ████████████████████████████████████

10   ████████████████████████████████ And he knew that his own publications were prior

11   art if published more than one year before his application was filed.[38]

12   The evidence here therefore at the very least raises genuine issues of material fact, and a

13   fact finder could reasonably conclude that it is clear-and-convincing evidence that Dr. Chetverin

14   knew his prior-art publications and the Stapleton '500 patent were material. Indeed, Plaintiffs

15   have not and cannot cite a case with comparable evidence where the court nevertheless granted

16   summary judgment of no inequitable conduct. To grant summary judgment here would require

17   impermissibly weighing evidence and deciding facts.

18   **C.    Dr. Chetverin made deliberate decisions to withhold material information from and
19          mislead the PTO**

20   The evidence in this case also shows (and at the very least raises related genuine issues of

21   material fact) that Dr. Chetverin deliberately decided to withhold his prior-art publications and

22   other information from and mislead the PTO. For example, (i) he selectively disclosed

23   information to the PTO, while withholding the most-material information, including his own

24   prior-art publications and the Stapleton '500 patent; (ii) that was despite repeated admonitions

---

[38] *See also Schering Corp. v. Mylan Pharma., Inc.*, No. 09-Civ-6383, 2011 WL 3736503, at *5 (D.N.J. Aug. 22, 2011) (denying summary judgment because a "reasonable fact finder could conclude that Schering had knowledge of the materiality of the withheld prior art" based on a "question of [the attorney's] credibility" and "given that Schering does not appear to dispute that it had knowledge of the relevant prior art," which raised genuine issues of material fact).

1  from his patent attorneys that his own publications could be material to patentability, and his

2  knowledge that those publications were prior art; (iii) he cited both of his prior-art publications

3  in his Ph.D. thesis and one in publication regarding his method; and (iv) he was aware of the

4  many occasions in prosecution where the question of whether the prior art disclosed or suggested

5  nucleic-acid colonies was at issue, where (through Mr. Hone) he made a series of misleading

6  arguments made to the PTO.

7       A fact-finder could reasonably infer from this evidence – combined with Plaintiffs'

8  failure to offer any alternative explanation for Dr. Chetverin's conduct – that Dr. Chetverin made

9  deliberate decisions to both withhold his prior-art publications and the Stapleton '500 patent

10  from the PTO, and mislead the PTO. *See Liberty Lobby*, 477 U.S. at 255.

11       Dr. Chetverin has not directly admitted that he deliberately withheld material information

12  and misled the PTO, but direct evidence is not required, and the circumstantial evidence –

13  including his pattern of selective disclosures and misleading arguments – clearly and

14  convincingly shows that he did so. *See, e.g., Aventis*, 675 F.3d at 1336-37 (affirming findings of

15  deliberate decisions to withhold references based on circumstantial evidence including selective

16  disclosures, as described above); *Therasense*, 649 F.3d at 1290-91; *Rohm & Haas Co. v. Crystal*

17  *Chem. Co*, 722 F.2d 1556, 1571 (Fed. Cir. 1983) ("It cannot be said that these misrepresentations

18  [in affidavits] to the PTO were the result of an honest mistake. While direct proof of intent to

19  mislead is normally absent, such submissions usually will support the conclusion that the

20  affidavit in which they were contained was the chosen instrument of an intentional scheme to

21  deceive the PTO.") (citation omitted). *See also* Exh. 1, Chambers Dep. Tr. at 137:12-143:10.

22       The evidence therefore at the very least raises genuine issues of material fact, and a fact-

23  finder could reasonably conclude that it is clear-and-convincing evidence that Dr. Chetverin

24  made deliberate decisions to both withhold his prior-art publications and other information from

25  the PTO, and mislead the PTO.[39]

26

27  [39] *See also Mitsubishi Heavy Indus., Ltd. v. General Elec. Co.*, No. 10-cv-812, 2012 WL 4336208, at *4
    (M.D. Fla. Sept. 21, 2012) (denying summary judgment where "[t]he evidence in the summary judgment
28  record is indeed indirect and circumstantial, consisting largely of the patent prosecution documents and
    the deposition testimony of [the alleged perpetrators]—both of whom deny intending to deceive the

1  **D.    Plaintiffs' remaining arguments lack merit**

2        Plaintiffs' remaining arguments fail to address – much less rebut – nearly all of the

3  evidence of Dr. Chetverin's intent to deceive the PTO, and generally only distort the record.

