1   MATTHEW D. MURPHEY (SBN 194111)
    TROUTMAN SANDERS LLP
2   11682 El Camino Real, Suite 400
    San Diego, CA  92130
3   Telephone: (858) 509-6000

4   BRADFORD PAUL SCHMIDT (SBN 174440)
    LIFE TECHNOLOGIES CORPORATION
5   5791 Van Allen Way
    Carlsbad, CA 92008
6   Telephone:  (760) 603-7200

7   NICHOLAS GROOMBRIDGE (*pro hac vice*)
    CATHERINE NYARADY (*pro hac vice*)
    PETER SANDEL (*pro hac vice*)
8   JENNY C. WU (*pro hac vice*)
    REBECCA FETT (*pro hac vice*)
9   ROBERT LIN (*pro hac vice*)
    PAUL, WEISS, RIFKIND, WHARTON &
10  GARRISON LLP
    1285 Avenue of Americas
11  New York, NY 10019
    Telephone: (212) 373-3000

12  Attorneys for Plaintiffs/Counterclaim Defendants
    LIFE TECHNOLOGIES CORPORATION,
13  APPLIED BIOSYSTEMS, LLC, INSTITUTE
    FOR PROTEIN RESEARCH, ALEXANDER
14  CHETVERIN, HELENA CHETVERINA, and
    WILLIAM HONE
15

16              **UNITED STATES DISTRICT COURT**

17              **SOUTHERN DISTRICT OF CALIFORNIA**

18  LIFE TECHNOLOGIES CORPORATION,         Case No. 3:11-cv-00703-CAB (DHB)
    APPLIED BIOSYSTEMS, LLC, INSTITUTE
19  FOR PROTEIN RESEARCH, ALEXANDER        **[REDACTED] MEMORANDUM OF**
    CHETVERIN, HELENA CHETVERINA, and      **POINTS AND AUTHORITIES IN**
20  WILLIAM HONE,                          **OPPOSITION TO  ILLUMINA AND**
                                           **SOLEXA'S MOTION FOR SUMMARY**
21        Plaintiffs/Counterclaim Defendants,   **JUDGMENT OF NON-INFRINGEMENT**

22  v.                                     **[FILED UNDER SEAL]**

23  ILLUMINA, INC. and SOLEXA, INC.,
                                           Date:       January 17, 2012
24        Defendants/Counterclaim Plaintiffs.   Time:       2:30 p.m.
                                           Courtroom:  2
25                                         Judge:      Hon. Cathy Ann Bencivengo

26

27

28

## TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

I.  INTRODUCTION ........................................................................................................ 1

II.  FACTUAL BACKGROUND ...................................................................................... 2

III.  ARGUMENT ............................................................................................................. 3

    A.  Legal Framework ............................................................................................ 3

    B.  Illumina's "Formamide"-Based Arguments Are Both Factually Disputed And Contrary To The Claim Construction Ruling................................................. 3

        1.  Formamide is not part of the "amplification system" .................................. 4

        2.  The Amplification System in the Accused Products is "Aqueous" Even if Formamide is a Component................................. 7

    C.  Illumina's Argument that the Amplification System is not "Entrapped" is Based on a Claim Construction the Court Rejected................................. 8

    D.  Illumina's Systems Perform Exponential Amplification ........................... 10

        1.  The Scientific Community Defines "Exponential Nucleic Acid Amplification" As Amplification Where The Copied Product Can Serve As A Template For The Next Round Of Amplification ...................................................................... 10

        2.  Illumina Seeks to Rewrite the Claim Language to Require Doubling and Equal Probability of Serving as a Template....................... 12

        3.  Illumina's Alternate Theory of "Geometric" Nucleic Acid Amplification Is Without Basis................................. 16

        4.  Illumina's Paired End Sequencing Relies on Exponential Amplification. ............................................................. 17

    E.  There is a Genuine Dispute of Fact Regarding The "Thickness" Limitation ........ 18

    F.  Illumina's Amplification Products Migrate By Diffusion and The Pore Size is Smaller than the Migration Distance................................. 19

    G.  Illumina's Systems Perform "Screening" by Detecting Nucleic Acid Sequences.............................................................. 22

IV.  CONCLUSION ..................................................................................................... 24

1

2

## Table of Authorities

3

Page(s)

4

CASES

5

*Alcon Research Ltd. v. Apotex Inc.,*
   __ F.3d ____ (Fed. Cir. 2012)......................................................................................... 24

6

*Ethicon EndoSurgery, Inc. v. U.S. Surgical Corp.,*
7   149 F.3d 1309 (Fed. Cir. 1998)....................................................................................... 3, 6

8   *Invitrogen Corp. v. Biocrest Mfg.,*
   327 F.3d 1364, 1369 (Fed.Cir.2003)............................................................................... 3, 6

9

*Moleculon Research Corp. v. CBS, Inc.,*
10   793 F.2d 1261 (Fed. Cir. 1986)....................................................................................... 19

11   *Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005)....................................................................................... 12

12

*Schumer v. Lab. Computer Sys.,*
13   308 F.3d 1304 (Fed. Cir. 2002)....................................................................................... 3

14   *Thorner v. Sony Computer Entm't Am. LLC,*
   669 F.3d 1362 (Fed. Cir. 2012)....................................................................................... 15

15

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
16   503 F.3d 1295 (Fed.Cir. 2007)........................................................................................ 9

17   OTHER AUTHORITIES

18   Fed. R. Civ. P. 56(c)....................................................................................................... 3

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

Life Technologies Corporation, Applied Biosystems, LLC, Institute for Protein Research, Alexander Chetverin, Helena Chetverina, and William Hone (collectively, "Plaintiffs") submit this memorandum of points and authorities in opposition to the motion of Illumina, Inc. and Solexa, Inc. (collectively, "Illumina") for summary judgment of non-infringement.

Illumina seeks summary judgment of non-infringement on no fewer than seven grounds. But, all of Illumina's arguments relate to issues that involve direct and material disputes of fact between the parties. For example, Illumina contends that it does not infringe because, in its view, a chemical component of the accused products—formamide—is part of the amplification system and is neither "entrapped" nor "aqueous." There is a direct factual dispute between the parties experts as to whether formamide is part of the amplification system at all. If formamide is not part of the "amplification system," as Plaintiff's expert contends, the claim terms "entrapped" and "aqueous" do not even apply to the formamide and Illumina's contentions are rendered moot. This factual dispute alone is sufficient to defeat summary judgment.

But even assuming Illumina were correct, and formamide is, in fact, part of the "amplification system," the accused products would still infringe the claims of the Chetverin Patents. Judge Kelly construed the terms "entrapped" and "aqueous liquid phase," and in doing so, disposed of the arguments now advanced by Illumina in its motion. Specifically, the Claim Construction Order held that the invention covers a system "in which individual components . . . can be transported in and out of the matrix, e.g., by a mobile liquid." [Claim Construction Order (Doc. No. 132) at 13.] Here, the ruling plainly disposes of Illumina's argument that the amplification system is not "entrapped" because any one or more of its components (*e.g.*, formamide) take the form of a flowing liquid. In addition, Judge Kelly construed the term "aqueous liquid phase" to mean "water-***based*** liquid phase," explaining that the term does not require all components of the amplification system "to be fully dissolved or even suspended in liquid." [Claim Construction Order (Doc. No. 132) at 7.] So even if formamide is not fully dissolved or suspended in the accused "water-based liquid phase," Illumina still meets this claim element and infringes the Chetverin Patents.

