MATTHEW D. MURPHEY (SBN 194111)
TROUTMAN SANDERS LLP
11682 El Camino Real, Suite 400
San Diego, CA 92130
Telephone: (858) 509-6000

BRADFORD PAUL SCHMIDT (SBN 174440)
LIFE TECHNOLOGIES CORPORATION
5791 Van Allen Way
Carlsbad, CA 92008
Telephone: (760) 603-7200

NICHOLAS GROOMBRIDGE (*pro hac vice*)
CATHERINE NYARADY (*pro hac vice*)
PETER SANDEL (*pro hac vice*)
JENNY C. WU (*pro hac vice*)
REBECCA FETT (*pro hac vice*)
ROBERT LIN (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of Americas
New York, NY 10019
Telephone: (212) 373-3000

Attorneys for Plaintiffs/Counterclaim Defendants
LIFE TECHNOLOGIES CORPORATION,
APPLIED BIOSYSTEMS, LLC, INSTITUTE
FOR PROTEIN RESEARCH, ALEXANDER
CHETVERIN, HELENA CHETVERINA, and
WILLIAM HONE

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFE TECHNOLOGIES CORPORATION, APPLIED BIOSYSTEMS, LLC, INSTITUTE FOR PROTEIN RESEARCH, ALEXANDER CHETVERIN, HELENA CHETVERINA, and WILLIAM HONE, <br><br> Plaintiffs/Counterclaim Defendants, <br><br> v. <br><br> ILLUMINA, INC. and SOLEXA, INC., <br><br> Defendants/Counterclaim Plaintiffs. | Case No. 3:11-cv-00703-CAB (DHB) <br><br> **[REDACTED] PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF LIFE TECHNOLOGIES CORPORATOIN FOR LACK OF STANDING AND MOTION FOR SUMMARY JUDGMENT OF NO LOST PROFITS** <br><br> **[FILED UNDER SEAL]** <br><br> Date: January 17, 2012 <br> Time: 2:30 p.m. <br> Courtroom: 2 <br> Judge: Hon. Cathy Ann Bencivengo |

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION...................................................................................................... 1

II.   BACKGROUND ...................................................................................................... 2

III.  LEGAL STANDARDS............................................................................................ 4

    A.    Summary Judgment........................................................................................ 4

    B.    Lost Profits .................................................................................................... 4

IV.   ARGUMENT ........................................................................................................... 5

    A.    Life Has Standing As A Plaintiff In This Case Based On Both Its Legal
        And Equitable Interest In The Chetverin Patents......................................... 5

    B.    Plaintiffs Are Entitled To Recover Lost Profits For Their Damages
        Suffered By Illumina's Infringement ........................................................... 7

    C.    The Law Is Clear That Lost Profits May Be Sought For Products That
        Would More Fully Compensate Plaintiffs Than Reasonable Royalty.................. 21

V.    CONCLUSION ...................................................................................................... 22

1

## Table of Authorities

2
Page(s)

3 **CASES**

4 *Arachnid, Inc. v. Merit Indus., Inc.,*
   939 F.2d 1574 (Fed. Cir. 1991)..................................................................... 9
5
   *Celotex Corp. v. Catrett,*
6    477 U.S. 317 (1986)............................................................................... 7, 10

7 *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.,*
   246 F.3d 1336 (Fed. Cir. 2001).......................................................... 8, 24, 25
8
   *Daubert v. Merrell Dow Pharm., Inc.,*
9    506 U.S. 579 (1993)................................................................................... 23

10 *Del Mar Avionics, Inc. v. Quinton Instrument Co.,*
    836 F.2d 1320 (Fed. Cir. 1987)..................................................................... 7
11
   *Ethicon EndoSurgery, Inc. v. U.S. Surgical Corp.,*
12   149 F.3d 1309 (Fed. Cir. 1998)..................................................................... 7

13 *Fonar v. Gen. Elec. Co.,*
    107 F.3d 1543 (Fed. Cir. 1997)................................................................... 22
14
   *Golden Blount, Inc. v. Robert H. Peterson Co.,*
15   438 F.3d 1354 (Fed. Cir. 2006)................................................................... 12

16 *Gray v. U.S.,*
    Civil No. 05cv1893, 2007 WL 4644736 (S.D. Cal. Mar. 12, 2007).................... 22
17
   *Gyromat Corp. v. Champion Spark Plug Co.,*
18   735 F.2d 549 (Fed. Cir. 1984)..................................................................... 22

19 *Kaufman Co., Inc. v. Lantech, Inc.,*
    926 F.2d 1136 (Fed. Cir. 1991)......................................................... 7, 12, 18
20
   *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,*
21   761 F.2d 649 (Fed. Cir. 1985)....................................................................... 7

22 *Lam, Inc. v. Johns-Manville Corp.,*
    718 F.2d 1056 (Fed. Cir. 1983)................................................................... 12
23
   *Mars, Inc. v. Coin Acceptors, Inc.,*
24   527 F.3d 1359 (Fed. Cir. 2008)................................................................... 11

25 *Micro Chem., Inc. v. Lextron, Inc.,*
    318 F.3d 119 (Fed. Cir. 2003)..................................................................... 19
26
   *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,*
27   575 F.2d 1152 (6th Cir. 1978)....................................................................... 8

28 *Pipe Liners, Inc. v. Am. Pipe & Plastics, Inc.,*
    893 F. Supp. 704 (S.D. Tex. 1995) ............................................................... 9

11-cv-00703-CAB (DHB)

*Rite-Hite Corp. v. Kelley Co., Inc.*,
   56 F.3d 1538 (Fed. Cir. 1995) ........................................................................................ 25

*Schumer v. Lab. Computer Sys.*,
   308 F.3d 1304 (Fed. Cir. 2002) ....................................................................................... 7

*Siemens Med. Sol'ns USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
   637 F.3d 1269, 1287-88 (Fed. Cir. 2011) ............................................................ 17, 20, 24

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
   883 F.2d 1573 (Fed. Cir. 1989) ................................................................................... 8, 24

