E. JOSEPH CONNAUGHTON (SBN 166765)
**PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
101 West Broadway, Ninth Floor
San Diego, CA 92101-8285
Telephone: 619-237-5200
Facsimile: 619-615-0700
jconnaughton@paulplevin.com

Kevin M. Flowers (pro hac vice)
Matthew C. Nielsen (pro hac vice)
Mark H. Izraelewicz (pro hac vice)
Cullen N. Pendleton (pro hac vice)
Amanda K. Antons (pro hac vice)
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, Illinois 60606-6357
(312) 474-6300

Ronald M. Wawrzyn (pro hac vice)
Matthew M. Wawrzyn (pro hac vice)
WAWRZYN LLC
233 South Wacker Drive
84th Floor, Willis Tower
Chicago, IL 60606
(312) 283-8330

Attorneys for Defendants
ILLUMINA, INC. and SOLEXA, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFE TECHNOLOGIES CORPORATION; APPLIED BIOSYSTEMS, LLC; INSTITUTE FOR PROTEIN RESEARCH; ALEXANDER CHETVERIN; HELENA CHETVERINA and WILLIAM HONE,<br><br>    Plaintiffs,<br>v.<br><br>ILLUMINA, INC. and SOLEXA, INC.,<br><br>    Defendants. | Case No. 3:11-cv-00703-CAB (DHB)<br><br>**ILLUMINA'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**<br><br>Date: January 17, 2013.<br>Time: 2:30 p.m.<br>Ctrm: Courtroom 2<br>Judge: Hon. Cathy Ann Bencivengo |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 1

    I.     THE PCT ANTICIPATES ALL OF THE ASSERTED CHETVERIN CLAIMS ............................................................................................................ 1

    II.    Life Has Not Raised a Genuine Dispute that the PCT Disclosed a Matrix Having an Average Pore Size Within the Claimed Range .......................... 2

        A.    The PCT Expressly Discloses a Matrix Having the Average Pore Size ........................................................................................ 2

        B.    The PCT Inherently Disclosed a Matrix Having the Average Pore Size ........................................................................................ 3

    III.   The PCT Disclosed a Heat-Stable Matrix ................................................... 4

    IV.   The PCT Disclosed "Distributing" Single, Non-Cellular, Nucleic-Acid Targets to Produce Clonal Colonies ............................................................. 5

        A.    Dr. Edwards Ignores the Plasmid Embodiment .............................. 5

        B.    Speculation About Plasma Cannot Create an Issue of Disputed Material Fact ................................................................................... 6

        C.    Dr. Edwards Admitted the PCT Disclosed Separating Viral Particles ............................................................................................. 6

    V.    THE ASSERTED CLAIMS WERE OBVIOUS .......................................... 8

        A.    The Claims Were Obvious in Light of the PCT and Spirin .......... 8

        B.    There is No Genuine Dispute that the Asserted Claims Were Obvious ............................................................................................. 8

        C.    No Evidence of a Material Dispute Over Secondary Considerations ............................................................................... 9

CONCLUSION ................................................................................................................... 10

# TABLE OF AUTHORITIES

Page

**Cases**

Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC,
597 F.3d 1374 (Fed. Cir. 2010) ............................................................................. 4, 7

Gambro Lundia AB v. Baxter Healcare Corp.,
110 F.3d 1573 (Fed. Cir. 1997) ................................................................................ 10

Iron Grip Barbell Co. v. USA Sports, Inc.,
392 F.3d 1317 (Fed. Cir. 2004) ................................................................................ 10

Kennedy v. Allied Mut. Ins. Co.,
952 F.2d 262 (9th Cir. 1991) .................................................................................. 4, 7

Norgren Inc. v. International Trade Com'n,
699 F.3d 1317 (Fed. Cir. 2012) .................................................................................. 8

Ormco Corp. v. Align Tech., Inc.,
463 F.3d 1299 (Fed. Cir. 2006) .................................................................................. 9

Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.,
264 F.3d 1344 (Fed. Cir. 2001) .................................................................................. 9

