1  E. Joseph Connaughton (SBN 166765)
   PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
2  101 West Broadway, Ninth Floor
   San Diego, CA 92101-8285
3  (619) 237-5200
   E-Mail: jconnaughton@paulplevin.com
4
   Kevin M. Flowers (pro hac vice)
5  Matthew C. Nielsen (pro hac vice)
   Mark H. Izraelewicz (pro hac vice)
6  Cullen N. Pendleton (pro hac vice)
   Amanda K. Antons (pro hac vice)
7  MARSHALL, GERSTEIN & BORUN LLP
   233 South Wacker Drive
8  6300 Willis Tower Chicago, IL 60606-6357
   (312) 474-6300
9
   Ronald M. Wawrzyn (pro hac vice)
10 Matthew M. Wawrzyn (pro hac vice)
   WAWRZYN LLC
11 233 South Wacker Drive
   84th Floor, Willis Tower
12 Chicago, IL 60606
   (312) 283-8330
13
   *Attorneys for Defendants/Counterclaim Plaintiffs Illumina, Inc. and Solexa, Inc.*
14
                    **UNITED STATES DISTRICT COURT**
15
               **SOUTHERN DISTRICT OF CALIFORNIA**
16

17 | LIFE TECHNOLOGIES CORPORATION; | )
18 | APPLIED BIOSYSTEMS, LLC; INSTITUTE | ) Case No. 3:11-cv-00703-CAB (DHB)
   | FOR PROTEIN RESEARCH; ALEXANDER | )
18 | CHETVERIN; HELENA CHETVERINA and | )
19 | WILLIAM HONE, | ) **ILLUMINA'S REPLY MEMORANDUM**
   | | ) **IN SUPPORT OF ITS MOTION FOR**
20 | Plaintiffs, | ) **SUMMARY JUDGMENT OF NON-**
   | | ) **INFRINGEMENT**
21 | v. | )
   | | ) Date: January 17, 2013
22 | ILLUMINA, INC. and SOLEXA, INC., | ) Time: 2:30 p.m.
   | | ) Ctrm: Courtroom 2
23 | Defendants. | ) Judge: Hon. Cathy Ann Bencivengo
   | | )
24 | | )

25

26

27

28

1

# TABLE OF CONTENTS

2
3      I.     ILLUMINA'S SYSTEM DOES NOT HAVE A WATER-BASED LIQUID PHASE
              THAT INCLUDES AN AMPLIFICATION SYSTEM ......................................................1

4             A.     Formamide Is A Necessary Component Of Illumina's Amplification System .........1

5             B.     All Of The Components Of The Amplification System Do Not Have
6                    To Be In The Same Place............................................................................................3

7             C.     Life Tech Does Not Dispute Illumina's Actual Non-Infringement Position.............4
8
       II.    ILLUMINA'S AMPLIFIED DNA PRODUCTS CANNOT "MIGRATE"........................5
9
       III.   ILLUMINA'S "AMPLIFICATION SYSTEM" IS NOT "ENTRAPPED" ......................6
10
       IV.    ILLUMINA DOES NOT "EXPONENTIALLY AMPLIFY" NUCLEIC ACIDS .............8
11     V.     ILLUMINA'S GEL LAYER IS ONLY ABOUT 1/100TH AS THICK AS
              CLAIMS 1 AND 2 OF THE '568 PATENT AND CLAIM 6 OF THE
12            '698 PATENT REQUIRE ..................................................................................................9

13     VI.    ILLUMINA'S SEQUENCING INSTRUMENTS CANNOT INFRINGE.......................10

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Crown Packaging Technology, Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373 (Fed. Cir. 2011) ................................................................................................................2

*Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374 (Fed. Cir. 2010) ....5

*Invitrogen Corp. v. Clontech Lab., Inc.*, 429 F.3d 1052 (Fed. Cir. 2005) .....................................10

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ...........................................9

**Rules**

Fed. R. Civ. P. 26(a)(2) ..................................................................................................................2

### INTRODUCTION

The parties agree on how Illumina's sequencing instruments work. Illumina submitted as Exhibit A to its summary judgment motion a Statement of Undisputed Facts describing how its instruments work. Life did not dispute or even reference the Statement in opposing Illumina's motion. All of these facts, then, should be deemed undisputed under Rule 56(e).

