PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
101 West Broadway, Ninth Floor
San Diego, CA 92101
(619) 619-237-5200
jconnaughton@paulplevin.com

Kevin M. Flowers (*pro hac vice*)
Matthew C. Nielsen (*pro hac vice*)
Mark H. Izraelewicz (*pro hac vice*)
Cullen N. Pendleton (*pro hac vice*)
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
Chicago, IL 60606-6357
(312) 474-6300

Ronald M. Wawrzyn (*pro hac vice*)
Matthew M. Wawrzyn (*pro hac vice*)
WAWRZYN LLC
233 South Wacker Drive
Chicago, IL 60606
(312) 283-8330

Jeffrey N. Costakos (pro hac vice)
Kimberly K. Dodd (SBN 235109)
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
(414) 271-2400

*Attorneys for Defendants/Counterclaim Plaintiffs*
*Illumina, Inc. and Solexa, Inc.*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFE TECHNOLOGIES CORPORATION; APPLIED BIOSYSTEMS, LLC; INSTITUTE FOR PROTEIN RESEARCH; ALEXANDER CHETVERIN; HELENA CHETVERINA and WILLIAM HONE, <br><br> Plaintiffs, <br><br> v. <br><br> ILLUMINA, INC. and SOLEXA, INC., <br><br> Defendants. | CASE NO. 3:11-cv-00703-CAB (DHB) <br><br> **ILLUMINA'S OBJECTION TO AND MOTION TO STRIKE LIFE'S UNTIMELY EXPERT DECLARATIONS** <br><br> Date: January 17, 2013 <br> Time: 2:30 p.m. <br> Courtroom: 2 <br> Judge: Hon. Cathy Ann Bencivengo <br><br> **ORAL ARGUMENT REQUESTED SUBJECT TO COURT APPROVAL** |

# TABLE OF CONTENTS

I.   Introduction ................................................................................................................. 1

II.   Factual background ..................................................................................................... 2

    A.   Fact discovery ................................................................................................. 2

    B.   The Court-ordered expert-discovery deadlines ......................................... 4

    C.   Expert discovery ............................................................................................. 6

    D.   Life's disclosure of the opinions in the Barron and Edwards declarations was untimely ................................................................................................. 8

III.   Argument ..................................................................................................................... 9

    A.   The governing legal standards ..................................................................... 9

    B.   The Barron and Edwards declarations should be stricken, and the opinions and information therein excluded from evidence .................................. 11

        1.   Life's belated disclosures of Drs. Barron and Edwards' new opinions violated the Court's Scheduling Orders ................................... 11

        2.   Life has no substantial justification for its untimely disclosures of the new opinions ................................................................................. 12

            (a)   Life knew from fact discovery that Illumina's "amplification system" is not "entrapped" because, *inter alia*, it includes formamide ............................................. 14

            (b)   Life knew from fact discovery that Illumina does not "exponentially" amplify nucleic acids ......................................... 16

            (c)   Life knew from fact discovery that Illumina's amplified DNA products cannot "migrate" ................................................ 18

            (d)   Dr. Backman explained in his opening expert report that the Stapleton PCT disclosed polyacrylamide as an amplification matrix ......................................................... 19

            (e)   Life should have sought leave to serve supplemental expert reports before expert discovery closed .......................... 20

        3.   Life's untimely disclosure of the Barron and Edwards declarations is highly prejudicial to Illumina ................................................ 21

IV.   Conclusion ................................................................................................................. 24

i

# TABLE OF AUTHORITIES

**Cases**

*Ashman v. Solectron, Inc.*, No. CV 08-1430 JF,
    2010 WL 3069314 (N.D. Cal. Aug. 4, 2010) .............................................. 10, 12

*AT&T Wireless Services of California LLC v. City of Carslbad, California*,
    No. 01-cv-2045–JM(LAB),
    2002 WL 34537564 (S.D. Cal. Nov. 7, 2002) ............................................. 22

*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*,
    199 F.R.D. 484 (E.D.N.Y. 2001) ................................................................ 22

*Cueto v. Overseas Shipholding Group, Inc.*, Civil No. 10CV1243 LAB (NLS),
    2012 WL 28357 (S.D. Cal. Jan. 4, 2012) ................................................. 13, 21

*General Elec. Co. v. Sonosite, Inc.*,
    641 F. Supp. 2d 793 (W.D. Wis. 2009) ..................................................... 16

*Hoffman v. Constr. Protective Servs., Inc.*,
    541 F.3d 1175 (9th Cir. 2008) ............................................................. 11, 21

*Keener v. United States*,
    181 F.R.D. 639 (D. Mont. 1998) ............................................................... 16

*Laser Design Int'l, LLC v. BJ Crystal, Inc.*, No. C03-1179 JSW, C03-3905 JSW,
    2007 WL 735763 (N.D. Cal. Mar. 7, 2007) .............................................. 13, 21

*Plumley v. Mockett*,
    836 F. Supp. 2d 1053 (C.D. Cal. 2010) ............................................. 10, 13, 15

*Procter & Gamble Co. v. McNeil-PPC, Inc.*,
    615 F. Supp. 2d 832 (W.D. Wis. 2009) ..................................................... 16

*Quevedo v. Trans-Pacific Shipping, Inc.*,
    143 F.3d 1255 (9th Cir. 1998) ................................................................. 10

*Reid v. Lockheed Martin Aeronautics Co.*,
    205 F.R.D. 655 (N.D. Ga. 2001) ............................................................... 16

*Shaba v. United States*,
    No. 07CV738-WQH-CAB,
    2009 WL 482350 (S.D. Cal. Feb. 23, 2009) ............................................ 21, 22

*Synbiotics Corp. v. Heska Corp.*, No. 98-CV-2076W (NLS),
    2000 WL 35632582 (S.D. Cal. Sept. 21, 2000) ......................................... 10

*Torres v. City of L.A.*,
    548 F.3d 1197 (9th Cir. 2008) ................................................................. 21

*Wong v. Regents of the Univ. of Cal.*,
   410 F.3d 1052 (9th Cir. 2005) ......................................................................... 10, 21, 22

*Yeti By Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001) ......................................................................... 10, 11

**Rules**

Fed. R. Civ. P. 26(a)(2)(A) ......................................................................... 9

Fed. R. Civ. P. 26(a)(2)(B) ......................................................................... 9

Fed. R. Civ. P. 26(a)(2)(D) ......................................................................... 9, 11

Fed. R. Civ. P. 37(c)(1) ......................................................................... 9, 11, 12, 21

iii

1    **I.      Introduction**

2         The recently-filed declarations of Life's expert witnesses, Dr. Barron, Dr. Edwards, and Mr.

3    Mulholland, should be stricken pursuant to Fed. R. Civ. P. 37 because of Life's inexcusable

4    failure to timely disclose the opinions and other information in those declarations under Fed. R.

5    Civ. P. 26. Life did not disclose the opinions or information in those declarations (which are

6    really supplemental expert reports) to Illumina until December 21, 2012, almost four months

7    after they were due, more than two months after the close of expert discovery, and more than a

8    month after Illumina filed its motions for summary judgment of non-infringement and invalidity.

9         Life admits that the opinions and information in these declarations are beyond the scope of

10   what Life disclosed during expert discovery. There can therefore be no question that these

11   declarations violate the Court's Scheduling Orders and Fed. R. Civ. P. 26.

12        Life's delay in disclosing the opinions in the declarations was neither "harmless" nor

13   "substantially justified." Life's explanation for waiting to disclose certain of these opinions – that

14   Illumina did not disclose its non-infringement positions until expert reports were served – is

15   contradicted by the facts, as Illumina timely disclosed corresponding non-infringement

16   contentions and information during fact discovery.