4        Contrary to Plaintiffs' assertion (Plaintiffs' Brief at 5-6), Illumina's "entire basis" for Dr.

5  Chetverin's knowledge of materiality is not that "it would have been evident" to Dr. Chetverin

6  that various information was material. Nor is it a "bare assertion" that Dr. Chetverin knew the

7  information that he withheld was material. And Illumina and Mr. Goolkasian do not make "only

8  conclusory statements" concerning Dr. Chetverin's intent to deceive the PTO.[40] As explained

9  above, the evidence shows that Dr. Chetverin knew that his own prior-art publications and other

10  information were material to patentability.

11        Plaintiffs' reliance (Plaintiffs' Brief at 7) on *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d

12  1367 (Fed. Cir. 2012), in which the Federal Circuit held that the evidence of knowledge of

13  materiality "cannot by itself prove" a deliberate decision to withhold, is inapposite. In *1st Media*,

14  the district court inferred intent to deceive the PTO simply from the applicants' knowledge that

15  most of the withheld references were material, and the absence of a credible good-faith

16  explanation for the non-disclosures in question. *Id.* at 1376.

17        In contrast, the evidence here shows that on two different occasions (in 1992 and 1997)

18  Dr. Chetverin selectively disclosed his publications that he knew were not prior art because of

19  their late publication dates, confirming that he considered which of his own publications to

20  disclose to the PTO, and carefully selected only those that could not bar issuance of a patent.

21  Meanwhile, he cited both of his prior-art publications in his 1995 Ph.D. thesis regarding his

22  method, and one of those publications in his 1998 publication regarding his method. And from

23

24  USPTO or even knowing of what was cited in the JPO's Decision to Grant Patent" because "[t]his Court
cannot resolve the question of intent to deceive at the summary judgment stage."); *Kathrein-Werke*, 2011

25  WL 4460393, at *10 (denying summary judgment because "[t]he record contains circumstantial evidence
from which intent to deceive may be reasonably inferred, including," among other facts, the patentee's

26  "alleged inaccurate representations to the USPTO during prosecution," and the "patent practitioner's
failure to make the necessary inquiry into the underlying facts and circumstances.").

27  [40] While Mr. Goolkasian said in his expert statement that certain things "would have been evident to a
patent applicant such as Dr. Chetverin," a plain reading of his expert statement shows that it was in

28  connection with a detailed recitation of extensive circumstantial evidence from which a fact-finder could
reasonably infer Dr. Chetverin's intent to deceive the PTO.

23

1    1992 through 1997, Dr. Chetverin was involved in making multiple misleading arguments to the

2    PTO about the prior art, where he instructed Mr. Hone on how to address the prior art, and knew

3    of the arguments made to the PTO. The reasoning of *1st Media* does not apply here.

4          Contrary to Plaintiffs' assertion (Plaintiffs' Brief at 7), Mr. Goolkasian did not say that he

5    has not seen evidence of Dr. Chetverin's decision to withhold. In his expert statement, Mr.

6    Goolkasian discussed extensive evidence showing that Dr. Chetverin made deliberate decisions

7    to withhold his prior-art publications and the Stapleton '500 patent. *See* Goolkasian Report (Exh.