1    Illumina's other arguments are no better.  The contention that Illumina's amplification

2    system is not "exponential" is simply a belated attempt to obtain a construction of this claim term

3    that would improperly narrow the scope of the claims.  Again, Illumina fails to mention that

4    during the claim construction phase, the parties met and conferred on the meaning of

5    "exponential," and that Illumina agreed with the meaning ultimately employed by Plaintiffs'

6    expert, Dr. Barron—the very meaning it now seeks to challenge.  But even under Illumina's new

7    interpretation of "exponential," material factual disputes preclude the entry of summary

8    judgment.[1]  Similarly, with respect to the "thickness" limitation, Illumina ignores that the entire

9    issue reduces to a  factual dispute between the parties' respective experts concerning the actual

10   thickness of a layer in the accused products.  Again, such disputes of fact are of course fatal to

11   summary judgment.

12        In the end, Illumina's motion simply lays out its own version of the facts and labels it

13   "undisputed," despite substantial evidence to the contrary.  The parties experts disagree on

14   virtually all of the facts germane to Illumina's motion.  And in some cases, the Court, through its

15   claim construction, has already rejected the entire premise on which Illumina's arguments are

16   based.  For at least these reasons, the Court should deny Illumina's motion in its entirety.

17   **II.    FACTUAL BACKGROUND**

18        As described in further detail in the accompanying declaration of Dr. Jeremy Edwards, the

19   Chetverin Patents relate to novel means of amplifying (*i.e.,* copying) DNA fragments to create a

20   population of identical fragments that are kept within limited zones by a solid medium.  In the

21   context of the Chetverin Patents, these collections of identical copies are termed "colonies."  The

22   colonies are generated by an amplification system, which is the set of reagents that together copy

23   the DNA.  The Chetverin patents are based on a type of amplification called "exponential

24   amplification," in which a copy of a nucleic acid can serve as a template for future rounds of

25   copying.  The ability to create large numbers of identical DNA fragments in a limited space has

26   proven useful for a variety of molecular biology techniques, including DNA sequencing.

27

28   [1] Examples of such factual disputes include, for example, whether doubling of the nucleic acid
     molecules occurs in the accused Illumina products and whether the templates and amplification
     products have an equal probability of being copied in each round of synthesis.

Illumina offers DNA sequencing products based on generating colonies of thousands of copies of identical DNA molecules, which Illumina terms "clusters." [Declaration of Robert Lin in support of Plaintiffs' Memorandum of Points and Authorities in Opposition to Illumina and Solexa's Motion for Summary Judgment of Non-Infringement (hereinafter "Lin Decl.") Exh. 1 (8/31/2012 Weinstock Report)  at ¶ 39.]  In Illumina's systems, the clusters are kept within limited zones by a solid matrix, ████████████████████████████  [*See e.g.* Lin Decl. Exh. 2 (8/3/2012 Barron Report) at ¶¶ 33-35.]  A detailed description of the Illumina system is provided by Dr. Barron in her Expert Report.  [*Id.* at ¶¶ 31-46.] ████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

## III.   ARGUMENT

### A.   Legal Framework

The summary judgment standard is well known and non-controversial.   Summary judgment is appropriate when the record demonstrates that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party, here Illumina, bears the burden of establishing the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  In this context, the  Federal Circuit has made clear that "the evidence [must be viewed] in a light most favorable to  the party opposing the motion with doubts resolved in favor of the opponent."  *Ethicon EndoSurgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998); *see also Schumer v. Lab. Computer Sys.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002) ("On summary judgment, all justifiable inferences are made in favor of the nonmovant.").

### B.   Illumina's "Formamide"-Based Arguments Are Both Factually Disputed And Contrary To The Claim Construction Ruling

Illumina argues that the Accused Products do not infringe the Chetverin Patent claims because Illumina's amplification system is not "water-based" and is not "entrapped" as the claims require.   At the heart of Illumina's argument is the late disclosed, and vigorously contested, factual assertion by Illumina that a compound called "formamide" is part of the "amplification

3

1   system" as that term was construed by the Court.  Illumina's contentions regarding formamide

2   were raised for the first time in the Rebuttal Expert Report of Dr. Weinstock dated August 31,

3   2012. [Lin Decl. Exh. 1 (8/31/2012 Weinstock Report) at ¶¶ 62-65.]  Dr. Weinstock claims that

4   formamide is necessary for amplification in Illumina's system and therefore must be part of the

5   "amplification system" of the Chetverin Patent claims.  *Id.*  According to Dr. Weinstock,

6   formamide is not mixed with water and therefore does not meet the claim limitation requiring "an

7   aqueous liquid phase that includes . . . [an] amplification system."  [*See e.g.*, Lin Decl. Exh. 3

8   ('478 patent) at claim 1.]  Illumina and Dr. Weinstock further claim that formamide is flowed in

9   and out of the matrix at different times than the other components of the amplification system,

10  and thus the amplification system is not "entrapped," as required by the claims.  But Illumina's

11  argument fails both because it depends on a disputed factual predicate and because it is a blatant

12  attempt to reargue positions previously rejected by the Court during claim construction.

### 1.    Formamide is not part of the "amplification system"

14  The threshold issue on which Illumina's motion depends is the factual question of whether

15  formamide is even a component of the amplification system at all.    The Court has already

16  construed the term "amplification system" to mean "a set of components that together can

17  amplify a nucleic acid."  [Claim Construction Order (Doc. No. 132) at 6.]  The dispute is thus a

18  purely factual one as to whether formamide is one of the components that amplifies (*i.e.,* copies)

19  the nucleic acid, or whether it serves a different function.

20  As set forth in the accompanying declaration of Dr. Edwards, formamide is not part of the

21  "amplification system" but is rather a denaturing agent.  [12/21/2012 Edwards Decl. at ¶ 19-25.]

22  In the context of DNA, "denaturing" refers to separating a double-stranded molecule into single

23  strands, usually using heat or one of a number of chemicals or enzymes.  *Id.*  This step is often

24  performed because polymerase enzymes used for amplification operate by copying a single-

25  stranded template and creating a double-stranded product.  *Id.*  If additional rounds or cycles of

26  amplification are required, the double-stranded product is typically denatured to recreate single-

27  stranded templates that will be recognized by the polymerase enzyme.  *Id*.

28

1    As Dr. Edwards explains in his declaration, formamide is analogous to heat in traditional

2    PCR, whereby after each round of amplification, the temperature of the reaction is increased to

3    denature the DNA by melting the two strands apart.  *Id.*  The temperature is then lowered to allow

4    the primers to anneal to the template strands to begin another round of amplification.  [*Id.* at ¶

5    22.]  PCR requires a heating step between each amplification cycle, but that does not mean heat

6    can be considered a "component" of the amplification system.  Indeed, the amplification system

7    of PCR consists only of those ingredients that actually participate in the amplification reaction:

8    the template strands, primer, polymerase enzyme and nucleotide bases.[2]  [*Id.* at ¶¶ 20- 23.]

9    The specification of the Chetverin Patents discusses the use of heat to create single-

10   stranded templates for additional cycles of amplification, but it does not describe heat as a

11   component of the amplification system.  [*See, e.g.*, Lin Decl. Exh. 3 ('478 patent) at 11:18-22]

12   ("Monolayer media are convenient to use if all the components of an amplification can be mixed

13   together without allowing the reaction to start until the layer is ready, as in PCR that does not

14   proceed unless temperature cycling is started.").  In fact, during the prosecution of the patents, the

15   inventors provided the USPTO with a table listing combinations of components included in the

16   "amplification system."  Significantly, heat was not listed among the components of the PCR

17   amplification systems, as shown in the figure below.

18

19

20

21

22

23

24

25

26

27

28

---

[2]   In a sense, heat or formamide or other denaturing process might be said to "set the stage," but stage hands are not characters in the play.

5

The following table lists some combinations of components
which Applicant teaches can be used in the claimed methods.

| System | Template | DNA-Directed DNA Polymerase | DNA-Directed RNA Polymerase | RNA-Directed RNA Polymerase | Reverse Transcriptase | XTPs | dXTPs | Primers | Primers with Promoters |
|--------|----------|---|---|---|---|---|---|---|---|
| VRP | RNA | | | ✓ | | ✓ | | | |
| VRP | DNA | ✓ | ✓ | ✓ | | ✓ | ✓ | | ✓ |
| PCR | DNA | ✓ | | | | | ✓ | ✓ | |
| PCR | RNA | ✓ | | | ✓ | | ✓ | ✓ | |
| 3SR | RNA | | ✓ | | ✓ | ✓ | ✓ | | ✓ |

[Lin Decl. Exh. 4 ('478 September 5, 1995 Amendment and Response) at p. 8.]

Like other denaturing methods, formamide may be used to efficiently undergo multiple rounds of amplification, but importantly, it is not a component of the system that actually does the copying of DNA strands. ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████    [Lin Decl. Exh. 2 (8/3/2012 Barron Report) at ¶ 60-61.]  This issue is also addressed in further detail in the declaration of Dr. Edwards, submitted herewith. [12/21/2012 Edwards Decl. at ¶ 19-25.]

Illumina's primary argument for characterizing formamide as a part of the amplification system is that amplification would not occur without the use of a denaturing method to separate the double strands into single strands.  But the same is true for PCR; without heat to denature the double strands, the components of the PCR amplification system cannot act to amplify the DNA, and yet, the reagents of PCR are universally recognized as an amplification system.  [*Id.* ¶¶ 21-22.]  The Chetverin patents also refer to the PCR reagents as an "amplification system" even where heat is not present and thus amplification cannot occur.  [*See, e.g.* Lin Decl. Exh. 3 ('478 patent) at 11:18-22.]

A major flaw in Illumina's argument is that amplification cannot actually occur in the presence of formamide.   The court construed "amplification system" to mean "a set of components that can ***together*** amplify a nucleic acid."  [Claim Construction Order (Doc. No. 132) at 6 (emphasis added).]  But Illumina concedes that formamide is incompatible with the rest of

6

1    the system, particularly the polymerase.  *See* Opening Br. (Doc. No. 320-1) at 7 (citing Weinstock

2    Report at ¶¶ 90-92) ("the polymerase would not work in formamide's presence.").  Because

3    polymerase and the other components of the amplification system cannot perform amplification

4    in the presence of formamide, it is clear that the set of components that can *together* amplify a

5    nucleic acid must exclude formamide.

6        In sum, Illumina's experts disagree with Plaintiffs' experts on the factual question of

7    whether formamide is a component of Illumina's amplification system.  In the summary judgment

8    context, of course, the evidence must be viewed in the light most favorable to the party opposing

9    the motion, *Ethicon*, 149 F.3d at 1315, and there is more than enough evidence for a reasonable

10   jury to find that formamide is not a component of the amplification system.   Illumina's

11   downstream non-infringement arguments—that the amplification system is not "water based" or

12   "entrapped"—depend entirely on the premise that formamide is part of the amplification system.

13   Because ample evidence supports Plaintiffs' position on this disputed factual issue, Illumina's

14   motion should be denied.

15               **2.     The Amplification System in the Accused Products is "Aqueous" Even
                          if Formamide is a Component.**
16

17       Having mischaracterized formamide as a component of the amplification system, Illumina

18   then argues that its amplification system is not "aqueous" because formamide is not water based

19   and "formamide and polymerase flow through separately."  [Opening Br. (Doc. No. 320-1) at 3,

20   5-6.]  Illumina did not timely disclose this contention, and raised it for the first time in its expert's

21   rebuttal report, in an apparent effort to get around the Court's claim construction order.    [Lin

22   Decl. Exh. 1 (8/31/2012 Weinstock Report) at ¶¶ 70-72.]     But even if formamide were

23   considered part of the amplification system (and it emphatically is not), Illumina's arguments still

24   fail.

25       The dispute as to whether Illumina's amplification system is aqueous is a purely factual

26   one.  Many of the asserted claims require an aqueous liquid phase that includes an exponential

27   amplification system.  The Claim Construction Order provides that "aqueous liquid phase" means

28   "water-***based*** liquid phase."   Further, as Judge Kelly expressly explained in the Claim

     Construction Order, the term "aqueous liquid phase" does not require all components of the

1   amplification system "to be fully dissolved or even suspended in liquid." [Claim Construction
2   Order (Doc. No. 132) at 7.]

3       Illumina's brief makes no mention of the fact that this issue has already been resolved in
4   Plaintiffs' favor during the claim construction proceedings. Illumina's argument—that its
5   amplification system is not aqueous because one component of the system, formamide, is not
6   dissolved in water—(Opening Br. (Doc. No. 320-1) at 3) was flatly rejected by the Court.
7   Moreover, Illumina's own expert recognizes that Illumina's amplification mix is aqueous, and
8   that the actual copying of DNA in Illumina's system occurs in an aqueous liquid phase. [*See* Lin
9   Decl. Exh. 5 (9/26/2012 Weinstock Deposition Tr.) at 184:6-14; *see also* Lin Decl. Exh. 2
10  (8/3/2012 Barron Report) at ¶ 121.] The amplification system is thus aqueous, even if formamide
11  is considered one component of the system that is not dissolved in water. At minimum, however,
12  a factual dispute exists as to whether an amplification system containing formamide is "aqueous"
13  under the Court's claim construction.

14          **C.    Illumina's Argument that the Amplification System is not "Entrapped" is**
15          **Based on a Claim Construction the Court Rejected.**

16      The asserted claims recite a solid matrix "entrapping" a water-based phase that contains
17  an amplification system. Illumina argues that it does not meet this claim limitation because
18  components of its amplification system are "staged and free-flowing." [Opening Br. (Doc. No.
19  320-1) at 7.] Illumina's argument with respect to components being "free flowing" is easily
20  disposed of because the Court rejected this precise argument during the claim construction phase.
21  One of the most vigorously disputed claim construction issues was whether some components of
22  the amplification system could flow through the matrix, as Plaintiffs contended, or whether all
23  components must be immobilized, as Illumina argued. [Claim Construction Order (Doc. No.
24  132) at 9-13.] Illumina's position was rejected by the Court, which held that "the invention
25  encompasses a system in which individual components of an amplification system can be
26  transported in and out of the matrix, e.g., by a mobile liquid, so long as the set of components that
27  together can amplify a nucleic acid remains entrapped." *Id.* at 13 (emphasis in original). Illumina
28  now makes a second attempt to argue this dispute it previously lost.

1    The Court's construction was based in part on statements in the prosecution history

2  explaining that although the aqueous liquid phase (and thereby the full amplification system) is

3  completely entrapped by the solid matrix, "individual components, e.g. nucleotides, need not be

4  completely entrapped in the matrix."  [Lin Decl. Exh. 6 ('478 File History December 23, 1994

5  Amendment) at 28 (emphasis added).]   As the Court stated, "These words I believe establish that

6  the invention encompasses a system in which individual components of an amplification system

7  can be transported in and out of the matrix, e.g., by a mobile liquid, so long as the set of

8  components that together can amplify a nucleic acid remains entrapped."  [Claim Construction

9  Order  (Doc. No. 132) at 13 (emphasis in original).]

10    Illumina's argument that it does not meet the entrapped limitation because certain

11  components of the amplification system purportedly "flow through" is inconsistent with the

12  Claim Construction Order.   That Order, issued after lengthy and detailed claim construction

13  proceedings, briefing, and oral argument, makes clear that it is entirely permissible for some

14  components to flow through the matrix.   Moreover, the Claim Construction Order is correct.  As

15  just one relevant example, the Chetverin patent specification describes an embodiment of the

16  invention whereby components of the amplification system flow through a column.  [Lin Decl.

17  Exh. 3 ('478 patent) at 10:11-42. ("A higher yield of the reaction can be obtained by packing the

18  capsules in a column and continuously washing them with a fresh substrate solution.")]

19  Illumina's interpretation would read this embodiment completely out of the scope of all of the

20  claims, which is of course strongly disfavored.  *See, e.g.*, *Verizon Servs. Corp. v. Vonage*

21  *Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007); *Invitrogen Corp. v. Biocrest Mfg., L.P.*,

22  327 F.3d 1364, 1369 (Fed. Cir. 2003).

23    With respect to the second part of Illumina's argument, that the components are not

24  "entrapped" because they are "staged," this is based solely on the contention that formamide is

25  flowed in at certain times and then "flushed" out of the flow cell before other components are

26  introduced.  [Opening Br. (Doc. No. 320-1) at 7; *see also* Lin Decl. Exh. 1 (8/31/2012 Weinstock

27  Report) at ¶ 73.]  This argument thus depends on first determining that formamide is a component

28

1   of the "amplification system."   For the reasons stated above, this argument is incorrect and

2   subject to direct factual disputes.

3        Plaintiff's expert, Dr. Barron, has stated that all of the components of Illumina's

4   amplification system are entrapped.  [Lin Decl. Exh. 2 (8/3/2012 Barron Report) at ¶ 138.]  Dr.

5   Barron has faithfully followed the Court's claim construction and is thus applying the correct

6   interpretation of the claims.  To the extent Illumina disagrees with Plaintiff's as to whether the

7   whether the components of Illumina's amplification system are kept within limited zones, this

8   only serves to create a factual dispute that precludes summary judgment.

9        **D.     Illumina's Systems Perform Exponential Amplification**

10       During the claim construction phase of this case, Illumina abandoned its initial request to

11  have the term construed by the Court.  And yet now, it is motion, Illumina seeks to improperly

12  narrow the scope of the asserted claims by  introducing a new claim construction that departs

13  from the plain and ordinary meaning of the term.  During the claim construction phase, Illumina's

14  proposed the following construction for "exponential amplification":  "a reaction wherein the

15  products of a round of amplification serve as templates, along with the original templates, in the

16  next round of amplification."  [Lin Decl. Exh. 7 (4/22/2010 Illumina Proposed Constructions).]

17  Plaintiffs' position was that no construction was necessary, but in the alternative, Plaintiffs

18  proposed a definition of "exponential amplification that was identical in substance to Illumina's

19  proposed construction: "amplification of nucleic acids in which an amplification product serves

20  as a template for one or more subsequent rounds of amplification."  [Lin Decl. Exh. 8 (Plaintiffs'

21  Proposed Constructions).]    Ultimately, Illumina conceded that the term did not require

22  construction; it should not be allowed to suggest otherwise at this late stage.

23       **1.     The Scientific Community Defines "Exponential Nucleic Acid**
                   **Amplification" As Amplification Where The Copied Product Can**
24                 **Serve As A Template For The Next Round Of Amplification**

25       As Plaintiffs' expert, Dr. Barron, explained, the term "exponential amplification" has a

26  plain and ordinary meaning in the field:  "in contrast to linear amplification, exponential

27  amplification is understood to refer to systems in which the newly synthesized copies can

28  themselves serve as templates for subsequent reactions."  [Lin Decl. Exh. 2 (8/3/2012 Barron

10

1   Report) at ¶ 63.]  Dr. Barron's opinion is consistent with the specification, which draws a clear

2   distinction between two types of amplification systems—linear and exponential.  [Lin Decl. Exh.

3   3 ('478 patent) at col.1:16-21.]   The specification also describes exponential amplification

4   reactions in terms of the amplification products acting as templates for subsequent rounds of

5   copying.  For example, in the context of  PCR, the specification states:  "the templates and

6   product strands have to be melted apart at elevated temperature . . . where each strand anneals

7   with one of the primers and serves as the template for additional replication.  The process is

8   repeated many times . . . resulting in an exponential amplification of the target region."  [*See Id.*

9   at col.2:8-15.]

10        Plaintiff's position  is also consistent with other experts in the field.   For example, in the

11   October 7, 2011 technology tutorial before the Court, Dr. Jeremy Edwards, a professor in

12   Microbiology at the University of New Mexico, explained that amplification is exponential when

13   each copied strand becomes a "template[] for the next round of the amplification."  [Lin Decl.

14   Exh. 9 (10/7/2011 Tutorial Tr.) at 19:13-21; 12/21/2012 Edwards Decl. ¶¶ 26-32.]   Illumina's

15   expert, Dr. Kevin Backman, has also characterized exponential amplification as "amplification in

16   which the products of one cycle are templates in the subsequent cycle leading ideally to

17   doubling." [Lin Decl. 10 (9/21/2012 Backman Deposition Tr.) at 26:9-22.]

18        There is no dispute that Illumina's systems perform "exponential amplification" under the

19   plain and ordinary meaning of the term.  Dr. Boutell, a scientist involved in the development of

20   Illumina's systems, admitted as much (Lin Decl. Exh. 11 (10/27/2010 Boutell Deposition Tr.) at

21   60:2-5):

22              Q.      Can the copies in Illumina's system serve as
                        templates for later rounds of amplification?

23              A.      Yes, they can.

24   Illumina now attempts to avoid infringement by arguing that the term "exponential amplification"

25   should ***not*** be given its ordinary meaning in the field, as understood by experts in the field.  This

26   untimely attempt to narrow the scope of the asserted claims is improper and should be rejected

27   out of hand.

28

11-cv-00703-CAB (DHB)

**2.      Illumina Seeks to Rewrite the Claim Language to Require Doubling and Equal Probability of Serving as a Template**

Illumina seeks to rewrite the asserted claims by introducing two requirements: (1) that the number of copies doubles after each cycle; and (2) that the templates and amplification products serve as "equally effective" templates for copying (i.e., they have the same probability of being replicated).  Put simply, there is no rational, scientific, or legal basis for rewriting the claims in this manner.

**(a)      "Exponential Amplification" Does Not Require Doubling**

Illumina argues that the accused systems do not perform exponential amplification because the number of copies generated is less than one would expect from doubling at each cycle.  [Opening Br. (Doc. No. 320-1) at 14.]  This overly simplistic analysis is incorrect.  In fact, Illumina's unfounded assumption that exponential amplification requires doubling the number of copies in each cycle conflicts with the testimony of its own experts.  For example, Dr. Backman opined that doubling never actually occurs in the real world:

> Q.   Now, when we are looking at an exponential amplification process, is there a perfect doubling from one cycle to the next?
>
>  MR. IZRAELEWICZ: Objection.
>
> A.   In the -- in the real world, nothing is ever perfect.  So doubling is -- is a theoretical maximum.

[Lin Decl. Exh. 10 (9/21/2012 Backman Deposition Tr.) at 27:2-8.]  Illumina's motion ignores this testimony.

Importantly, the same practical limitations that prevent ideal doubling in Illumina's system apply to ordinary PCR amplifications, and it is undisputed that PCR results in exponential amplification.  Illumina's expert, Dr. Backman explained at his deposition that during PCR, there is a point where the number of new copies of DNA levels off.  [*Id.* at 34:2-35:18.]  He testified: As "the concentrations of those starting reagents fall, then the efficiency of synthesis drops and, of course, if they become depleted, the synthesis stops altogether."  *Id*.  He further testified that in later cycles, the longer DNA molecules "crowd the priming reaction out, and the reaction slows down to a crawl."  *Id*.  Despite the crowding and reducing efficiency, however, it is beyond dispute that PCR is considered "exponential amplification."   The Chetverin Patents specifically

12

describe PCR as "resulting in an exponential amplification." [Lin Decl. Exh. 3 ('478 patent) at col.2:13-14.] And Dr. Backman conceded even this point at his deposition. [*See* Lin Decl. Exh. 10 (9/21/2012 Backman Deposition Tr.) at 27:9-13 ("Q. [C]an we agree that the most widely used exponential amplification system is PCR? A. Today, I think that's probably true. I don't have any basis other than my sense of things to go on, but I think it's probably true.").]

The only basis Illumina has for introducing a doubling requirement is a series of dictionary definitions of the mathematical term "exponential," taken out of the context of nucleic acid amplification. These isolated dictionary definitions cannot trump generally accepted principles within the field of the invention. *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) ("The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent.").

Illumina has thus presented no reliable evidence that the scientific community defines exponential nucleic acid amplification according to whether the actual yield corresponds to a doubling at each round. Indeed such an interpretation is contradicted by Illumina's own expert.

**(b)    The Parties Dispute Whether Doubling In Fact Occurs in Illumina's Amplification Systems**

Even if exponential amplification were understood to require doubling of template molecules at each round, substantial evidence supports Plaintiffs' contention that this, in fact, occurs in the Illumina system. This factual dispute precludes summary judgment. According to Illumina, the physical reason why doubling does not occur in Illumina's system is that crowding occurs and "[a]s amplification continues from cycle to cycle…available primer strands become more rare." [Opening Br. (Doc. No. 320-1) at 13.] But this only addresses the system as it exists after many rounds of amplification have already occurred, and even if accepted as true, Illumina's argument does not bear on this critical issue of whether there is a doubling of the number of molecules during early rounds of amplification. On this more relevant issue, Illumina's own expert expressed uncertainty (Lin Decl. Exh. 5 (9/26/2012 Weinstock Deposition Tr.) at 177:1-21):

Q:  Now, in the Illumina system are there cycles in which the number of copies doubles?
A: Yes.
Q:  And how many cycles would you expect to meet that requirement?
A:  How many would I expect?  I don't know.  I think that the first cycle, where you go from a single template and you do a bridge amplification and now you have two templates, certainly must have doubling at that point.  Certainly by the time you are at the last cycle, 35, you are not—you haven't doubled the number of molecules that were there from cycle 34… So somewhere in there, and presumably fairly early on, the process follows something other than a doubling type of process."

In short, Illumina's own expert therefore admits that doubling occurs at least for some cycles of the amplification.  He just cannot be sure exactly when the doubling ceases to occur.

Simple arithmetic shows that doubling must occur in at least some cycles of Illumina's amplification process.  Using Illumina's own numbers, it performs 35 cycles of amplification to obtain several thousand copied molecules.[3]  In fact, Dr. Boutell testified that the number of copies generated after 35 cycles is in the order of two, three, or four thousand DNA molecules per cluster.  [Lin Decl. Exh. 11 (10/27/2010 Boutell Deposition Tr.) at 50:20-51:2.]  If only one copy were made in each cycle, the total number of molecules at the end would be 35.  The only way the Illumina process can generate a cluster of several thousand molecules is if in at least some of the early cycles of amplification.  The claims of the patent require no more than this.  And Illumina's argument to the contrary is simply an attempt to create additional claim limitations where none exist.

        (c)    **"Exponential Amplification" Does Not Require Equal Probability of Serving as a Template**

Illumina also argues  that its amplification system cannot "exponentially" amplify because "the product and the template do not both serve as equally effective templates in the next round of synthesis."  [Opening Br. (Doc. No. 320-1) at 12.]  This concept was explained by Illumina's expert, Dr. Slater as follows: "[e]xponential amplification occurs when all the molecules produced during the previous cycle can act as template for each of the next cycles with essentially the same probability of replication."  [Lin Decl. Exh. 12 (8/29/2012 Slater Report) at ¶ 185.]

---

[3] Illumina's brief refers to 1200 copies, but does not identify the source of this number.  [Opening Br. (Doc. No. 320-1) at 14.]

14

1    Illumina's argument is based solely on part of a single sentence in the specification that

2    appears in the context of describing one type of amplification system, called the VRP reaction.

3    This sentence reads:  "In VRP reaction, exponential synthesis occurs because the product and

4    template RNAs remain single-stranded during RNA synthesis, and both serve as equally effective

5    templates in the next round of synthesis."  [Lin Decl. Exh. 3 ('478 patent) at col.1:30-33.]  But

6    this language simply describes one specific type of amplification reaction; it does not purport to

7    serve as a limiting definition for the term "exponential."  Nor could it.  The specification goes on

8    to describe other exponential amplification systems, such as PCR and 3SR and describes each of

9    these exponential reactions in terms of the amplification products acting as templates for

10   subsequent rounds of copying, rather than "equally effective" templates.  *Id.* at col.2:8-15, 2:54-

11   57.

12   Moreover, according to Plaintiff's expert, Dr. Edwards, a person of ordinary skill in the

13   art would understand the discussion of VRP reactions in the Chetverin Patents, and its reference

14   to "equally effective templates" as referring to the two strands as having the same general features

15   that allow them to act as templates—namely, being single stranded and having a sequence

16   complementary to the primer sequence.  [12/21/2012 Edwards Decl. at ¶ 31.]  This statement in

17   the specification simply does not address practical limitations of crowding, primer availability, or

18   specific probabilities of acting as a template in a given reaction.  *Id.*  Here, Illumina is simply

19   attempting to narrow the claim scope without any support in the patent itself.

20   There is nothing in the specification of the Chetverin Patents to suggest that the inventors

21   were using the term exponential amplification in anything other than its usual sense and thus

22   Illumina's argument fails as a matter of law.    *Thorner v. Sony Computer Entm't Am. LLC*, 669

23   F.3d 1362, 1365 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must clearly set

24   forth a definition of the disputed claim term other than its plain and ordinary meaning…the

25   patentee must clearly express an intent to redefine the term.").  Illumina has not identified any

26   statements in the specification that clearly express intent to redefine the term, and Illumina's

27   attempt to do so now should be rejected.

28

(d)     **The Parties Dispute Whether The Product and Template Molecules Have An Equal Probability of Serving as a Template**

A significant factual dispute exists between the parties, even if one accepts Illumina's strained interpretation of "exponential amplification."  According to Plaintiff's expert, Dr. Edwards, the template and product in Illumina's products do, in fact, have a substantially equal probability of being copied at least during the early rounds of amplification.  [12/21/2012 Edwards Decl. at ¶ 30.]  According to Dr. Edwards, crowding and primer depletion would not alter the relative probabilities of serving as a template because the available molecules are in a similar physical environment in any given round of amplification.  *Id.*  Dr. Edwards further explains that even if crowding and primer depletion did alter the probabilities of replication, this would only occur in later rounds of amplification.  *Id*.  During the early rounds, however, the product and template must necessarily have equal probabilities of serving as templates in the next round.  *Id.*

Furthermore, Illumina's expert admits that the same primer depletion and crowding considerations apply during PCR.  [Lin Decl. Exh. 10 (9/21/2012 Backman Deposition Tr.) at 34:14-18, 35:16-18.]  And as explained above, there is no dispute between the parties that PCR results in exponential amplification.  *See*, *e.g.*, *id.* at 27:9-13; Lin Decl. Exh. 3 ('478 patent) at 2:13-14.

**3.     Illumina's Alternate Theory of "Geometric" Nucleic Acid Amplification Is Without Basis.**

Illumina further contends that its amplification system is neither linear nor exponential, but can instead be described as a third type of amplification system, termed "geometric" by Illumina's expert, Dr. Slater.  Plaintiffs vigorously dispute this factual assertion.

The concept of "geometric" growth is a creation of Illumina's expert, Dr. Slater.  The term simply had no meaning to a person of ordinary skill, or anyone else for that matter, in 1992.  Dr. Slater admitted that he was not aware of any evidence of the use of the term "geometric amplification" during the relevant time period, and it was not until 2003 that his own publications introduced the concept.  [Lin Decl. Exh. 13 (9/21/2012 Slater Deposition Tr.) at 30:1-12.]  Even

16

Illumina's other expert, Dr. Backman, testified that he had never heard of geometric amplification:

> Q.   Have you ever heard of something called geometric amplification, which is neither linear nor exponential?
>
> A.   No.

[Lin Decl. Exh. 10 (9/21/2012 Backman Deposition Tr.) at 26:23-27:1.]

Illumina's argument—that its amplification system is not "exponential" because it is instead "geometric" —is based entirely on Dr. Slater's idiosyncratic wordplay and creates a factual issue that Plaintiffs strongly dispute.

### 4.   Illumina's Paired End Sequencing Relies on Exponential Amplification.

Lastly, Illumina argues that one specific sequencing process performed using the Illumina systems, termed "paired end sequencing," does not infringe even under Plaintiffs' construction of the term "exponential."[4]

The major flaw in Illumina's argument is that it ignores the fact that exponential amplification occurs earlier in Illumina's process—namely, during the cluster generation stage. [Lin Decl. Exh. 14 (8/3/2012 Barron Report Appendix C '478 claim chart) at 1; Lin Decl. Exh. 2 (8/3/2012 Barron Report at ¶ 62-64.]  Illumina does not appear to dispute that this amplification process is exponential under Plaintiffs' definition, and does not contend that there is any difference between the cluster generation process for paired end sequencing as compared to other sequencing applications.   [Lin Decl. Exh. 15 (10/31/2012 Boutell Decl.) at ¶¶ 4-8 (portion of ¶ 4 omitted by Illumina).]

Instead, Illumina argues that a second, additional, step occurs during paired end sequencing that is not exponential.   This additional step is irrelevant to the question of whether the overall process infringes.  *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1271 (Fed. Cir. 1986) ("An accused method does not avoid literally infringing a method claim having the

---

[4] Illumina's brief is not entirely clear on the point, but paired end sequencing involves doing all the normal amplification steps found in the Illumina process, then moving the device in which the amplification is carried out to a separate machine and performing one further round of amplification on that machine. Illumina's argument is that this last round of amplification does not infringe because it generates only a single set of additional copies and thus those copies do not themselves serve as templates in further cycles of amplification.

transitional phrase "which comprises" (or "comprising") simply because it employs additional steps.") (citing *AB Dick Co. v. Burroughs Corp.,* 713 F.2d 700, 703 (Fed. Cir. 1983), *cert. denied,* 464 U.S. 1042 (1984)).   Exponential amplification does occur the cluster generation step, and thus the overall process leading to paired end sequencing infringes.

Illumina cannot avoid infringement by artificially dividing its process into different segments and then arguing that one segment considered in isolation, does not meet  the elements of the patent claims.

### E. There is a Genuine Dispute of Fact Regarding The "Thickness" Limitation

Claims 1 and 2 of the '568 Patent and Claim 6 of the '698 Patent require that the solid matrix layer has a thickness of between 1 micron ($\mu$m) and 10 millimeters (mm).   Here the only dispute between the parties is how thick the polyacrylamide gel layer is in Illumina's system. This is unambiguously a dispute of fact that turns on conflicting opinions between Plaintiffs' expert and Illumina's expert. ████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████ But without even reaching Dr. Barron's opinion, the studies commissioned by Illumina before this litigation are sufficient to raise a genuine dispute of material fact.  If Illumina's own tests are accurate—and the jury is certainly within its province to conclude that they are—then Illumina meets this claim limitation.  Illumina is free to challenge its own tests at trial, but it cannot pretend that the tests do not exist in order to seek summary judgment.

18

11-cv-00703-CAB (DHB)

1    Significantly, Illumina's expert, Dr. Czymmek, does not appear to have much confidence

2    in the accuracy of the results on which Illumina relies. ████████████████████████████

3    ████████████████████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████████████████

6    ██████████████████████████████████   Such wild variation is in itself a reason to discount Dr.

7    Czymmek's opinions.

8    Illumina also challenges Dr. Barron's expert opinion that Illumina infringes the thickness

9    limitation under the doctrine of ███████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████████████████████

14   █████████████████████████   Illumina's argument that it does not infringe under the doctrine of

15   equivalents thus hinges on a purely factual dispute as to how thick the gel layer is—a dispute for

16   which Plaintiffs have extensive evidence supporting their position.

17   In the final analysis, this issue is very simple.  There is a direct factual dispute over the

18   thickness of the Illumina device, and, for this reason summary judgment cannot be granted.

19   **F.**   **Illumina's Amplification Products Migrate By Diffusion and The Pore Size is**
              **Smaller than the Migration Distance**
20

21   Illumina argues that it does not infringe the asserted claims of the '698 Patent because

22   "Illumina's amplified DNAs are anchored in place and therefore cannot 'migrate by diffusion,' as

23   required by '698, claim 1."  [Opening Br. (Doc. No. 320-1) at 4.]  Illumina first disclosed this

     non-infringement theory in its Rebuttal Expert Report of Dr. Weinstock, served on August 31,
24
     2012.  The specific claim term at issue specifies that "the average distance between the nearest
25
     solid surfaces is smaller than the distance which the synthesized nucleic acid product can migrate
26
     by diffusion during the reaction."
27
     At the claim construction stage, the Court agreed with Plaintiffs that no construction of
28
     this term was necessary and stated that the term was best understood in the context of the

19

11-cv-00703-CAB (DHB)

1    invention's goal of preventing diffusion of the amplification products to generate "distinct

2    colonies."   [Claim Construction Order (Doc. No. 132) at 19.]   Whereas the prior art

3    methodologies amplified nucleic acids in liquid so that movement was unconstrained, the

4    Chetverin invention uses a solid matrix to produce colonies.  The matrix is designed to have an

5    average distance between solid surfaces sufficiently small to trap the amplification products

6    within a confined space.  This average distance is referred to as "pore size."  *Id*.  The matrix can

7    thereby act as a brake on the spread of each colony during the reaction.  [12/21/2012 Edwards

8    Decl. at ¶ 38; 12/21/2012 Barron Decl. at ¶ 5.]

9         Illumina argues that it does not infringe because the products in Illumina's systems are

10   tethered to the matrix and thus cannot migrate by diffusion.  [Opening Br. (Doc. No. 320-1) at 4.]

11   However, migration by diffusion does occur in Illumina's system, notwithstanding the "tethering"

12   of the nucleic acids at one end.  [12/21/2012 Edwards Decl. at ¶ 40-41; 12/21/2012 Barron Decl.

13   at ¶ 7.]  DNA is a long chain, and immobilizing one end of the chain does not prevent movement

14   of the rest of the molecule.  [12/21/2012 Edwards Decl. at ¶ 40-41;  Lin Decl. Exh. 5 (9/26/2012

15   Weinstock Deposition Tr.) at 185:6-9.]  A DNA chain where **both** ends were fixed would have

16   very little if any diffusion—but the same cannot be said of a DNA chain that is only fixed at **one**

17   end.  This is because the free end is highly dynamic and constantly in motion, and this movement

18   is a diffusive process.  [12/21/2012 Edwards Decl. at ¶ 40-41; 12/21/2012 Barron Decl. at ¶ 7; Lin

19   Decl. Exh. 5 (9/26/2012 Weinstock Deposition Tr.) at 185:6-9) ("Q.  Can they move around to

20   any extent, even though one end of the nucleic acid molecule is, if you will, tethered?  A.  The

21   other end can move, yes.").

22        Illumina's position that there can be no diffusion if one end of the DNA is fixed to the

23   matrix would also read out a preferred embodiment described in the specification.  The '698

24   Patent specifically teaches that it is advantageous to tether the nucleic acid molecules to the

25   matrix in order to "restrain diffusion," "resulting in colonies with a smaller size, sharper edges,

26   and higher concentration of nucleic acids."  [Lin Decl. Exh. 17 ('698 patent) at col. 8:4-9.]  The

27   patent thus contemplates immobilizing nucleic acids on a matrix, just as Illumina's system does.

28

1   This directly contradicts Illumina's argument that the Chetverin's invention cannot encompass

2   systems in which the nucleic acids are tethered to the matrix.

3        Illumina's amplification system relies on this random motion of the tethered DNA

4   molecules because it is only through such motion that the free end can make contact with one of

5   the nearby surface-bound primers so that it may hybridize and perform the process called "bridge

6   amplification," by which each newly synthesized strand reaches over to a nearby primer to begin

7   a new round of strand copying.   [12/21/2012 Edwards Decl. at ¶ 40-41.]   As a result of this

8   process, the clusters start as a single template and grow both in number and in lateral distance

9   from the original template over the course of the amplification.

10        Illumina's motion improperly focuses on individual molecules rather than the cluster as a

11   whole.  This is incorrect because the '698 patent claims refer to "separate, detectable colonies of

12   the synthesized nucleic acid product" [Lin Decl. Exh. 7 ('698 patent) claim 1], making clear the

13   "product" is an entire colony, Further, as Dr. Edwards explains, a person of ordinary skill would

14   understand the claim to refer to entire clusters rather than individual molecules.  [12/21/2012

15   Edwards Decl. at ¶ 43.]  This is important because it means that the relevant comparison is

16   between the migration distance of the entire cluster or colony, and the pore size of the gel.  The

17   former can be determined from the radius of the colony because the original template will be in

18   the center and the migration distance is how far the progeny have spread from that point during

19   all amplification cycles.  [*Id.* at ¶ 45.]

20        The specification is also clear that the colony size can be used to approximate the distance

21   the synthesized nucleic acid product can migrate by diffusion during the reaction:

22            The upper limit on the pore size should be less then [sic] the
         distance at which the synthesized nucleic acids or proteins can
23            migrate by diffusion during the reaction.  For example, nucleic
         acids that are about 100 nucleotides in length diffuse at the rate of
24            approximately 1mm per hour at room temperature, judging from the
         <u>size of the colonies</u> seen in FIGS. 2A to 2C.  [Lin Decl. Exh. 17
25            ('698 patent) at 7:2-8 (emphasis added).]

26        Dr. Barron has specifically made the comparison between the migration by diffusion and

27   pore size in the Illumina system.  As set forth in her declaration submitted herewith, she has

28   calculated the diffusion from the single original template as being approximately ████

21

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████   Dr. Barron's declaration also explains how the cluster size can be larger than the pore size and that is because the clusters can grow within voids in the gel matrix while the pores are small interconnecting openings between those voids.  [*Id.* at ¶ 8.]  No more is required to show that this claim limitation is met.  And of course, to the extent Dr. Weinstock disagrees with Dr. Barron, that merely serves to create a dispute of fact, rendering summary judgment impossible.

### G.   Illumina's Systems Perform "Screening" by Detecting Nucleic Acid Sequences.

The asserted claims of the '698 Patent are directed to "a method of detecting a nucleic acid sequence in a sample." Illumina contends that it does not infringe the two asserted independent claims—claims 1 and 17—because it does not "screen" the colonies.  This argument is based on another new claim construction argument from Illumina, namely that "screening" in the '698 Patent refers to a method that determines "which DNA molecules in a collection of molecules have a particular sequence." [Opening Br. (Doc. No. 320-1) at 23.]  As with Illumina's other new claim constructions, the time for Illumina to challenge the plain and ordinary meaning of this term has passed.  This new claim interpretation is not only untimely, it is also at odds with the specification and the claim language.

Illumina attempts to erect a straw man in the guise of a false dichotomy between "detection" and "screening."  Illumina suggests that "whenever detection is used alone, it is used to mean methods that are universal to colonies" whereas "'screening' is always used in the context of methods that look for a particular sequence unique to certain colonies."  *Id.* at 23. Illumina then argues that the Illumina system detects, but does not screen, because the "process reads the entire sequence of every DNA strand."  *Id.* at 24.  Illumina's argument fails on two fronts.  First, Illumina's untimely claim construction would violate a fundamental tenant of patent

22

law—that independent claims must encompass the subject matter of dependent claims. *Alcon Research Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012). Second, even under Illumina's construction, the claim element is met because, contrary to Illumina's argument, Illumina does differentiate between clusters—Illumina screens each cluster repeatedly for the presence of an A, C, T, or G.

Illumina's claim construction position is that "screening" in claims 1 and 17 must be sequence specific and that this is different than detection. If all clusters are detected then, according to Illumina, this cannot be "screening." However, Illumina's argument ignores the claims that depend on claim 1. Claim 7, which depends on claim 1, is directed to "[t]he method of claim 1, wherein said step of screening comprises visualizing detectable colonies with an **intercalating dye**." [Lin Decl. Exh. 17 ('698 patent) Claim 7 (emphasis added).] The use of intercalating dyes is not sequence specific and is expressly recognized in the specification as a method of detection. [*See e.g ,id.* at col. 13:18-20 ("After incubation, nucleic acid colonies can be detected by a variety of methods, for example, by staining the layer with **intercalating dyes**.") (emphasis added).] The Specification makes clear that "carrying a particular nucleic acid sequence" is only one means of screening. [*See e.g., id* at col. 13:27-28 ("Colonies can be screened for possessing a particular trait, **such as** carrying a particular nucleic acid sequence.") (emphasis added).] Thus, while the patent includes types of screening that identify unique characteristics, the patent does not limit screening to only those embodiments and includes non-specific screening.



11-cv-00703-CAB (DHB)

1

2

3

4

5

6

7

8        In short, Illumina's arguments on this issue are contrary to the clear disclosure of the '698

9   patent, the claims of the '698 patent, and unavailing even under Illumina's proffered construction.

10   Illumina's arguments in this regard should be rejected.

11   **IV.    CONCLUSION**

12        Illumina's motion for summary judgment of non-infringement is based on numerous

13   disputed factual issues and improper attempts at claim construction arguments that are at odds

14   with the claim language, specification, and the Claim Construction Order.  Illumina has not met

15   its burden of demonstrating the absence of a genuine issue of material fact as to any of the

16   disputed claim limitations and its motion should be denied.

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated:  December 21, 2012                Respectfully Submitted,

2

3                                            By:   /s/ Jenny C. Wu
4                                            Jenny C. Wu

5                                            Bradford Paul Schmidt
                                             LIFE TECHNOLOGIES CORPORATION
6                                            5791 Van Allen Way
7                                            Carlsbad, CA 92008
                                             Telephone:  (760) 603-7200
8
                                             Nicholas Groombridge (*pro hac vice*)
9                                            Catherine Nyarady (*pro hac vice*)
                                             Peter Sandel (*pro hac vice*)
10                                           Jenny C. Wu (*pro hac vice*)
                                             Rebecca Fett (*pro hac vice*)
11                                           Robert Lin (*pro hac vice*)
12                                           PAUL, WEISS, RIFKIND, WHARTON &
                                             GARRISON LLP
13                                           1285 Avenue of Americas
                                             New York, NY 10019
14                                           Telephone: (212) 373-3000

15                                           Matthew D. Murphey
16                                           TROUTMAN SANDERS LLP
                                             11682 El Camino Real, Suite 400
17                                           San Diego, CA  92130
                                             Telephone:     (858) 509-6000
18
                                             *Attorneys for Plaintiffs*
19                                           LIFE TECHNOLOGIES CORPORATION,
20                                           APPLIED BIOSYSTEMS, LLC, INSTITUTE FOR
                                             PROTEIN RESEARCH, ALEXANDER
21                                           CHETVERIN, HELENA CHETVERINA, and
                                             WILLIAM HONE
22

23

24

25

26

27

28

                                             25

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that, on December 21, 2012, a true and correct copy of the document entitled:

3      **[REDACTED] MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
       **TO  ILLUMINA'S MOTION FOR SUMMARY JUDGMENT OF NON-**
4      **INFRINGEMENT**

5      was transmitted to the parties and counsel of record listed below via the Court's CM-ECF system

6      as a result of the electronic filing of these documents.

7             I also certify that true and correct copies of the following sealed lodged proposed

8      documents entitled:

9      **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
       **ILLUMINA'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**
10     **[FILED UNDER SEAL]**

11

| | |
|---|---|
| Bradford P. Schmidt<br>LIFE TECHNOLOGIES CORPORATION<br>5791 Van Allen Way<br>Carlsbad, CA 92008<br>Telephone:  (760) 603-7200<br>Email:<br>bradford.schmidt@lifetech.com | *Attorneys for Plaintiffs*<br>LIFE TECHNOLOGIES<br>CORPORATION, APPLIED<br>BIOSYSTEMS, LLC, INSTITUTE<br>FOR PROTEIN RESEARCH,<br>ALEXANDER CHETVERIN,<br>HELENA CHETVERINA, and<br>WILLIAM HONE |
| Nicholas Groombridge  (*pro hac vice*)<br>Catherine Nyarady  (*pro hac vice*)<br>Peter Sandel  (*pro hac vice*)<br>Rebecca Fett (*pro hac vice*)<br>Jenny C. Wu  (*pro hac vice*)<br>Robert Lin (*pro hac vice*)<br>Catherine Nyarady (*pro hac vice*)<br>PAUL, WEISS, RIFKIND, WHARTON &<br>GARRISON LLP<br>1285 Avenue Of Americas<br>New York, NY 10019<br>Telephone:  (212) 373-3000<br>Email:<br>ngroombridge@paulweiss.com<br>psandel@paulweiss.com<br>rfett@paulweiss.com<br>jcwu@paulweiss.com<br>rlin@paulweiss.com | *Attorneys for Plaintiffs*<br>LIFE TECHNOLOGIES<br>CORPORATION, APPLIED<br>BIOSYSTEMS, LLC, INSTITUTE<br>FOR PROTEIN RESEARCH,<br>ALEXANDER CHETVERIN,<br>HELENA CHETVERINA, and<br>WILLIAM HONE |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

| | |
|---|---|
| Matthew D. Murphey<br>TROUTMAN SANDERS LLP<br>11682 El Camino Real, Suite 400<br>San Diego, CA 92130<br>Telephone:  (858) 509-6000<br>Email:<br>matt.murphey@troutmansanders.com | *Attorneys for Plaintiffs*<br>LIFE TECHNOLOGIES<br>CORPORATION, APPLIED<br>BIOSYSTEMS, LLC, INSTITUTE<br>FOR PROTEIN RESEARCH,<br>ALEXANDER CHETVERIN,<br>HELENA CHETVERINA, and<br>WILLIAM HONE |
| E. Joseph Connaughton<br>PAUL, PLEVIN, SULLIVAN & CONNAUGHTON<br>LLP<br>101 Broadway, Ninth Floor<br>San Diego, CA 94304<br>Telephone:  (619) 744-3645<br>Email:<br>connaughton@paulplevin.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |
| Mark H. Izraelewicz *(pro hac vice)*<br>Kevin M. Flowers *(pro hac vice)*<br>Matthew C. Nielsen *(pro hac vice)*<br>Cullen N. Pendleton *(pro hac vice)*<br>John R. Labbe *(pro hac vice)*<br>MARSHALL, GERSTEIN & BORUN LLP<br>233 South Wacker Drive<br>6300 Willis Tower<br>Chicago, IL 60606<br>Telephone:  (312) 474-6300<br>Email:<br>mizraelewicz@marshallip.com<br>kflowers@marshallip.com<br>mnielsen@marshallip.com<br>cpendleton@marshallip.com<br>jlabbe@marshallip.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |
| Ronald M. Wawrzyn *(pro hac vice)*<br>Matthew M. Wawrzyn *(pro hac vice)*<br>WAWRZYN LLC<br>233 South Wacker Drive, 84th Floor, Willis Tower<br>Chicago, IL 60606<br>Telephone:  (312) 283-8330<br>Email:<br>matt@wawrzynlaw.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |
| Jeffrey N. Costakos *(pro hac vice)*<br>Rebecca J. Pirozzolo-Mellowes *(pro hac vice)*<br>FOLEY & LARDNER, LLP<br>777 East Wisconsin Avenue<br>Milwaukee, WI 53202<br>Telephone:  (414) 297-5717<br>Email:<br>jcostakos@foley.com<br>jpirozzolo-mellowes@foley.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA INC. and SOLEXA, INC. |

2

| | |
|---|---|
| Steven J. Balick<br>Andrew Dieter Cordo<br>Lauren E. Maguire<br>Tiffany Geyer Lydon<br>ASHBY & GEDDES<br>500 Delaware Avenue, 8th Floor<br>PO Box 1150<br>Wilmington, DE  19899<br>Telephone:  (302) 654-1888<br>Email:<br>sbalick@ashby-geddes.com<br>acordo@ashby-geddes.com<br>lmaguire@ashby-geddes.com<br>tlydon@ashby-geddes.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |

I declare under penalty of perjury under the laws of the State of California and the United States of America, that the above is true and correct, and that I executed this Certificate of Service on December 21, 2012 at New York, New York.

*s/ Jenny C. Wu*
Jenny C. Wu
E-mail:  JCWu@paulweiss.com

3