*Steelcase, Inc. v. Smart Techs., Inc.*,
   336 F. Supp. 2d 714 (W.D. Mich. 2004) ........................................................................ 9

*U.S. v. Stone*,
   222 F.R.D. 334 (E.D. Tenn. July 8, 2004) ..................................................................... 22

*W.R. Grace & Co.-Conn. v. Intercat, Inc.*,
   60 F. Supp. 2d 316 (D. Del. 1999) ............................................................................ 21, 24

*WiAV Solutions LLC v. Motorola, Inc.*,
   631 F.3d 1257 (Fed. Cir. 2010) ...................................................................................... 9

**STATUTES**

35 U.S.C. § 284 ................................................................................................... 8, 24, 25

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) ............................................................................................................ 7

Fed. R. Evid. 703 ........................................................................................................ 21, 22

## I.   INTRODUCTION

Life Technologies Corporation ("Life"), Applied Biosystems, LLC ("AB"), William Hone, Helena Chetverina, and Alexander Chetverin (collectively with Life and AB, "Plaintiffs") submit this memorandum of points and authorities in opposition to the motion of Illumina, Inc. and Solexa, Inc. (collectively, "Illumina") to dismiss Life as a plaintiff and for lack of standing and summary judgment of no lost profits.

As an initial matter, and as will be detailed below, Life is properly a party to this case, as it has both a legal interest and an equitable interest in the patents, which entitles it to seek both monetary damages and injunctive relief against continuing infringement.  In a sharply contested case such as this between direct competitors, there can hardly be any doubt that an overall parent company has a compelling interest in the outcome.   However, as a practical matter, it is unclear why Illumina cares whether Life remains a party to this case.  Whether Life is a named plaintiff or not, the relief sought by Plaintiffs against Illumina will be exactly the same because all of the necessary parties have been properly joined in this suit.

Illumina also argues that AB is not entitled to recover lost profits by questioning whether AB "is in the business of selling DNA sequencing products." [Opening Br. (Doc. No. 329-1) at 9.]  Again, Illumina's assertion is wrong.  As shown for example by sales invoices provided in discovery, AB does indeed sell sequencing products.  Moreover, even if some sales of products at issue are made by AB's wholly-owned subsidiaries, the law allows AB as the parent to collect on those profits as well.

Turning to Illumina's request for summary judgment of no lost profits, all of the core factual issues are directly in dispute.  First, whether the market for the relevant technology consisted of only two players or more than two players is by definition a question of fact. Illumina argues that in addition to itself and Life,[1] a third company now referred to as Roche (but formerly known as 454) was also in competition.  But Illumina's own documents and the testimony of its own witnesses establish that the Roche technology could not in fact compete with

---

[1] Plaintiffs' damages expert, Julie Davis, referred to Life and AB interchangeably in her August 3, 2012 expert report regarding her lost profits calculation.  To avoid confusion, Plaintiffs will do the same here except where stated otherwise.

1  Illumina and Life, and that during the relevant time period, Roche had been relegated to the status

2  of a niche player unable to challenge the other two companies for the sales that are the subject of

3  the damages demand.

4  　　　Similarly, with respect to the availability of acceptable non-infringing alternatives, there is

5  a direct factual conflict between the evidence submitted by the two parties. The first purported

6  alternative to which Illumina points, the so-called "BTA" attachment chemistry, was abandoned

7  because Illumina could not get it to work properly. The second purported alternative, a

8  technology called "rolling circle amplification" or "RCA" is highly complex and, in the opinion

9  of Plaintiffs' expert Dr. Jeremy Edwards, unsuitable for use with the accused Illumina systems.

10  　　　Illumina also challenges Life's ability to manufacture sufficient products to meet demand

11  in the lost profits analysis. Here, Illumina's position is apparently based not on underlying facts

12  but on the assertion that as a matter of legal procedure Life's damages expert is not permitted to

13  rely on information she obtained in discussions with the relevant employees at Life. That is

14  simply incorrect—it is well established that experts are permitted to rely on hearsay, and indeed

15  entirely normal for damages experts to do so in opining about manufacturing capacity in the

16  context of lost profits. In any event, there is more than enough admissible evidence in the form of

17  deposition testimony for Life to carry its burden on this issue.

18  　　　Finally, Illumina contends that Life is not permitted to simultaneously seek lost profits on

19  a portion of its infringing sales and a reasonable royalty on the rest. Such blended damages

20  claims are commonplace in patent litigation, and it is unclear why Illumina would even contend

21  to the contrary. For the foregoing reasons, Illumina's motion should be denied.

22  **II.    BACKGROUND**

23  　　　Nucleic acids, such as deoxyribonucleic acid (DNA) and ribonucleic acid (RNA) are

24  molecules that contain the genetic code for all living organisms. DNA and RNA molecules are

25  composed of a sequence of subunits called nucleic acids or bases. This sequence contains the

26  information required to build all the proteins of an organism, and hence all the cells and tissues of

27  that organism. The human genome contains 3 billion base pairs or 6 billion bases.

28

1    Thus, DNA and RNA sequences represent the code for life, and are of particular interest
2    to researchers and scientists, with genetic analysis paving the way for personalized medicine.
3    However, because it is difficult and costly to detect a single nucleic acid molecule, making
4    multiple copies of the target nucleic acid molecule enables the analysis of that molecule.  This
5    process of copying a target nucleic acid molecule is often referred to as "amplifying" the nucleic
6    acid.

7    The husband-and-wife team of Dr. Alexander Chetverin and Helena Chetverina invented a
8    novel method of amplifying nucleic acids in such a way that a mix of nucleic acids may be
9    amplified as separate discrete colonies wherein each colony is a homogeneous population of a
10   single nucleic acid sequence and its copies. By creating concentrated copies of a nucleic acid
11   template, the signal to noise ratio is improved such that detecting a nucleic acid strand for
12   sequencing becomes much easier.

13   Because DNA sequences are difficult to analyze, the cost of sequencing started out as an
14   expensive endeavor.  For example, the first human genome was sequenced using first-generation
15   sequencing machines known as capillary electrophoresis ("CE") machines through the
16   government-backed Human Genome Project.  [Lin Decl. Exh. 1 (8/3/2012 Davis Report) at 10.]
17   That effort carried a price tag of $300 million in 2003, requiring 13 years of work by an
18   international consortium of laboratories.  *Id*.  AB was the primary supplier for the CE machines
19   used to complete the Human Genome Project.

20   The newer sequencing technology at issue in this matter is referred to as next-generation
21   sequencing ("NGS").  The major advances offered by NGS are the ability to produce an
22   enormous volume of data quickly (i.e., high throughput) and inexpensively (*i.e.,* at a low cost per
23   data run).  In contrast to the cost to sequence a human genome using first-generation CE
24   technology, the goal of NGS technology is to sequence a human genome for $1,000.  This is
25   known as the race for the $1,000 genome.  NGS relies "on a combination of template preparation,
26   sequencing and imaging, and genome alignment and assembly methods" or a workflow of sample
27   prep, amplification, and sequencing.  Although individual components may be sold by
28   themselves, NGS systems require the components that perform all steps of the workflow in order

1  to function.  Today, commercially available NGS technology can sequence a human genome for

2  approximately $10,000.

3  **III.    LEGAL STANDARDS**

4  **A.  Summary Judgment**

5  The summary judgment standard is well known and non-controversial.  Summary

6  judgment is appropriate when the record demonstrates that there is no genuine issue of material

7  fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving

8  party, here Illumina, bears the burden of establishing the absence of a genuine issue of material

9  fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  In this context, the  Federal

10  Circuit has made clear that "the evidence [must be viewed] in a light most favorable to  the party

11  opposing the motion with doubts resolved in favor of the opponent."  *Ethicon EndoSurgery, Inc.*

12  *v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998); *see also Schumer v. Lab. Computer*

13  *Sys.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002) ("On summary judgment, all justifiable inferences are

14  made in favor of the nonmovant.").

15  **B.  Lost Profits**

16  Plaintiffs in a patent infringement action may recover profits that they lost as a result of

17  the defendants' infringement when it is proven that, "but for" the infringement, the plaintiffs

18  would have made sales that the defendants made.  *See Del Mar Avionics, Inc. v. Quinton*

19  *Instrument Co.*, 836 F.2d 1320, 1326 (Fed. Cir. 1987).  This inquiry is based on the objective

20  standard of "reasonable probability."  *Kaufman Co.., Inc. v. Lantech, Inc.*, 926 F.2d 1136, 1141

21  (Fed. Cir. 1991).  That is, "[a] patentee need not negate every possibility that the purchaser might

22  not have bought another product other than his absent the infringement.  Instead, the patentee

23  need only show that there was a reasonable probability that the sales would have been made 'but

24  for' the infringement."  *Id.*  Once the patentee establishes the reasonableness of the inference, the

25  patentee has sustained its burden of proof.  *Id.* at 1141-42.  As explained by the Federal Circuit,

26  "Fundamental principles of justice require us to throw any risk of uncertainty upon the wrongdoer

27  rather than upon the injured party."  *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761

28  F.2d 649, 655 (Fed. Cir. 1985) (internal citations omitted), *cert. denied*, 474 U.S. 902 (1985).

The so-called *Panduit* factors refer to a four-factor test for proving lost profits.  *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir. 1978).  The four factors are:  (1) demand for the patented product; (2) the absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capacity to exploit the demand; and (4) the amount of profit the patentee would have made.

When lost profits are not available or cannot be shown, the Patent Act makes clear that a patentee is still entitled to claim damages adequate to compensate for infringement, "but in no event less than a reasonable royalty." 35 U.S.C. § 284.   In other words, "a reasonable royalty for each infringing device . . . is the minimum measure of damages."  *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001) (emphasis added). Thus, "the award may be split between lost profits as actual damages to the extent they are proven and a reasonable royalty for the remainder."  *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989).

## IV.   ARGUMENT

### A. Life Has Standing As A Plaintiff In This Case Based On Both Its Legal And Equitable Interest In The Chetverin Patents[2]

Illumina contends that Life should be dismissed from this case because it is neither an owner of, nor an exclusive licensee to, the Chetverin Patents.  Illumina is incorrect.

Life has legal standing to enforce the Chetverin Patents and sue for damages resulting from Illumina's infringement.  Under the terms of the agreement licensing the Chetverin Patents to Agencourt (AB's predecessor), Life as the parent of its wholly-owned subsidiary AB is defined as an Affiliate of AB and can thus exercise certain rights on behalf of AB as the exclusive licensee.  [*See* Lin Decl. Exh. 2 (Chetverin Patents License) at CHET00015906 ("'Affiliate' shall mean any legal entity . . . that . . . controls AGENCOURT."); *see also e.g.*, Life Technologies Corporation 10-K Filing[3].]  Specifically, this license agreement also contains a grant clause in Paragraph 2.2, wherein Affiliates of AB, such as Life, have rights to practice the inventions as enumerated in Paragraph 2.1.  [*See* Lin Decl. Exh. 2 (Chetverin Patents License) at

---

[2] References to "Life" in Section IV.A of this brief refer only to Life Technologies Corporation.
[3] http://www.sec.gov/Archives/edgar/data/1073431/000093639209000101/a51607e10vk.htm

1    CHET00015910 ("2.2. AGENCOURT may exercise the rights granted under Section 2.1 through

2    its Affiliates for so long as they remain Affiliates of AGENCOURT and AGENCOURT reports

3    and pays under this Agreement on their behalf.").]  Through this provision, Life acts an extension

4    of AB in exercising the exclusive rights of AB, and any of Life's lost sales due to Illumina's

5    infringement are essentially AB's lost sales.  It is well-settled that an exclusive licensee has

6    standing to sue for infringement.  *See WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257 (Fed.

7    Cir. 2010) (holding that exclusive licensee had standing to sue).  Here, by the express terms of the

8    agreement, the exclusive licensee is AB, either acting alone or through its designated Affiliate,

9    Life.

10         Further, Paragraph 7.1 of the license to the Chetverin Patents provides that Agencourt

11   (AB's predecessor) has the right to enforce against "third parties infringing Agencourt's exclusive

12   rights under this agreement."    [*See* Lin Decl. Exh. 2 (Chetverin Patents License) at

13   CHET00015915.]  Thus, AB is entitled to protect its exclusive rights, including those exclusive

14   rights that are exercised on AB's behalf by an Affiliate such as Life under Paragraph 2.2.

15         Additionally, Life has an equitable interest in the patents.  Based on this equitable interest,

16   Life has standing to sue at least for equitable relief such as the injunction being sought against

17   Illumina for its continued infringement of the Chetverin Patents.   The Federal Circuit has

18   recognized that such an equitable interest may lend standing to a party seeking an equitable

19   remedy for the harm it has suffered from another's infringement.  *See, e.g., Arachnid, Inc. v.

20   Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991) (noting that equitable title to a patent

21   may give rise to standing for seeking equitable relief); *Pipe Liners, Inc. v. Am. Pipe & Plastics,

22   Inc.*, 893 F. Supp. 704, 706 (S.D. Tex. 1995) (denying motion to dismiss parent corporation of

23   patentee subsidiary corporation in suit because parent corporation had an equitable title to the

24   patent via its ownership of the subsidiary).  *But see Steelcase, Inc. v. Smart Techs., Inc.*, 336 F.

25   Supp. 2d 714, 719 (W.D. Mich. 2004) ("[A] parent does not have equitable title in a patent solely

26   by virtue of its ownership of the subsidiary.").  More so than in *Pipe Liners*, Life has equitable

27   title to the Chetverin Patents via Life's ownership of AB and, further, by virtue of the fact that all

28

of AB's profits are automatically reported back to and recognized by Life as discussed below. Thus, Life has standing as a plaintiff.  Illumina cites no law otherwise.

**B. Plaintiffs Are Entitled To Recover Lost Profits For Their Damages Suffered By Illumina's Infringement**

In its motion for summary judgment of no lost profits, Illumina launches a series of attacks on Plaintiffs' damages evidence, including allegations that: (1) Plaintiffs have not proved that AB is the legal entity that actually sells all of the infringing systems; (2) the relevant market is larger than a two-supplier market because Roche is a viable competitor; (3) Illumina could have implemented acceptable noninfringing alternatives; and (4) Plaintiffs lack evidence regarding their capacity and costs for additional sales.  Illumina also makes a number of miscellaneous arguments that it has simply titled "additional flaws," most of which overlap with Illumina's other allegations.  Illumina's arguments are legally incorrect and/or involve areas of genuine factual dispute.  None meet the burden of establishing the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323-24.

**1. AB Can Recover Lost Profits[4]**

To start, Illumina argues that, to prove entitlement to lost profits, Plaintiffs must establish that AB is the entity that sells the systems that compete with the accused Illumina systems. [Opening Br. (Doc. No. 329-1) at 9.]  Otherwise, according to Illumina, AB is not entitled to collect lost profits on such sales, including sales made to customers outside the United States and sample prep kits purchased from AB's Affiliate, Ambion.  [*Id*. at 23-25.]  To the extent that Illumina is arguing that AB has not produced any evidence to prove that it is the entity that sells competing products, that is simply not correct.  As even Illumina admits, AB has produced sales invoices that exemplify the roles of AB and its wholly-owned subsidiaries in selling SOLiD-related products.  [Opening Br. (Doc. No. 329-1) at 9.]  Samples of sales invoices are submitted herewith.  [*See, e.g.*, Lin Decl. Exh. 4 (CHET00042054); Lin Decl. Exh. 5 (CHET01905912).]  Plaintiffs also concurrently submit a declaration from Jereme Sylvain, Senior Director of Financial Reporting at Life, to support AB's basis for recovering lost profits as discussed in further detail below:

---

[4] "AB" in Section IV.B.1 of this brief refers only to Applied Biosystems LLC.

- In general, AB sells all SOLiD-related products domestically including sample prep reagents.  [Sylvain Decl. at ¶ 4; *see, e.g.*, Lin Decl. Exh. 4 (AB invoice) at CHET00042054.]

- Ambion, a wholly-owned subsidiary of AB, also sells some sample prep reagents for the SOLiD system domestically.  [Sylvain Decl. at ¶ 4]

- In general, wholly-owned foreign subsidiaries of AB sell all SOLiD-related products to overseas customers. [Sylvain Decl. at ¶ 5; *see, e.g.*, Lin Decl. Exh. 5 (ABI invoice) at CHET01905912.]

- ████████████████████████████████████████████

There can be no dispute that AB is entitled to recover profits on the sales that it would have made itself but for Illumina's infringing activity.  The Federal Circuit has also noted that a parent corporation may recover the profits lost on sales that its wholly owned subsidiaries could have made absent an infringer's presence from the market when the subsidiaries' profits flow inexorably to the parent.  *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008); *mandate amended and recalled on other grounds by Mars, Inc. v. Coin Acceptors, Inc.*, 557 F.3d 1377 (Fed. Cir. 2009).  That is the case here. Thus, in sum, by virtue of all profits from its wholly-owned subsidiaries flowing inexorably to AB, AB is entitled to lost profits on all the SOLiD-related sales at issue in this case, including domestic and foreign sales, and for all components of the SOLiD system including sample prep reagents sold by Ambion.

### 2.  The Relevant Market Is A Two-Supplier Market

Illumina and Plaintiffs agree that Ms. Davis's opinion on lost profits is based on a theory of two-supplier market.  The dispute between the parties is an inherently factual one—that is, whether or not there are other competitors in the relevant market who would have taken sales away from Life if the infringing Illumina technology were not available.  Illumina alleges that Roche was such a competitor.  However, as explained in detail below, the Roche technology was limited to niche applications and, as Illumina's own documents show, the competition for the sales that are the subject of the lost profits claim was entirely between Illumina and Life.

As an initial matter, the Federal Circuit as held that "a patentee need not negate **every possibility** that the purchaser might not have purchased a product other than his absent the infringement…the patentee need only show that there was a **reasonable probability** that the infringing sales cause the loss of profits." *Kaufman*, 926 F.2d at 1142 (emphasis added); *see Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1370 (Fed. Cir. 2006) (upholding district court opinion that "Based on Golden Blount's testimony that Peterson and Golden Blount controlled 95% of the market . . . there was a two-supplier market and that 'but for' Peterson's infringing activities, Blount would have made the sales it normally would have made."); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983) ("[W]hile the damages [in lost profits calculation] may not be determined by mere speculation or guess, it will be enough if the evidence show [sic] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.  The wrongdoer is not entitled to complain that they cannot be measured with the exactness and prevision that would be possible if the case, which he alone is responsible for making, were otherwise.").

Thus, the law does not require the Plaintiffs to exclude any metaphysical possibility that Roche might have made some additional sales had Illumina not infringed.  Rather, the law only requires that Plaintiffs show a reasonable probability that Illumina's infringing sales caused the lost profits.  Here, there is a host of evidence that during the relevant period—from 2006 to date—Illumina and Life were the only players in a two-supplier market, while Roche was a niche player not in contention for the same business.

The market for NGS technology can best be understood by looking at how it evolved.  Prior to the advent of NGS technology, DNA sequencing was accomplished using the prior generation of technology, known as "capillary" or "CE" systems.  This prior generation of technology had been dominated by Life's predecessor company, Applied Biosystems or AB.  The former head of Illumina's sequencing business admitted that AB was the market leader.  [Lin Decl. Exh. 6 (12/8/2012 West Deposition Tr.) at 36:13-37:2], and Illumina's ██████████

██████████████████████████████████████████

████████████████████████

1    The most important segment of the market consisted of six major "genome centers" that

2  by themselves accounted for ███████████████████████████████████████████████

3  █████████████████████████████████████████████████████████████████████████████

4  █████████████████████████████████████████████████████████████████████████████

5  █████████████████████████████████████████████████████████████████████████████

6  ████████████████████]   Prior to the advent of NGS technology, AB dominated the

7  genome center market. ████████████████████████████████████████████████████████

8  █████████████████████████████████████████████████████████████████████████████

9  █████████████████████████████████████████████████████████████████████████████

10 █████████████████████████████████████████████████████████████████████████████

11 █████████████████████████████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████████████████████████████

13 █████████████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████

15    Between 2005 to 2008, a period of critical importance in this case, there was a

16 competition between several companies each developing its own NGS technology, to see which

17 of them would be able to displace AB's prior generation products and become the new dominant

18 player in the DNA sequencing market.   The first one to introduce a product was a company

19 known as "454," which was later acquired by Roche.  [*Id.* at 10:25-11:13, 34:25-36:3.]  This is

20 the technology referred to as the Roche product (or sometimes "Roche 454") in Illumina's

21 summary judgment brief.  [*See, e.g.,* Opening Br. (Doc. No. 329-1) at 10-11.]

22    Importantly, however, the quality of the 454 technology was not sufficient to displace

23 even the prior AB capillary technology. ███████████████████████████████████████

24 █████████████████████████████████████████████████████████████████████████████

25 █████████████████████████████████████████████████████████████████████████████

26 ██████████████████████████████████   Mr. West, the former head of Illumina's

27 sequencing business put it as follows:

28



Illumina began shipping the first accused product, its Genome Analyzer system, in approximately June 2006. [*Id.* at 27.]   At almost exactly the same time, another major event occurred: AB announced that it would enter the NGS marketplace with a rival technology developed by a company called Agencourt Personal Genomics.[5]   AB purchased Agencourt and brought the Agencourt technology to market under the name SOLiD.  This is the product that is the subject of Life's lost profits claim.  [Lin Decl. Exh. 1 (8/3/2012 Davis Report) at 18-20.]

---

[5] This acquisition is the reason why AB acquired the license to the Chetverin Patents originally entered into by Agencourt as described above.



Doc#: US1:8302381v1

11-cv-00703-CAB (DHB)



Doc#: US1:8302381v1

11-cv-00703-CAB (DHB)



The Federal Circuit has upheld a finding of a two-supplier market based on analogous facts.   In *Siemens Med. Sol'ns USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, the defendants argued that the relevant market was not limited to two suppliers, but instead consisted of three competing sellers for scanners.   *See* 637 F.3d 1269, 1287-88 (Fed. Cir. 2011).   The Federal Circuit affirmed a finding of a two-supplier market because the third player's product was offered at a different price point and targeted towards a different set of customers.   *See id.*

Doc#: US1:8302381v1

11-cv-00703-CAB (DHB)

In sum, the mere fact that Roche or 454 was present in the market in no way serves to defeat Plaintiffs' lost profits claim.  Plaintiffs have never contested that AB competed with Roche in niche markets.  Those niche markets are not the subject of the lost profits however.  As Plaintiffs' damages expert, Ms. Davis, explains, "I think that customers who chose Illumina already did so over Roche and, therefore, deliberately decided it didn't want to buy Roche.  I think the most likely product it would buy instead is the product that's most like Illumina's which is the SOLiD product."  [Lin Decl. Exh. 17 (9/14/2012 Davis Deposition Tr.) at 93:5-17.]  Furthermore, as noted above, Plaintiffs do not need to exclude every possibility, no matter how remote, that Roche might have made some additional sales.  There is a host of evidence to show, as the law requires, that a "reasonable possibility that [Illumina's] infringing sales caused the loss of [Lifetech's] profits." *Kaufman*, 926 F.2d at 1142.  To the extent that Illumina argues differently, these are disputed issues of material fact to be resolved at trial, not summary judgment.

### 3.  There Are No Acceptable Noninfringing Alternatives Available

Illumina separately argues that Plaintiffs are not entitled to seek any lost profits at all because Plaintiffs have "presented no evidence suggesting that Illumina's alternatives would have been unavailable or unacceptable."  [Opening Br. (Doc. No. 329-1) at 17.]  This argument is wholly meritless.

████████████████████████████████████████████████████

████████████████████████████████████████████████████  [Lin Decl. Exh. 18 (12/10/2010 Eidel Deposition Tr.) at 245:25-246:8.]  Only *after* Plaintiffs' damages expert, Julie Davis, had submitted her opening report on lost profits did Illumina first identify these alternatives as a rebuttal to Ms. Davis's opinion.  To suggest that Plaintiffs' lost profits evidence is deficient because it did not address Illumina's brand new theories is disingenuous.

In any event, Illumina is incorrect factually—the record is replete with evidence that neither of Illumina's proposed alternatives would be acceptable or even available in the marketplace.  To be "acceptable," a noninfringing substitute must not possess "disparately

different prices or significantly different characteristics." *See Siemens*, 637 F.3d at1288.  To be "available," an acceptable noninfringing substitute must have been "available or on the market at the time of infringement." *Id.* (emphasis and internal quotation marks omitted).  A substitute need not be on sale at the time of infringement, but if the substitute cannot be commercialized "readily," then it is not available for purposes of a lost profits determination. *See Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 119, 1123 (Fed. Cir. 2003).

Illumina contends that it had two different acceptable noninfringing alternatives that it could have implemented in place of its currently infringing amplification method—either by amplifying DNA using an attachment chemistry called BTA, or by amplifying DNA using a technique known as rolling circle amplification ("RCA").  [Opening Br. (Doc. No. 329-1) at 5.] But the supposed alternatives were neither acceptable nor available.

11-cv-00703-CAB (DHB)



As the Federal Circuit has held, "if the substitute cannot be commercialized readily, then it is not available for purposes of a lost profits determination." *Siemens*, 637 F.3d at 1288.  A proposed substitute is not readily commercializable when it is, for example, "at least a year and a

half behind . . . in development," not used in any "commercial [products] sold on the market," or possesses "several disadvantages." *Id.* at 1288-89. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████ There is no evidence that either BTA or RCA were available in commercial products sold on the market. And, as discussed in detail above, both BTA and RCA have inherent disadvantages such that they cannot be considered acceptable alternatives. Thus, far from being unrebutted, there are genuine issues of material facts as to the availability of BTA and RCA as viable noninfringing alternatives.

### 4. AB Has The Manufacturing Capacity To Make Additional Sales

"To prove capability to meet demand for lost sales, the patent owner need only show a reasonable probability that its manufacturing and marketing efforts were adequate, or could have been made adequate, to make the additional sales." *W.R. Grace & Co.-Conn. v. Intercat, Inc.*, 60 F. Supp. 2d 316, 322 (D. Del. 1999) (citing *Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 276-77 (Fed. Cir. 1985).

Illumina does not contend that Ms. Davis's analysis regarding manufacturing capability lacks the requisite rigor. It only contends that Ms. Davis's analysis is based on inadmissible evidence. This is legally and factually incorrect.

There is nothing improper about Ms. Davis's reliance on information provided by Life employees, which includes the deposition testimony of Mr. Shaf Yousaf, Life's Rule 30(b)(6) witness who testified about, among others, Life's manufacturing capabilities and conversations with Mr. Graham Howe, Life's Head of Instrument Manufacturing and Ms. Rosy Lee, Life's Director of Product Management. [*See, e.g.*, Lin Decl. Exh. 1 (8/3/2012 Davis Report) at 30-31.] Rule 703 of the Federal Rules of Evidence expressly permits reliance on "facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. Damages experts can reasonably rely on employee conversations regarding manufacturing capacity. *See* Davis Decl. ¶¶

4-8; *see also U.S. v. Stone*, 222 F.R.D. 334, at *8 (E.D. Tenn. July 8, 2004) (citing *Indian Coffee Corp. v. Procter & Gamble Co.*, 752 F.2d 891, 895-97 (3d Cir. 1985) ("Other courts are in agreement that the trial court may consider the expert's own testimony concerning the types of data that are reasonably relied upon by experts in his field.").  As recognized by the Federal Circuit, this reliance by Ms. Davis is especially appropriate as only Life employees had knowledge of the company's own manufacturing capacity and production costs.  *See, e.g.*, *Fonar v. Gen. Elec. Co.*, 107 F.3d 1543, 1553 (Fed. Cir. 1997) (finding substantial evidence of manufacturing capacity based on patentee's testimony that the patentee had the machinery, sufficient employees, and a "fast growth rate" to show that it could have increased its production); *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 554 (Fed. Cir. 1984) (affirming finding of manufacturing capacity based on testimony of president of patentee and accounting exhibit detailing the infringer's sales).

Indeed, Illumina can hardly complain about an expert relying on company employees for information because Illumina has done the same in this case as well.  For example, Illumina's damages expert, John Jarosz, relied on written statements from Illumina's employees, Kevin Hall and Kevin Gunderson, for the issue of noninfringing alternatives.  [Lin Decl. Exh. 22 (8/31/2012 Jarosz Report) at 50-54.]  In addition, George Weinstock, Illumina's noninfringement expert, relied on statements from Illumina's employees, Diane Bond-Nutter, John Bryant, and Maria Rogert, about the operation and functionality of Illumina's systems  [Lin Decl. Exh. 23 (8/31/2012 Weinstock Report) at ¶ 68, 139, 146.]  As this Court has found, when a certain type of information is relied upon by both parties' experts, that is evidence that information is the type that is reasonably relied upon by experts under Rule 703.  *See Gray v. U.S.*, Civil No. 05cv1893, 2007 WL 4644736, at *7 (S.D. Cal. Mar. 12, 2007) ("At this point, the Court finds it reasonable [under Rule 703] for a vocational expert to rely on consultations with and information provided by recruiters, as evidenced, in part, by Defendant's vocational expert's own consultation with employers and recruiters in the development of his report.").

Here, Ms. Davis's reliance on information provided by Life's employees is more robust than what Illumina has done since, unlike Mr. Jarosz and Dr. Weinstock, she actually spoke with

1   Life's employees rather than merely relying on written statements.  [Lin Decl. Exh. 25 (9/26/2012
2   Jarosz Dep. Tr.) at 174:20-175:13; Lin Decl. Exh. 8 (9/26/2012 Weinstock Dep. Tr.) at 192:12-
3   17.]   Lastly, to the extent Illumina argues that such information should be in the form of
4   declarations rather than a discussion, Plaintiffs also herein submit a declaration by Mr. Howe.

5          Illumina's complaint regarding Ms. Davis's reliance on Life employees is a red herring.
6   The correct inquiry has always been whether Ms. Davis's opinion "rests on a reliable foundation
7   and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.*, 506 U.S. 579, 597
8   (1993).  And Plaintiffs have properly responded to these issues in their opposition to Illumina's
9   *Daubert* motion to exclude certain testimony of Julie Davis relating to lost profits and a
10  reasonable royalty.  [*See* Opp. to Davis Daubert at Section IV.B.]  In fact, Ms. Davis's report
11  contains ample evidence to support her conclusions. ████████████████████████████████
12  ██████████████████████████████████████████████████████████████████████████████████
13  ██████████████████████████████████████████████████████████████████████████████████
14  ██████████████████████████████████████████████████████████████████████████████████
15  ██████████████████████████████████████████████████████████████████████████████████
16  ██████████████████████████████████████████████████████████████████████████████████
17  ██████████████████████████████████████████████████████████████████████████████████
18  ██████████████████████████████████████████████████████████████████████████████████
19  ████████████████████████  Ms. Davis further bases her opinion on discussions with Ms. Lee
20  and Mr. Howe.  [*Id.*]
21          Also, Ms. Davis properly relies on Mr. Howe to determine Life's internal ramp up costs
22  for increase manufacturing capacity. ████████████████████████████████████
23  ██████████████████████████████████████████████████████████████████████████████████
24  ████████  ████████████████████████████████████████████████████████████████████████
25  ██████████████████████████████████████████████████████████████████████████████████
26  ██████████████████████████████████████████████████████████████████████████████████
27  ██████████████████████████████████████████████████████████████████████████████████
28  ██████████████████████████████████████████████████████████████████████████████████

Doc#: US1:8302381v1                                                  11-cv-00703-CAB (DHB)

1 ███████████████████████████████████████████

2 ███████████████████████████████████████████

3 ███████████████████████████████████████████

4 ███████████████████████████████████████████

5 ████████████████████

6      Ms. Davis has more than shown "a reasonable probability that [AB]'s manufacturing and

7 marketing efforts were adequate, or could have been made adequate, to make the additional

8 sales." *W.R. Grace*, 60 F. Supp. 2d at 322.  Moreover, the extent that Illumina disputes the facts

9 underlying Ms. Davis's analysis, these are genuine issues of fact that should be decided at trial.

10     C.  The Law Is Clear That Lost Profits May Be Sought For Products That Would More
       Fully Compensate Plaintiffs Than Reasonable Royalty

11     Illumina argues that Plaintiffs may not recover a reasonable royalty for less profitable

12 products and lost profits for more profitable profits.  [Opening Br. (Doc. No. 329-1) at 21, 25.]  It

13 is not surprising that Illumina cites no law in support of its argument because this argument is

14 entirely incorrect.  Illumina's argument that a reasonable royalty sets the floor for the entire

15 recovery is wrong.  [*Id*. at 22 n. 6.]  The  Federal Circuit has clearly explained that "a reasonable

16 royalty for ***each infringing device*** . . . is the minimum measure of damages."  *Crystal*

17 *Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001)

18 (emphasis added); *see also* 35 U.S.C. § 284.  And Illumina's argument that Plaintiffs cannot use a

19 reasonable royalty for some products and lost profits for others is wrong again.  [*See* Opening Br.

20 (Doc. No. 329-1) at 25.]  *See Crystal Semiconductor*, 246 F.3d at 1354 ("A patentee receives a

21 reasonable royalty for any of the infringer's sales not included in the lost profit calculation.");

22 *Siemens*, 637 F.3d at 1290 (damages "award may be split between lost profits as actual damages

23 to the extent they are proven and a reasonable royalty for the remainder."); *Mor-Flo Indus., Inc.*,

24 883 F.2d at 1577 (The "floor for a damage award is no less than a reasonable royalty and the

25 award may be split between lost profits as actual damages to the extent they are proven and a

26 reasonable royalty for the remainder."); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545

27 (Fed. Cir. 1995) (citing *Mor-Flo*).

28

1    Illumina's only argument is that an award that combines a reasonable royalty and lost

2    profits "ignores the realities of both the business world and the 'but for' world."  [Opening Br.

3    (Doc. No. 329-1) at 22.]    Whatever this cursory and vague sentence means, it makes no

4    difference.  The Patent Act clearly states that a patentee is entitled to claim damages adequate to

5    compensate for infringement, "but in no event less than a reasonable royalty."  35 U.S.C. § 284.

6    The case law also makes clear that a patentee can seek lost profits for some products and

7    reasonable royalty for others.  In a world where lost profits are indisputably available (a "but-for"

8    world), the patentee is not required to accept lost profits if that recovery would be less than a

9    reasonable royalty.  *See Crystal Semiconductor*, 246 F.3d at 1353.  Illumina's view of the world

10   would require a patentee to accept damages less than a reasonable royalty for some infringing

11   products if it sought lost profits on any products.  This is not a "reality of the business world,"

12   and it is not the governing law.  Illumina's arguments to the contrary are wrong and should be

13   rejected.

14   **V.    CONCLUSION**

15   For the reasons set forth above, Plaintiffs respectfully request that the Court deny

16   Illumina's motion.

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  December 21, 2012          Respectfully Submitted,


By:   /s/ Jenny C. Wu
Jenny C. Wu

Bradford Paul Schmidt
LIFE TECHNOLOGIES CORPORATION
5791 Van Allen Way
Carlsbad, CA 92008
Telephone:  (760) 603-7200

Nicholas Groombridge (*pro hac vice*)
Catherine Nyarady (*pro hac vice*)
Peter Sandel (*pro hac vice*)
Jenny C. Wu (*pro hac vice*)
Rebecca Fett (*pro hac vice*)
Robert Lin (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of Americas
New York, NY 10019
Telephone: (212) 373-3000

Matthew D. Murphey
TROUTMAN SANDERS LLP
11682 El Camino Real, Suite 400
San Diego, CA  92130
Telephone:  (858) 509-6000

*Attorneys for Plaintiffs*
LIFE TECHNOLOGIES CORPORATION,
APPLIED BIOSYSTEMS, LLC, INSTITUTE FOR
PROTEIN RESEARCH, ALEXANDER
CHETVERIN, HELENA CHETVERINA, and
WILLIAM HONE

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 21, 2012, a true and correct copy of the document

entitled:

**[REDACTED] PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' TO DISMISS PLAINTIFF LIFE TECHNOLOGIES CORPORATOIN FOR LACK OF STANDING AND MOTION FOR SUMMARY JUDGMENT OF NO LOST PROFITS**

was transmitted to the parties and counsel of record listed below via the Court's CM-ECF system

as a result of the electronic filing of these documents.

I also certify that true and correct copies of the following sealed lodged proposed

documents entitled:

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' TO DISMISS PLAINTIFF LIFE TECHNOLOGIES CORPORATOIN FOR LACK OF STANDING AND MOTION FOR SUMMARY JUDGMENT OF NO LOST PROFITS [FILED UNDER SEAL]**

| | |
|---|---|
| Bradford P. Schmidt<br>LIFE TECHNOLOGIES CORPORATION<br>5791 Van Allen Way<br>Carlsbad, CA 92008<br>Telephone:  (760) 603-7200<br>Email:<br>bradford.schmidt@lifetech.com | *Attorneys for Plaintiffs*<br>LIFE TECHNOLOGIES CORPORATION, APPLIED BIOSYSTEMS, LLC, INSTITUTE FOR PROTEIN RESEARCH, ALEXANDER CHETVERIN, HELENA CHETVERINA, and WILLIAM HONE |
| Nicholas Groombridge  (*pro hac vice*)<br>Catherine Nyarady  (*pro hac vice*)<br>Peter Sandel  (*pro hac vice*)<br>Rebecca Fett (*pro hac vice*)<br>Jenny C. Wu  (*pro hac vice*)<br>Robert Lin (*pro hac vice*)<br>Catherine Nyarady (*pro hac vice*)<br>PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP<br>1285 Avenue Of Americas<br>New York, NY 10019<br>Telephone:  (212) 373-3000<br>Email:<br>ngroombridge@paulweiss.com<br>psandel@paulweiss.com<br>rfett@paulweiss.com<br>jcwu@paulweiss.com<br>rlin@paulweiss.com | *Attorneys for Plaintiffs*<br>LIFE TECHNOLOGIES CORPORATION, APPLIED BIOSYSTEMS, LLC, INSTITUTE FOR PROTEIN RESEARCH, ALEXANDER CHETVERIN, HELENA CHETVERINA, and WILLIAM HONE |

Doc#: US1:8302381v1

11-cv-00703-CAB (DHB)

| | |
|---|---|
| Matthew D. Murphey<br>TROUTMAN SANDERS LLP<br>11682 El Camino Real, Suite 400<br>San Diego, CA 92130<br>Telephone:  (858) 509-6000<br>Email:<br>matt.murphey@troutmansanders.com | *Attorneys for Plaintiffs*<br>LIFE TECHNOLOGIES<br>CORPORATION, APPLIED<br>BIOSYSTEMS, LLC, INSTITUTE<br>FOR PROTEIN RESEARCH,<br>ALEXANDER CHETVERIN,<br>HELENA CHETVERINA, and<br>WILLIAM HONE |
| E. Joseph Connaughton<br>PAUL, PLEVIN, SULLIVAN & CONNAUGHTON<br>LLP<br>101 Broadway, Ninth Floor<br>San Diego, CA 94304<br>Telephone:  (619) 744-3645<br>Email:<br>connaughton@paulplevin.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |
| Mark H. Izraelewicz *(pro hac vice)*<br>Kevin M. Flowers *(pro hac vice)*<br>Matthew C. Nielsen *(pro hac vice)*<br>Cullen N. Pendleton *(pro hac vice)*<br>John R. Labbe *(pro hac vice)*<br>MARSHALL, GERSTEIN & BORUN LLP<br>233 South Wacker Drive<br>6300 Willis Tower<br>Chicago, IL 60606<br>Telephone:  (312) 474-6300<br>Email:<br>mizraelewicz@marshallip.com<br>kflowers@marshallip.com<br>mnielsen@marshallip.com<br>cpendleton@marshallip.com<br>jlabbe@marshallip.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |
| Ronald M. Wawrzyn *(pro hac vice)*<br>Matthew M. Wawrzyn *(pro hac vice)*<br>WAWRZYN LLC<br>233 South Wacker Drive, 84th Floor, Willis Tower<br>Chicago, IL 60606<br>Telephone:  (312) 283-8330<br>Email:<br>matt@wawrzynlaw.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |
| Jeffrey N. Costakos *(pro hac vice)*<br>Rebecca J. Pirozzolo-Mellowes *(pro hac vice)*<br>FOLEY & LARDNER, LLP<br>777 East Wisconsin Avenue<br>Milwaukee, WI 53202<br>Telephone:  (414) 297-5717<br>Email:<br>jcostakos@foley.com<br>jpirozzolo-mellowes@foley.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA INC. and SOLEXA, INC. |

Doc#: US1:8302381v1    11-cv-00703-CAB (DHB)

| | |
|---|---|
| Steven J. Balick<br>Andrew Dieter Cordo<br>Lauren E. Maguire<br>Tiffany Geyer Lydon<br>ASHBY & GEDDES<br>500 Delaware Avenue, 8th Floor<br>PO Box 1150<br>Wilmington, DE  19899<br>Telephone:  (302) 654-1888<br>Email:<br>sbalick@ashby-geddes.com<br>acordo@ashby-geddes.com<br>lmaguire@ashby-geddes.com<br>tlydon@ashby-geddes.com | *Attorneys for*<br>*Defendants/Counterclaimants*<br>ILLUMINA, INC. and SOLEXA, INC. |

I declare under penalty of perjury under the laws of the State of California and the United States of America, that the above is true and correct, and that I executed this Certificate of Service on December 21, 2012 at New York, New York.

*s/ Jenny C. Wu*
Jenny C. Wu
E-mail:  JCWu@paulweiss.com