Seachange Intern., Inc. v. C-COR, Inc.,
413 F.3d 1361 (Fed. Cir. 2005) ............................................................................... 1, 2

**Statutes**

35 U.S.C. §102 .................................................................................................................... 1

**Rules**

Fed. R. Civ. P. 56(e) ........................................................................................................... 2

# INTRODUCTION

What has happened since Illumina originally moved for summary judgment of invalidity based on Dr. Marilyn Stapleton's PCT? Life's experts, Drs. Barron and Edwards, have admitted that the PCT discloses how to make the claimed heat-stable matrix and distribute a single, non-cellular nucleic acid target within this matrix, and Illumina's experts have opined, unopposed, that the PCT discloses the claimed pore size. In short, expert discovery has resolved the open issues that the Court identified regarding what the PCT discloses. The Court should, therefore, enter judgment that the asserted claims are invalid under 35 U.S.C. §102 (and §103).

# ARGUMENT

## I. THE PCT ANTICIPATES ALL OF THE ASSERTED CHETVERIN CLAIMS

Life fails to raise a genuine dispute that the PCT discloses the claimed average pore size, a heat-stable matrix, and distributing single, non-cellular nucleic-acid targets. Life also disputes the "entrapping" and "separate, detectable colonies" limitations,[1] but Dr. Edwards admitted that these are redundant to the pore-size, heat-stable matrix, and "distributing" issues.[2] (Mem. at 2 n.1, 14.) Because Life ignores critical disclosures in the PCT and admissions by Drs. Edwards and Barron, Life fails to create a genuine dispute.

Life does not dispute that only the pore size and stable matrix issues were applicable to Claims 1 and 2 of the '568 patent. (Mem. at 14-15) Neither Life nor its experts dispute that the agarose matrix disclosed in the PCT has the required **pore size**, nor do they dispute that the agarose matrix is **stable** when used with the PCT's disclosed isothermal or alkaline methods. That alone is sufficient to grant summary judgment. *Seachange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1380 (Fed. Cir. 2005)("To be anticipating, ... disclosing the embodiment in textual form is enough. The fact that another embodiment is disclosed does not detract from the remainder of the disclosure.") With respect to polyacrylamide, Life mischaracterizes Illumina's

---

[1] Life asserts that Illumina did not address "cell-free." We did. (Mem. at 9-13.)

[2] Dr. Edwards admitted that the dispute about "entrapping" is resolved along with the "heat-stable matrix" dispute (Ex. 1 (Edwards Dep. Tr.) at 268:2-269:10), and that "separate detectable colonies" is resolved along with the "pore size," "heat-stable matrix," and "distributing" disputes (Ex. 1 (Edwards Dep. Tr.) at 269:11-270:10). *See also* Ex. 26 (Edwards Rep.) at ¶¶ 71-73.

experts' testimony on pore size, and offers no rebuttal expert opinion of its own. With respect to stability, they rely on a new declaration from Dr. Edwards that contradicts his prior testimony and the PCT's disclosure.

The only additional issue raised for the other asserted claims is "distributing" cell-free nucleic acids. Life's argument about this issue mischaracterizes Dr. Edwards's testimony about the PCT's disclosure of using plasmids, offers only speculation about the PCT's disclosure of using plasma, and treats virus particles as if they were cells, despite Dr. Edwards's admission that they differ materially from cells because, unlike cells, they only contain one nucleic acid molecule. The PCT's disclosure of distributing any one of these (plasmids, plasma, or viruses), let alone all three, is sufficient to anticipate the Chetverin claims. *Seachange Intern., Inc.*, 413 F.3d at 1380.

### A. Life Has Not Raised a Genuine Dispute that the PCT Disclosed a Matrix Having an Average Pore Size Within the Claimed Range

Illumina proved with admissible evidence that the PCT explicitly (and inherently) disclosed the claimed average pore size. (Mem. at 3-7.) Life failed to cite any evidence that could satisfy its burden under Rule 56(c) to rebut this evidence. Fed. R. Civ. P. 56(e).

#### 1. The PCT Expressly Disclosed a Matrix With the Claimed Pore Size

Based on attorney argument and misrepresentations, Life argues that the *polyacrylamide* matrices disclosed in the PCT lack the claimed pore size. (Opp. at 12-15.) However, Life does not dispute that the *agarose* matrices in the PCT have the claimed average pore size.

Even for polyacrylamide, there is no *genuine* dispute that it has the claimed pore size. Illumina based its motion on the testimony of its two experts who demonstrated that gels having the polyacrylamide concentrations disclosed in the PCT (via incorporation of *Sealy*) have the claimed pore size. (Mem. at 4.) Dr. Barron admitted that gels having such concentrations were known in the prior art (Mem. at 4-5; Opp. at 12-15), and Dr. Edwards admitted that the concentration of a gel determines pore size. (Ex. 1 (Edwards Dep. Tr.) at 262:24-263:6

1   To contradict all four experts, Life's attorneys assert that an article by Chambrach shows that polyacrylamide (again, *not* agarose) does not always have the claimed average pore size when used in the concentrations described in the PCT/Sealy, because the pores are too small. (Opp. at 14.) This argument grossly misrepresents the record in three important ways.

First, Dr. Stellwagen testified that polyacrylamide has two distinct sets of pores - large pores and small pores. (Ex. 27 (Stellwagen Dep. Tr.) at 52:22 to 53:9; 54:14-21; & 60:6-19; *also see generally id.* at 50:21-69:17.) Dr. Stellwagen testified that the technique used in Chambrach only measured the small pores; it did not measure the large pores. (*Id* at 53:10-54:2.) Knowing this, she reported that when *all* the pores of polyacrylamide were accounted for, the *average* pore size is within the average pore size range recited in the claims. (*Id.* at 55:5-16; Ex. 5 (Stellwagen Report) ¶¶ 131-32.) Second, Dr. Backman testified that he questioned the reliability of the data reported in Chambrach, based on his personal experience. (Ex. 28 (Backman Dep. Tr.) at 58:25-60:5; 58:3-11.) Third, Life submitted no expert testimony regarding Chambrach, or any evidence to rebut Dr. Stellwagen's testimony. (*See, e.g.,* Ex. 1 (Edwards Dep. Tr.) at 263.)

### 2. The PCT Inherently Disclosed a Matrix With the Claimed Pore Size

Illumina also based its motion on evidence that the PCT disclosed "entrapping" and thus inherently disclosed the claimed pore size. (Mem. at 6) Life disputes that the PCT disclosed a matrix that could entrap only because Life disputes that the PCT disclosed a heat-stable matrix. But Life cannot dispute the PCT's clear disclosure of entrapment: "DNA sequences of a few hundred nucleotides or more remain ***essentially immobilized*** during amplification . . . while allowing short oligonucleotides, mononucleotides or enzymes to diffuse as necessary." (Mem. at 6 (emphasis added); Ex. 3 (PCT) at 11:5-10; *see also, e.g.,* PCT at 5:18-21, 7:7-13, 10:9-12, 19:19-21, & 39:14-16.) Life also ignores Dr. Edwards's admission that keeping DNA sequences essentially immobilized in a gel is governed by pore size. (Mem. at 15.)

Finally, Dr. Edwards never opined that the pore sizes of the PCT's matrices were incapable of entrapping; he only said they were not heat-stable. (Ex. 1 (Edwards Dep. Tr.) at 268.) Since there is not a genuine dispute that the PCT discloses a heat-stable matrix (as

discussed immediately below), however, there can be no genuine dispute that the PCT discloses entrapment and inherently discloses the claimed pore size.

### B. The PCT Disclosed a Heat-Stable Matrix

The PCT discloses three independent ways to make a heat-stable matrix that entraps: (1) use of an alkaline buffer; (2) use of isothermal techniques that do not require heat; and (3) use of a polyacrylamide matrix. (Mem. at 7-9.) Dr. Backman explained, and Life's experts admitted, that the first two ways were compatible with stable amplification in both agarose and polyacrylamide. (Mem. at 8.) Remarkably, despite supplementing Dr. Edwards's opinion on this limitation with his new 12/21/12 declaration, Life still does not argue or provide any evidence disputing the PCT's disclosures of using (1) an alkaline buffer or (2) isothermal techniques, both of which would render the matrix heat-stable and allow the matrix to entrap. (Opp. at 15-16.) There is thus no genuine dispute that the PCT discloses a heat-stable matrix.

Even for the third way, Life only argues that the PCT discloses polyacrylamide for electrophoresis, and not for amplification. (Opp. at 15.) This is both insufficient and wrong. First, as Dr. Backman reported, the PCT discloses using electrophoresis matrices for amplification. (Ex. 4 (Backman Report) ¶ 142 (quoting PCT 50:31-35:"Amplification…may be performed directly in the same hydrogel matrix in which the size classes [of DNA] have been separated [by electrophoresis].").) Second, Dr. Edwards admitted that the PCT discloses amplification within a polyacrylamide matrix. (Ex. 1 (Edwards Dep. Tr.) at 305 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Third, Dr. Edwards's late-filed declaration should not be admitted as it violates the Court's Scheduling Order and, in any event, should be given no weight since it directly contradicts his sworn deposition testimony. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony"); *Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1381 (Fed. Cir. 2010).

---

[3] See also Ex. 1 (Edwards Dep. Tr.) at 304, in which he agrees that "they" [the PCT] disclosed using polyacrylamide as the matrix material.

### C. The PCT Disclosed "Distributing" Single, Non-Cellular, Nucleic-Acid Targets to Produce Clonal Colonies

The PCT discloses three ways to distribute single, non-cellular nucleic-acid targets to form clonal populations ("colonies") of DNA product: (1) plasmids; (2) plasma; and (3) viral particles. (Mem. at 11-14.) Life fails to create a genuine dispute here because it cannot overcome the admissions Dr. Edwards made at his deposition.

#### 1. Dr. Edwards Ignores the Plasmid Embodiment

Illumina's experts demonstrated that the PCT's disclosure of the plasmid embodiment (PCT at 39:21-31) satisfies the Chetverin claim limitation of "distributing" single, non-cellular nucleic-acid targets. (Mem. at 9-10.) Dr. Edwards ignored the plasmid embodiment in his expert report. Life asserts that Dr. Edwards addressed plasmids in paragraphs 58-67, but none of these discuss the plasmid embodiment at PCT 39:21-31 or even uses the word "plasmid."[4]

Life also misstates Dr. Edwards's deposition testimony, arguing that he said all plasmids are cells. Life neglects to mention his admission that the plasmids discussed at PCT 39:21-31 are "free DNA," *i.e.*, single, non-cellular targets: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 1 (Edwards Dep. Tr.) at 243:1-12.)

Life's opposition devolves into attorney argument that the plasmid embodiment does not count because the PCT states that "the ability to distinguish individual, positional amplification diminished as the number of amplification cycles increased when using thermal cycling." (PCT at 39:23-26) This argument is wrong. First, the only expert to opine on the plasmid embodiment—Dr. Backman—demonstrated that this was one example of distributing a single nucleic-acid target. (Mem. at 9-10.) Second, the PCT notes that the ability to distinguish the

---

[4] Life also argues that Dr. Stapleton never performed experiments on single, isolated DNA molecules. In order to make this assertion, Life has carefully ignored that Dr. Stapleton had recorded the very concept of spreading single, isolated plasmid DNA molecules in her notebook. (*See* Stapleton Report ¶ 76; Stapleton Dep. Tr. at 130:11-132:10)

| ILLUMINA'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY | 5 | Case No. 3:11-cv-00703-CAB (DHB) |

amplified product merely "diminished" in later cycles; not that it was eliminated. (*Id.*) Third, Life ignores the PCT's disclosure of isothermal methods and heat-stable matrices that avoid even a "diminished" ability to distinguish colonies. (*Id.* at 39:31-34.)

Life also fails to raise a genuine dispute regarding Dr. Backman's definition of "colony." Dr. Backman testified that the PCT's plasmid embodiment met the Chetverin limitations even under Life's narrower reading of the claims. (Ex. 4 (Backman Report) ¶ 133 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ (emphasis added); *see also id.* ¶¶137-38; Ex. 28 (Backman Dep. Tr.) at 213:10-19, 122:2-123:17 & 124:24-125:12).

### 2. Dr. Edwards's Speculation About Plasma Cannot Create a Genuine Issue of Disputed Material Fact

Life's opposition fails to offer anything but speculation that the PCT's disclosure of spreading plasma in a two-dimensional plane does not meet the "distributing" step. Dr. Edwards cannot create a genuine dispute by opining "*it is not clear that* a person of skill in the art would understand the term 'plasma' as used in the context of Example 3 to refer to a cell-free blood fraction." (Ex. 9 (Edwards Report) ¶ 62 (emphasis added).) And Dr. Edwards's equivocation and speculation that the plasma embodiment might have contained cells was rendered totally irrelevant when he admitted at his deposition that cells would likely have been removed in the process used to make the plasma. (Ex. 1 (Edwards Dep. Tr.) at 216:10-217:7.) In his report, Dr. Edwards stated "there is no indication or teaching that the distribution be sufficient to result in the separation of both target and non-target nucleic acids." (Ex. 9 (Edwards Report) ¶ 63.) This ignores the PCT's express disclosure of spreading "single targets," the detection of "individual entities," and multiplication "in the vicinity of each original target molecule." (PCT 42:33-43:1.)

### 3. Dr. Edwards Admitted the PCT Disclosed Separating Viral Particles

Illumina proved that the PCT disclosed distributing and amplifying single, non-cellular viral particles. (Mem. at 11-12.) Dr. Edwards admitted at his deposition that viral particles are single, non-cellular nucleic-acid particles and the PCT could be fairly read to disclose spreading of these particles. (Mem. at 12.) There is therefore no genuine dispute of material fact that the

PCT discloses the distribution of single, non-cellular nucleic-acid targets.

Life does not dispute that the PCT discloses distributing viral particles. Instead, Life's opposition is based on Dr. Edwards's statement in his expert report that the PCT is limited to amplifying cellular material (*i.e.*, by mischaracterizing viral particles as cells). But that statement cannot create a dispute of material fact, because Dr. Edwards' deposition admissions directly contradict his report. *Kennedy*, 952 F.2d at 266; *Delaware Valley Floral Group, Inc.*, 597 F.3d at 1381. Contrary to his report and Life's argument, Dr. Edwards admitted that viral particles are not cells and that, unlike cells, viral particles do not contain chromosomal DNA or cellular RNA, but rather only contain a single nucleic acid. (Ex. 1 (Edwards Dep. Tr.) at 204:24-25; Mem. at 12; *see also* Ex. 4 (Backman report) ¶ 138; *compare* Ex. 28 (Backman Dep. Tr.) at 132:17-133:5) Life does not dispute that Dr. Edwards made these admissions or that these admissions contradict his report; instead, it ignore the admissions[5] and look only at Dr. Edwards's report.

To the extent Life argues that spreading virus particles is not the same as spreading nucleic acids, it misreads the claims and raises a legal issue, not a factual issue. It is undisputed that virus particles consist only of a single nucleic acid attached to a protein (Ex. 1 (Edwards Dep. Tr.) at 241-242), and the claims only require that nucleic acids be separated from each other, not that nucleic acids be separated from proteins. In fact, the '478 patent itself says in an exemplary embodiment that non-nucleic acid components (*e.g.*, proteins) are only "preferably" separated from nucleic acids before amplification, not that they must be removed.[6] ('478 patent at 15:8-10) Even under Life's construction, Dr. Edwards admitted, and Life did not dispute, that the PCT discloses removing non-nucleic-acid components prior to amplification. (Mem. at 20;

---

[5] Life cites page 134 of Dr. Edwards' deposition in its opposition (Opp. at 19), but that portion came Dr. Edwards admitted that viruses are not cells (Ex. 1 (Edwards Dep. Tr.) at 200), and before he admitted that viruses, unlike cells, only contain a single nucleic acid (*Id.* at 241-242).

[6] Life persuaded Judge Kelly during claim construction that the use of "preferably" in the Chetverin patents meant that the "preferably" absent element can be present, but is just preferred not to be present. *See, e.g.,* Markman Order (D.I. 132) at p. 11 ("The specifications note that [the feature at issue] … is merely 'preferabl[e]' - as opposed to mandatory"); *see also* Life Responsive Markman Brief (D.I. 75) at p. 12-13.

Ex. 1 (Edwards Dep. Tr.) at 235-236.)[7]

## II. THE ASSERTED CLAIMS WERE OBVIOUS

Life's opposition attempts to raise non-issues, ignores the evidence, and ignores fatal admissions by its own experts. Life fails to create a dispute that the asserted claims are obvious over the PCT, alone or in combination with the Spirin 1991 article. Thus, summary judgment on obviousness, which is a question of law, should be granted. *Norgren Inc. v. International Trade Com'n*, 699 F.3d 1317, 1322 (Fed. Cir. 2012) ("Obviousness is a question of law.").

### A. The Claims Were Obvious in Light of the PCT and Spirin

Illumina has produced evidence showing that the PCT at the very least rendered the asserted claims obvious. (Mem. at 17-19.). Illumina also produced extensive evidence that the asserted claims were obvious over the PCT combined with the Spirin 1991 article. (Mem. at 19-21; *id.* at n.14.) Life's only argument that the asserted claims were not obvious in light of the PCT and Spirin was Dr. Edwards's assertion that one of ordinary skill would not make the combination because the PCT only disclosed "amplifying in a cell." (Ex. 9 (Edwards Report) ¶ 191.) As set forth in Illumina's opening brief (Mem. at 20-21)—and ignored by Life—Dr. Edwards admitted at least four times that the PCT disclosed amplifying outside of a cell.

### B. There is No Genuine Dispute that the Asserted Claims Were Obvious

Life's opposition fails to raise a genuine issue of fact. First, Life claims that Illumina has ignored many of the limitations, but as explained above, this is simply not true: Dr. Edwards admitted that "entrapping," "separate detectable colonies," and "cell-free amplification system" are redundant to pore-size, heat-stable, and distributing. (Ex. 1 (Edwards Dep. Tr.) at 268:2-270:10 & 271:16-20.; *see also supra* at n.1.)

Second, Life's attempt to create a dispute regarding the level of ordinary skill in the art fails because Dr. Backman stated that "even a person of lesser skill could have implemented the teachings of the prior art to arrive at the claimed methods." (Ex. 4 (Backman Report) ¶ 38.) In

---

[7] Life asserts that the '500 patent is not prior art for the reasons stated in Life's earlier opposition. Life does not genuinely dispute the '500 patent as prior art, however, as Life provides no claim chart or expert testimony that would support Life's assertion.

addition, Life fails to identify a single instance where its alleged difference would create a *material* dispute.

Third, Life insists that it has "provided extensive evidence" that the claims are not obvious. However, this "extensive" evidence is simply the statement in Dr. Edwards's report that the PCT does not disclose amplification outside of a cell. (*Cf.* Opp. at 21-22 *with* Ex. 9 (Edwards Report) ¶¶ 66 & 190-91.) As explained above, Dr. Edwards admitted multiple times in his deposition that this is not true. Therefore this is not a genuine dispute.

Fourth, Life dedicates nearly an entire page to argue that Spirin fails to disclose some of the claim limitations. (Opp. at 23.) But this simply confuses anticipation with obviousness. In any event, Life did not dispute that the PCT discloses all of the claim limitations asserted to be missing from Spirin.[8]

Fifth, Life states that there is a dispute over the scope and content of the prior art. However, Dr. Backman's obviousness analysis adopted Life's purported scope, and still arrived at the conclusion that the asserted claims were obvious. (*See* Ex. 4 (Backman Report) ¶¶ 176-81 & 300-04.) Thus, there is no genuine dispute over the scope of the prior art.

### C. There is No Evidence of a Material Dispute Over Secondary Considerations

While the Court should consider any secondary considerations, here they cannot overcome the strong showing of obviousness. *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1355 (Fed. Cir. 2001). Moreover, Life has failed to show that there is any nexus between Illumina's commercial success and its accused technology. "Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006).

First, it is undisputed that the accused technology accounts for only a small part of

---

[8] *See, e.g.*, the motivation to use polyacrylamide (Mem. at 18-19 & 20; Ex. 4 (Backman Report) ¶¶ 180 & 301); to use cell-free DNA (Mem. at 20-21; Ex. 4 (Backman Report) ¶¶ 176, 178, and 302); to use the claimed pore size (Mem. at 19 & 20; Ex. 4 (Backman Report) ¶¶ 175 & 300); to use isolated targets (Mem. at 17-18 & 20; Ex. 4 (Backman Report) ¶¶ 176, 178, & 302 and see ¶¶ 280 & 282); and to use the thickness (Mem. at 20; Ex. 4 (Backman Report) ¶¶ 288, 296, & 304).

1  Illumina's process. (Ex. 15 (Weinstock Report) ¶ 198.) ███████████████████
2  ████████████████████████████████████████████████████████████████████
3  ████████████████████████████████████████████████████████████████████
4  ████████████████████████████████ Third, no competitor of Illumina (including Life)
5  uses the claimed technology. This is not surprising, considering the extensive evidence that
6  customers do not care about the specific amplification technique used. (*See* Ex. 15 (Weinstock
7  Report) ¶¶ 197 & 199; and Ex. 29 (Weinstock Dep. Tr.) at 189:5-18.)

8  Life cites *Gambro* to imply that a nexus has been shown. (Opp. at 21.) But in *Gambro*,
9  the inference of a nexus was based on the prominence of the patented technology in defendant's
10  advertising. *Gambro Lundia AB v. Baxter Healcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997).
11  Dr. Edwards has not asserted that the accused technology was mentioned in Illumina's
12  advertising, let alone prominently featured. Additionally, while secondary considerations were
13  mentioned in *Gambro*, the holding of nonobviousness was primarily based on a lack of
14  motivation to combine the prior-art references. *Id* at 1578-80.

15  Life has also not provided any evidence of a long-felt need satisfied by the Chetverins'
16  claimed inventions. Dr. Edwards criticizes Dr. Backman's logic, but does not suggest that a need
17  existed. (Ex. 9 (Edwards Report) ¶ 195; Ex. 4 (Backman Report) ¶¶ 195-96.) *See e.g., Iron Grip
18  Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) ("Absent a showing of
19  long-felt need or the failure of others, the mere passage of time without the claimed invention is
20  not evidence of nonobviousness."). Additionally, Life has not shown that anyone but the
21  Chetverins practiced the method until a full 14 years after the method's publication.

## CONCLUSION

Life has failed to raise any genuine dispute of material fact that could preclude summary judgment. Consequently, the asserted claims should be found invalid as obvious.

---

[9] The only "dispute" Life attempts to raise on this point is Dr. Edwards's statement that the cost of implementing RCA would have been high—not that Illumina would not have been successful in the implementation. (Davis Report, Ex. J, Edwards Decl. ¶ 11.) The undisputed fact is that Illumina *has* successfully utilized RCA in its system.

Dated: January 10, 2013

Respectfully submitted,

By: /s/ E. Joseph Connaughton
101 West Broadway, Ninth Floor
San Diego, CA 92101
(619) 237-5200

Kevin M. Flowers
Matthew C. Nielsen
Mark H. Izraelewicz
Cullen N. Pendleton
Amanda K. Antons
Marshall, Gerstein & Borun LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, IL 60606
(312) 474-6300

Ronald M. Wawrzyn
Matthew M. Wawrzyn
Wawrzyn LLC
233 South Wacker Drive
84th Floor, Willis Tower
Chicago, IL 60606
(312) 283-8330

*Attorneys for Defendants*
*Illumina, Inc. and Solexa, Inc.*

---

ILLUMINA'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

11

Case No. 3:11-cv-00703-CAB (DHB)