Life's opposition raises only questions of law: How should Judge Kelly's constructions of the relevant claim limitations be interpreted and applied? Illumina relies on Judge Kelly's order and the undisputed evidence, while Life urges different constructions from those that Judge Kelly already determined. Illumina's accused systems do not infringe any of the asserted claims.

### ARGUMENT

### I.  ILLUMINA'S SYSTEM DOES NOT HAVE A WATER-BASED LIQUID PHASE THAT INCLUDES AN AMPLIFICATION SYSTEM

All of the independent claims but one ('698, claim 1) require an "aqueous" (water-based) liquid phase containing an amplification system (a "set of components that together can amplify a nucleic acid"). (Mem. at 3.) Formamide is a necessary component of that set. (*Id.*) Illumina produced substantial evidence that no water-based liquid phase in Illumina's system ever includes formamide. (Mem. at 3.)[1] Life did not dispute that evidence. (Opp. at 7-8.)[2]

#### A. Formamide is a necessary component of Illumina's amplification system

Instead, Life argues that formamide is not a component of Illumina's amplification system. (Opp. at 4-7.) Life is wrong. Judge Kelly construed "amplification system" as the "set of components that together can amplify a nucleic acid." (Mem. at 8.) Formamide is a component necessary to be able to amplify the nucleic acids in Illumina's system. (Mem. at 8-9; Ex. A at 4-5.) Life does not dispute that Illumina's system requires formamide to amplify of the original template nucleic acid. (Opp. at 6). Thus, under Judge Kelly's construction, formamide is a component of Illumina's amplification system as a matter of law.

---

[1] Life says that Illumina did not timely raise this non-infringement argument (Opp. at 7.) That is incorrect: on February 18, 2010, Illumina explained in an interrogatory response that its products did not meet this "aqueous liquid phase" limitation. (Ex. 22 (Illumina Interrog. Resp.) at 5.)

[2] Life does not address Undisputed Fact No. 11. (Mem., Ex. A at 4, ¶ 11.)

1    Life is now trying to avoid this construction of "amplification system" (which Life argued

2    for). Life argues that formamide is not actually a component of Illumina's amplification system,

3    but is rather a "denaturing agent" that merely "sets the stage" for the other components of the

4    amplification system that physically "copy" the DNA strands. (Opp. at 4-7.) Relying solely on

5    the late-filed and thus inadmissible declaration of Dr. Edwards (which Illumina is moving to

6    exclude),[3] Life mischaracterizes formamide, a chemical reagent, as a "method," and argues that

7    only the reagents involved in the copying step are components of the amplification system: "a

8    person of ordinary skill in the art would not have interpreted 'amplification system' to include

9    methods of separating double stranded DNA into single strands." (Edwards 12/21/12 Declaration

10   (D.I. 373-1) at 7, ¶ 24.) As Life argues, "heat or formamide or other denaturing process [*sic*]

11   might be said to 'set the stage,' but stage hands are not characters in the play." (Opp. at 5 n. 2.)

12   Life's new argument that formamide is not a component of the amplification system is

13   contradicted by the Chetverin patent specification and Dr. Edwards's deposition testimony. The

14   patent specification identifies RNase H—a reagent whose only purpose (like formamide's) is to

15   turn double-stranded molecules into single-stranded molecules—as part of the 3SR

16   "amplification system."[4] Original claim 21, also part of the specification,[5] recites "wherein the

17   ***amplification system includes*** a DNA-directed RNA polymerase, a reverse transcriptase, ***RNase***

18   ***H***, ribonucleotides and deoxyribonucleotide substrates." (Ex. 23 (Original App.) at 53, emphasis

19   added). At his deposition, Dr. Edwards agreed that the specification describes RNase H as one of

20   the "components" of the 3SR "amplification system." (Ex. 24 (Edwards Dep. Tr.) at 257:2-8.

21   The patent specification explains that RNase H's role in the 3SR amplification system, like

22   that of formamide in Illumina's system, is to "set the stage" for the polymerase that does the

23

24   3 Life's entire argument about formamide relies on the opinions set out in the late-filed
     declaration of Dr. Edwards. For the reasons set out in Illumina's concurrently filed motion to
25   strike, that declaration violates Fed. R. Civ. P. 26(a)(2) and cannot be relied on.

26   [4] "AMV reverse transcriptase, T7 RNA polymerase, RNase H, and a template . . . ." (Ex. 10
     ('478) at 18:22-26.)

27   5 The original claims in a patent application are part of the specification. *Crown Packaging
28   Technology, Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373 (Fed. Cir. 2011).

1  copying. (Ex. 10 ('478) at 2:51-54) ("RNase H destroys the RNA template involved in the

2  RNA:DNA heteroduplex after the first-strand cDNA synthesis, enabling the second strand of the

3  cDNA to be synthesized").)[6] The disclosure of the specification – that a component that only

4  "sets the stage" for copying is nevertheless a component of the amplification system – cannot be

5  reconciled with Life's new interpretation that such "stage-setting" components (like formamide)

6  are not part of the amplification system. Life's belated attempt at a new construction should be

7  rejected.

8  　　　Life argues that formamide is like the heat used to denature DNA in PCR, which the

9  Chetverins did not list as a component of their amplification system.[7] (Opp. at 4-6.) But heat is a

10  form of energy, not a chemical reagent like formamide or RNase H. The Chetverins' description

11  of reagents like RNase H (but not heat) as components of an amplification system proves this.

12  　　　**B. All of the components of the amplification system do not have to be in the same place**

13  　　　Life next mischaracterizes Judge Kelly's construction of "amplification system" as meaning

14  the amplifying components that are at the same place at the same time (Opp. at 6-7), (which

15  would exclude formamide as a component of the amplification system). Judge Kelly construed

16  "amplification system" to mean "a set of components that can together amplify a nucleic acid,"

17  but there is no basis in the claim-construction order supporting Life's narrow interpretation of

18  "together" as meaning just those components that are in the same place at the same time. In the

19  claimed method, "components that together can amplify" simply means the set of components

20  that are necessary to make multiple copies of the template DNA strand(s); neither the claim nor

21  _____

22  [6] *See also* Guatelli et al. (Ex. 25) (cited in '478 patent at 2;60-65) at 1875 ("cDNA synthesis can proceed to completion of both strands due to the degradation of RNA in the intermediate RNA:DNA hybrid by RNase H."); at Fig. (illustrating the role of RNase H as making a single-

23  stranded DNA); and at 1878 ("Retroviral RNase H is considered to be the enzyme responsible for the digestion of RNA·DNA hybrids, so that second-strand cDNA synthesis can occur.")

24  [7] Life also suggests that a table from the prosecution history, which does not list heat, is a comprehensive list of the components of the Chetverins' amplification system (Opp. at 5-6). But

25  during the claim-construction proceeding, Life argued that this same table was *not* comprehensive. ("Similarly, Illumina's citation to the table describing components for particular

26  amplification systems is nothing more than a summary of '*some* [not all] combinations of

27  components' from the examples described in the specification.") (Life Tech's Responsive Claim

28  Construction Br. (D.I. 75) at 3.)

1   its construction requires that all of the components have to do their job in the same place at the
2   same time (just as two people might work "together" on a brief without ever being in the same
3   place at the same time. (*Markman* Order (D.I. 132) at 5-6.)

4       Life never addresses the intrinsic and extrinsic evidence supporting Illumina's interpretation
5   of "amplification" as requiring multiple rounds of nucleic-acid replication. (Mem. at 8.) It is
6   incontrovertible that a denaturing reagent like formamide is necessary for amplification—to
7   make an identical copy of a nucleic-acid strand, you first need to split a double-stranded nucleic
8   acid into two single strands. Moreover, all of the claims require an "exponential" amplification
9   system. (Mem. at 9.) Life cannot dispute that this requires a set of components capable of
10  exponentially amplifying (Mem. at 9-11), or that without formamide, Illumina's system could
11  not meet even Life's definition of "exponential" amplification. (*Id.*) This leads to the inescapable
12  conclusion that formamide is a component of Illumina's amplification system.

13      **C. Life Tech does not dispute Illumina's actual non-infringement position**

14      Life mischaracterizes Illumina's non-infringement position as being that formamide is
15  merely never "*dissolved*" in water." (Opp. at 8.) But Illumina's position (based on Dr.
16  Weinstock's undisputed testimony) is that formamide is never *in* (whether "dissolved,"
17  "suspended," or "included") any water-based liquid phase. (Mem. at 3-4.) Judge Kelly held that
18  the components of the amplification system did not have to be "fully dissolved" or "suspended"
19  in the water-based phase, but he also held that the water-based phase must "include" (*i.e.*,
20  contain) the complete amplification system: "water-based liquid phase that *includes* a cell-free
21  enzymatic, exponential nucleic acid amplification system." (Ex. 11 (D.I. 132) at 7, emphasis
22  added.) [8]

23      Illumina's system cannot be found to infringe when its aqueous liquid phase contains just
24  *some* components of the amplification system, as Life proposes. (Opp. at 8.) All of the asserted

25  ─────────────────────────
26  [8] Life took this same view during the *Markman* phase. *See, e.g.*, Life Tech's Responsive Claim
    Construction Br. (D.I. 75) at 5 ("The claim language states that the claimed aqueous liquid phase
    merely "includes" an amplification system, which does not require any dissolution but instead
27  generically allows for individual components of the amplification system to be either dissolved
28  or suspended in solution or attached to the solid matrix.").

claims (except '698, claim 1) require that the aqueous liquid phase contain the complete
amplification system, not just a portion of it (in contrast to, *e.g.*, '478 Claims 21, 27, and 38,
which recite that only a "portion" of the amplification system is included). (Mem. at 3.) Life's
argument that only a portion of the amplification system need be in the aqueous liquid phase
cannot raise a *genuine* issue of disputed material fact.

## II.    ILLUMINA'S AMPLIFIED DNA PRODUCTS CANNOT "MIGRATE"

At the end of discovery, Life agreed that Illumina's amplified DNA products cannot migrate:
Life's expert Dr. Barron admitted: "Synthesized nucleic acid products [in the Illumina system]
***cannot migrate by diffusion*** as they are covalently attached to the SFA hydrogel . . . ." (Mem.
Ex. 2 (Barron Report), Appendix E at 2)(emphasis added) (*see also* Mem. at 4-5, and Ex. 1
(Weinstock Report) ¶176.) Thus, Illumina's system cannot satisfy the "average distance"
limitation in '698 claim 1,[9] and the Court should find the claim not infringed.

To avoid summary judgment, Life relies on the late-filed and thus inadmissible declarations
from Drs. Barron and Edwards[10] stating opinions that ***directly*** contradict Dr. Barron's original
statement. (Opp. at 20.) Both witnesses disregard Life's previous admission ("nucleic acid
products ***cannot*** migrate by diffusion"), and now swear that Illumina's amplified products ***can***
and ***do*** migrate. (*Id.*) Dr. Barron even purports to have measured the migration distance—a
distance she swore did not exist just a few months ago. (*Id.* at 21-22.) In any event, Life's new

[9] Life inaccurately complains that Illumina disclosed this non-infringement theory for the first
time in Dr. Weinstock's rebuttal expert report. (Opp. at 19.) That is not correct. Almost two
years ago, on February 18, 2010, Illumina stated that its products did not meet this "migration"
limitation in response to Life's interrogatory. (Ex. 22 (Illumina Interrog. Resp.) at 5.)

10 These late-filed reports should be excluded both from consideration regarding this motion and
from trial, as Illumina requests in its concurrently filed motion to strike. And even if these
reports were admissible, the Court should not assign any weight to opinions that contradict Life's
previous admission. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("a party
cannot create an issue of fact by an affidavit contradicting his prior deposition testimony");
*Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1381 (Fed. Cir.
2010) ("[W]hen a party has given clear answers to unambiguous questions which negate the
existence of any genuine issue of material fact, that party cannot thereafter create such an issue
with an affidavit that merely contradicts, without explanation, previously given clear
testimony.") (quotations omitted).

1   theory that Illumina's DNA product can migrate because one free end moves is refuted by Dr.

2   Barron's admission. (Ex. 2 (Barron Report), Appendix E at 2.)

3       Life's argument (Opp. at 20) that '698 teaches an embodiment like Illumina's system, where

4   the DNA products are tethered to the matrix, ignores that that embodiment includes "***reversible***

5   interactions" ("the interactions should not be too strong, and the modification should not be too

6   extensive, so that the immobilization of the nucleic acids on the solid matrix is ***readily***

7   ***reversible***") (Ex. 9 ('698) at 8:18-21), unlike Illumina's ***irreversibly*** immobilized DNAs. Life

8   also ignores Dr. Edwards's admission that the Chetverin patents nowhere disclose irreversible

9   ("covalent") immobilization. (Ex. 24 (Edwards Dep. Tr.) at 324:17-23).

10      Finally, Life incorrectly argues "Illumina's motion improperly focuses on individual

11  molecules rather than the cluster as a whole." (Opp. at 21.) It is Life that improperly equates the

12  "synthesized nucleic acid products" that must "migrate by diffusion" in '698 claim 1 with

13  Illumina's DNA clusters as a whole: '698 claim 1 plainly differentiates the two in reciting

14  "colonies ***of the*** synthesized nucleic acid product." (Ex. 9 ('698) at 23:53-54)(emphasis added).

15  **III.    ILLUMINA'S "AMPLIFICATION SYSTEM" IS NOT "ENTRAPPED"**

16      All of the asserted claims require a "matrix" that "[completely] entraps" the aqueous liquid

17  phase containing the amplification system. (Mem. at 5.) Judge Kelly construed the terms

18  "[completely] entrapping" to mean "[completely] keeping within limited zones." (*Id.* at 6.)

19  Illumina demonstrated that it does not keep an aqueous liquid phase or an amplification system

20  in the matrix, let alone within a limited zone in the matrix. (*Id.* at 6-7.) Instead, Illumina flushes

21  every component completely out of the matrix during each amplification cycle. (Mem. at 6-7 and

22  Ex. A ¶¶ 9-13.) Life did not dispute these facts.[11] (Opp. at 4.) It is undisputed that during each

23  amplification cycle, formamide completely pushes any water-based liquid out of the flow cell,

24

25  [11] Life does not address, and thus admits under Rule 56(e), that "a pre-amplification mix is
    flowed in, which pushes the formamide out of the channel" (Mem., Ex. A ¶ 9); that "Polymerase
26  enzymes (Bst polymerase) and nucleotides are then flowed through and the primer is extended
    under isothermal conditions" (*id.* ¶ 10); that "the reagent formamide is again flowed into the flow
27  cell" (*id.*, ¶ 11); and that "After the formamide step, a pre-amplification mix is again flowed in to
28  push the formamide out of the channel." (*Id.*, ¶ 13.)

1    completely displacing it. (Mem. at 5-7; Opp. at 4.) Thus, there can be no genuine dispute that the

2    amplification system contained in the aqueous liquid phase in Illumina's system is not

3    "entrapped" (*i.e.*, kept "within limited zones") in the matrix, as the claims require. (Mem. at 6-7.)

4         Life opposes summary judgment by re-arguing the construction of "entrapping," arguing now

5    that the aqueous phase need ***not*** remain in the matrix. (Opp. at 8-9.) But the *Markman* order

6    expressly states that the matrix must keep the aqueous liquid phase containing the amplification

7    system in a limited zone in the matrix: "The claims do not require that the solid matrix entrap all

8    liquid, only the aqueous liquid phase that includes an amplification system." Applying the

9    Court's constructions, '478 Claim 1 requires a "matrix … completely [keeping in limited zones]

10   said [water-based] liquid phase."[12] The properly construed claim language contradicts Life's

11   attorney argument that the aqueous phase need not remain in the matrix.

12        Life concedes that Dr. Barron did not consider whether formamide was entrapped in the

13   matrix. (Opp. at 6.) Because formamide is a component of the amplification system, Life cannot

14   prove that the full amplification system is entrapped. Likewise, Life agrees that the amplification

15   mix is part of the amplification system. (Opp. at 8.) But Life does not dispute that this mix is *not*

16   *kept in the matrix* but rather is completely flushed out by formamide. (Mem. Ex. A ¶¶ 9 and 11.)

17   Instead, Life's position rests on the idea that one component – the primers – is kept in the matrix.

18   (Opp. at 10). But the primers are not the full "set of components that together can amplify a

19   nucleic acid," which Judge Kelly held must remain entrapped in the matrix. (Mem. Ex. 11 at 7.)

20        Life relies on an embodiment in the '478 patent in which the nucleotide component of the

21   amplification system is washed over granules containing a matrix with the other components of

22   the system. (Opp. at 9, citing '478 at 10:11-14.) Judge Kelly's construction of "completely

23   entrapping" covers this embodiment: the fresh substrate solution can flow through, yet a

24   complete amplification system is always present in a "limited zone" (the granules): "The reaction

25   is then carried out ***in the coated granules*** (capsules) by incubating them ***in a substrate-***

26

27

28   [12] See also, Life's contradictory argument in Ex. 11 (*Markman Order*) at 10.

1  *containing solution.*" (Ex. 10 ('478) at 10:4-6) (emphasis added).) This is in stark contrast to

2  Illumina's system, where the complete set of components is *never* in the same "limited zone."

3  **IV.   ILLUMINA DOES NOT "EXPONENTIALLY AMPLIFY" NUCLEIC ACIDS**

4  Illumina provided unrebutted evidence showing, based on the amount of amplified DNA

5  products the accused Illumina systems produce, that Illumina's system cannot be performing

6  "exponential" amplification within the meaning of the asserted claims. (Mem. at 13-14 and Ex.

7  A ¶¶ 15, 16.) Life says it "vigorously dispute[s]" Dr. Slater's conclusion that Illumina does not

8  exponentially amplify, but it does not have any evidence to challenge Dr. Slater's conclusion.

9  Life points to Dr. Weinstock's testimony that in the first cycle Illumina's system doubles the

10  amount of DNA (Opp. at 14), but that does not require finding "exponential" amplification.

11  Linear amplification also doubles the DNA in the first cycle, yet Life agrees that linear

12  amplification is not "exponential." (*Id.* at 10-11.) Dr. Slater was unequivocal that Illumina's

13  amplification is never "exponential." (Mem. at 13-14 and Ex. A ¶¶ 15, 16.)

14  Life has no evidence to show that Illumina exponentially amplifies, so Life argues for an

15  interpretation of "exponential amplification" that broadly encompasses "amplification where the

16  copied product *can* serve as a template for the next round of amplification." (Opp. at 10

17  (emphasis added).) The passage in the patent which Life quotes (Opp. at 11, quoting '478 at 2:8-

18  15) does not support this construction: rather, it says that the amplified product *actually* serves as

19  a template in later rounds, not that it merely *can* do so. In contrast, Illumina's construction of

20  "exponential" is supported by multiple disclosures in the specification and the prosecution

21  history. (Mem. at 11-13.)[13] Life ignores this prosecution history, including the fact that the

22  Chetverins distinguished the O'Driscoll reference as not disclosing "exponential" amplification

23  because it suffered from "molecular crowding," just as occurs in Illumina's system, and the fact

24

25  _____

26  [13] Life argues that Illumina waived this claim-construction issue. (Opp. at 10.) But Illumina did
    not seek a construction of "exponential" only because Life requested that each side be limited to
27  12 terms, and Illumina expressly reserved its right to later seek construction of other terms. *See*
    Illumina's Reply Memorandum of Points and Authorities in Support of Its Motion to Exclude
28  Dr. Barron's Testimony Regarding "Exponential" Amplification at 4.

that O'Driscoll's amplification system would meet Life's proposed meaning for "exponential." (*Compare* Mem. at 13 *with* Opp. at 10-17.)[14]

Finally, Life is simply wrong to say that the dictionary definitions on which Illumina relies are out of context.15 (Opp. at 13.) Illumina relies on biotechnology dictionaries defining the term specifically in the context of nucleic-acid amplification, as the Federal Circuit deemed proper in *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996).

## V.   ILLUMINA'S GEL LAYER IS ONLY ABOUT 1/100TH AS THICK AS CLAIMS 1 AND 2 OF THE '568 PATENT AND CLAIM 6 OF THE '698 PATENT REQUIRE

Illumina cannot infringe these thickness-limited claims because its gel layer is only about 12 nm thick. (Mem. at 16.) This was proven by Dr. Czymmek's atomic force microscopy ("AFM") tests. Life does not dispute that Dr. Czymmek's tests were conducted properly, nor does Life dispute that AFM is the single most accurate way to measure the thickness of Illumina's gel layer. (*Id.*) Life also does not dispute that its own experts' admissions about the TIRF data prove that Illumina's gel layer cannot be 500 nm or more thick. (*Id.* at 17-18.) Nor does Life dispute that the data from the one test that Life conducted on the gel layer in its natural state – the confocal test – could not have been acquired if the gel was 500 nm or more thick. (*Id.* at 18-19.)

Life's only quibble with the data is that AFM says the gel layer is ▮▮▮▮ thick, whereas TIRF and confocal data can only conclusively say the layer is less than ▮▮▮▮▮▮ thick, respectively. But ▮▮▮▮▮▮▮ are the resolution limits of those techniques; they can conclusively say that something is thinner than that, but not how much less, or the exact

---

[14] Life expanded on its claim-construction arguments regarding "exponential" in opposing Illumina's *Daubert* motion to exclude Dr. Barron's opinions (D.I. 350). Illumina's Reply Brief in support of its *Daubert* motion sets out Illumina's more-detailed responses to these arguments.

[15] Life mischaracterizes Illumina's proposed construction as being limited to perfect doubling. (Opp. at 12-13.) Dr. Slater's opinion, however, accounts for the inefficiencies that prevent perfect doubling: "[O]ne of ordinary skill in the art in October 1992 would still have recognized PCR as an exponential amplification reaction, despite inefficiencies that prevent theoretical levels of amplification because—despite these inefficiencies—the template and product DNAs are still equally effective as templates in each subsequent round of amplification, even though neither is 100% efficient." (Ex. 6 (Slater Report) ¶ 71.)

1  thickness. Thus, the data Illumina relies on is not "wildly varying," as Life argues, but rather is

2  entirely consistent and proves that Illumina's gel layer is much thinner than the claims require.

3      Life's reliance on Illumina's pre-litigation tests is disingenuous and cannot preclude

4  summary judgment. Life did not dispute that Dr. Barron admitted that those tests were

5  unreliable. (Mem. at 18.) Life cannot manufacture a genuine dispute by relying on flawed

6  evidence. *Invitrogen Corp. v. Clontech Lab., Inc.*, 429 F.3d 1052, 1081 (Fed. Cir. 2005).

7      Finally, Life's argument about the Doctrine of Equivalents is inapt. As Life admitted in its

8  opposition, its arguments only apply to layers that are at least 500 nm thick. (Opp. at 19.) But the

9  undisputed data, proves that Illumina's layer is much less than 500 nm thick.

10 **VI.   ILLUMINA'S SEQUENCING INSTRUMENTS CANNOT INFRINGE**

11     Life does not dispute that the paired-end process in Illumina's accused sequencing

12 instruments does not exponentially amplify; instead, Life argues that *other instruments* perform

13 exponential amplification. (Opp. at 17.) But that does not rebut Illumina's motion. Pointing to

14 other instruments that may infringe is irrelevant to whether the sequencing instruments infringe.

15     Illumina also established that none of its sequencing instruments can "screen." Life responds

16 with two claim-construction arguments (Opp. at 22-23), neither of which has any merit. First,

17 Life argues claim differentiation: because claim 7 says the "step of screening comprises

18 visualizing detectable colonies with an intercalating dye." But this does not rebut Illumina's

19 argument. Claim 7 merely recites how the screened colonies are *visualized* (by intercalating

20 dyes); it does not mean the colonies are not *screened*. In other words, Claim 7 requires the

21 colonies to be screened for a particular sequence (*e.g.*, by the use of a hybridizing probe) and

22 then visualized by the use of an intercalating dye (*e.g.*, a dye attached to the probe).

23     Second, Life argues that Illumina's instruments screen merely because, at each step, they

24 detect whether a colony has an A, T, C or G. This construction would read the word "screen" out

25 of the claim: the Illumina instruments would "screen" merely because they look for *every*

26 sequence. But this is the opposite of screening – which means to look for a *particular* sequence.

27

28

1   Dated: January 10, 2013                          Respectfully submitted,

2
                                                      By: /s/ E. Joseph Connaughton
3                                                          101 West Broadway, Ninth Floor
                                                           San Diego, CA 92101
4                                                          (619) 744-3645

5
                                                           Kevin M. Flowers
6                                                          Matthew C. Nielsen
                                                           Mark H. Izraelewicz
7                                                          Cullen N. Pendleton
                                                           Amanda K. Antons
8                                                          Marshall, Gerstein & Borun LLP
                                                           233 South Wacker Drive
9                                                          6300 Willis Tower
                                                           Chicago, IL 60606
10                                                         (312) 474-6300

11
                                                           Ronald M. Wawrzyn
12                                                         Matthew M. Wawrzyn
                                                           Wawrzyn LLC
13                                                         233 South Wacker Drive
                                                           84th Floor, Willis Tower
14                                                         Chicago, IL 60606
                                                           (312) 283-8330
15

16                                                         *Attorneys for Defendants*
                                                           *Illumina, Inc. and Solexa, Inc.*
17

18

19

20

21

22

23

24

25

26

27

28
     ILLUMINA'S REPLY MEMORANDUM IN                   11        Case No. 3:11-cv-00703-CAB (DHB)
     SUPPORT OF ITS MOTION FOR SUMMARY
     JUDGMENT OF NON-INFRINGEMENT