17        Indeed, as the party asserting infringement of the Chetverin patents, it was Life's burden to

18   prove that each limitation of its asserted patent claims has been met. Now, Dr. Edwards, who had

19   not earlier opined on the alleged infringement, and who stated at his deposition that his opinions

20   were limited to the subject matter of his opening report (the alleged validity of the Chetverin

21   patent claims), is suddenly offering infringement opinions. Moreover, in many cases, the new

22   opinions directly contradict those witnesses' prior expert reports and sworn deposition testimony,

23   upon which Illumina relied in briefing its motions.

24        Even assuming for the sake of argument that Life was surprised, and supplemental expert

25   reports were warranted, the time for Life to request leave to serve such reports was more than

26   two months ago, before the close of expert discovery, before Illumina deposed Dr. Edwards, and

27   certainly before Illumina filed summary-judgment motions. Life has no reasonable excuse, much

28

less "substantial justification," for its lack of diligence, which obviously harmed Illumina by, *e.g.*, preventing it from deposing Drs. Barron and Edwards on their newly-disclosed opinions before filing summary-judgment motions. Life is at fault for these belated disclosures, the timing of which was under its control. As Life itself told the Court earlier in this case, "[c]ourt scheduling orders exist for a reason – to encourage the swift and efficient adjudication of disputes." Life's attempt to disclose new expert opinions "after the close of fact discovery and after motions for summary judgment have been filed threatens that purpose and should not be condoned." ECF No. 240-1 at 8. The Court granted Life's corresponding motion to strike, stating in part "[t]he Court finds these submissions untimely and their production after the close of discovery with the summary judgment motions already filed, prejudicial to Life Technologies." Order On Parties' Cross Motions For Summary Judgment And Plaintiff's Motion To Strike [Doc. Nos. 171, 209, 240] (ECF No. 279) at 3.

The only appropriate sanction is to strike the belatedly-disclosed opinions of Dr. Barron, Dr. Edwards, and Mr. Mulholland under Fed. R. Civ. P. Rule 37, and to preclude those witnesses from testifying about those opinions at trial. And for the same reasons, the Court should also strike the belatedly-disclosed declarations of Graham Howe and Jereme Sylvain, which Life also waited to disclose until opposing Illumina's motions for summary judgment.

**II.    Factual background**

    **A.    Fact discovery**

Early in fact discovery (on February 18, 2010), Illumina told Life, in response to Life's contention interrogatory, that Illumina did not infringe any of the Chetverin patent claims because its accused systems did not satisfy specific limitations in the claims. For example, Illumina disclosed that it did not infringe because its "amplification system" is not "completely

entrapped" or in an "an aqueous liquid phase,"[1] because it does not "exponentially" amplify nucleic acids,[2] and because its systems do not use a matrix "'wherein the average distance between the nearest solid surfaces is smaller than the distance which the synthesized nucleic acid product can migrate by diffusion during the reaction' . . . ."[3]

Life never told Illumina that it believed those interrogatory answers were insufficient, and indeed, Life provided the same type of information (listing the elements that Life contended was missing from its accused products) in their own answer to the same interrogatory concerning Illumina's four patents-in-suit, *e.g.*, "The Defendants/Counter-Claim Plaintiffs' infringement contentions do not establish, as required by 35 U.S.C. § 271, that each limitation of the asserted claims of the '505 Patent (claims 1,2,3,5, and 6) is met by the SOLiD system. Moreover, the SOLiD system does not infringe the asserted claims of the '505 Patent (claims 1,2,3,5 and 6) for at least the reason that the claim limitation requiring 'a device-readable medium embodying a program of instructions for execution by said device to perform a method of ... tracking positions of the microparticles' is not met." Nielsen Decl. Exh. 2 (Life's First Supplemental Response And Objections To Illumina And Solexa's Interrogatory Number 1) at 4-5.

Also during fact discovery (on October 27, 2010), Life took at Fed. R. Civ. P. 30(b)(6) deposition of Illumina on the topic of Illumina's "[m]ethods utilized for the amplification of nucleic acids,"[4] and learned that Illumina considered formamide to be a component of its

---

[1] *See* Nielsen Decl. Exh. 1 (Illumina And Solexa's Objections And Responses To Plaintiffs' Second Set Of Interrogatories [Nos. 6-11]) (dated February 18, 2010) at 5-7 ("[T]he relevant Illumina products do not infringe any of the asserted claims" of the Chetverin patents because "at least the following limitations therein are not met either literally or under the Doctrine of Equivalents: . . . 'an aqueous liquid phase that includes a cell-free, enzymatic, exponential nucleic acid amplification system' . . . 'matrix completely entrapping said amplification system' . . . 'a preformed immobilized medium . . . comprising an aqueous liquid phase that includes a cell-free nucleic acid polymerase system capable of performing said process' . . . . 'said matrix completely entrapping said amplification system' . . .").

[2] *See id*. at, *e.g*., 5-6 ("[T]he relevant Illumina products do not infringe any of the asserted claims" of the Chetverin patents because "at least the following limitations therein are not met either literally or under the Doctrine of Equivalents: . . . 'exponential nucleic acid amplification' . . . 'a cell-free, enzymatic exponential amplification system' . . . .").

[3] *Id*. at 7.

[4] Nielsen Decl. Exh. 3 (Plaintiffs' Amended Notice Of Deposition Pursuant To Federal Rule Of Civil Procedure 30(b)(6)) at 4.

1    "amplification system." *See* Nielsen Decl. Exh. 4, Boutell Tr. at 27:19-24 ("Then after that first

2    extension for 90 seconds at 74 degrees C, then we lower the temperature to 60 degrees

3    centigrade and *then we flush in the first of our amplification reagents, which is formamide*, so

4    -- yeah, needs 100 percent formamide, which is flushed through the flow cell.") (emphasis

5    added); 38:2-8 ("Q. When you say 'isothermal amplification method,' what do you mean? A. It's

6    the way we amplify DNA on the surface of the flow cell by holding the flow cell at a constant

7    temperature and flushing over the cycles of *amplification reagents of formamide* followed by

8    premix, followed by amplification mix.") (emphasis added); 46:9-18 ("A. [S]o when she first did

9    the isothermal amplification . . . *she was using formamide, wash buffer, premix, and*

10   *amplification mix. So she had four sets of reagents for each cycle*, and she was changing the

11   tubes manually between each of those, for 35 cycles of amplification.") (emphasis added).

12       Illumina also produced documents describing the components of its amplification method,

13   including the role and significance of formamide in its amplification method. *See, e.g.*, Nielsen

14   Decl. Exh. 5 (ILMN_0096975-82).

### B.    The Court-ordered expert-discovery deadlines

16       Following completion of fact discovery, the Court originally ordered the parties to serve

17   opening Fed. R. Civ. P. 26(a)(2)(B) expert reports by July 13, 2012. *See* Scheduling Order dated

18   April 25, 2012 (ECF No. 284) at ¶1 ("Each expert witness designated by a party shall prepare a

19   written report or disclosure to be provided to all other parties before **July 13, 2012**, containing

20   the information required by Fed. R. Civ. P. 26(a)(2)(B)-(C)." (emphasis in original). That

21   deadline was ultimately extended to August 3, 2012 by the Court's July 25, 2012 Order Granting

22   Joint Motion To Continue Expert Deadlines (ECF No. 308).

23       The Court admonished the parties of the consequences for failing to make timely disclosures:

24   "**Except as provided in the paragraph below, any party that fails to make these disclosures**

25   **shall not, absent substantial justification, be permitted to use evidence or testimony not**

26   **disclosed at any hearing or at the time of trial. In addition, the Court may impose sanctions**

27   **as permitted by Fed. R. Civ. P. 37(c).**" Scheduling Order dated April 25, 2012 (ECF No. 284)

28

at ¶1 (emphases in original).

The deadline for the parties to serve rebuttal expert reports was originally August 8, 2012. *Id*. at 2, ¶2 ("Any party, through any expert designated, shall in accordance with Fed. R. Civ. P. 26(a)(2)(D)(ii) and Fed. R. Civ. P. 26(e), supplement any of its expert reports or disclosures regarding evidence intended solely to contradict or rebut evidence on the same subject matter identified in an expert report or disclosure submitted by another party. Any such supplemental reports or disclosures are due on or before August 8, 2012.") (emphasis omitted), and was extended to August 29, 2012 (Order Granting Joint Motion to Continue Expert Deadlines (ECF No. 308)), which the parties then agreed to extend through August 31, 2012 (Nielsen Decl. Exh. 6, August 28, 2012 email correspondence)).

In other words, under the Scheduling Order, to be timely, any "supplemental reports or disclosures" under Fed. R. Civ. P. 26(e) "intended to contradict or rebut evidence" in an opening expert report were due within 28 days of receiving that opening expert report.

The deadline for the parties to complete expert discovery (*i.e.*, depositions of the experts on their reports) was originally September 21, 2012. *Id*. at 2, ¶3 ("All expert discovery must be completed by all parties on or before **September 21, 2012**. 'Completed' means that all discovery under Rules 30-36 of the Federal Rules of Civil Procedure, and discovery subpoenas under Rule 45, must be initiated a sufficient period of time in advance of the cutoff date, so that it may be completed by the cutoff date, taking into account the times for service, notice, and response as set forth in the Federal Rules of Civil Procedure. Counsel must promptly and in good faith meet and confer with regard to all discovery disputes in compliance with Local Rule 26.1 a. **A failure to comply in this regard will result in a waiver of a party's discovery issue. Absent an order of the Court, no stipulation continuing or altering this requirement will be recognized by the Court**.") (emphases in original). The September 21, 2012 deadline was ultimately extended to October 12, 2012 by the Court's Order Granting Joint Motion To Extend Time For Expert Depositions And To File Summary Judgment Motions (ECF No. 313).

### C.    Expert discovery

In accordance with these Court-ordered deadlines, the parties exchanged opening expert reports on August 3, 2012. Among Life's opening expert reports was a report by Dr. Barron on the topic of the alleged infringement of the Chetverin patents (Nielsen Decl. Exh. 7). Life did not serve an opening expert report for Dr. Edwards.

Dr. Barron's opening report addressed, among other topics, the alleged entrapment of Illumina's "amplification system" (*id*. at ¶¶55, 61, 68, 81-97, 90, 105, 107, 121, 138), but not the topic of whether formamide is a component of that "system." Dr. Barron also addressed Life's allegation that Illumina's amplification is "exponential" (although, as Illumina contends in its pending motion to exclude (ECF No. 330), Dr. Barron's proposed testimony is inadmissible). Nielsen Decl. Exh. 7 at ¶¶62-65, 83, 106, 126, 139. She also addressed whether Illumina's amplified DNA "migrate[s] by diffusion," and said that "[s]ynthesized nucleic acids products cannot migrate by diffusion as they are covalently attached to the SFA hydrogel via the P7 and P5 primers" (Nielsen Decl. Exh. 8 (Expert Report of Annelise Barron, Ph.D., Appendix E: Analysis of U.S. Patent No. 5,958,698 and Illumina's Instruments and Reagents) at 2) and that, for Illumina, "the template (and the resulting products) are amplified by a polymerase reaction, and as they are produced, remain bound to the polymer matrix; thus, the amplification reaction's products cannot diffuse away." Nielsen Decl. Exh. 7 at ¶33.[5]

Among Illumina's opening expert reports served on August 3, 2012 was an opening report by Dr. Backman on the invalidity of the asserted claims in the Chetverin patents. Nielsen Decl. Exh. 9. Among the specific topics that Dr. Backman discussed in his report is how the Stapleton PCT publication disclosed polyacrylamide as an amplification matrix.[6]

---

[5] *See also* Nielsen Decl. Exh. 7 (Barron opening report) at ¶¶ 39, 68, and ¶84.

[6] Nielsen Decl. Exh. 9 (Opening Expert Statement of Keith C. Backman, Ph.D.) at, *e.g.*, ¶¶180 (*e.g.*, "Polyacrylamide was disclosed in Stapleton's PCT as one of the matrix materials, and is one that was known to be heat stable."), ¶123 ("At page 20 of her PCT publication, Dr. Stapleton says that the matrix could be made from agarose, polyacrylamide, or similar polymers"), ¶124 (stating that the Stapleton PCT and the asserted patents disclosed the same matrix materials for amplification, including polyacrylamide), ¶147 (referring to acrylamide for amplification in the PCT), and ¶155 (again referring to acrylamide for amplification in the PCT).

On August 31, 2012, the parties exchanged rebuttal expert reports. Drs. Barron and Edwards each submitted rebuttal reports about the alleged validity of claims in the Chetverin patents (Nielsen Decl. Exhs. 10 and 11, respectively). Neither of those reports addressed the Stapleton PCT's disclosure of polyacrylamide as a matrix for amplification. Nor did Life serve any other rebuttal report addressing that topic.

Among Illumina's rebuttal expert reports served on August 31, 2012 was a rebuttal report by Dr. Weinstock on Illumina's non-infringement of the asserted claims in the Chetverin patents, in which he explained how Illumina's sequencing products do not satisfy the "wherein the average distance between the nearest solid surfaces is smaller than the distance which the synthesized nucleic acid product can migrate by diffusion during the reaction" limitation of claim 1 of the '698 patent.[7] Dr. Weinstock further explained how formamide is an essential component of Illumina's amplification system, and how Illumina's sequencing products do not literally infringe any of the asserted Chetverin patent claims because they do not "entrap" the set of components of Illumina's amplification system.[8] Dr. Weinstock further explained how Illumina's sequencing products do not result in "exponential" amplification of nucleic acids or use an "exponential" nucleic acid amplification system."[9] Illumina also served a rebuttal expert report by Dr. Gary Slater, in which he discussed how the Illumina cluster-generation process does not result in "exponential amplification."[10]

Illumina deposed Drs. Barron and Edwards on September 14 and 27, 2012, respectively.

---

[7] Nielsen Decl. Exh. 12 at, *e.g.*, ¶¶173-183 (heading: "Illumina's Sequencing Products Do Not Satisfy The 'Wherein The Average Distance Between The Nearest Solid Surfaces Is Smaller Than The Distance Which The Synthesized Nucleic Acid Product Can Migrate By Diffusion During The Reaction' Limitation Of Claim 1 Of The '698 Patent"); *see also* ¶¶ 113, 115, and 116.

[8] *See id*. at, *e.g.*, ¶¶ 62-69 (heading: "Formamide is a necessary component of Illumina's Amplification System"), and 70-73 (under the heading "Illumina's Sequencing Products Do Not Literally Infringe Any Asserted Claim Because They Do Not Entrap the Set of Components of Illumina's Amplification System").

[9] *See id*. at, *e.g.*, ¶¶ 150-154 (heading: "Illumina's Sequencing Products Do Not Result In 'Exponential' Amplification Of Nucleic Acids Or Use An 'Exponential' Nucleic Acid Amplification System.").

[10] Nielsen Decl. Exh. 21 at, *e.g.*, ¶¶ 39-58 and 86-176.

Dr. Edwards testified that the "subject matter" of his opinions that he intended to provide at trial were "all contained" in his rebuttal expert report. Edwards Dep. Tr. (Nielsen Decl. Exh. 13) at 140:8-141:23. And Dr. Edwards admitted that the Stapleton PCT discloses polyacrylamide as a matrix for amplification.[11]

Expert discovery closed on October 12, 2012. (ECF No. 313).

### D.   Life's disclosure of the opinions in the Barron and Edwards declarations was untimely

Pursuant to the Court's October 29, 2012 Order, the parties moved for summary judgment on various issues on November 2, 2012. Illumina moved for summary judgment of invalidity and non-infringement of the asserted claims in the Chetverin patents. ECF Nos. 320 and 323.

On December 21, 2012, more than two months after expert discovery closed, and more than a month after Illumina filed its motions for summary judgment, Life filed the declarations of Drs. Barron and Edwards, in which they disclosed wholly new opinions upon which Life now seeks to rely.[12]

Dr. Barron provides new opinions on the issue of the alleged infringement of the Chetverin claims, specifically that Illumina's amplified DNA products "migrate by diffusion," despite having stated in her opening expert report that no such migration or diffusion was possible. Nielsen Decl. Exh. 14 at ¶¶4-9. Dr. Edwards opines for the first time about the alleged infringement of the Chetverin claims, i.e., whether formamide is part of an "amplification system" (¶¶19-25),[13] the alleged meaning of the claim term "exponential amplification" (¶¶26-

---

[11] Nielsen Decl. Exh. 13 (Edwards Tr.) at 304:16 - 305: 24 ("(Q. They [the Stapleton PCT publication] described it [polyacrylamide] as the matrix material, right? A. They described it as the potential matrix material. . . . Q. Here's what I'm saying. I'm saying that Stapleton disclosed using polyacrylamide. She [in the Stapleton PCT publication] also disclosed putting PCR mix in the acrylamide. A. Right. Q. She might dehydrate it and rehydrate it with the mix? A. At times she says that.").

[12] Nielsen Decl. Exh. 14 (Declaration Of Annelise E. Barron In Support Of Plaintiffs' Memorandum Of Points And Authorities In Opposition To Illumina's Motion For Summary Judgment Of Non-Infringement And Motions To Exclude) (cited hereafter as "12/21/12 Barron Decl."); Nielsen Decl. Exh. 15 (Declaration Of Jeremy S. Edwards In Support Of Plaintiffs' Memoranda Of Points And Authorities In Opposition To Illumina's Summary Judgment Motions And Motions To Exclude) (cited hereafter as "12/21/12 Edwards Decl.").

[13] Life admits that Dr. Barron did not earlier address the use of formamide in Illumina's

8

32), and "migration by diffusion" (¶¶37-46). Dr. Edwards also further opines on the alleged validity of claims in the Chetverin patents, contradicting his prior sworn testimony that the Stapleton PCT publication discloses polyacrylamide as a potential matrix for amplification. *Id*. at ¶36.[14]

Also on December 21, 2012, Life submitted declarations of Jonathan Mulholland (regarding "TEM Sample Preparation" and "Anti-dsDNA Staining," and in support of, *inter alia*, Life's opposition to Illumina's motion for summary judgment of non-infringement) (Nielsen Decl. Exh. 16), Graham Howe (regarding information provided to Ms. Davis, and in support of, *inter alia*, Life's oppositions to Illumina's motions for summary judgment) (Nielsen Decl. Exh. 17), and Jereme Sylvain (regarding sales, and in support of, *inter alia*, Life's oppositions to Illumina's motions for summary judgment) (Nielsen Decl. Exh. 18). These declarations similarly provided information and opinions that were not previously disclosed.

## III.   Argument

### A.   The governing legal standards

Fed. R. Civ. P. 26(a)(2) requires "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705" (Rule 26(a)(2)(A)), "this disclosure must be accompanied by a written report," and "[t]he report must contain: (i) ***a complete statement of all opinions the witness will express and the basis and reasons for them***; [and] (ii) the facts or data considered by the witness in forming them; . . ." Rule 26(a)(2)(B) (emphasis added). Rule 26(a)(2)(D) mandates that "[a] party ***must make these disclosures at the times and in the sequence that the court orders***." (emphasis added).

---

"amplification system." Memorandum Of Points And Authorities In Opposition To Illumina And Solexa's Motion For Summary Judgment Of Non-Infringement (ECF No. 370) at 6 ("Dr. Barron's infringement report identified the components that actually perform amplification in Illumina's system: 'The flow cell contains a complete set of components (buffer, BST polymerase enzyme, dNTPs, and oligonucleotide primers) that together can amplify a nucleic acid.' Dr. Barron thus did not include formamide as a component of Illumina's amplification system.").

[14] Dr. Edwards also opines on other topics in his declaration (*e.g.*, "Overview of DNA Sequencing" (¶¶12-14), "Technology Of The Chetverin Patents" (¶¶15-18), and "Stability" (¶¶33-35)), which Illumina also moves to strike for the reasons explained in this brief.

9

Fed. R. Civ. P. 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party *is not allowed to use that information or witness to supply evidence on a motion*, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." (emphasis added). *See also* Scheduling Order dated April 25, 2012 (ECF No. 284) at ¶1 ("**Except as provided in the paragraph below, any party that fails to make these disclosures shall <u>not</u>, absent substantial justification, be permitted to use evidence or testimony not disclosed at any hearing or at the time of trial. In addition, the Court may impose sanctions as permitted by Fed. R. Civ. P. 37(c).**") (emphases in original).

It is Life's burden to prove the failure to disclose was "substantially justified" or "harmless." *Yeti By Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001) ("Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness.").

Courts regularly apply Rule 37(c)(1) to preclude from consideration and strike expert declarations submitted after the close of discovery. *Quevedo v. Trans-Pacific Shipping, Inc.*, 143 F.3d 1255, 1258 (9th Cir. 1998) (district court did not abuse its discretion in disregarding the untimely designation and report of plaintiff's expert when the designation was twenty days late and the report was submitted with the plaintiff's opposition to the defendant's motions for summary judgment more than one month after the deadline for expert designation and reports)*; Plumley v. Mockett*, 836 F. Supp. 2d 1053, 1064-65 (C.D. Cal. 2010) (excluding "supplemental" expert report that provided new opinions, rather than correcting error or omission in original report, and refusing to consider supplemental report on motion for summary judgment); *Synbiotics Corp. v. Heska Corp.*, No. 98-CV-2076W (NLS), 2000 WL 35632582, at *2 (S.D. Cal. Sept. 21, 2000) (granting motion to strike supplemental expert report served more than two months after discovery had closed).

Indeed, courts have warned that "[p]arties must understand that they will pay a price for failure to comply strictly with scheduling and other orders, and that failure to do so may properly support severe sanctions and exclusions of evidence." *Ashman v. Solectron, Inc.*, No. CV 08-1430 JF, 2010 WL 3069314, at *4 (N.D. Cal. Aug. 4, 2010) (citing *Wong v. Regents of the Univ.*

*of Cal.*, 410 F.3d 1052, 1060 (9th Cir. 2005)) (noting also that this authority is necessary for the Court to "efficiently and effectively" manage its cases). *See also* Scheduling Order dated April 25, 2012 (ECF No. 284) at ¶1 ("**Except as provided in the paragraph below, any party that fails to make these disclosures shall <u>not</u>, absent substantial justification, be permitted to use evidence or testimony not disclosed at any hearing or at the time of trial. In addition, the Court may impose sanctions as permitted by Fed. R. Civ. P. 37(c).**") (emphasis in original). As the Ninth Circuit has explained, such sanctions and exclusions include "forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly*, 259 F.3d at 1106 (noting that the authority to impose such sanctions and exclusions under Rule 37 (c)(1) is what "gives teeth" to the Rule 26 requirements).

Rule 37(c)(1) is a "'self-executing,' 'automatic,' sanction to 'provide[] a strong inducement for disclosure of material.'" *Yeti by Molly*, 259 F.3d at 1106 (quoting Advisory Committee Notes to Rule 37 (c)(1)). No willfulness, fault, or bad faith need be shown under Rule 37(c)(1) where the sanction would not result in a complete dismissal. *Id.* ("Courts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded. . . . [E]ven absent a showing in the record of bad faith or willfulness, exclusion is an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a)."); *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008) (district court not required to make a finding of willfulness or bad faith before excluding evidence not disclosed but mandated by Rule 26 (a)).

**B.     The Barron and Edwards declarations should be stricken, and the opinions and information therein excluded from evidence**

**1.     Life's belated disclosures of Drs. Barron and Edwards' new opinions violated the Court's Scheduling Orders**

There can be no question that Life violated Fed. R. Civ. P. 26 and this Court's Scheduling Orders by failing to timely disclose the opinions and other information in the Barron and Edwards declarations until more than four months after they were due, more than two months after the close of expert discovery, and more than a month after Illumina filed its motions for

summary judgment. Fed. R. Civ. P. 26(a)(2)(D) ("Time to Disclose Expert Testimony. A party must make these disclosures at the times and in the sequence that the court orders."). As a sister court has recognized, "any supplemental disclosure [after the close of discovery] would be untimely." *Ashman*, 2010 WL 3069314, at *4. For the same reasons, the opinions and other information in these declarations violate Rule 26 because they are beyond the scope of the expert reports that Life served during the Court-ordered period for expert discovery.[15]

Because Life failed to timely disclose the opinions and other information in the Barron and Edwards declarations as required under Fed. R. Civ. P. 26, Life bears the burden of proving that its failure to disclose was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1).

### 2. Life has no substantial justification for its untimely disclosures of the new opinions

Life has no reasonable excuse, much less substantial justification, for its failure to timely disclose the new opinions and other information in the Barron and Edwards declarations. Life's only explanation so far is that, for certain now-disclosed opinions, Illumina did not disclose corresponding non-infringement grounds until serving its rebuttal expert reports. But that is simply not true. Illumina disclosed to Life during fact discovery that its system does not satisfy the specific limitations of the Chetverin patent claims about which Life now seeks to provide additional expert opinions, and disclosed how Illumina's "amplification system" correspondingly operated. Moreover, it was Life's burden to prove infringement of the asserted patent claims.

Life therefore could have (and should have) reasonably anticipated the need to provide its new expert opinions during the Court-ordered period for expert discovery. Indeed, Dr. Edwards, who earlier provided no opinions on the alleged infringement of the Chetverin patents, now suddenly offers opinions on those issues. Life simply chose to introduce a new expert report on

---

[15] Even if Life had a legitimate reason to supplement their expert reports, Life cannot cite anything in the Court's Scheduling Order that permitted waiting to submit such reports until more than two months after the close of expert discovery and after Illumina filed motions for summary judgment. Moreover, the Court's Scheduling Orders allowed 28 days after opening expert reports were exchanged to serve rebuttal reports. Life does not explain why it could not have served its new declarations/reports within 28 days of receiving Illumina's non-infringement expert reports on August 31, 2012,  or before the close of expert discovery on October 12, 2012.

those issues. For other opinions that Life now seek to introduce, Life offer no explanation whatsoever for their untimely disclosure. This is the type of conduct that courts have found fails to constitute "substantial justification" under Rule 37. *Cueto v. Overseas Shipholding Group, Inc.*, Civil No. 10CV1243 LAB (NLS), 2012 WL 28357, at *1-2 (S.D. Cal. Jan. 4, 2012) (denying motion for leave to file supplemental expert report approximately six months after the deadline to supplement expert reports and approximately five months after the close of expert discovery: "In short, Defendants seek to add information and theories that should have been either included in the original report or in a timely submitted supplemental report. Thus, the supplementation is neither required nor permitted by Rule 26(e)."); *Laser Design Int'l, LLC v. BJ Crystal, Inc.*, No. C03-1179 JSW, C03-3905 JSW, 2007 WL 735763, at *4 (N.D. Cal. Mar. 7, 2007) (failure to disclose testimony was not substantially justified where the party "has been on notice for quite some time that" the subject matter "is an element of the claims at issue and is a significant issue in th[e] litigation" and the party "has not provided any justification as to why it waited until after [the opposing party] filed a motion for summary adjudication to seek to introduce evidence by [the declarant] in response.").[16]

Even assuming for the sake of argument that Life was surprised by the rebuttal reports of Illumina's experts, Life should have at the very least requested leave to serve supplemental expert reports before Illumina deposed Life's experts, before the close of expert discovery, and certainly before Illumina filed motions for summary judgment. There simply was no justification

---

[16] *See also Cueto*, 2012 WL 28357, at *2 ("Although Fed. R. Civ. P. 26(e) requires a party to supplement or correct a disclosure upon information later acquired, that provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report. Similarly, a party may not rely on Rule 26(e)(1) as a way to remedy a deficient expert report or as a means of getting in, in effect, a brand new report. Supplementation does not cover failures of omission because the expert did an inadequate or incomplete preparation. To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would reek havoc in docket control and amount to unlimited expert opinion preparation.") (internal citations and quotations omitted); *Plumley*, 836 F. Supp. 2d at 1062 ("However, supplementary disclosures do not permit a party to introduce new opinions after the disclosure deadline under the guise of a 'supplement'. . . . Accordingly, a supplemental expert report that states additional opinions or seeks to strengthen or deepen opinions expressed in the original expert report is beyond the scope of proper supplementation and subject to exclusion under Rule 37(c).") (internal citations and quotations omitted).

for Life's waiting until expert discovery has been closed for more than two months, and Illumina has prepared and filed its motions for summary judgment, to disclose the new opinions and information in the Barron and Edwards declarations.

> **(a)   Life knew from fact discovery that Illumina's "amplification system" is not "entrapped" because, *inter alia*, it includes formamide**

As explained above, in Dr. Edwards's declaration, he opines for the first time on the alleged infringement of claims in the Chetverin patents, including on Illumina's defense that its "amplification system" is not "entrapped," in part because it includes formamide. Nielsen Decl. Exh. 15 at ¶¶19-25. Attempting to justify the untimely disclosure of these opinions, Life says "[a]t the heart of Illumina's argument is the late disclosed, and vigorously contested, factual assertion by Illumina that a compound called 'formamide' is part of the 'amplification system' as that term was construed by the Court. Illumina's contentions regarding formamide were raised for the first time in the Rebuttal Expert Report of Dr. Weinstock dated August 31, 2012."[17] Life says the same thing about Illumina's argument that its system does not satisfy the "aqueous" limitation of the Chetverin claims: "Illumina did not timely disclose this contention, and raised it for the first time in its expert's rebuttal report, in an apparent effort to get around the Court's claim construction order."[18]

This is false. First, as set forth above, Illumina disclosed nearly three years ago during fact discovery that it did not infringe the Chetverin claims because its "amplification system" is not "completely entrapped" or in an "aqueous liquid phase." Nielsen Decl. Exh. 1 (Illumina And Solexa's Objections And Responses To Life's Second Set Of Interrogatories [Nos. 6-11]) (dated February 18, 2010) at 5-7.

If Life suggests that Illumina should have set forth evidence or additional information in support of its non-infringement contentions (in response to Life's contention interrogatory), that cannot be reconciled with Life's own non-infringement contentions (set forth above), in which

---

[17] Memorandum Of Points And Authorities In Opposition To Illumina And Solexa's Motion For Summary Judgment Of Non-Infringement (ECF No. 370) at 3-4 (citation omitted).

[18] *Id.* at 7 (citation omitted).

Life said certain elements of Illumina's patents-in-suit were not met, and set forth no corresponding evidence or additional information. Nielsen Decl. Exh. 2 (Life's First Supplemental Response And Objections To Illumina And Solexa's Interrogatory Number 1) at 4-5.

Second, on October 27, 2010, Life deposed Illumina under Fed. R. Civ. P. 30(b)(6) on the topic of Illumina's "[m]ethods utilized for the amplification of nucleic acids,"[19] and (as also set forth above) learned that Illumina considered formamide to be a component of its "amplification system." Nielsen Decl. Exh. 4 (Boutell Dep. Tr.) at 27:19-24; 38:2-8; 46:9-18.[20]

Third, during fact discovery Illumina produced documents describing the operation of its "amplification system" including how formamide is necessary for amplification. Nielsen Decl. Exh. 5 (ILMN_0096975-82).

There is no substantial justification for Dr. Edwards, who previously offered no opinion on the alleged infringement of the Chetverin patent claims, to now offer opinions on Illumina's defense that its "amplification system" is not "entrapped," in part because it includes formamide. Life was aware of this defense from Illumina's non-infringement contentions, a Rule 30(b)(6) deposition on Illumina's "[m]ethods utilized for the amplification of nucleic acids," and from other fact discovery. Life simply wants to introduce an untimely supplemental expert report on an issue on which they bear the burden of proof, and could have reasonably anticipated a need for the testimony that they now seek to offer. *Plumley*, 836 F. Supp. 2d at 1062, 1064 ("As Plumley notes, Haas's opinions in his most recent declaration depart substantially from the ones

---

[19] Nielsen Decl. Exh. 3 (Plaintiffs' Amended Notice Of Deposition Pursuant To Federal Rule Of Civil Procedure 30(b)(6)) at 4.

[20] *See also* p. 4 n.7 of Illumina's concurrently filed Reply in Support of its Motion to Exclude the Testimony of Dr. Barron Regarding "Exponential Amplification" Limitations (ECF No. 401): "Illumina's position on the construction of the 'exponential' terms was also made clear during discovery. See 30(b)(6) Dep. Tr. Jonathan Mark Boutell (Oct. 27, 2010) at, e.g., 50:15-19 (amplification in the Illumina systems is "neither linear nor an exponential growth"), 51:3-5 ("exponential amplification . . . would be doubling the number of molecules per cycle"); 53:8-18 (explaining why product strands are not available as templates in succeeding cycles); 30(b)(6) Dep. Tr. Andrea Sabot (Oct. 28, 2010) at 178:4-15 (amplification is not exponential) (Ex. 10 & 11)."

1    he submitted within the Court's time frame for expert discovery. . . . Haas's 'supplemental'

2    report, rather than correcting an error or omission in his prior report, provides a new opinion that

3    is designed to strengthen Defendants' legal argument for inequitable conduct, and as a result is

4    not a proper supplement under Rule 26(e)."); *General Elec. Co. v. Sonosite, Inc.*, 641 F. Supp. 2d

5    793, 799 (W.D. Wis. 2009) (supplemental expert report cannot raise entirely new matters not

6    raised in initial report); *Procter & Gamble Co. v. McNeil-PPC, Inc*., 615 F. Supp. 2d 832, 838-

7    839 (W.D. Wis. 2009) (same); *Reid v. Lockheed Martin Aeronautics Co*., 205 F.R.D. 655, 662

8    (N.D. Ga. 2001) (plaintiff was not permitted to file "supplemental" expert witness reports, which

9    substantially revised analysis in original reports and revised deposition testimony, after court-

10   imposed deadline for expert witness reports and information); *Keener v. United States*, 181

11   F.R.D. 639, 642 (D. Mont. 1998) (concluding that "supplemental" report was so substantially

12   different from initial report that it fell outside any reasonable notion of correcting incomplete or

13   inaccurate expert report, as contemplated by rule requiring supplementation).

### (b) Life knew from fact discovery that Illumina does not "exponentially" amplify nucleic acids

15   As explained above, in Dr. Edwards's declaration, he opines for the first time about the

16   alleged meaning of the claim term "exponential amplification." Nielsen Decl. Exh. 15 at ¶¶26-

17   32. In attempting to justify its untimely disclosure of these opinions, Life says that "Illumina

18   abandoned its initial request to have the term construed by the Court" and "seeks to improperly

19   narrow the scope of the asserted claims by introducing a new claim construction that departs

20   from the plain and ordinary meaning of the term." ECF No. 370 (Memorandum Of Points And

21   Authorities In Opposition To  Illumina And Solexa's Motion For Summary Judgment Of Non-

22   Infringement) at 10.

23   This too is false. First, as set forth above, Illumina told Life during fact discovery that it does

24   not exponentially amplify nucleic acids. Nielsen Decl. Exh. 1 (Illumina And Solexa's Objections

25   And Responses To Life's Second Set Of Interrogatories [Nos. 6-11]) (dated February 18, 2010)

26   at 5-6.

27   Second, Illumina is not asserting a new construction of "exponential amplification";

28

16

Illumina's interpretation of "exponential" (that the number of nucleic acids increases as an exponential function of the elapsed time because all nucleic acids are equally likely to serve as templates in each amplification cycles)[21] simply refines its draft construction ("a reaction wherein the products of a round of amplification serve as templates, along with the original templates, in the next round of amplification)[22] by clarifying that perfect "doubling" is not required. Moreover, Illumina's construction effectively quotes what the specification says about exponential amplification, is consistent with how the Chetverins used the term in the prosecution history to distinguish the O'Driscoll prior-art reference, and is the same as the definitions of "exponential" found in dictionary definitions used by the scientific community (as discussed in Illumina's concurrently-filed Reply in Support of its Motion for Summary Judgment of Non-infringement and its Reply in Support of its Motion to Exclude the Testimony of Dr. Barron Regarding "Exponential Amplification" Limitations).

Third, Illumina's construction is also no different than what Life's own expert Dr. Edwards explained at the technology tutorial in this case: if both the original and new DNA strands serve as ***equal*** templates in the next round, there is substantially a doubling of the number of DNA strands, which is "exponential." Nielsen Decl. Exh. 19 (Oct. 7, 2011 Hearing Tr.) at 19:4-23 ("***And this would be an exponential amplification, and we'll call it exponential, because each time you heat, if you heat these two strands, they will then denature, and they are both equal templates for the next round of the amplification***. Okay. So we have one double-stranded molecule. You heat it, you get two single-stranded molecules. And then after you do the extension, you have two double-stranded. And then you heat it, and you get four single-stranded. And that will then all become double-stranded. And you can go through ***this process of exponential amplification***.") (emphasis added).

Fourth, Life was aware of Illumina's defense that it does not "exponentially" amplify nucleic acids, because Dr. Barron addressed the basis for this defense in her opening report. Nielsen

---

[21] Memorandum Of Points And Authorities In Support Of Illumina And Solexa's Motion For Summary Judgment Of Non-Infringement (ECF No. 320-1) at 12:4-5 and 15-16.

[22] Nielsen Decl. Exh. 20 (Illumina's Draft Constructions For Its Proposed Claim Terms) at 1.

Decl. Exh. 7 (Expert Report Of Annelise Barron, Ph.D.) at ¶¶62-65, 106, 126, and 139. In turn, as set forth above, Dr. Weinstock's rebuttal report explained how Illumina's sequencing products do not result in "exponential" amplification of nucleic acids or use an "exponential" nucleic acid amplification system." Nielsen Decl. Exh. 12 at, *e.g.*, ¶¶ 150-154. And Dr. Slater's rebuttal report discussed how the Illumina cluster-generation process does not result in "exponential amplification." Nielsen Decl. Exh. 21 at, *e.g.*, ¶¶ 39-58 and 86-176. Life had those rebuttal reports (served on August 31, 2012) long before Dr. Edwards was deposed on September 27, 2012, yet Dr. Edwards testified that the "subject matter" of his opinions that he intended to provide at trial were "all contained" in his rebuttal expert report. Nielsen Decl. Exh. 13 (Edwards Dep. Tr.) at 140:8-141:23.

There is no substantial justification for Dr. Edwards, who previously had no opinion on the alleged infringement of the Chetverin patent claims, to now offer opinions on "exponential" amplification. Life was aware of this defense from Illumina's fact-discovery non-infringement contentions and rebuttal expert reports, Dr. Barron addressed it in her opening expert report, and there is nothing new or unexpected about Illumina's non-infringement position (which is based on the same interpretation that Dr. Edwards himself used at the technology tutorial in this case).

### (c)   Life knew from fact discovery that Illumina's amplified DNA products cannot "migrate"

In Dr. Barron's declaration, she provides new opinions addressing Illumina's defense that its amplified DNA is anchored in place and consequently does not "migrate by diffusion." Nielsen Decl. Exh. 14 at ¶¶4-9. Attempting to justify its untimely disclosure of these opinions, Life says "Illumina first disclosed this non-infringement theory in its Rebuttal Expert Report of Dr. Weinstock, served on August 31, 2012." ECF No. 370 (Memorandum Of Points And Authorities In Opposition To  Illumina And Solexa's Motion For Summary Judgment Of Non-Infringement) at 19.

Yet again, the facts contradict Life's explanation: as set forth above, during fact discovery, Illumina disclosed that its system does not satisfy the Chetverin claim limitation ""wherein the average distance between the nearest solid surfaces is smaller than the distance which the

synthesized nucleic acid product can migrate by diffusion during the reaction' . . . ." Nielsen Decl. Exh. 1 (Illumina And Solexa's Objections And Responses To Life's Second Set Of Interrogatories) [Nos. 6-11] (dated February 18, 2010) at 6-7.

As also set forth above, Dr. Barron addressed Illumina's non-infringement contention regarding this limitation in her opening expert report, where she said that in Illumina's system, "[s]ynthesized nucleic acids products cannot migrate by diffusion as they are covalently attached to the SFA hydrogel via the P7 and P5 primers." Nielsen Decl. Exh. 8 (Appendix E to Expert Report of Annelise Barron, Ph.D.) at 2, and  Nielsen Decl. Exh. 7 (Expert Report Of Annelise Barron, Ph.D.) at ¶¶ 33, 39, 49, 68, and 84.

Additionally, it was Life's burden in the first instance to prove this limitation is satisfied by Illumina's products, and that proof should have been disclosed in Dr. Barron's opening report, regardless of whether Illumina contested the presence of the limitation.

Life simply appears to now regret what Dr. Barron admitted about this limitation in her opening expert report, because it establishes non-infringement, and seeks to have Dr. Barron submit a brand-new expert report on this limitation, in which she contradicts what she said in her opening expert report. Nielsen Decl. Exh. 14 (Barron 12/21/12 Decl.) at ¶7.

This is not a reasonable excuse, much less substantial justification, for the untimely disclosure of these opinions in violation of Fed. R. Civ. P. 26.

>    **(d)**     **Dr. Backman explained in his opening expert report that the Stapleton PCT disclosed polyacrylamide as an amplification matrix**

In Dr. Edwards's declaration, he further opines on the alleged validity of claims in the Chetverin patents, saying for the first time that the Stapleton PCT does not disclose polyacrylamide as a potential matrix for amplification. Nielsen Decl. Exh. 15 at ¶36. Life offers no explanation for its untimely disclosure of Dr. Edwards's new opinion. There is none. As set forth above, Illumina's expert Dr. Backman explained in his opening expert report (served on August 3, 2012) that that the Stapleton PCT disclosed polyacrylamide as an amplification matrix. Nielsen Decl. Exh. 9 at, *e.g.*, ¶¶180, 123, 124, 147, and 155. Life's experts could have tried to

contest that irrefutable point in their August 31, 2012 rebuttal reports, but chose not to. Indeed, when Dr. Edwards was deposed (on September 27, 2012), he admitted that the Stapleton PCT discloses polyacrylamide as a matrix for amplification,[23] which Life now appears to regret and have Dr. Edwards contradict by saying "[t]he polyacrylamide matrices disclosed in the Stapleton PCT Application are only identified for use in electrophoresis, an application distinct from amplification."[24] There was no substantial justification for Life's failure to disclose these opinions and information until more than two months after the close of expert discovery.

### (e) Life should have sought leave to serve supplemental expert reports before expert discovery closed

Even assuming for the sake of argument that Life was genuinely surprised by the rebuttal reports of Illumina's experts on August 31, 2012, the time to request leave to file supplemental expert reports was by October 12, 2012, when expert discovery closed. Instead, Life waited almost four months after Illumina's reports were all submitted (until December 21, 2012) to file declarations. Life has no reasonable excuse for not requesting leave to serve supplemental reports for Drs. Barron and Edwards before the close of expert discovery. This Court should strike the declarations just as it excluded the Burch Declaration and evidence submitted by Illumina in support of its original motion for summary judgment. Order On Parties' Cross Motions For Summary Judgment And Plaintiff's Motion To Strike [Doc. Nos. 171, 209, 240] (ECF No. 279) at 3 ("Illumina has not demonstrated diligence identifying the invoices or the witness, to excuse the untimeliness of the disclosures.").

There is no reasonable excuse, much less substantial justification, for Life's untimely submission of the Barron and Edwards declarations. Life could have reasonably anticipated the need to provide the new proposed testimony during the Court-ordered period for expert

---

[23] *See* Nielsen Decl. Exh. 13 (Edwards Tr.) at 304:16 - 305: 24 ("(Q. They [the Stapleton PCT publication] described it [polyacrylamide] as the matrix material, right? A. They described it as the potential matrix material. . . . Q. Here's what I'm saying. I'm saying that Stapleton disclosed using polyacrylamide. She [in the Stapleton PCT publication] also disclosed putting PCR mix in the acrylamide. A. Right. Q. She might dehydrate it and rehydrate it with the mix? A. At times she says that.").

[24] Nielsen Decl. Exh. 15 (Edwards 12/21/12 Decl.) at ¶36.

discovery, or at the very least, requested leave to serve supplemental expert reports before the close of expert discovery (and certainly before Illumina filed its motions for summary judgment). Life's failure to do so is simply inexcusable. *Cueto*, 2012 WL 28357, at \*1-2; *Laser Design*, 2007 WL 735763, at \*4.

> ### 3.   Life's untimely disclosure of the Barron and Edwards declarations is highly prejudicial to Illumina

Fed. R. Civ. P. 37(c)(1) prohibits a party from using information that was not disclosed pursuant to Rule 26 unless it is "harmless." The courts have found that a failure to disclose is not "harmless" where the declaration was not filed until after "the deadline to conduct both fact and expert discovery[] have all expired," as the opposing party "would need to have fact and expert discovery reopened" for new "discovery and investigation," and "would need to depose [the declarant] again based on new information and desire an opportunity [to] incorporate such new information in its motion for summary adjudication." *Laser Design*, 2007 WL 735763, at \*4.

A supplemental expert declaration filed in opposition to a motion for summary judgment is not "harmless" where "allowing Plaintiff to disregard the deadline for disclosing supplemental expert opinions would at a minimum require the Court to reopen discovery and change the deadlines set by the scheduling order." *Shaba v. United States*, No. 07CV738-WQH-CAB, 2009 WL 482350, at \*5 (S.D. Cal. Feb. 23, 2009). "In the context of Rule 37(c), '[d]isruption to the schedule of the court and other parties is not harmless. Courts set such schedules to permit the court and the parties to deal with cases in a thorough and orderly manner, and they must be allowed to enforce them, unless there are good reasons not to.'" *Id*. (quoting *Wong*, 410 F.3d at 1062). *See also Hoffman*, 541 F.3d at 1180 (9th Cir. 2008) (reopening discovery or changing the trial date can constitute harm pursuant to Rule 37(c)(1)); *Torres v. City of L.A.*, 548 F.3d 1197, 1213 (9th Cir. 2008) (unfair surprise or unnecessary expenditure can also constitute harm); Order On Parties' Cross Motions For Summary Judgment And Plaintiff's Motion To Strike [Doc. Nos. 171, 209, 240] (ECF No. 279) at 3 ("The Court finds these submissions untimely and their production after the close of discovery with the summary judgment motions already filed, prejudicial to Life Technologies.").

21

Here, allowing Life to rely on the Barron and Edwards declarations – submitted more than two months after expert discovery closed, and only in opposition to Illumina's motions for summary judgment – would similarly require the Court to reopen discovery. Illumina would need its expert witnesses to evaluate the declarations and prepare and serve corresponding supplemental rebuttal expert reports, and Illumina would need to depose Drs. Barron and Edwards on their opinions and other information set forth in their declarations. Illumina would then need to file supplemental summary judgment papers addressing that information. Such "[d]isruption to the schedule of the court and other parties is not harmless." *Wong*, 410 F.3d at 1062. *See also Cueto*, 2012 WL 28357, at *4 ("[Life's] experts have already given their complete opinions and depositions without the benefit of the supplemental report. If the supplemental report were allowed, Plaintiff would need the chance to supplement his own expert reports, which might also lead to the need to for further depositions. Accordingly, the late submission of the supplemental report cannot be found harmless."); *Shaba*, 2009 WL 482350, at *5.

Life's untimely disclosure of the Barron and Edwards declarations is also highly prejudicial because many of the statements therein contradict prior, clear statements in earlier expert reports and depositions, on which Illumina relied. "The general purpose of establishing a pretrial sequencing of disclosure for expert testimony is to provide parties with adequate notice for purposes of effective cross-examination and an opportunity for submission of contradicting evidence-in-chief." *AT&T Wireless Services of California LLC v. City of Carslbad, California*, No. 01-cv-2045–JM(LAB), 2002 WL 34537564, at *2 n.3 (S.D. Cal. Nov. 7, 2002) (quoting *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc*., 199 F.R.D. 484, 487 (E.D.N.Y. 2001)). Illumina proceeded with its motions for summary judgment with the understanding that certain facts were undisputed based on sworn representations by Life and its experts. Life's eleventh-hour attempts for a "do-over" on those representations is highly prejudicial to Illumina. For example, Dr. Barron said in her opening expert report that Illumina's

1   synthesized nucleic acid products could not migrate by diffusion, but now says the opposite.[25]

2   Dr. Edwards has contradicted his own prior testimony about the meaning of "exponential" in the

3   context of amplification.[26] Dr. Edwards has also previously admitted that polyacrylamide was

4   disclosed as a matrix for amplification in the Stapleton PCT publication, but now contradicts

5   those admissions in his declaration.[27] Dr. Edwards also now says that only the components

6   involved in the copying step of amplification are the components of an amplification system.[28]

7   This contradicts his prior testimony that the Chetverin patents include a component not involved

8   in the copying step – RNase – as a component of the 3SR amplification system.[29] Illumina had

9   no earlier notice of these new, contradictory opinions, which has prejudiced its case.

10

11  [25] *Compare* Nielsen Decl. Exhs. 7 and 8 (Expert Report of Annelise Barron, Ph.D. and Appendix
    E: Analysis of U.S. Patent No. 5,958,698 and Illumina's Instruments and Reagents) at 2
12  ("[s]ynthesized nucleic acids products cannot migrate by diffusion as they are covalently
    attached to the SFA hydrogel via the P7 and P5 primers") with Nielsen Decl. Exh. 14 (Barron
13  12/21/12 Decl.) at 7 (purporting to measure the migration by diffusion distance in the SFA gel).

    [26] *Compare* Nielsen Decl. Exh. 19 (Oct. 7, 2011 Hearing Tr.) at 19: 4-23 ("[W]e'll call it
14  exponential, because . . . they are both equal templates for the next round of the amplification.")
    with Nielsen Decl. Exh. 15 (Edwards 12/21/12 Decl.) at, *e.g.*, ¶31 ("I also understand that
15  Illumina is arguing that one of the necessary conditions of exponential amplification is that each
    template has an equal probability of making a new copy in each round of amplification. It is my
16  opinion that one of ordinary skill in the art would not understand this to be a requirement for
    exponential amplification.").
17
    [27] *Compare* Nielsen Decl. Exh. 13 (Edwards Tr.) at 304:16 - 305: 24 ("(Q. They [the Stapleton
18  PCT publication] described it [polyacrylamide] as the matrix material, right? A. They described
    it as the potential matrix material. . . . Q. Here's what I'm saying. I'm saying that Stapleton
19  disclosed using polyacrylamide. She [in the Stapleton PCT publication] also disclosed putting
    PCR mix in the acrylamide. A. Right. Q. She might dehydrate it and rehydrate it with the mix?
20  A. At times she says that.") with Nielsen Decl. Exh. 15 (Edwards 12/21/12 Decl.) at ¶36 ("[t]he
    polyacrylamide matrices disclosed in the Stapleton PCT Application are only identified for use
21  in electrophoresis, an application distinct from amplification").

22  [28] Nielsen Decl. Exh. 15 (Edwards 12/21/12 Decl.) at ¶25 ("It is my opinion that formamide is
    not part of the 'amplification system,' because it is merely a denaturing method, analogous to
23  heat, and is not part of 'a set of components that together can amplify a nucleic acid.'").

24  [29] Nielsen Decl. Exh. 13 (Edwards Tr.) at 256:25-257:12 ("Q. [S]o the components then of the
    3SR exponential amplification system in Example 2 include reverse transcriptase enzyme, RNA
25  polymerase, RNase and two primers, right? A. That's what it says. Two-primer mixture, yup. Q.
    And those are all components you need in order to exponentially amplify using 3SR, right? A.
26  Those are the enzyme components."). *See also* Illumina's Reply in Support of its Motion for
    Summary Judgment of Non-Infringement for a discussion of the role of RNase as only for
27  denaturing.

28

Moreover, as the party who brought this case, Life was obligated to make a timely disclosure of all opinions that their expert witnesses would express and the basis and reasons for those opinions. Indeed, it is Life's burden to prove that each and every limitation of the patent claims that it asserts have been practiced. Waiting until more than two months after expert discovery has closed and Illumina has moved for summary judgment does not satisfy these burdens. For these reasons, Life's dilatory disclosures are not harmless and, pursuant to Rule 37(c)(1), the declarations of Drs. Barron and Edwards should be stricken and Life should be barred from relying on their testimony in opposing Illumina's motions for summary judgment or at trial. If Life contends that striking these declarations will result in dismissal, and that willfulness, fault, or bad faith must be found, the record discussed above shows that Life is at fault for its belated disclosures, the timing of which was under its control. As Life itself has told the Court, "[c]ourt scheduling orders exist for a reason – to encourage the swift and efficient adjudication of disputes," and Life's attempt to introduce expert declarations "after the close of fact discovery and after motions for summary judgment have been filed threatens that purpose and should not be condoned." ECF No. 240-1 at 8.[30]

## IV.    Conclusion

For the foregoing reasons, Illumina objects to the untimely expert declarations of Drs. Barron and Edwards and Mr. Mulholland, as well as the untimely declarations of Messrs. Howe and Sylvain, and respectfully requests the Court to strike these declarations and preclude each of these witnesses from testifying about the opinions and information contained in the above mentioned declarations at trial.

---

[30] April 9, 2012 Hearing Tr. (ECF No. 278) at 59:14-19 ("It's just untimely. This is clearly a defense that [Illumina has] been aware of for quite some time, and while I appreciate that Dr. Stapleton is an older individual and it may have taken her some time to identify or collect these documents, discovery does have to end at some point. And this would just require reopening and depositions, and we're not going there.").

Dated: January 10, 2013

Respectfully submitted,


By:  *E. Joseph Connaughton*
E. Joseph Connaughton (SBN 166765)
PAUL, PLEVIN, SULLIVAN &
CONNAUGHTON LLP
101 West Broadway, Ninth Floor
San Diego, CA 92101
(619) 619-237-5200
jconnaughton@paulplevin.com

Kevin M. Flowers (*pro hac vice*)
Matthew C. Nielsen (*pro hac vice*)
Mark H. Izraelewicz (*pro hac vice*)
Cullen N. Pendleton (*pro hac vice*)
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
Chicago, IL 60606-6357
(312) 474-6300

Ronald M. Wawrzyn (*pro hac vice*)
Matthew M. Wawrzyn (*pro hac vice*)
WAWRZYN LLC
233 South Wacker Drive
Chicago, IL 60606
(312) 283-8330

Jeffrey N. Costakos (*pro hac vice*)
Kimberly K. Dodd (SBN 235109)
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
(414) 271-2400

*Attorneys for Defendants/Counterclaim*
*Plaintiffs Illumina, Inc. and Solexa, Inc.*