8    36) at, *e.g.*, ¶¶ 52-82, 98-171, 188-195, 197-204, 208-214. When Mr. Goolkasian was asked in

9    deposition what evidence shows that Dr. Chetverin considered disclosing his prior-art

10   publications, he said that he was aware of evidence showing that Dr. Chetverin was advised that

11   publications like those could be prior art and needed to be disclosed, and he later clarified (in

12   errata) that although he is not aware of "direct" evidence of such a consideration, circumstantial

13   evidence of such consideration is discussed throughout his expert statement. Exh. 40. Moreover,

14   Plaintiffs' proposed patent-law expert has confirmed that

15

16                                                                                    Exh. 1, Chambers

17   Dep. Tr. at 137:12-143:10. *See also Aventis*, 675 F.3d at 1336-37 (affirming inequitable conduct

18   based on comparable evidence).[41]

19          Contrary to Plaintiffs' assertion (Plaintiffs' Brief at 8), as explained above, abundant

20   evidence shows that Dr. Chetverin was actively, directly involved in the prosecution of the

21   Chetverin Patents and was aware of misleading arguments made to the PTO, including the more

22   than 90 written communications between Dr. Chetverin and his attorneys about prosecution, and

23   Mr. Hone's testimony that Dr. Chetverin instructed him on how to address the prior art and was

24   aware of the arguments made to the PTO. Dr. Chetverin's involvement was therefore not limited

25   to "explaining technical subject matter." *Id.*

26

27   ---
[41] Plaintiffs cite specific pages of Mr. Goolkasian's transcript without making it clear which testimony
     was with respect to which withheld information. None of the testimony that Plaintiffs cite was about the
28   Stapleton '500 patent, and only 104:19-105:10 and 106:1-12 had anything to do with Dr. Chetverin's
     1989 and 1991 prior art Russian publications.

Contrary to Plaintiffs' assertion (Plaintiffs' Brief at 9), the facts in this case are not "very similar" to those in *Carl Zeiss Vision Int'l GmbH v. Signet Armorlite, Inc.*, No. 07-cv-894, 2011 WL 6372785 (S.D. Cal. Dec. 19, 2011). In *Carl Zeiss*, the only evidence of intent to deceive for most withheld references was the mere withholding of the references. *Id.* at *5-6.[42] In contrast, here we have extensive evidence of Dr. Chetverin's intent to deceive the PTO (*e.g.*, his withholding of his own prior-art publications, his involvement in prosecution, his misleading arguments, his selective disclosures, his knowledge of which publications were prior art, and citing the withheld prior-art publications in other contemporaneous documents). Accordingly, there is far more evidence of Dr. Chetverin's intent to deceive than there was in *Carl Zeiss*.

## VI.   Conclusion

This Court should deny Plaintiffs' motion for summary judgment. Plaintiffs ignore nearly all of the evidence, and fail to satisfy their initial burden of showing that there is no genuine issue of material fact such that they are entitled to summary judgment. The issues are fact-intensive, a fact-finder could reasonably conclude that the evidence clearly and convincingly shows that Dr. Chetverin knew that the publications and other information he deliberately withheld were material to patentability, and Plaintiffs have offered no alternative explanation for Dr. Chetverin's conduct. At the very least, the evidence raises genuine issues of material fact concerning Dr. Chetverin's intent to deceive the PTO, which precludes summary judgment.

---

[42] In *Carl Zeiss*, there was an alleged selective disclosure of two withheld references, but one was discussed in prior art disclosed to the PTO, and there was record evidence (unlike here) of what was deemed an equally reasonable explanation for withholding the other. *Id.* at *6.

Dated: December 21, 2012

Respectfully submitted,


By: /s/ E. Joseph Connaughton
    101 West Broadway, Ninth Floor
    San Diego, CA 92101
    (619) 744-3645

    Kevin M. Flowers
    Matthew C. Nielsen
    Mark H. Izraelewicz
    Cullen N. Pendleton
    Marshall, Gerstein & Borun LLP
    233 South Wacker Drive
    6300 Willis Tower
    Chicago, IL 60606
    (312) 474-6300

    Ronald M. Wawrzyn
    Matthew M. Wawrzyn
    Wawrzyn LLC
    233 South Wacker Drive
    84th Floor, Willis Tower
    Chicago, IL 60606
    (312) 283-8330

    *Attorneys for Defendants*
    *Illumina, Inc. and Solexa, Inc.*

CASE NO. 11-CV-00703-CAB (DHB)
ILLUMINA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT